## IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| **OLLIE GODWIN,** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | |
| | ) | |
| **V.** | ) | **CASE NO: 2:05-cv-00783-SRW** |
| | ) | |
| **NATIONAL UNION FIRE INSURANCE** | ) | **From Circuit Court of Crenshaw Co.** |
| **COMPANY OF PITTSBURGH, INC.,** | ) | **Case No: CV05-69** |
| **ET AL.,** | ) | |
| | ) | |
| **DEFENDANTS.** | ) | |
| | ) | |

## MOTION FOR SUMMARY JUDGMENT

COMES NOW the Defendant National Union Fire Insurance Company of Pittsburgh, PA (hereinafter "NUFIC")[1], and hereby moves this Honorable Court to enter, pursuant to Rules 54 and 56 of the Federal Rules of Civil Procedure, a final summary judgment in its favor, dismissing all claims made by the Plaintiff against NUFIC on the grounds that there are no genuine issues of material fact and NUFIC is entitled to a final summary judgment as a matter of law.

### STATEMENT OF UNDISPUTED FACTS

1.     The Plaintiff, Mr. Ollie Godwin (hereinafter "Mr. Godwin"), leases three trucks to Godwin Material Services, Inc. (hereinafter "Godwin Material"). (Godwin Depo. p.49:5-7, Exhibit 1).

---

[1] The plaintiff incorrectly named the defendant in its complaint as "AIG d/b/a National Union Fire Insurance Company of Pittsburgh, Inc." The entities issuing policies relative to this suit were AIG Life Insurance Company (not "AIG") and National Union Fire Insurance Company of Pittsburgh, PA. Thus, "AIG" had no role in the events made the basis of his suit and is not a proper party in this suit. Further, service was not perfected or even attempted on "AIG" as the plaintiff merely served this defendant, NUFIC, via registered agent pursuant to Ala. Code ' 10-2B-15.10 and ALA. R. CIV. P. 4(c)(6). There was no service on "AIG". Without service, the lower court from which this case was removed never obtained personal jurisdiction over "AIG". Ala. R. Civ. P. 4.2. Thus, no judgment should be entered against "AIG". For the purposes of this Motion, NUFIC responds for both AIG Life and NUFIC.

2.      Mr. Godwin also drives one of the trucks he leases to Godwin Material.  (Exhibit 1, p.49:8-10)  He contracts with other drivers to drive his other two trucks for Godwin Material.   Currently those drivers are Mark Morgan and Clyde Williamson. (Exhibit 1, pp.49:11-23 and 50:1-9).

3.      Godwin Material requires its leased drivers to maintain occupational accident insurance through a group policy obtained by Godwin Material.  (Exhibit 1, p.36:1-20)  Mr. Godwin became an insured on Godwin Material's policy in 1999.  (Pine Affidavit, p.1, Exhibit 2)

4.      In addition to occupational accident insurance, Mr. Godwin obtained Blue Cross Blue Shield health insurance through Godwin Material.  (Exhibit 1, pp.43:16-23 and 44:1-14)

5.      The premiums for Mr. Godwin's occupational accident insurance and health insurance were deducted from his monthly check from Godwin Material.  (Exhibit 1, p.48:12-21)

6.      Godwin Material purchased its occupational accident insurance through Palomar Insurance Corporation (hereinafter "Palomar"), an insurance broker.  (Exhibit 2, p.1)

### 2003 Injury Claim

7.      As of May 1, 2003, Godwin Material's group occupational accident insurance was issued by AIG Life Insurance Company (hereinafter "AIG Life").  (Exhibit 2, pp.1-2)

8.      On or about October 25, 2003, Mr. Godwin claims to have fallen on the tarp rack on his truck.  (Exhibit 1, pp.65:17-23 and 66:1-8)

9.      Godwin Material requested drivers call in when they were injured.  (Exhibit 1, p.73:12-16)  Mr. Godwin called Ms. Cindy Jordan at Godwin Material to tell her he fell on the tarp rack; however, he did not fill out a claim for this incident, and he did not ask Cindy to make a claim for him.  (Exhibit 1, p.69:6-22)

10.      Mr. Godwin did not see a doctor after he fell on the tarp rack.  (Exhibit 1, p.70:11-13)  He also did not report this accident to AIG Life.  (Exhibit 1, p.69:17-19)

11.      On or about November 22, 2003, around 11:00 a.m., a muffler fell on Mr. Godwin while he was repairing a busted exhaust pipe on one of the trucks he owned but allowed another driver to operate.  (Exhibit 1, pp.73:22-23; 74:1-6; 76:20-23; 77:10-23 and 78:1-9)

12.      Mr. Godwin was working on the truck at his home at the time of the accident, and he had not made any deliveries for Godwin Material that day.  (Exhibit 1, pp.76:17-19 and 77:1-3)

13.      The next day, Mr. Godwin called Ms. Jordan at Godwin Material to tell her he had been injured when the muffler fell on him.  (Exhibit 1, pp.86:1-10)

14.      On December 9, 2003, AIG Life received a call reporting a stomach injury to Mr. Godwin which occurred on November 22, 2003.  (Exhibit 2, p.2)

15.      AIG Life received a Policyholder Loss Information Report completed by Ms. Jordan on December 10, 2003, regarding Mr. Godwin's injury which was forwarded through Palomar to AIG Life.  (Exhibit 2, p.2)  The Policyholder Loss Information Report noted Mr. Godwin was not under dispatch at the time of the accident, and he was scheduled to be at home.  (Exhibit A of Exhibit 2)

16.      On January 8, 2004, Mr. Godwin signed a Proof of Loss form received by AIG

Life.  The form asked the following question:

GIVE FULL DESCRIPTION OF INJURY OR DISEASE FROM WHICH YOU ARE NOW SUFFERING.  IF AN INJURY, TELL WHEN IT HAPPENED (DATE AND TIME), PLACE WHERE ACCIDENT OCCURRED, WHAT YOU WERE DOING AND HOW IT HAPPENED

Mr. Godwin's answer was:

On November 22, 2003 around 11:00 A.M. at home in shop working on truck, changing the muffler dropped it, hit me in lower stomach.

(Exhibit B of Exhibit 2)

17.    Additionally, the "No" box was filled in after the question: "Have you ever had this, or a similar condition, in the past?"  (Exhibit B of Exhibit 2)

18.    Mr. Godwin alleges in his Complaint that "[o]n or about October/November 2003, the Plaintiff suffered an occupational injury that resulted in the Plaintiff having surgery for hernia."  (Complaint ¶11)

19.    AIG Life informed Mr. Godwin through a letter dated February 27, 2004, that, under the terms of the Policy and according to the information received by AIG Life, the accident was considered non-occupational because Mr. Godwin was "not under dispatch nor was [his] truck loaded at the time of the accident."  Thus, the benefit maximum was $7500.00 and that amount was paid to L.V. Stabler Hospital. (Exhibit 2, p. 2 and Exhibit C of Exhibit 2)

20.    After receiving the February 27, 2004 letter from AIG Life, Mr. Godwin alleges he spoke to Mr. Hank Strother[2] of Palomar regarding the fact the truck he was working on was loaded and under dispatch at the time of the accident.  (Exhibit 1, p.95:6-22)

21.    As far as Mr. Godwin can recall, Mr. Strother is the only person, besides Ms. Jordan and Mr. Jerry Godwin of Godwin Material, he spoke with about the truck

_____

[2] Mr. Strother was incorrectly referred to as Mr. Strott throughout the deposition of Mr. Godwin.

being loaded and under dispatch. (Exhibit 1, p.100:2-11)

22.     On March 17, 2004, Mr. Jerry Godwin of Godwin Material sent a letter to Palomar mentioning Mr. Godwin had hit his stomach in October 2003 while under dispatch. (Exhibit E of Exhibit 2)

23.     The letter also noted Mr. Godwin "was maintaining the truck at the direction of Godwin for DOT purposes." (Exhibit E of Exhibit 2)

24.     On July 1, 2004, Palomar sent two letters to Mr. Godwin regarding the alleged October 2003 injury. (Defendant Palomar Insurance Corporation's Response to Plaintiff's First Request for Interrogatories and First Request for Production, Exhibit 3) The letters requested Mr. Godwin to fill out claims forms regarding the alleged October 2003 injury and enclosed forms for him to complete. (Exhibit 3, pp.10 & 14)

25.     On February 23, 2005, Mr. Godwin submitted another claim form regarding his 2003 loss. (Exhibit 2, p.3 and Exhibit E of Exhibit 2) This claim form again describes the November 2003 injury, but mentions nothing about an October 2003 injury. Additionally, the "No" box was again filled in after the question: "Have you ever had this, or a similar condition, in the past?" (Exhibit E of Exhibit 2)

26.     Mr. Godwin did not pay any medical bills relating to his hernia claim; he believes Blue Cross Blue Shield paid the remainder of the medical bills related to his hernia. (Exhibit 1, p.104:6-13)

27.     Mr. Godwin was out of work from December 22, 2003 through February 3, 2004 because of his hernia injury. (Exhibit 1, p.115:1-9)

**<ins>2004 Injury Claim</ins>**

5

28. In May 2004, Godwin Material's occupational accident insurance was issued through NUFIC. (Exhibit 2, p.3)

29. On October 27, 2004 at approximately 11:00 a.m., while hauling concrete to The Concrete Company, Mr. Godwin twisted his knee while getting out of his truck. (Exhibit 1, pp.115:10-23; 116:1-15; and 121:8-16)

30. Mr. Godwin did not call anyone at Godwin Material on October 27, 2004 about his twisted knee. (Exhibit 1, p.120:4-10) He did later report his twisted knee to Ms. Jordan. (Exhibit 1, pp.122:18-23 and 123:1-4)

31. A few days after he twisted his knee, Mr. Godwin went to see Dr. Adams. (Exhibit 1, p.122:4-17) Dr. Adams referred Mr. Godwin to Dr. Barrington after determining he could not help Mr. Godwin. After examination, Dr. Barrington advised Mr. Godwin he would need total hip replacement for his left hip. (Exhibit 1, pp.123:10-23 and 124:1-17)

32. On December 7, 2004, NUFIC received a phone call reporting the injury incurred by Mr. Godwin on October 27, 2004. (Exhibit 2, p.3)

33. On January 6, 2005, and then again on January 10, 2005, NUFIC received from Palomar a Proof of Loss signed by Mr. Godwin on December 8, 2004, a Claim Form signed by Dr. Barrington on January 3, 2005, a Policyholder Loss Information Report signed by Ms. Cindy Jordan on December 8, 2004, and information regarding Mr. Godwin's earnings. (Exhibit 2, p.3 and Exhibit F and G of Exhibit 2)

34. On January 25, 2005, Ms. Stephanie Pine, NUFIC's claims examiner, sent a fax to Dr. Barrington requesting information regarding Mr. Godwin's claim for benefits. This fax requested the following information:

Is the claimant's disability due to injuries he sustained on 10/27/2004? If no, please explain in detail.
Is the claimant's disability due to a congenital and/or degenerative disease? If yes, please explain?
Please submit medical records and office notes for the period 1/1/2004 to present.

(Exhibit 2, p.3 and Exhibit H of Exhibit 2)

35.    Dr. Barrington's office responded to Ms. Pine's fax with notes and medical records indicating osteonecrosis of both femoral heads.  (Exhibit 2, p.4 and Exhibit I of Exhibit 2)

36.    Ms. Pine also spoke with Dr. Barrington.  (Exhibit 2, p.4)

37.    On or about February 10, 2005, Mr. Godwin underwent hip replacement surgery. (Exhibit 1, p.124:18-21)

38.    On February 19, 2005, Ms. Pine sent a letter to Mr. Godwin informing him he did not qualify for Temporary Total Disability and Accident Medical Expense benefits because, after corresponding with and talking to Dr. Barrington, his loss did not qualify as an Occupational Injury.  (Exhibit 2, p.4 and Exhibit J of Exhibit 2)

39.    Dr. Barrington sent a letter to Ms. Pine on March 2, 2005, explaining he treated Mr. Godwin for avascular necrosis with collapse of the left hip.  Dr. Barrington noted Mr. Godwin had increased pain in his left side since he stepped out of his truck in November, and it probably resulted from a previously unknown underlying condition, which was the avascular necrosis.  (Exhibit K of Exhibit 2)

40.    After receiving Dr. Barrington's letter, Ms. Pine sent Mr. Godwin's claim to Dr. Lafleche for review.  (Exhibit 2, p.4)

41.    Ms. Pine learned from Dr. Lafleche that Mr. Godwin's hip problems did not result solely from the knee injury but also from the previously unknown condition of

avsacular necrosis.  (Exhibit 2, p.4)

42. Thereafter, on May 3, 2005, Ms. Pine sent another letter to Mr. Godwin further explaining the reasons that Mr. Godwin's October 27, 2004 loss did not qualify for coverage.  (Exhibit 2, p.4 and Exhibit L of Exhibit 2)

43. On May 12, 2005, Ms. Arlene Richardson, counsel for Mr. Godwin, sent a letter to Ms. Pine demanding reconsideration of his claims of 2003 and 2004.  (Exhibit M of Exhibit 2)

44. Then, on July 12, 2005, Mr. Godwin filed this present suit in Crenshaw County, Alabama, against Palomar Insurance Corporation, AIG d/b/a National Union Fire Insurance Company of Pittsburgh, Inc. and Godwin Material Services, Inc.

45. NUFIC removed the suit to the United States District Court for the Middle District of Alabama, Northern Division on the basis of diversity jurisdiction because Godwin Material and Palomar were fraudulently joined defendants.

46. This Court denied Mr. Godwin's Motion to Remand, and this litigation has proceeded in this Court.

47. In response to discovery propounded by NUFIC, Mr. Godwin claims, among other things, that he "should have received disability payments of $500.00 per week for six months under the insurance policy while [he] was injured and recovering."  (No. 3, Plaintiff Answers to Interrogatories and Request for Production Propounded by Defendant, Exhibit 4, pp.1-2)

48. During the course of this litigation, NUFIC retained the services of Dr. Daniel Michael to review the medical records and diagnostic studies of Mr. Godwin and render opinions as needed.  (Dr. Michael Affidavit, Exhibit 5)

49.     After review of Mr. Godwin's medical records, x-rays and MRIs, Dr. Michael

concluded that the MRIs taken in early November 2004 after Dr. Godwin twisted

his knee revealed no collapse of the left femoral head.  Because avascular necrosis

was already apparent in both hips at that time and given the time it takes avascular

necrosis to develop, Dr. Michael concluded there was no relationship between Mr.

Godwin's accident in October 2004 and the onset and subsequent problems Mr.

Godwin has in both hips from the avascular necrosis of the femoral heads.  (Exhibit

5, pp.1-2)

50.     After his left hip replacement, Mr. Godwin underwent an experimental procedure

on his right hip and, later, hip replacement surgery on his right hip; he is not

claiming any cost associated with those procedures as damages because, Mr.

Godwin alleges, Dr. Barrington told him his Blue Cross Blue Shield insurance

should cover those procedures.  (Exhibit 1, pp.129:15-23; 130:1-23; 131:1-13;

137:20-23; and 138:1-4)

51.     Although some payments were made by NUFIC with regard to his October 27,

2004 loss claim, these payments were made in error; NUFIC's position has always

been and remains to be that the October 27, 2004 loss claim does not qualify for

coverage.  (Exhibit 2, p.5-6)

**Applicable Policy Provisions**

52.     The AIG Life Truckers Occupational Accident Insurance Policy in effect in 2003

states, in pertinent part, as follows:

SECTION I        GENERAL DEFINITIONS

* * *

9

**Dispatch** means the period of time during which an Insured operates his or her vehicle, or performs vehicle repair, while being en route to pick up a load, picking up a load, en route to deliver a load, and unloading a load.

\* \* \*

**Injury** means bodily injury to an Insured Person caused by an Occupational accident while coverage is in force under this Policy, which ***results directly from and independently of all other causes*** in a Covered Loss.  All Injuries sustained by an Insured Person in any one accident shall be considered a single Injury.

\* \* \*

**Occupational** means, with respect to an activity, accident, incident, circumstance or condition involving an insured, that the activity, accident, incident, circumstance or condition occurs or arises out of or in the course of the Insured performing services within the course and scope of contractual obligations for the Policyholder, ***while under Dispatch***.  Occupational does not encompass any period of time during the course of everyday travel to and from work.

\* \* \*

SECTION VII    CLAIMS PROVISIONS

**Notice of Claim.**  Written notice of claim must be given to the Company within 20 days after an Insured Person's loss, or as soon thereafter as reasonably possible.  Notice given by or on behalf of the claimant to the Company at American International Companies, Accident and Health Claims Division, P.O. Box 15701, Wilmington, DE 19850-5701, with information sufficient to identify the Insured Person, is deemed notice to the Company.

\* \* \*

**Proof of Loss.**  Written proof of loss must be furnished to the company within 90 days after the date of the loss.  If the loss is one for which the Policy requires continuing eligibility for periodic benefit payment, subsequent written proofs of eligibility must be furnished at such intervals as the Company may reasonably require.  Failure to furnish proof within the time required neither invalidates nor reduces any claims if it was not reasonably possible to give proof within such time, provided such proof if furnished as soon as reasonably possible and in no event, except in the absence of legal capacity of the claimant, later than one year from the time proof is otherwise required.

\* \* \*

**NON-OCCUPATIONAL COVERAGE RIDER**

This Rider is attached to and made part of the Policy as of the Policy Effective Date shown in the Policy's Master Application.  It applies only with respect to accidents that occur on or after that date.  It is subject to all of the provisions, limitations and exclusions of the Policy except as they are specifically modified by this Rider.

**Non-Occupational Coverage.**  References in the Policy to an injury or accident, where applicable, are hereby deemed to include Non-Occupational Injury and Non-Occupational accident, respectively.

Benefits shall be payable for only those Covered Losses listed in the Schedule under Non-Occupational Accident Benefits, and shall be subject to the Non-Occupational Accident Benefit limitations shown therein.

**Non-Occupational** – as used in this Rider, means, with respect to an activity, accident, incident, circumstance or condition involving an Insured Person, that it does not occur or arise out of or in the course of the Insured Person performing Occupational services for the Policyholder, while under Dispatch.

**Non-Occupational Injury** – as used in this Rider, means, bodily injury caused by a Non-Occupational accident occurring while this Policy is in force as to the person whose injury is the basis of claim and resulting directly and independently of all other causes in a Covered Loss.

All injuries sustained by an Insured Person in any one accident shall be considered a single Injury.

\* \* \*

A. Occupational Accident Benefits:

   CLASS 1 & 2

\* \* \*

   (5)  <u>X</u>  Temporary Total Disability Benefit
                  Commencement Period (Initial Disability)…….90 days
                  Waiting Period…………………………..…7 days
                  Participation Percentage…………………….....70%
                  Maximum Weekly Benefit Amount………………$500

11

Maximum Benefit Period………………..104 weeks

* * *

A. Non-Occupational Accident Benefits:

CLASS 1 & 2

(1)  <u>X</u>  Accidental Death Benefit
Principal Sum…………………………………$10,000
Incurral Period………………………………365 days
Deductible Amount…………………………………$0

(2)  <u>X</u>  Accidental Dismemberment Benefit
Principal Sum…………………………………....$10,000
Incurral Period………………………………365 days
Deductible Amount…………………………………$0

(3) <u>X</u>  Accident Medical Expense Benefit (Primary)
Commencement Period………………………90 days
Deductible Amount…………………………………$0
Maximum Benefit Period…………………104 weeks
Dental Maximum………………..$1,000 per accident
Maximum Benefit Amount……………….....$7,500

(Exhibit N, pp. 3, 4, 16, & 24 of Exhibit 2) (emphasis added)

53.      The NUFIC Truckers Occupational Accident Insurance Policy in effect in 2004

states, in pertinent part, as follows:

**<u>SECTION 1</u>**                          **GENERAL DEFINITIONS**

* * *

**Covered Loss(es)** means one or more of the losses or expenses described in Section IV of this Policy.

* * *

**Injury** means bodily Injury to an Insured Person caused by an Occupational accident while coverage is in force under this Policy, which *results directly and independently of all other causes in a Covered Loss*. All Injuries sustained by an Insured Person in any one accident shall be considered a single Injury.

* * *

**Pre-Existing Condition** means a condition for which an Insured Person has sought or received medical advice or treatment during the twelve months immediately preceding his or her effective date of coverage under this Policy.

* * *

### SECTION VI                    EXCLUSIONS

This Policy does **not** cover any losses caused in whole or in part by, or resulting in whole or in part from the following:

* * *

2. **sickness, disease** or infections of any kind, except bacterial infections due to an accidental cut or wound, botulism or ptomaine poisoning;

* * *

(Exhibit O, p.3, 4, & 15 of Exhibit 2)

### STANDARD OF REVIEW

In order to succeed on a motion for summary judgment, the movant must show that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law.  See FED. R. CIV. P. 56(c).  The movant may meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-324 (1986).  Further:

> [i]f the movant succeeds in demonstrating the absence of a material issue of fact, the burden shifts to the non-movant to establish, with evidence beyond the pleadings, that a genuine issue material to the non-movant's case exists.  See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-17 (11th Cir. 1993); see also FED. R. CIV. P. 56(e) ("When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of [his] pleading, but [his] response ... must set forth specific facts showing that there is a genuine issue for trial.").  What is material is determined by the substantive law applicable to the case.  Anderson v. Liberty Lobby Inc., 477

13

U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).  A dispute of material fact 'is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.  The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).  Rather, the non-movant must present "affirmative evidence" of material factual conflicts to defeat a properly supported motion for summary judgment. Anderson, 477 U.S. at 257.  If the non-movant's response consists of nothing more than conclusory allegations, the court must enter summary judgment for the movant. See Holifield v. Reno, 115 F.3d 1555, 1564 n. 6 (11th Cir. 1997); Harris v. Ostrout, 65 F.3d 912 (11th Cir. 1995).

Home Ins. Co. v. Hartford Fire Ins. Co., 379 F. Supp. 2d 1282, 1285-1286 (M.D. Ala. 2005)

## ARGUMENT

## I.    MR. GODWIN'S BREACH OF CONTRACT CLAIM FAILS AS A MATTER OF LAW.

Mr. Godwin alleges NUFIC breached its contract with him by failing and refusing to perform its part of the Policy.  (Complaint ¶35).  However, Mr. Godwin's claim of breach of contract fails as to each of his alleged occupational injuries because he did not fulfill the conditions precedent to the coverage he claims he is due.  In order to prove a breach of contract, Mr. Godwin must establish the following:  1) the existence of a valid contract binding the parties in the action, 2) his own performance under the contract; 3) AIG Life or NUFIC's non-performance; and 4) damages.  See State Farm Fire and Cas. Co. v. Slade, 747 So. 2d 293, 303 (Ala. 1999) quoting Southern Medical Health Systems, Inc. v. Vaughn, 669 So. 2d 98, 99 (Ala. 1995).

### A. 2003 Injury Does Not Qualify as Occupational Injury because Mr. Godwin was Not Under Dispatch

The maximum Non-Occupational Accident Medical Expense Benefit, $7500.00, was paid on Mr. Godwin's behalf by AIG Life for his hernia resulting from his November 2003 loss.  Mr. Godwin alleges, however, that his claim is due to be paid as an Occupational Injury

14

and, by not doing so, the insurance contract was breached.  Because Mr. Godwin's loss does not qualify as an Occupational Injury because he was ***not*** "under Dispatch," he cannot establish the second element of his breach of contract claim and, therefore, AIG Life is entitled to judgment as a matter of law.  Id.

The Policy specifically outlines, and the February 27, 2004 letter from AIG Life to Mr. Godwin confirms, that in order to receive benefits for an Occupational Injury, an Insured must be "under Dispatch."  The Policy defines "Dispatch" as "the period of time during which an Insured operates his or her vehicle, or performs vehicle repair, while being en route to pick up a load, picking up a load, en route to deliver a load, and unloading a load."  (Exhibit N)  It is undisputed that Mr. Godwin ***not*** under Dispatch at the time the muffler fell on him and he injured himself.  Mr. Godwin stated he was at home at the time of the accident and had not made any deliveries that day.  Although Mr. Godwin claims the truck he was repairing was loaded, this truck was driven, not by Mr. Godwin, but by one of Mr. Godwin's drivers.  That driver, not Mr. Godwin, was under Dispatch.  Mr. Godwin was not "en route to pick up a load, picking up a load, en route to deliver a load, [or] unloading a load."  Because Mr. Godwin's injury failed to meet the definition of "Occupational" because he was not "under Dispatch," he is not entitled to an Occupational benefit; he cannot prove his own performance under the Policy which would qualify him for Occupational benefits, and his breach of contract claim for his 2003 injury fails as a matter of law.

Mr. Jerry Godwin of Godwin Material attempted to relate Mr. Godwin's hernia to an unreported accident occurring in October 2003.  However, this information does not change the benefit to which Mr. Godwin is entitled.  In order to qualify as an Injury for which benefits will be paid, the injury must arise out of one accident.  As defined in the Policy, Injury "means

bodily injury to an Insured Person caused by an Occupational[3] accident while coverage is in force under this Policy, ***which results directly from and independently of all other causes*** in a Covered Loss.  All Injuries sustained by an Insured Person in any one accident shall be considered a single Injury."  In order to fit the definition of Injury in the Policy, the alleged October accident and the November accident cannot combine to cause the Injury.  Simply stated, Mr. Godwin's 2003 loss does not fit the definition of Occupational because he was not "under Dispatch."  Alabama law states "ambiguities will not be inserted, by strained and twisted reasoning, into contracts where no such ambiguities exist."  Madison Co. Sheriff's Posse, Inc. v. Horseman's United Assoc., Inc., 434 So. 2d 1387, 1389 (Ala. 1983).  Thus "Occupational" and "Dispatch" cannot be twisted to encompass Mr. Godwin's situation.

Also, Mr. Godwin never reported the October accident to AIG Life.  On the Proof of Loss form signed by Mr. Godwin on January 8, 2004, in response to the question, "Give full description of injury or disease from which you are now suffering.  If an injury, tell when it happened (date and time), place where accident occurred, what you were doing and how it happened," Mr. Godwin replied: "On November 22, 2003, around 11:00 A.M. at home in shop working on truck, changing the muffler dropped it, hit me in lower stomach."  Mr. Godwin also marked the "no" box after the question, "Have you ever had this, or a similar condition in the past?"  In order to recover under the Policy, written notice of a claim must be provided within 20 days and written proof of loss must be furnished to the company within 90 days after the date of the loss.  No notice or proof of loss was ever received from Mr. Godwin regarding the October 2003 incident.  Furthermore, after he was provided additional forms to complete regarding the October 2003 claim in response to Godwin Material's letter, Mr. Godwin

---

[3] The definition of Injury is modified by the Non-Occupational Coverage Rider to include Non-Occupational Injuries and accidents for which limited benefits are provided.  (Exhibit N)

16

completed the form mentioning still only the November 2003 incident and again marking the "no" box in response to the question, "Have you ever had this, or a similar condition, in the past?"

In Alabama, "the requirements of an insurance policy that the insured shall give notice and furnish proofs of loss within a certain time are conditions precedent to the right to sue." American Fire and Casualty Co. v. Burchfield, 285 Ala. 358, 363, 232 So. 2d 606, 610 (Ala. 1970) citing Vardaman v. Benefit Ass'n of Railway Employees, 263 Ala. 236, 240, 82 So. 2d 272, 275 (Ala. 1955) quoting 29 AM. JUR. Insurance §1105, p. 829. Such failure entitles AIG Life to judgment as a matter of law. See Nationwide Ins. Co. v. Nilsen, 745 So. 2d 264 (Ala. 1998) (insured's failure to comply with condition precedent entitled insurer to judgment as a matter of law). Thus, AIG Life is not in breach of its contract, and Mr. Godwin cannot maintain his suit as he failed to meet the condition precedent of written notice of the October 2003 injury. Additionally, Mr. Godwin's November 2003 injury was Non-Occupational. Thus, he cannot recover for the 2003 alleged injuries.

**B. 2004 Incident Does Not Qualify as Injury**

Mr. Godwin is not entitled to benefits for his October 2004 claim because Mr. Godwin's avascular necrosis of the hip does not fulfill the definition of Injury. "Injury" is defined in the Policy as "bodily Injury to an Insured Person caused by an Occupational accident while coverage is in force under this Policy, which results directly and independently of all other causes in a Covered Loss. All Injuries sustained by an Insured Person in any one accident shall be considered a single Injury." Because Mr. Godwin's hip replacement was necessitated by avascular necrosis, it neither resulted "directly" from the October 2004 incident, nor "independently of all other causes."

The disability claim form completed by Dr. Barrington on January 7, 2005 indicated avascular necrosis of both hips.  Ms. Pine's correspondence with Dr. Barrington confirms Mr. Godwin suffered from osteonecrosis of both hips.  (Exhibit K, p.2)  Furthermore, when Ms. Pine spoke to Dr. Barrington directly, he confirmed the avascular necrosis was a previously unknown underlying condition that was aggravated by work.  As such, Mr. Godwin's injury does not qualify as an "Injury" under the Policy because it did ***not*** result "directly and independently of all other causes."

Additionally, as pointed out by Ms. Pine in her February 19, 2005 letter to Mr. Godwin, the Policy also specifically excludes from coverage "any losses caused in whole or in part by, or resulting in whole or in part from the following: … 2. ***sickness, disease*** or infections of any kind, except bacterial infections due to an accidental cut or wound, botulism or ptomaine poisoning; …." (emphasis added)  This exclusion also precludes Mr. Godwin from receiving coverage for his October 2004 injury.  Dr. Michael confirms avascular necrosis is a disease.

The Middle District of Alabama recently had the opportunity to decide a factually similar case.  Black-Gammons v. Zurich America Ins. Co., No. 1:04cv819-MHT (WO), 2006 U.S. Dist. LEXIS 1942 (M.D. Ala. Jan. 2, 2006).  In Black-Gammons, the plaintiff was an independent contractor truck driver leased to U.S. Xpress.  Id. at *3.  While exiting her cab one day, she slipped and fell.  Id.  Thereafter, she filed a claim for benefits under a group occupational accident insurance policy issued by the defendant to U.S. Xpress.  Id. at *4. Much like the Policy at issue in this case, the benefits Black-Gammons sought applied only to injuries defined as "an accidental bodily injury that is caused solely by accidental means and is independent of all other causes."  Id.  The policy also provided benefits only when a disability "resulted solely and directly" from an injury sustained while performing occupational duties, as

18

opposed to disability resulting from sickness, disease, or repetitive or cumulative traumas.  Id.

> Granting the defendant insurer's motion for summary judgment, the court held
>
> It is not disputed that the insurance policy at issue in this case does not cover illness or disease, as opposed to injuries resulting "solely and directly" from an accident.  It is also not disputed that doctors have diagnosed Black-Gammons with non-injury-related illnesses.  Zurich America has presented evidence that it terminated Black-Gammons's policy because doctors reported that her disability is the result of degenerative disc disease, independent of her work-related injury.  Such disease would disqualify Black-Gammons for benefits under the explicit terms of the policy.
> …
> Black-Gammons has presented no medial evidence whatsoever that the herniated discs which form the only basis of her claim are solely and directly related to her accident, as opposed to stemming from the degenerative-disc disease with which she has been diagnosed.
> …
> In sum, Zurich America has produced evidence that Black-Gammons is ineligible for benefits under the clear terms of the insurance policy, and Black-Gammons has failed entirely to come forward with any argument, much less any specific facts, showing that summary judgment should not be granted on her breach of contract claim.

Id. *9-12.  Likewise, in this case, the Policy provides that any loss caused in part by sickness, disease or infection is excluded and that an Injury must result from an Occupational accident, directly and independently of all other causes.  Also, the medical evidence as reported to NUFIC by Dr. Barrington noted Mr. Godwin suffered from a previously underlying condition, avascular necrosis.  NUFIC's expert Dr. Michael noted the early November 2004 x-rays and MRIs revealed avascular necrosis was present in the left hip, but there was no collapse of the femoral head.  He found "no relationship between the alleged October 2004 accident and the onset and subsequent problems Mr. Godwin had in both hips from the avascular necrosis of the femoral heads."  On the other hand, Mr. Godwin has not provided any medical evidence that his need for hip surgery resulted directly and independently of all other causes.  Thus, NUFIC, like the defendant insurer in Black-Gammons, is entitled to summary judgment for Mr.

Godwin's breach of contract claim.  See also Westbrook v. Safeco Life Ins. Co., 908 F.2d 927 (11th Cir. 1990).

## II.      MR. GODWIN'S BAD FAITH CLAIM FAILS AS A MATTER OF LAW.

In order to maintain a bad faith claim, Mr. Godwin must show 1) an insurance contract between the parties and a breach thereof by AIG Life or NUFIC; 2) an intentional refusal to pay Mr. Godwin's claim; 3) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason); 4) AIG Life or NUFIC's actual knowledge of the absence of any legitimate or arguable reason; 5) if the intentional failure to determine the existence of a lawful basis is relied upon, Mr. Godwin must prove AIG Life or NUFIC's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.  See State Farm Fire and Cas. Co. v. Slade, 747 So. 2d 293, 304 (Ala. 1999) quoting Nat'l Sec. Fire and Cas. Co. v. Bowen, 417 So. 2d 179, 183 (Ala. 1982).  Requirements 1) through 4) represent the "normal" case; requirement 5) represents the "abnormal" case.  Slade, 747 So. 2d at 306.

First, any claims for bad faith must fail because there was no breach of the insurance contract by AIG Life or NUFIC.  See infra Part I.  In a "normal" bad faith case, "in order for a plaintiff to make out a prima facie case of bad faith refusal to pay an insurance claim, the proof offered must show that the plaintiff is entitled to a directed verdict on the contract claim and, thus, entitled to recover on the contract claim as a matter of law."  Nat'l Savings Life Ins. Co. v. Dutton, 419 So. 2d 1357, 1362 (Ala. 1982).  But, breach of contract is a requisite element of "abnormal" bad faith claims as well.  Slade, 747 So. 2d at 318.  Because Mr. Godwin's breach of contract claim must fail, so must both his "normal" and "abnormal" bad faith claims.

Second, Mr. Godwin cannot prove the absence of any reasonably legitimate or arguable

reason for AIG Life's determination that his loss constituted a Non-Occupational Injury.

> An "arguable reason" means "'open to dispute or question,' and '[w]hen a claim is fairly debatable the insurer is entitled to debate it, whether the debate concerns a matter of fact or law.'" <u>Simmons v. Congress Life Ins. Co. and Insurers Admin. Corp.</u>, 2000 WL 1137368, *6 (Ala. 2000) (bad-faith refusal to pay, or to investigate, certain health-insurance claims) (<u>quoting</u> <u>National Security Fire & Casualty Co. v. Bowen</u>, 417 So. 2d 179, 183 (Ala. 1982)).

<u>West Beach Dev. Co. v. Royal Indem. Co.</u>, No. Civ.A. 99-0782-P-S, 2000 WL 1367994, n.10 (S.D. Ala. Sept. 19, 2000). Mr. Godwin's 2003 injury qualified as a Non-Occupational Injury and AIG Life paid benefits as such. Mr. Godwin's 2004 claim did not qualify as an Injury under the Policy, and thus he was not eligible for benefits. Because AIG Life and NUFIC abided by the terms of their respective Policies, they had completely legitimate reasons for their actions. Thus, Mr. Godwin's bad faith claim fails as a matter of law.

Third, Mr. Godwin's "abnormal", or failure-to-investigate, bad faith claim must fail because Mr. Godwin cannot prove that further investigation of his claim by AIG Life or NUFIC would have resulted in coverage. In order to prove a bad-faith-failure-to-investigate claim, Mr. Godwin must prove that a proper investigation would have revealed that his loss was covered under the terms of the contract. <u>Slade</u>, 747 So. 2d at 318.

With regard to Mr. Godwin's 2003 claim, no further investigation by AIG Life would have changed the fact that his injury was properly determined to be Non-Occupational because he was not "under Dispatch" when he injured himself in November. The letter sent by Godwin Material does not refute this fact. Even if he was under Dispatch in October 2003 when he allegedly injured himself with the tarp rack, he would still not qualify for additional benefits. As discussed <u>infra</u> in Part I, the October and November 2003 incidents cannot combine to cause an Injury. And, as Mr. Godwin stated at his deposition, he was at home and had made no

deliveries on the day of his accident. He was not "under Dispatch." No further investigation would change this information. As the Middle District has previously held, "If a lawful basis for denial exists, 'the insurer, as a matter of law, cannot be held liable in an action based upon the tort of bad faith.'" Alberson v. Nationwide Assur. Co., No. 03-T-011-S, 2003 U.S. Dist. LEXIS 24963 (M.D. Ala. Oct. 24, 2003), *13. Additionally, AIG Life's efforts to obtain more information from Mr. Godwin were thwarted when he filled out a second Proof of Loss with the exact same information he had already provided about the November 2003 incident and no mention of the October 2003 incident. Thus, Mr. Godwin's "abnormal" bad faith claim for his 2003 claim must fail.

With regard to Mr. Godwin's 2004 claim, an "abnormal" bad faith claim cannot be maintained because, again, no further investigation would have resulted in coverage. Slade, 747 So. 2d at 318. NUFIC investigated Mr. Godwin's claim by contacting Dr. Barrington. Dr. Barrington confirmed the 2004 injury was probably merely an aggravation of the previously unknown underlying avascular necrosis. Further, NUFIC had Dr. Lafleche review Mr. Godwin's records, and he also determined, because of the avascular necrosis, Mr. Godwin's 2004 loss did not qualify as an Injury. Indeed, Dr. Michael has concluded the avascular necrosis and its resulting problems are unrelated to Mr. Godwin twisting his knee. Not only did NUFIC thoroughly investigate Mr. Godwin's claim, but the investigation led to the same initial conclusion – Mr. Godwin's 2004 loss does not qualify as an Injury. Therefore, Mr. Godwin's "abnormal" bad faith claim for his 2004 loss must also fail.

## CONCLUSION

Both AIG Life and NUFIC are entitled to judgment as a matter of law because Mr. Godwin cannot prove breach of contract for either his 2003 or 2004 injuries. Mr. Godwin

received the benefit to which he was entitled for his November 2003 Non-Occupational Injury. Mr. Godwin's 2003 injury does not qualify him for Occupational benefits because he was not under Dispatch.  Further he failed to provide notice for his alleged October 2003, and such notice is a condition precedent of the right to sue.  Also, Mr. Godwin's 2004 loss does not qualify as an Injury under the Policy, and thus his breach of contract claim against NUFIC must fail as well.

Since Mr. Godwin cannot maintain a breach of contract claim, his bad faith claim fails as a matter of law.  Additionally, since Mr. Godwin cannot prove any further investigation into any of his claims would have resulted in a difference in coverage, his abnormal bad faith claim fails as well.  Because there is no dispute as to any material fact and NUFIC is entitled to judgment as a matter of law as to each of Mr. Godwin's claims, this Motion for Summary Judgment is due to be granted.

Respectfully submitted,

/s/ Michelle L. Crunk
John W. Dodson                (DOD012)
Michelle L .Crunk             (CRU017)
*Attorneys for AIG d/b/a National Union Fire Insurance Company of Pittsburgh, Inc*

OF COUNSEL:
**FERGUSON, FROST & DODSON, LLP**
2500 Acton Road, Suite 200
Birmingham, Alabama 35243

## CERTIFICATE OF SERVICE

This is to certify that on this the 6th day of October, a copy of the forgoing document has been served upon counsel for all parties to this proceeding via EMC/CF e-filing:

Arlene M. Richardson
RICHARDSON LEGAL CENTER, LLC
Post Office Box 971
Hayneville, Alabama  36040-0971

/s/ Michelle L. Crunk_____
OF COUNSEL

137228

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **OLLIE GODWIN,** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | |
| | ) | |
| **V.** | ) | **CASE NO:  2:05-cv-00783-SRW** |
| | ) | |
| **NATIONAL UNION FIRE INSURANCE** | ) | **From Circuit Court of Crenshaw Co.** |
| **COMPANY OF PITTSBURGH, INC.,** | ) | **Case No:  CV05-69** |
| **ET AL.,** | ) | |
| | ) | |
| **DEFENDANTS.** | ) | |
| | ) | |

## PROPOSED ORDER

This matter having come before the Court upon the Motion for Summary Judgment of National Union Fire Insurance Company of Pittsburgh, PA, this Court does hereby ORDER, ADJUDGE and DECREE as follows:

**Summary Judgment is GRANTED in favor of National Union Fire Insurance Company of Pittsburgh, PA, and the same is made final pursuant to Federal Rule of Civil Procedure 54(b) as there is no just reason for delay and all issues as to all parties are hereby resolved.  Costs taxed as paid.**

Done and ordered this _____ day of _____, 2006.


_____
Magistrate Judge Susan Russ Walker


cc:
John W. Dodson                           Arlene M. Richardson
Michelle L. Crunk                        RICHARDSON LEGAL CENTER, LLC
FERGUSON, FROST & DODSON, L.L.P.  Post Office Box 971
2500 Acton Road, Suite 200               Hayneville, Alabama 36040-0971
Birmingham, Alabama  35243

137589

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| OLLIE GODWIN, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| V. | ) | CASE NO:  2:05-cv-00783-SRW |
| | ) | |
| NATIONAL UNION FIRE INSURANCE | ) | From Circuit Court of Crenshaw Co. |
| COMPANY OF PITTSBURGH, INC., | ) | Case No:  CV05-69 |
| ET AL., | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| | ) | |

### INDEX OF EXHIBITS TO MOTION FOR SUMMARY JUDGMENT

Exhibit 1      Portions of Deposition Transcript of Ollie Godwin

Exhibit 2      Affidavit of Stephanie Pine

        A.      Policyholder Loss Information Report

        B.      Claim Form

        C.      AIG Life Letter

        D.      Godwin Material Letter

        E.      Claim Form

        F.      January 6, 2005 Fax

        G.      January 10, 2005 Fax

        H.      Barrington Fax

        I.      Pine Fax

        J.      February 2005 NUFIC Letter

        K.      Barrington Letter

        L.      May 2005 NUFIC Letter

      M.       Richardson Letter

      N.       AIG Life Policy

      O.       NUFIC Policy

Exhibit 3    Defendant Palomar Insurance Corporation's Response to Plaintiff's First

           Request for Interrogatories and First Request for Production

Exhibit 4    Plaintiff Answers to Interrogatories and Request for Production Propounded by

           Defendant

Exhibit 5    Affidavit of Dr. Daniel W. Michael


               /s/ Michelle L. Crunk_____
               John W. Dodson        (DOD012)
               Michelle L .Crunk      (CRU017)
               *Attorneys for AIG d/b/a National Union Fire Insurance Company of Pittsburgh, Inc*

OF COUNSEL:
**FERGUSON, FROST & DODSON, LLP**
2500 Acton Road, Suite 200
Birmingham, Alabama 35243


### **CERTIFICATE OF SERVICE**

      This is to certify that on this the 6th day of October, a copy of the forgoing document has been served upon counsel for all parties to this proceeding via EMC/CF e-filing:

Arlene M. Richardson
RICHARDSON LEGAL CENTER, LLC
Post Office Box 971
Hayneville, Alabama  36040-0971


               /s/ Michelle L. Crunk_____
               OF COUNSEL

137570

OLLIE GODWIN
NATIONAL UNION FIRE INSURANCE COMPANY

OLLIE GODWIN
July 10, 2006

---

Page 1

1    IN THE UNITED STATES DISTRICT COURT,
2    FOR THE NORTHERN DISTRICT OF ALABAMA,
3         NORTHERN DIVISION
4
5    CIVIL ACTION NO. CV-205-cv-00783-SRW
6
7    OLLIE GODWIN,
8         Plaintiff,
9    vs.
10   NATIONAL UNION FIRE INSURANCE
11   COMPANY OF PITTSBURGH, INC., et al.,
12        Defendants.
13
14        DEPOSITION
15           of
16        OLLIE GODWIN
17        JULY 10, 2006
18
19
20   TAKEN BEFORE: Donald R. Eaton
21              Registered Professional
22              Reporter and Notary Public
23

---

Page 3

1         A P P E A R A N C E S
2
3
4    FOR THE PLAINTIFF:
5       Ms. Arlene M. Richardson
6       Attorney at Law
7       133 Hayneville Plaza
8       Post Office Box 971
9       Hayneville, Alabama 36040-0971
10
11   FOR THE DEFENDANT,
12      Ms. Michelle L. Crunk
13      Attorney at Law
14      Ferguson, Frost & Dodson
15      2500 Acton Road, Suite 200
16      P.O. Box 430189
17      Birmingham, Alabama 35223
18
19
20
21
22
23

---

Page 2

1         S T I P U L A T I O N
2         IT IS STIPULATED AND AGREED,
3    by and between the parties, through their
4    respective counsel, that the deposition
5    of OLLIE GODWIN may be taken before
6    Donald R. Eaton, Registered Professional
7    Reporter and Notary Public, State at
8    Large;
9         That the signature to and
10   reading of the deposition by the witness
11   is waived, the deposition to have the
12   same force and effect as if full
13   compliance had been had with all laws and
14   rules of Court relating to the taking of
15   depositions;
16        That it shall not be necessary
17   for any objections to be made by counsel
18   to any questions, except as to form or
19   leading questions, and that counsel for
20   the parties may make objections and
21   assign grounds at the time of trial, or
22   at the time said deposition is offered in
23   evidence, or prior thereto.

---

Page 4

1              I N D E X
2                   PAGE:
3    EXAMINATION BY MS. CRUNK........ 6
4    EXAMINATION BY MS. RICHARDSON... 150
5    REEXAMINATION BY MS. CRUNK...... 172
6
7      DEFENDANT'S EXHIBITS:
8    Defendant's Exhibit 1........... 64
9    Defendant's Exhibit 2........... 87
10   Defendant's Exhibit 3........... 94
11   Defendant's Exhibits 4A and 4B.. 120
12   Defendant's Exhibits 5A and 5B.. 125
13   Defendant's Exhibits 6A, 6B & 6C 135
14
15      PLAINTIFF'S EXHIBITS:
16   Plaintiff's Exhibits 1 and 1A... 150
17   Plaintiff's Exhibits 2A, 2B & 2C 153
18   Plaintiff's Exhibit 3........... 154
19   Plaintiff's Exhibit 4........... 155
20   Plaintiff's Exhibit 5........... 157
21   Plaintiff's Exhibit 6........... 159
22   Plaintiff's Exhibit 7........... 161
23   Plaintiff's Exhibit 8........... 162

---

1 (Pages 1 to 4)

OLLIE GODWIN
NATIONAL UNION FIRE INSURANCE COMPANY

Page 33

1    A.    They sent forms and filled
2  them out and mailed them back in.
3    Q.    Who sent forms?
4    A.    I believe it was AIG, the
5  insurance company.
6    Q.    Who did you report your
7  accident to at work?
8    A.    I didn't report it to nobody.
9  They knew about it. Jerry Godwin, he
10 knew it. I didn't know nothing for a
11 couple of days.
12   Q.    Did you contact AIG personally
13 to receive the forms to fill out?
14   A.    My wife did it for me.
15   Q.    Did you get a form from work
16 that you filled out as a result of this
17 accident, from Godwin Material?
18   A.    I don't know. My wife took
19 care of all that because my hand was
20 broke. It was in a cast. I couldn't
21 write. Busted one of my eardrums, you
22 know, and she took care of all of that.
23   Q.    You stated earlier that Godwin

Page 34

1  Material had AIG insurance for the lease
2  drivers around 1991 or '92 for the first
3  time; is that correct?
4    A.    I think so.
5    Q.    And your wreck occurred in
6  '92; is that correct?
7    A.    '92, '93, right in there.
8    Q.    When you first enrolled for
9  this occupational accident policy in 1991
10 or 1992, did you receive any materials
11 regarding the policy?
12   A.    No. All I received was just a
13 little old card, you know, an insurance
14 card.
15   Q.    Who gave you the insurance
16 card?
17   A.    Office did, Godwin Material.
18   Q.    How did you become enrolled in
19 the policy?
20   A.    The company set it all up. We
21 went down there and filled out the
22 papers.
23   Q.    Where did you go to fill out

Page 35

1  the papers?
2    A.    Brantley.
3    Q.    Is Brantley where Godwin
4  Material's office is located?
5    A.    Yes.
6    Q.    What papers did you have to
7  sign to become enrolled?
8    A.    Well, you just put your age,
9  you know, Social Security number, stuff
10 like that, who you wanted to be the
11 beneficiary if you died or something, got
12 killed in the truck.
13   Q.    Did you read the paper that
14 you signed and filled out to become
15 enrolled?
16   A.    Yes.
17   Q.    Do you remember what that
18 paper said?
19   A.    That was a long time back.
20   Q.    Did anyone explain the policy
21 to you when you became enrolled at Godwin
22 Material?
23   A.    No.

Page 36

1    Q.    How did you know about this
2  insurance coverage that was to be made
3  available to you through Godwin Material?
4    A.    Well, through them. They told
5  us, you know, we had to have it.
6    Q.    Who told you?
7    A.    Jerry Godwin. We either had
8  to have occupational insurance or they
9  wasn't going to let us -- you couldn't
10 load your trucks.
11   Q.    Did Jerry Godwin talk to you
12 about this one-on-one?
13   A.    No. Just, you know, like at a
14 safety meeting talked about it.
15   Q.    So at a safety meeting Jerry
16 Godwin explained to you and other lease
17 drivers that you had to have this
18 insurance policy or you couldn't load
19 your truck; is that correct?
20   A.    That's correct.
21   Q.    Did he say anything else about
22 the policy?
23   A.    No. He just told us, you

9 (Pages 33 to 36)

Page 41

1    policy that you currently have through
2    Pinkard Agency, is that a policy that you
3    took out individually?
4        A.    Yes.
5        Q.    Did you have to provide proof
6    of occupational accident insurance to
7    Jerry Godwin or Godwin Material to begin
8    driving with them again?
9        A.    Yes.
10       Q.    Other than the wreck that you
11   were in in 1992, have you ever made any
12   other claim under an occupational
13   accident policy other than the hernia or
14   hip claim we're here to discuss today?
15       A.    No.
16       Q.    Did you have a copy of your
17   accident policy when your wreck occurred
18   in 1992?
19       A.    Didn't have a policy or
20   anything.
21       Q.    What information regarding
22   your policy did you have in 1992 when the
23   wreck occurred?

Page 42

1        A.    None.  We had to call them and
2    get them to send the forms.
3        Q.    Did you request a copy of the
4    policy at that time?
5        A.    No, I didn't.
6        Q.    Have you ever asked anyone at
7    Godwin Material for a copy of your AIG
8    occupational accident policy?
9        A.    Yes.
10       Q.    When?
11       A.    When I hurt my hip.
12       Q.    Who did you ask for a copy of
13   your policy?
14       A.    Cindy.
15       Q.    What did Cindy tell you?
16       A.    She gave me one.
17       Q.    When Cindy gave you a copy of
18   the policy, was this before or after you
19   had obtained a copy of the policy from
20   your brother-in-law?
21       A.    It was after.
22       Q.    Who was your brother-in-law
23   that gave you a copy of the policy?

Page 43

1        A.    Eddie Faulk.
2        Q.    Do you know how Eddie Faulk
3    got a copy of the policy?
4        A.    No, not really.  I reckon he
5    had back surgery and all.
6        Q.    When you asked Cindy for a
7    copy of the policy and she gave it to
8    you, did she have it there in the office?
9        A.    Yes.
10       Q.    Had you ever asked her or
11   anyone else at Godwin, previous to the
12   occasion where you received a copy of the
13   policy from Cindy Jordan, for a copy of
14   the policy?
15       A.    No.
16       Q.    Besides occupational accident
17   insurance, do you receive any other
18   insurance through your lease relationship
19   with Godwin Material?
20       A.    Blue Cross Blue Shield.
21       Q.    How long have you had Blue
22   Cross Blue Shield through Godwin
23   Material?

Page 44

1        A.    Probably six years.
2        Q.    Previous to having Blue Cross
3    Blue Shield health insurance through
4    Godwin Material, did you have health
5    insurance?
6        A.    Yes.  With my wife through her
7    work at Russell Corporation.
8        Q.    Who was your health insurance
9    company through your wife at Russell?
10       A.    Blue Cross Blue Shield.
11       Q.    Do you currently have Blue
12   Cross Blue Shield health insurance
13   through Godwin Material?
14       A.    Yes.
15       Q.    Since you began having Blue
16   Cross Blue Shield health insurance
17   through Godwin Material approximately six
18   years ago, has there ever been a lapse in
19   your health insurance coverage?
20       A.    No.
21       Q.    Have you ever had health
22   insurance through any company other than
23   Blue Cross Blue Shield?

11 (Pages 41 to 44)

OLLIE GODWIN
NATIONAL UNION FIRE INSURANCE COMPANY

Page 45

1    A.   No.
2    Q.   Have you ever made a claim
3  underneath your Blue Cross Blue Shield
4  health insurance policy through Godwin
5  Material?
6    A.   Yes.
7    Q.   Would you tell me about those
8  claims?
9    A.   Well, my hernia. I filed it
10  on my hips. And when I had a pin put in
11  my hip, I had filed it on it.
12    Q.   Any other claims you've made
13  under Blue Cross Blue Shield besides the
14  hernia, hip and pin in hip?
15    A.   No. When I had the wreck.
16  And I don't know which one of them paid
17  it, but I never heard one thing about it.
18  Then I had the -- I had hip replacement.
19  Then they put a pin in my right hip.  I
20  filed it then because that pin didn't
21  work.  It was an experimental thing.
22  They were just starting trying it. So it
23  collapsed. And, so, I had another hip

Page 46

1  put in.
2    Q.   So you had two hip
3  replacements?
4    A.   Yes.
5    Q.   Did Blue Cross Blue Shield pay
6  for any claims you made related to your
7  hernia injury?
8    A.   Yes.
9    Q.   Regarding your first hip
10  replacement, did Blue Cross Blue Shield
11  pay any and all claims you made regarding
12  that hip replacement?
13    A.   Yes.  They paid some, and then
14  AIG paid a few.  And then everybody now
15  is wanting their money back. They're
16  thinking AIG should pay it all.  That's
17  what I mean, it's just a big mess.
18    Q.   Blue Cross Blue Shield and AIG
19  paid on your first hip replacement; is
20  that correct?
21    A.   Yeah, paid some.  Blue Cross
22  paid.  Then they asked for their money
23  back from several of the doctors.

Page 47

1    Q.   Do you know what doctors Blue
2  Cross Blue Shield has requested their
3  money back from?
4    A.   From Dr. Adams and from, I
5  think, the anesthesiologist, then from
6  the X-ray place where I went and had some
7  X-rays done.  I don't know who else.
8  She's got letters on it all.
9    Q.   What is your fee arrangement
10  through your lease with Godwin Material?
11    A.   My what?
12    Q.   How do you get paid through
13  Godwin?
14    A.   Well, you get paid once a
15  month.  And it's on whatever you haul.
16  They get ten percent.
17    Q.   And you get 90 percent; is
18  that correct?
19    A.   Yeah.
20    Q.   What expenses are deducted
21  from your fee arrangement with Godwin
22  Material?
23    A.   Nothing.  Just the ten

Page 48

1  percent, you know.  Like if you run
2  $10,000, they get a thousand dollars.
3  But we can buy -- then they take our
4  liability insurance out and what fuel we
5  burn and parts we buy.  They take that
6  out.
7    Q.   Who is your liability
8  insurance through, what company?
9    A.   I'm not sure.  I would have to
10  check.  It's through Palomar.  I know
11  they write it, but they change them up.
12    Q.   So, liability insurance, fuel
13  and parts are taken out of your check
14  from Godwin.  Are your premiums for your
15  occupational accident policy also taken
16  out of your check?
17    A.   Well, it was, but it's not now
18  on mine.  Yes.
19    Q.   What about your health
20  insurance?
21    A.   Yes, it's taken out.
22    Q.   Is your lease with Godwin
23  Material in your name?

12 (Pages 45 to 48)

Page 49

1    A.    Yes.
2    Q.    Has it always been in your
3  name?
4    A.    That's right.
5    Q.    How many trucks do you lease
6  with Godwin Material?
7    A.    Three.
8    Q.    And you drive one of those
9  trucks, I presume, correct?
10   A.    Yeah, when I'm able.
11   Q.    Who drives the other two?
12   A.    Mark Morgan and Clyde
13 Williamson.
14   Q.    Do Clyde Williamson and Mark
15 Morgan have their own leases with Godwin?
16   A.    No.  They have their own,
17 their own everything except for the
18 accident policy.  I pay it.
19   Q.    You pay the premiums for Mark
20 Morgan and Clyde Williamson's
21 occupational accident policy?
22   A.    Yes.
23   Q.    Are Mark Morgan and Clyde

Page 50

1  Williamson salaried employees of you?
2    A.    Yeah.  You know, like contract
3  drivers, they get a percentage of the
4  truck.
5    Q.    So you have a contract with
6  Mark Morgan and you have a contract with
7  Clyde Williamson separate from your
8  arrangement with Godwin Material?
9    A.    Yes.
10   Q.    Have you held any second jobs
11 since you've been working with Godwin
12 Material?
13   A.    No.
14   Q.    Now, I'm not asking you for
15 exact figures, but over the last five
16 years could you give me an average yearly
17 earning for your trucks that you leased
18 with Godwin Material?
19   A.    It varies.  I mean, do you
20 want the gross?
21   Q.    That's fine.
22   A.    I would say average around
23 375, 375,000.

Page 51

1    Q.    For each truck?
2    A.    No, for all of them.  Some
3  years they do better.  It's just
4  according to how the work is, you know.
5    Q.    What kind of income tax
6  statement do you receive from Godwin
7  Material?
8    A.    We just get a statement, you
9  know, of the money, what we run, parts
10 and fuel and everything taken out of it.
11   Q.    Do you file taxes as a
12 self-employed person?
13   A.    Yeah.
14   Q.    Do you file taxes jointly with
15 your wife?
16   A.    Yes.
17   Q.    Have you always filed taxes
18 jointly with your wife?
19   A.    Yes.
20   Q.    Do you have any life insurance
21 policies currently?
22   A.    Yes.
23   Q.    Through what insurance

Page 52

1  companies do you have life insurance?
2    A.    Probably three different ones.
3  It's Ronnie Paulk Agency.  He's the one
4  that writes them up and all.
5    Q.    Paulk?
6    A.    Yeah.  He's in Greenville.
7    Q.    How long have you had your
8  life insurance policies?
9    A.    Probably 20 years.
10   Q.    Have you obtained any life
11 insurance over the past five years?
12   A.    Yes.
13   Q.    Do you know what insurance
14 company that policy would be through?
15   A.    No.
16   Q.    Did you have to take a medical
17 examination to obtain that life
18 insurance?
19   A.    Yeah.  Well, you had to take a
20 blood test, stuff like that.
21   Q.    Which doctor conducted the
22 examination that was necessary to obtain
23 that policy?

13 (Pages 49 to 52)

OLLIE GODWIN
NATIONAL UNION FIRE INSURANCE COMPANY

OLLIE GODWIN
July 10, 2006

Page 65

1    A.    Just a little old card you
2  signed each year. Might have been a
3  paper, I guess. All you did was put your
4  name and stuff on it, then your spouse,
5  you know, stuff like that.
6    Q.    But the sheet that you filled
7  out may have had information similar to
8  this on it?
9    A.    No, it don't have that.
10  That's the first time I ever saw that
11  (indicating).
12    Q.    Okay. Now, I would like to
13  talk about your hernia claim. Could you
14  tell me the date that you were injured?
15    A.    October 22nd when I fell on a
16  tarp rack.
17    Q.    Describe to me what happened
18  on October 22nd, 2003.
19    A.    Well, I rolled my tarp back up
20  to the front of the trailer, and I
21  strapped it down. Climbing over -- I had
22  my steps in the front of the trailer, and
23  I was climbing over the rail. And the

Page 66

1  tarp bracket's got -- you know, you set
2  your tarp in front of the trailer on some
3  of them. This one here, I climbed over
4  the steps, and it was a little damp. And
5  I slipped, and it hit me in the side, the
6  tarp bracket did. And I told Cindy about
7  it. And then, you know, it was giving me
8  a little problem, but it wasn't bad.
9    Then I think it was on the
10  25th of November or something I was
11  putting a muffler on the truck. And I
12  had to pick it up by the pipe. And when
13  I did, the top of it was loose. And it
14  got overbalanced with me and pushed me
15  back. And I fell, and the muffler hit me
16  right where I hurt myself with the tarp
17  rack. And I reported that.
18    Q.    Let's go back to October 22nd,
19  2003 when you were pulling the tarp and
20  the tarp rack hit you. Why were you
21  pulling the tarp? Were you pulling the
22  tarp over a load?
23    A.    I had just dumped the load

Page 67

1  out. You've got to push it back up
2  before you can put another load in it.
3    Q.    Where had you dumped the load
4  previous to rolling up the tarp?
5    A.    I'm not sure. That settlement
6  there will show it. Look on the 22nd.
7    MS. RICHARDSON: He also
8  brought with him today his settlement
9  sheets that have those dates on them.
10  And I've made you a copy.
11    MS. CRUNK: Okay. Thanks.
12    MS. RICHARDSON: Off the
13  record.
14    (Off-the-record discussion.)
15    A.    That's the last day I worked
16  before I had the surgery. That's when I
17  went back to work. On the 25th is when I
18  fell on the tarp rack. I was hauling
19  sand to -- I think to a concrete company.
20    Q.    (BY MS. CRUNK:) On October
21  25th, 2003 is when you pulled the tarp
22  rack on yourself; is that correct? What
23  day of the week was that?

Page 68

1    A.    I'm not sure.
2    MS. RICHARDSON: Do you want
3  me to get a calendar?
4    A.    It seemed like it was on a
5  Thursday, though.
6    MS. RICHARDSON: Let's let him
7  look at a calendar before he answers that
8  question.
9    MS. CRUNK: Okay.
10    MS. RICHARDSON: If you don't
11  mind, he can testify to his memory.
12    MS. CRUNK: That's fine.
13    Q.    (BY MS. CRUNK:) If you don't
14  remember the day of the week it is,
15  that's fine. My next question is, it
16  shows that you had a load on October
17  25th, 2003, which is when you were
18  injured by the tarp rack, correct? And
19  then again on October 27th, 2003, you
20  were driving; is that correct?
21    A.    Yeah.
22    Q.    Did you miss a day of work on
23  October 26th, 2003?

17 (Pages 65 to 68)

OLLIE GODWIN                                                        OLLIE GODWIN
NATIONAL UNION FIRE INSURANCE COMPANY                               July 10, 2006

Page 69

1    A.  I don't remember.  I hurt
2  myself then, but I kept working, you
3  know.  And then when the muffler fell on
4  me, that's when I had to have something
5  done about it.
6    Q.  You stated earlier that after
7  the tarp rack hit you, you told somebody
8  at Godwin Material about that?
9    A.  Yes.
10   Q.  Cindy Jordan; is that correct?
11   A.  Yes.
12   Q.  What did you tell Cindy?
13   A.  I told her I fell on the tarp
14 rack and hurt my stomach.  It swolled up
15 and it bruised, so I told her, you know,
16 in case anything come up about it.
17   Q.  Did you fill out a claim for
18 that injury?
19   A.  No.
20   Q.  Did you request Cindy to fill
21 out a claim for you?
22   A.  No.  I just -- they always
23 tell us to call when something happens so

Page 70

1  they'll have it on record.
2    Q.  Did you call Cindy to let her
3  know that you had been injured or did you
4  speak to her in person?
5    A.  I called her.
6    Q.  What did she say to you in
7  response?
8    A.  She just said, okay, she'd
9  make a note of it, put it on file, you
10 know.
11   Q.  Did you go see a doctor after
12 your injury on October 25th?
13   A.  No, not right then.
14   Q.  Do you know if you did miss
15 any work on October 26th or not?
16   A.  I'm not sure.
17   Q.  Okay.  Looking at the sheets
18 that your attorney just gave me, I'm
19 missing the month of November, 2003.
20   MS. CRUNK:  Do you have those
21 sheets?
22   MS. RICHARDSON:  No.
23   MS. CRUNK:  I have October

Page 71

1  2003, and then the next sheet starts on
2  December 12th, 2003.
3    MS. RICHARDSON:  Let's see.
4  Maybe we just didn't copy it.  Were you
5  out of work?  No.  We don't have those.
6    MS. CRUNK:  Okay.
7    Q.  (BY MS. CRUNK:)  These sheets
8  that I have in front of me, these
9  commission reports, are these documents
10 that you maintain or did you get these
11 from Godwin Material?
12   A.  No.  We maintain them.
13   Q.  So would you have in your
14 possession the records for the month of
15 November 2003?
16   A.  Yes.
17   Q.  And we could get those?
18   A.  These are what comes in with
19 your settlement each month so you'll know
20 exactly how many loads you hauled.
21   Q.  Okay.
22   A.  Yeah, she'd have that.
23   Q.  Okay.  So, on October 25th,

Page 72

1  you were injured with the tarp rack, and
2  called in Cindy and told her that you
3  were hurt, but you did not file a claim
4  at that time; is that correct?
5    A.  That's correct.
6    Q.  And then what happened in --
7  let's go back.  On October 25th, you had
8  just unloaded a load; is that correct?
9    A.  That's correct.
10   Q.  Did you go pick up a load
11 after you hurt yourself?
12   A.  Yeah.
13   Q.  That same day; is that
14 correct?
15   A.  No, not that day.  The next
16 day I did.
17   Q.  So -- I'm sorry to interrupt
18 you.  The load that you had just unloaded
19 on October 25th before you injured
20 yourself was your last load for that day?
21   A.  That's correct.
22   Q.  And as far as you know, you
23 went the next day?

18 (Pages 69 to 72)

OLLIE GODWIN
NATIONAL UNION FIRE INSURANCE COMPANY

OLLIE GODWIN
July 10, 2006

Page 73

1    A.    I worked the next day.
2    Q.    Worked the next day.  Okay.
3    A.    The papers show it.  I'm not
4    one just to run to the doctor just every
5    little bump.
6    Q.    After you were hit with the
7    tarp rack, did you go immediately home?
8    A.    Yeah.
9    Q.    Did you call Cindy from your
10   house?
11   A.    Yes.
12   Q.    You stated that Godwin
13   Material requested that you call in every
14   time you had an injury; is that correct?
15   A.    Anything that something might
16   occur from it later on, yeah.
17   Q.    Prior to being hit with a tarp
18   rack on October 25th, 2003, had you ever
19   called any other injury in to Godwin
20   Material?
21   A.    Not that I can remember.
22   Q.    You stated earlier that on
23   November 25th, 2003 you hit yourself with

Page 74

1    a muffler; is that correct?
2    A.    Yeah, with a muffler.
3    Q.    What time of day did this
4    occur?
5    A.    I think it was around about
6    11:00.
7    Q.    What time of day was it when
8    you were hit with the tarp rack in that
9    paper?
10   A.    Probably around 4:30 or 5:00.
11   Q.    Do you typically finish work
12   daily around 4:30 or 5:00?
13   A.    Well, I did then because if
14   you notice, all the tickets is that
15   concrete company, TCC.  That's just --
16   that's when they was building the Hyundai
17   plant.  I was hauling sand from one side
18   of Montgomery, from the north side to the
19   south side.  So most of it all run out
20   about the same time.
21   Q.    It looks like during the month
22   of December 2003 and also over here in
23   February 2004 that TCC is also the same

Page 75

1    company that you're driving for.  Is this
2    also in relation to building the Hyundai
3    plant?
4    A.    Yeah.
5    Q.    So for how long did you do
6    that?
7    A.    About seven or eight months.
8    It was a long time.  Some days we'd fill
9    them up and go somewhere else, but I was
10   their primary hauler for them.
11   Q.    When you were delivering sand
12   from north of Montgomery to south of
13   Montgomery for TCC, what time in the
14   morning would you start?
15   A.    Most of the time it'd be about
16   7:00.
17   Q.    So am I correct in
18   understanding that from about 7:00 to
19   about 5:00 in the evening you would just
20   make continuous runs hauling sand from
21   north of Montgomery to south of
22   Montgomery?  Is that correct?
23   A.    Yeah.

Page 76

1    Q.    Okay.  Tell me what happened
2    the day that you were hit with a muffler.
3    A.    On a big truck, you got big
4    mufflers.  I took the top clamp off.  I
5    took the bottom clamps off to pick it up.
6    On a T-600 Kenworth, you've got a guard
7    comes around.  You have to pick the
8    muffler up over the guard and out.  When
9    I picked it up over the guard and coming
10   out with it at an angle, I had to come
11   out of the bracket at the top.  And it
12   was pushing me backwards.
13   So when I tripped, the
14   muffler -- I fell on my back, and the
15   muffler hit me in the stomach, same place
16   I hit the tarp rack.
17   Q.    Where were you working on the
18   muffler?
19   A.    At home, my shop.
20   Q.    You stated earlier that this
21   happened around 11:00 a.m.; is that
22   correct?
23   A.    Yes.

19 (Pages 73 to 76)

OLLIE GODWIN
NATIONAL UNION FIRE INSURANCE COMPANY

OLLIE GODWIN
July 10, 2006

Page 77

1    Q.    Had you made any deliveries
2  that day?
3    A.    No. It's been a while back.
4  I don't believe so. Seemed like the
5  truck was loaded with pea gravel when the
6  pipe blowed out. You have to fix it
7  because DOT will shut the truck down if
8  they catch you because of exhaust going
9  to the cab of the truck with the driver.
10    Q.    When had the pipe broke?
11    A.    Bringing it in, you know,
12  fixing to take a load to haul it. We was
13  taking a load off. He brought it in to
14  the house because the pipe busted.
15    Q.    Who brought it into the house?
16    A.    I forgot who was driving for
17  me then. I can check on it.
18    Q.    This was not the truck you
19  were driving at that time?
20    A.    Not right there at the time,
21  it wasn't. But I was going to take it
22  off.
23    Q.    So would this have been Clyde

Page 78

1  or Mark who was driving the truck?
2    A.    No, wouldn't be one of those.
3    Q.    But it was another person with
4  whom you had contracted to drive one of
5  your trucks; is that correct?
6    A.    Yeah. It was my truck.
7    Q.    When the pipe burst, you were
8  not driving the truck; is that correct?
9    A.    No.
10    Q.    Would you have records at home
11  that would be able to show who the driver
12  was on that truck at that time?
13    A.    I might have. I would have to
14  look. I should have receipts for the
15  parts that were purchased to fix the
16  truck.
17    Q.    Did you purchase the parts to
18  fix that truck from Godwin Material?
19    A.    I don't remember if I got them
20  from them or the parts house.
21    Q.    Where is the parts house?
22  What is that?
23    A.    Well, we use several different

Page 79

1  ones: Capitol Volvo, Fleet Pride,
2  Freightliner, Kenworth, Peterbilt.
3    Q.    So I'm correct that you don't
4  purchase all of your parts from Godwin
5  Material; is that correct?
6    A.    No.
7    Q.    Is there a shop at Godwin
8  Material where you can work on your
9  trucks?
10    A.    They have their own shop,
11  yeah.
12    Q.    Does the shop at Godwin
13  Material ever make any repairs on the
14  trucks you own?
15    A.    They have when my hips was --
16  I had surgery on my hip.
17    Q.    When Godwin Material did work
18  on your trucks when you were injured with
19  your hip, in addition to any parts that
20  you had to purchase for those trucks, did
21  you have to pay Godwin Material for any
22  labor?
23    A.    No.

Page 80

1    Q.    Did you have to pay for
2  anything besides parts?
3    A.    No.
4    Q.    Have you ever worked on a
5  truck at the shop at Godwin Material?
6    A.    Yeah.
7    Q.    When have you worked on a
8  truck at Godwin's shop?
9    A.    It's been a couple of years
10  back. I put a back end in one,
11  transmission on one.
12    Q.    Was this work you were doing
13  on trucks you owned?
14    A.    On my trucks, yeah.
15    Q.    How do you decide whether to
16  do the work at your house or at the shop
17  at Godwin when you're repairing your own
18  trucks?
19    A.    Well, it's according to where
20  it breaks down at. We take it to the
21  closest place.
22    Q.    Do you do all your repair on
23  your own trucks?

20 (Pages 77 to 80)

OLLIE GODWIN
NATIONAL UNION FIRE INSURANCE COMPANY

OLLIE GODWIN
July 10, 2006

Page 85

1  paper. I forgot exactly which day I did
2  go.
3      Q.   On this paper?
4      A.   No. It was on one my wife
5  left.
6          MS. RICHARDSON: The package
7  that I gave you earlier with the
8  insurance coverages.
9          MS. CRUNK: Okay. All the
10 sheets that you gave me earlier relate to
11 the hip problem.
12     Q.   (BY MS. CRUNK:) Did you go to
13 the doctor the next day?
14     A.   I'm not sure. I think -- I
15 would have to see exactly which day it
16 fell. I went a couple of days after,
17 next day or a couple after. I can find
18 the records at the house if you want me
19 to.
20         MS. RICHARDSON: Well, it will
21 be reflected in the medical records, too,
22 I'm sure.
23     A.   Yeah.

Page 86

1      Q.   Did you call Cindy or anyone
2  else at Godwin Material the day of the
3  accident to let them know?
4      A.   The next day I did.
5      Q.   Who did you speak with?
6      A.   Cindy.
7      Q.   What did you tell Cindy?
8      A.   Told her I had a muffler fall
9  on me, hit me in the same place I hurt
10 myself with the tarp rack.
11     Q.   Did you fill out a claim at
12 that time?
13     A.   No.
14     Q.   Did you request that Cindy
15 make a claim at that time?
16     A.   No. They don't ever ask you
17 to make a claim. They just tell you to
18 report it. And then when you go to the
19 doctor and everything, then you'll get
20 your papers and fill them all out. The
21 doctor fills his part out.
22     Q.   Who did you get the papers
23 from that you filled out for your hernia?

Page 87

1      A.   I think from Cindy. On the
2  hernia, I went to see Dr. Hood, and then
3  Dr. Hood called Dr. McGowin. He was the
4  surgeon.
5      Q.   Take a look at these two
6  sheets for me, if you will.
7      A.   (Reviewing document.)
8      Q.   Do you remember filling out
9  that form?
10     A.   My wife filled the top part
11 out, I know.
12     Q.   Is that your signature on the
13 bottom of the page?
14     A.   Yes.
15     Q.   Both pages?
16     A.   Yes.
17     Q.   Okay.
18     A.   Some of this I believe is what
19 the doctors filled out.
20         MS. RICHARDSON: Can we mark
21 that?
22         MS. CRUNK: Sure.
23         (Whereupon, Defendant's

Page 88

1  Exhibit 2 was marked for
2  identification.)
3      Q.   (BY MS. CRUNK:) Okay. It
4  looks like to me here it said the injury
5  occurred on the 11/22nd/03. And here it
6  says, "When is the first date that you
7  consulted a physician for this condition?
8  December 4th, 2003." Do you agree with
9  me that that's what it says?
10     A.   That's what it looks like it
11 says. Yes.
12     Q.   This sheet that you signed is
13 dated January 8th, 2004. Is that the
14 first form you filled out regarding your
15 hernia claim?
16     A.   I'm not sure.
17     Q.   Okay.
18     A.   The 8th, the 8th is when I
19 went back to have the staples taken out.
20     Q.   Okay. This is a copy of the
21 complaint that you filed, and I'm going
22 ask you to look at page three,
23 specifically paragraphs 11 and 12. Would

22 (Pages 85 to 88)

OLLIE GODWIN                                          OLLIE GODWIN
NATIONAL UNION FIRE INSURANCE COMPANY                 July 10, 2006

Page 93

1   while back.
2       Q.   Was this someone with AIG or
3   was --
4       A.   AIG.
5       Q.   Was this a telephone
6   conversation or did this happen through
7   written correspondence?
8       A.   It was on the telephone.
9       Q.   Did you call AIG?
10      A.   Yeah.
11      Q.   Where did you get the phone
12  number you called?
13      A.   They've got one on their card
14  we have.  Like on the hip, I can tell you
15  who I talked to then.
16      Q.   What did you ask the person
17  you spoke with at AIG?
18      A.   Just asked them had they
19  received the papers and all.  And they
20  said yes, it would be taken care of, you
21  know, being processed.  But, you know,
22  nothing ever happened.
23      Q.   When was the next time you

Page 94

1   either spoke to or wrote or received
2   correspondence from AIG?
3       A.   I'm not sure.  I think she
4   received a letter saying it was denied,
5   you know.
6       Q.   I'll show you this sheet and
7   ask you to read it.
8       A.   (Reviewing document.)  Cindy's
9   got it marked "no" on here.
10      Q.   Is this incorrect that the --
11      A.   That's incorrect.
12           MS. RICHARDSON:  Can we mark
13  that exhibit, please?
14           MS. CRUNK:  Sure.
15           (Whereupon, Defendant's
16           Exhibit 3 was marked for
17           identification.)
18      Q.   (BY MS. CRUNK:)  So it's
19  incorrect when it says, "Was this vehicle
20  loaded at the time of the accident"?
21      A.   Where she said no, that is
22  incorrect.
23      Q.   I would like to show you this

Page 95

1   and have you read that.
2       A.   (Reviewing document.)  I've
3   read all this.
4       Q.   You recall receiving this
5   letter?
6       A.   Yes.
7       Q.   After you received this letter
8   that says, "According to the information
9   we received, you were not under dispatch
10  nor was your truck loaded at the time of
11  the accident," did you ever tell anyone
12  at AIG that this was incorrect?
13      A.   Yes.  I told Hank Strott, the
14  agent at Palomar.
15      Q.   That -- what did you tell Hank
16  Strott?
17      A.   I told him the truck was
18  loaded and it was under dispatch.  Y'all
19  have totally rewritten the policy since
20  this.  My son has the other ones at home,
21  the new one.  They have changed it all
22  up.
23      Q.   Hank Strott was your agent at

Page 96

1   Palomar; is that what you said?
2       A.   That's right.
3       Q.   Did you have a telephone
4   conversation with Mr. Strott?
5       A.   Yeah, several of them.
6       Q.   What did Mr. -- I'm sorry,
7   what is his last name?
8       A.   Strott, I think.
9       Q.   Strott.  Did Hank Strott tell
10  you he was going to do something about
11  this information?
12      A.   Yes.  He said he would correct
13  it, have it corrected.
14      Q.   Did Mr. Strott ever tell you
15  that he did have it corrected?
16      A.   No.  But he said I should --
17  he said he had it pretty well under
18  control, he thought.
19      Q.   When were you having these
20  conversations with Mr. Strott?
21      A.   Probably end of February.
22      Q.   You had spoken with someone at
23  AIG before you received this letter; is

24 (Pages 93 to 96)

OLLIE GODWIN
NATIONAL UNION FIRE INSURANCE COMPANY

OLLIE GODWIN
July 10, 2006

Page 97

1  that correct?
2      A.   Yes.
3      Q.   Did you speak with anybody at
4  AIG after you received this letter?
5      A.   I don't remember. I called
6  them several times, you know, but don't
7  recall when I did.
8      Q.   Did you ever tell anybody at
9  AIG that this information in this letter
10  was incorrect?
11      A.   Yes, I told them it was
12  incorrect.
13      Q.   Who did you tell at AIG that
14  this information was incorrect?
15      A.   I don't know who. It was some
16  lady.
17      Q.   Did you ever receive any other
18  correspondence from AIG besides this
19  letter?
20      A.   No, not that I recall. If I
21  did, it should be in amongst these papers
22  somewhere.
23      Q.   After you spoke with

Page 98

1  Mr. Strott and he told you that he had it
2  pretty much under control, did you ever
3  speak to him again to notify him that it
4  had not been changed as far as you knew?
5      A.   No. I mean, he knew through
6  Jerry. I talked to Jerry Godwin, and
7  Jerry talked to him and all, you know.
8      Q.   How long were you out of work
9  as a result of the hernia?
10      A.   Probably about six weeks.
11      Q.   Do you have any pending
12  medical bills as a result of the surgery
13  or any expenses associated with your
14  hernia injury?
15      A.   No. I don't think I've
16  received anything lately on that.
17      Q.   Have you ever had a hernia
18  prior to this hernia that you received
19  from the muffler falling on you?
20      A.   No.
21      Q.   Have you had any hernias since
22  that one?
23      A.   No.

Page 99

1      Q.   Do you have any continuing
2  pain in your stomach from the muffler
3  falling on you?
4      A.   No.
5      Q.   After you went back to work
6  after your hernia injury, did you go back
7  to work in the same capacity as you had
8  before?
9      A.   You had to be easier climbing
10  in and out of the truck and all.
11      Q.   Is there anything that you
12  could do before your hernia injury that
13  you cannot do now?
14      A.   No.
15      Q.   Did you speak with anyone
16  besides Mr. Strott at Palomar regarding
17  your hernia claim?
18      A.   Yes. One girl named Suzanne,
19  I think.
20      Q.   Did you tell Suzanne anything
21  about AIG stating you were not loaded at
22  the time of the accident and you said you
23  were?

Page 100

1      A.   I don't recall.
2      Q.   So as far as you know,
3  Mr. Strott at Palomar is the only person
4  you had a conversation with regarding
5  this misinformation in the letter?
6      A.   Yes.
7      Q.   Besides Jerry Godwin or Cindy
8  Jordan, did you have any conversations
9  with anybody else at Godwin Material
10  about your hernia claim?
11      A.   No.
12      Q.   According to this sheet, it
13  says, "When did you become totally
14  disabled, unable to work?" And it says
15  "12/29/03." Did you work from 11/22 when
16  the accident occurred until 12/29/03?
17      A.   Yeah. Yeah.
18      Q.   The next line, it says, "When
19  were you able to again perform part of
20  your occupational duties?" And you say,
21  "There is no light duty in my job, having
22  to pay someone to keep truck up." Who
23  did you pay to keep your truck up?

25 (Pages 97 to 100)

OLLIE GODWIN
NATIONAL UNION FIRE INSURANCE COMPANY

OLLIE GODWIN
July 10, 2006

Page 101

1    A.   My youngest son.
2    Q.   Did you pay your youngest son
3  to help you fix the muffler that day?
4    A.   No. He just fixed it.
5    Q.   Had he helped you work on your
6  trucks in the past?
7    A.   Yes.
8    Q.   Had you paid him in the past
9  for his work on your trucks?
10   A.   Yes.
11   Q.   Why weren't you paying him the
12 day that he was helping you with the
13 muffler?
14   A.   Well, he was in the shop
15 messing with his car when it fell. Then
16 when I got hurt, they finished it up. It
17 wasn't but a 30-minute thing.
18   Q.   So you had paid your youngest
19 son in the past to help you work on your
20 trucks before you were injured?
21   A.   Yeah. I pay him now, too.
22   Q.   Are you alleging any pay that
23 you haven't paid your youngest son as a

Page 102

1  result of this injury as damages in this
2  lawsuit?
3    A.   No. I just, you know, just
4  pay him for working on whatever he does.
5  He goes to college. He doesn't work, a
6  regular job, so we do that.
7    Q.   You stated earlier that you
8  went to see Dr. Hood for your hernia
9  first; is that correct?
10   A.   Yes.
11   Q.   And then he referred you to
12 Dr. McGowin; is that correct?
13   A.   Well, I was seeing Dr. Hood.
14 They are in the same office. And
15 Dr. Hood looked at me and checked me.
16 And he said, well, let me get Norman. So
17 he walked out of the room, come back in
18 about five minutes with old Norman
19 McGowin. He checked me. He said, you
20 need it fixed. He said that's what made
21 my stomach and all hurt.
22   Q.   Besides Dr. Hood and
23 Dr. McGowin, did you see any other

Page 103

1  doctors as a result of your hernia?
2    A.   No.
3    Q.   I'm going to show you your
4  answer to interrogatory number three. If
5  you would like to read it, you can.
6    A.   Answer number three.
7  (Reviewing document.) I have no idea.
8        MS. RICHARDSON: You want him
9  to read the answer?
10       MS. CRUNK: Yes, the answer.
11       MS. RICHARDSON: The question
12 is: "Describe in detail the nature and
13 amount of damage alleged in the
14 complaint." And you say, "I should have
15 received disability payments of $500 a
16 week for six months under the insurance
17 policy while I was injured and
18 recovering. The policy should have paid
19 my surgery and treatment; therefore, I'm
20 asking for the amount of my medical
21 bills, injury, mileage to and from
22 treatment and other incidentals." And
23 you have listed out here your hernia

Page 104

1  injury and what AIG paid.
2    A.   Yeah, they paid that.
3        MS. RICHARDSON: And then the
4  balance that is owed and the incidentals,
5  and that totals $4,875.
6    Q.   (BY MS. CRUNK:) Okay. I want
7  to go over right now this November 2003
8  breakdown you have. Your hernia injury,
9  you say, cost $12,315.50. AIG paid 7,500
10 of that, leaving a balance owed of
11 $4,815.50. Did you pay the $4,815.50 of
12 the balance on your hernia?
13   A.   No. Blue Cross did.
14   Q.   Has Blue Cross come back and
15 asked for any of the money it paid
16 relating to your hernia claim?
17   A.   They sent some letters about
18 it, said they paid a claim they didn't
19 think was right. Then I talked to them
20 about it, and they dropped it.
21   Q.   Do you have those letters that
22 Blue Cross Blue Shield sent you?
23   A.   I don't know. I would have to

26 (Pages 101 to 104)

OLLIE GODWIN
NATIONAL UNION FIRE INSURANCE COMPANY

OLLIE GODWIN
July 10, 2006

Page 113

1 Ms. Gambino about this information being
2 incorrect in this letter?
3    A.  I don't remember if I did or
4 not.
5    Q.  So your dispute with your
6 hernia claim is that you should have been
7 paid $500 a week for disability payments;
8 is that correct?
9    A.  Yes.
10      MS. CRUNK: Let's take a
11 break.
12      (Recess.)
13    Q.  (BY MS. CRUNK:) I have a
14 couple more questions with regard to your
15 hernia claim. When the driver of the
16 truck called and told you that the pipe
17 had busted, did you tell him to bring the
18 truck into your shop? Is that correct?
19    A.  Yes.
20    Q.  Did the truck have to be towed
21 or could he drive it that far?
22    A.  No. He drove it in.
23    Q.  Okay. Did you notify anyone

Page 114

1 at Apek that the load was not going to be
2 delivered that evening?
3    A.  No.
4    Q.  Did you notify anyone at
5 Godwin that the load would not be
6 delivered?
7    A.  No.
8    Q.  Did you notify anybody at
9 Godwin that the pipe had burst on the
10 truck?
11    A.  No.
12    Q.  So the decision to fix the
13 muffler was your decision?
14    A.  Yes. Well, it was filling the
15 cab up with smoke. And the DOT will shut
16 you down for that. Then you will tow it
17 in or fix it beside the highway.
18    Q.  So the first time anyone at
19 Godwin knew that there was something
20 wrong with the truck is when you called
21 to report the muffler falling on you; is
22 that correct?
23    A.  That's correct.

Page 115

1    Q.  These sheets that you produced
2 to me today indicate that your last day
3 of work in 2003 was 12/22/03; is that
4 correct?
5    A.  That's correct.
6    Q.  And your first day of work
7 after your hernia was February 3rd, 2004;
8 is that correct?
9    A.  That's correct.
10    Q.  Okay. Let's move on from your
11 hernia injury to your hip injury. Tell
12 me what happened in October of 2004 when
13 you injured your hip and knee.
14    A.  Well, I was hauling to the
15 concrete company.
16    Q.  The same company that you were
17 hauling to in February of 2004?
18    A.  Yeah.
19      MS. RICHARDSON: Hang on just
20 a second.
21      (Off-the-record discussion.)
22      MS. RICHARDSON: Okay.
23    Q.  (BY MS. CRUNK:) So you were

Page 116

1 hauling to the concrete company?
2    A.  That's correct.
3    Q.  And then what happened?
4    A.  Well, I got out, opened the
5 tailgate of my truck, dumped my load of
6 sand out, pulled my truck forward. And I
7 started letting my bed down, so I stepped
8 out of the truck. And the front wheel
9 had went up on a mound, and I didn't know
10 it. I misjudged it. When I stepped out,
11 the bottom step was about two foot high
12 instead of about a foot high. And I
13 misjudged it, and I fell, which at the
14 time I thought I twisted my knee, you
15 know.
16    Q.  When that accident happened or
17 when you twisted your knee, did you get
18 back in the truck and drive for the rest
19 of the day?
20    A.  Yes. Well, I got up. You
21 know, I thought I would kick it off. I
22 was walking around kicking my knee, you
23 know, trying to get it to feel better.

29 (Pages 113 to 116)

Page 117

1 The load man, he seen me when I fell out.
2 He asked me, you know, was I all right.
3 I said, I think I just twisted my knee a
4 little bit. I got up, walked around,
5 thought I would walk it off.
6        And I got back in the truck
7 and went and hauled another load. And,
8 you know, I thought it was my knee. It
9 kept hurting, kept hurting. That went on
10 for -- I went to the doctor with it. He
11 gave me some medicine, x-rayed it and
12 all. And then it went on for another
13 week or so, and it wasn't getting any
14 better. So I went back to the doctor,
15 told him something had to be done.
16        So he got me an appointment
17 with Dr. Barrington. And
18 Dr. Barrington's assistant checked me,
19 twisted my leg, you know, the way they
20 check your knee and everything. He walks
21 out the door and meets Dr. Barrington.
22 The assistant tells Dr. Barrington, says,
23 it's not his knee; it's his hip. So

Page 118

1 Dr. Barrington said, I'll have to check
2 him.
3        He went on in there and he
4 checked me. When he popped my hip out,
5 you know, then when I left there, I had a
6 crutch, walking stick and all. And
7 that's the way it come out.
8    Q.   You said the load man saw you
9 trip or twist your knee?
10   A.   Yeah.
11   Q.   Who was that?
12   A.   Name was Robert. Do you have
13 his name and all? I turned it all in.
14   Q.   Is that the Robert --
15        MS. RICHARDSON:  It should be
16 on the interrogatories.
17   A.   That might be them that I
18 didn't know their last name.
19   Q.   Let's look at them again.
20   A.   Yeah. Robert and Steve,
21 that's them. They don't work for Godwin
22 Material, though.
23   Q.   Who do they work for?

Page 119

1    A.   I'm not sure about Robert, but
2 Steve works for I think it's USA, Ready
3 Mix. I think they bought out the
4 concrete company.
5    Q.   Okay.
6    A.   I do believe it's Sylacauga
7 where he works. Now, Robert, I don't
8 know where he works now.
9    Q.   At the time, was he working
10 for Godwin Material?
11   A.   No. They were working for the
12 concrete company, both of them.
13   Q.   Both of them were?
14   A.   Yeah. They worked for the --
15   Q.   So they both saw that, saw --
16   A.   Steve was in the office. When
17 I walked in there, he seen me limping.
18 He asked me what happened. I told him I
19 twisted my knee.
20   Q.   Did you go into the office to
21 tell someone what had happened?
22   A.   I went and signed my -- he
23 signed my ticket.

Page 120

1    Q.   That's why you went in there
2 was to get your ticket signed?
3    A.   Yeah.
4    Q.   Did you call anyone at Godwin
5 Material that day and let them know that
6 you had --
7    A.   No, not that day. Because I
8 figured I would walk it off. It figured
9 it was just a little old sprain, it would
10 be all right.
11   Q.   I'll let you look at these two
12 sheets.
13   A.   (Reviewing document.) All
14 these are right.
15   Q.   Okay.
16        MS. RICHARDSON:  Let's mark
17 these as exhibits.
18        MS. CRUNK:  Let's mark it as
19 an exhibit. Let's mark it as one
20 exhibit.
21        MS. RICHARDSON:  That's fine.
22 A and B.
23        (Whereupon, Defendant's

30 (Pages 117 to 120)

OLLIE GODWIN
NATIONAL UNION FIRE INSURANCE COMPANY

OLLIE GODWIN
July 10, 2006

Page 121

1       Exhibits 4A and 4B were marked
2 for identification.)
3    Q.   (BY MS. CRUNK:) Is this your
4 signature on both of these page?
5    A.   Yes.
6    Q.   Did you fill out these sheets?
7    A.   No. My wife did.
8    Q.   Your wife did. According to
9 this sheet, it was October 27th, 2004
10 when you twisted your leg?
11    A.   Uh-huh.
12    Q.   Does that sound right?
13    A.   Yes.
14    Q.   It also says at approximately
15 11:00 a.m.
16    A.   Yes.
17    Q.   So did you drive for the rest
18 of that day?
19    A.   Yes, I drove the rest of the
20 day. Well, I knocked off early because
21 it started hurting bad.
22    Q.   It says you first consulted a
23 physician on November 5th, 2004.

Page 122

1    A.   Uh-huh.
2    Q.   Does that sound right to you?
3    A.   Yes.
4    Q.   Did you work from October 27th
5 until November 5th?
6    A.   Seemed like that was -- the
7 27th, seemed like it was on a Thursday.
8 I tried working some Friday, and then we
9 didn't work Saturday or Sunday. Then I
10 got my appointment. You know, I tried
11 working, and it kept getting worse. So I
12 called and got me an appointment with
13 Dr. Adams. I mean, I would be coming
14 home early because riding up and down the
15 bypass here in Montgomery with all the
16 red lights, you couldn't clutch the
17 truck.
18    Q.   This one signed by you on
19 December 8th, 2004, is that when you
20 first went and notified anybody at Godwin
21 that you had twisted your knee?
22    A.   I'm not sure. I did -- I told
23 Cindy I twisted my knee. That's what I

Page 123

1 thought it was wrong with me.
2    Q.   Did you tell Cindy about your
3 knee before you went to the doctor?
4    A.   Yes.
5    Q.   Did Cindy give you this form
6 to fill out?
7    A.   I don't know. Looks like
8 something she faxed to the house, you
9 know.
10    Q.   Okay. So you go to -- you
11 said you went to the doctor, got some
12 medicine and an X-ray and went back to
13 the doctor because your knee was still
14 hurting. And then when you went back to
15 the doctor is when you found out that it
16 was a hip injury; is that correct?
17    A.   That's correct.
18    Q.   What did Dr. Barrington tell
19 you when he determined it was your hip,
20 not your knee?
21    A.   Said you have to have surgery.
22 They x-rayed it and all.
23    Q.   Was this your left hip?

Page 124

1    A.   Yes.
2    Q.   What kind of surgery did he
3 tell you you were going to have to have?
4    A.   The total hip replacement.
5    Q.   The first time you went to the
6 doctor for your knee, did you go see
7 Dr. Adams?
8    A.   Yes.
9    Q.   And then Dr. Adams referred
10 you to Dr. Barrington?
11    A.   Barrington.
12    Q.   Did Dr. Adams refer you to
13 Dr. Barrington that first time you went
14 to the doctor?
15    A.   No, when I went back. Because
16 he told me he had done all he could do
17 for me.
18    Q.   When did you have your surgery
19 on your hip?
20    A.   February the 10th, I believe
21 it was.
22    Q.   I'll show you this letter.
23    A.   (Reviewing document.)

31 (Pages 121 to 124)

Page 129

1  regarding a specific bill?
2      A.   Well, the bills, benefits
3  you're supposed to -- you know, $500 a
4  week payment and all that. See, I was
5  out of work a long time before I had the
6  surgery. I mean, you don't just -- you
7  know, you just cannot walk in there and
8  get a hip replacement, you know, like a
9  lot of surgeries and all.
10     Q.   How long were you out of work
11  for your hip injury?
12     A.   I was out from -- I would have
13  to look at that. After I went to
14  Dr. Barrington, I couldn't drive no more.
15     Q.   Did Dr. Barrington tell you
16  you couldn't drive anymore?
17     A.   No. He don't have to tell you
18  when your hip is gone. No, he don't have
19  to tell you you can't drive. So I went
20  home and got the surgery lined up. And
21  the quickest he could do it was in
22  February. When he did the surgery in
23  February, they brought me home on an

Page 130

1  ambulance. I had to stay in the house
2  for six weeks, couldn't walk out,
3  couldn't put no weight on the left leg.
4      Then I went back to him. He
5  told me not to do anything for six more
6  weeks, said I could walk outside a little
7  bit, you know. Then they said they
8  wanted to put a pin in my right side to
9  keep it from collapsing, experimenting
10  with it. So they did that, and it worked
11  for a while. I was out about six, seven
12  weeks with that. Then when it failed, I
13  went back and had the other one done.
14  They took the hardware out and put
15  another new hip in.
16     Q.   So your second hip replacement
17  surgery was for your right hip; is that
18  correct?
19     A.   Yeah. They way Dr. Barrington
20  told me, he said that me not knowing I
21  had that blood disease, he said, the
22  insurance should cover it. But, I mean,
23  that's -- you know, he told me that his

Page 131

1  self. But he said, your other one is
2  going to have to be fixed. Blue Cross
3  will take care of those. So I didn't
4  bother AIG filing on the pin. I didn't
5  bother them with filing on the other hip
6  either.
7      Q.   So you're not claiming any
8  damages regarding the pin put in your
9  right hip or your right hip replacement
10  under your occupational accident policy;
11  is that correct?
12     A.   I didn't file it on it. But
13  my left one, you know, AIG.
14     Q.   When you received this letter
15  that stated, "The disability claim forms
16  completed by Dr. Barrington on January
17  7th, 2005 indicated avascular necrosis of
18  both hips with collapse on the left side.
19  When we corresponded with
20  Dr. Barrington's office to clarify the
21  reason for your disability we were
22  provided office records that state
23  November 22nd, 2004, Mr. Godwin is here

Page 132

1  with complaint of pain in the left leg
2  and hip. He says that he had not had any
3  specific injury to the hip. When we
4  spoke with Dr. Barrington directly, he
5  stated that your condition was an
6  underlying condition that was aggravated
7  by work. He says you had this condition
8  but were not aware of it," did you call
9  Stephanie Pines after you received this
10  letter?
11     A.   Yes.
12     Q.   And what did you ask her?
13     A.   Asked her about all of it. We
14  talked. She said that it was under
15  review. I mean, that was her favorite
16  word anytime you asked her anything.
17     Q.   Did she say it was under
18  review both before and after this letter?
19     A.   Every time you ever talked to
20  her, it was under review.
21     Q.   Did you talk to Dr. Barrington
22  about this letter?
23     A.   That's who wrote them another

33 (Pages 129 to 132)

OLLIE GODWIN
NATIONAL UNION FIRE INSURANCE COMPANY

OLLIE GODWIN
July 10, 2006

Page 137

1    Q.    When did you have the pin put
2    in your right hip?
3    A.    June of last year, I think it
4    was.
5    Q.    June 2005?
6    A.    Yeah.
7    Q.    When did you have your second
8    hip replacement?
9    A.    Been so many of them.  I
10   really need my wife.  She can tell you
11   all the dates.
12        MS. RICHARDSON:  What year was
13   it, to start with?
14   A.    2005.
15   Q.    Okay.  After the pin, correct?
16   A.    Yeah.
17   Q.    So, the last half of June
18   2005?
19   A.    Yeah.
20   Q.    Just so I'm clear, are you
21   contending that AIG owes you any benefits
22   for the pin or the second hip
23   replacement?

Page 138

1        MS. RICHARDSON:  No.
2    A.    No.
3    Q.    Just the left hip --
4    A.    The left hip.
5    Q.    -- surgery?  Prescriptions,
6    you have a total of 97.46; medical
7    supplies, 144.55; and incidentals of --
8    is that $525?  Do you have any
9    documentation to support these figures
10   that you provided?
11   A.    Yeah.
12        MS. CRUNK:  I would like to
13   just make a request for those.
14        MS. RICHARDSON:  I've already
15   given it to you, I think.
16        MS. CRUNK:  Well, I'll check.
17        MS. RICHARDSON:  But I'll
18   check.
19   Q.    (BY MS. CRUNK:)  And the
20   disability payments not made are for 26
21   weeks and three days, and was that
22   figured at $500 a week also?
23   A.    Yes.

Page 139

1    Q.    Are there any other damages
2    that you are claiming, compensatory
3    damages that you are claiming for either
4    of these claims other than those outlined
5    on this sheet and your response to
6    interrogatory number three?
7        MS. RICHARDSON:  Would you
8    break that down for him, compensatory
9    damages?
10   Q.    Are there any out-of-pocket
11   damages that you're claiming, money that
12   you had to pay or that you're liable for
13   other than these as outlined in your
14   answer for interrogatory number three?
15   A.    Like the ambulance bills and
16   stuff like that?
17        MS. RICHARDSON:  Yes,
18   anything.
19   A.    I don't know.  I've got to
20   check all the records and everything.
21   But I know like the ambulance, I had to
22   pay that, and I had to pay the co-pays at
23   the hospital.

Page 140

1    Q.    The ambulance bill, did you
2    submit that to Blue Cross Blue Shield?
3    A.    Yeah.
4    Q.    And was the claim denied?
5    A.    Paid $20 on it.
6    Q.    Did you have to have an
7    ambulance to bring you home because you
8    had to lay flat?
9    A.    Yes.  The doctors requested
10   that.
11   Q.    Now, I just want to go through
12   these documents y'all gave me so I'll
13   understand what they are.  I just
14   received this zero check from Godwin
15   Material.
16   A.    Yes.
17   Q.    Can you tell me what this is?
18   A.    That's to show you that I did
19   not work during the time of that hernia.
20   Q.    What's this handwritten note,
21   "took out of March G 108"?
22   A.    Well, the money shows like on
23   the -- the secretary wrote that.  It's

35 (Pages 137 to 140)

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| OLLIE GODWIN, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| V. | ) CASE NO: 2:05-cv-00783-SRW |
| | ) |
| NATIONAL UNION FIRE INSURANCE | ) From Circuit Court of Crenshaw |
| Co. | |
| COMPANY OF PITTSBURGH, INC., | ) Case No: CV05-69 |
| ET AL., | ) |
| | ) |
| DEFENDANTS. | ) |
| | ) |

## AFFIDAVIT OF STEPHANIE PINE

STATE OF Delaware        )
COUNTY OF New Castle     )

My name is Stephanie Pine. I am over the age of nineteen years and have
personal knowledge of the facts set forth herein.

1.    I am the claims examiner for Mr. Ollie Godwin's (hereinafter "Mr. Godwin")
claims under Godwin Material Services, Inc.'s (hereinafter "Godwin
Material") Truckers Occupational Accident Policies with AIG Life Insurance
Company and National Union Fire Insurance Company of Pittsburgh, PA
(hereinafter "NUFIC"). Mr. Godwin became an Insured on Godwin
Material's policy in 1999. Godwin Material purchased its Occupational
Accident coverage at issue through Palomar Insurance Corporation
(hereinafter "Palomar"), an insurance broker.

2.    As of May 1, 2003, Godwin Material's group occupational accident insurance

was issued by AIG Life Insurance Company (hereinafter "AIG Life"). (AIG Life Policy, attached hereto as Exhibit N)

3.   On December 9, 2003, AIG Life received a call reporting a stomach injury to Mr. Godwin which occurred on November 22, 2003.

4.   AIG Life received a Policyholder Loss Information Report completed by Ms. Jordan on December 10, 2003, regarding Mr. Godwin's injury which was forwarded through Palomar to AIG Life. The Policyholder Loss Information Report noted Mr. Godwin was not under dispatch at the time of the accident, and he was scheduled to be at home. (Policyholder Loss Information Report, attached hereto as Exhibit A)

5.   Mr. Godwin signed on January 8, 2004, a Proof of Loss form received by AIG Life. (Claim Form, attached hereto as Exhibit B)

6.   AIG Life informed Mr. Godwin through a letter dated February 27, 2004, that, under the terms of the Policy and according to the information received by AIG Life, the accident was considered non-occupational because Mr. Godwin was "not under dispatch nor was [his] truck loaded at the time of the accident." Thus, the benefit maximum was $7500.00 and that amount was paid to L.V. Stabler Hospital. (AIG Life Letter, attached hereto as Exhibit C)

7.   On March 17, 2004, Mr. Jerry Godwin of Godwin Material sent a letter to Palomar mentioning Mr. Godwin had hit his stomach in October 2003 while under dispatch which was later received by AIG Life. (Godwin Material Letter, attached hereto as Exhibit D) Thereafter, Palomar sent additional claims forms to Mr. Godwin regarding this October incident.

8.  On February 23, 2005, Mr. Godwin submitted another claim form regarding his 2003 injury. (Claim Form, attached hereto as Exhibit E) Yet, this claim form again describes the November 2003 injury, but mentions nothing about an October 2003 injury. Additionally, the "No" box was again filled in after the question: "Have you ever had this, or a similar condition, in the past?" (Exhibit E)

9.  In May 2004, Godwin Material's occupational accident insurance was issued through NUFIC. (NUFIC Policy, attached hereto as Exhibit O)

10. On December 7, 2004, NUFIC received a phone call reporting the injury incurred by Mr. Godwin on October 27, 2004.

11. On January 6, 2005, and then again on January 10, 2005, NUFIC received from Palomar a Claim Form signed by Mr. Godwin on December 8, 2004, a Claim Form signed by Dr. Barrington on January 3, 2005, a Policyholder Loss Information Report signed by Ms. Cindy Jordan on December 8, 2004, and information regarding Mr. Godwin's earnings. (Faxes, attached hereto as Exhibit F and G)

12. On January 25, 2005, I sent a fax to Dr. Barrington requesting information regarding Mr. Godwin's claim for benefits. This fax requested the following information:

> Is the claimant's disability due to injuries he sustained on 10/27/2004? If no, please explain in detail.
> Is the claimant's disability due to a congenital and/or degenerative disease? If yes, please explain?
> Please submit medical records and office notes for the period 1/1/2004 to present.

(Barrington Fax, attached hereto as Exhibit H)

13. Dr. Barrington's office responded to my fax with notes and medical records indicating osteonecrosis of both femoral heads. (Pine Fax, attached hereto as Exhibit I)

14. I also spoke to Dr. Barrington on the phone about Mr. Godwin.

15. On February 19, 2005, I sent a letter to Mr. Godwin informing him he did not qualify for Temporary Total Disability and Accident Medical Expense benefits because, after corresponding with and talking to Dr. Barrington, his loss did not qualify as an occupational injury. (February 2005 NUFIC Letter, attached hereto as Exhibit J)

16. Dr. Barrington sent a letter to me on March 2, 2005, explaining he treated Mr. Godwin for avascular necrosis with collapse of the left hip. (Barrington Letter, attached hereto as Exhibit K)

17. After receiving Dr. Barrington's letter, I sent Mr. Godwin's claim to Dr. Lafleche for review. Dr. Lafleche informed me Mr. Godwin's hip problems did not result solely from the knee injury but also from the previously unknown condition of avsacular necrosis.

18. On May 3, 2005, I sent another letter to Mr. Godwin further explaining the reasons that Mr. Godwin's October 27, 2004 loss did not qualify for coverage. (May 2005 NUFIC Letter, attached hereto as Exhibit L)

19. On May 12, 2005, Ms. Arlene Richardson, counsel for Mr. Godwin, sent a letter to me demanding reconsideration of his claims of 2003 and 2004. (Richardson Letter, attached hereto as Exhibit M)

20. Although some payments were made by NUFIC with regard to his October

27, 2004 loss claim, these payments were made in error. NUFIC's position has always been and remains that the October 27, 2004 loss claim does not qualify for coverage.

21.  The documents attached hereto are business records either prepared or received in the usual course of business, and procedures are in place to maintain their accuracy.

Further affiant saith not.

*Stephanie Pine*
Stephanie Pine

STATE OF _Delaware_     )
COUNTY OF _New Castle_  )

BEFORE ME, the undersigned Notary Public in and for said County and State, personally appeared Stephanie Pine, whose name is signed to the foregoing Affidavit, and who is known to me and who, being by me first duly sworn, on oath deposes and says that she has personal knowledge of the statements contained in the foregoing Affidavit and that they are true and correct.

SWORN TO and subscribed before me on this the _6_ day of _October_, 2006.

*Karen a M Linton*
NOTARY PUBLIC

My Commission Expires: _Feb 6, 2008_

KAREN A. M. LINTON
Notary Public - Delaware
My Comm. Expires Feb. 6, 2008

137475



Page 5 of 5



**AMERICAN INTERNATIONAL COMPANIES®**
**ACCIDENT & HEALTH CLAIMS DIVISION**
**OCCUPATIONAL ACCIDENT UNIT**
P.O. Box 11129 • Montgomery, AL • 36111-0129
Phone: (800)452-7394 • (334) 409-3136
Fax: (334) 322-0525

## POLICYHOLDER LOSS INFORMATION REPORT

To: _Palomar Insurance Corporation_        Fax Number: _(334) 323-0525_

Policy Number: _8058434_        Policyholder/Participating Organization: _GODWIN_

Driver Name: _OLLIE GODWIN_        Driver Social Security No.: _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_

Driver's Company: _GODWIN MATERIALS_        Company Location: _BRANTLEY, AL_

Dispatcher Name: _____        Dispatcher Phone No.: _334-527-3840_

Unit No.: _G108_        Order No.: _____

Date of Injury: _11-22-03_        Time of Injury: _____        Member / Claim Tracking No.: _____

In addition to the information provided above, if the claimant is a Helper (i.e. Lumper, Casual Laborer, Co-Driver), please provide the following information:

Helper Name: _____        Helper Social Security No.: _____

Helper Address: _____

Helper Telephone Number: _____

Please answer the following questions about the listed claimant, and then fax or mail back to the fax number or address above.

1  Was the vehicle loaded at the time of the accident?        ☐ Yes  ☒ No
2  If unloaded, was the driver under dispatch to pick up a load?  ☐ Yes  ☒ No
3  What was the last day worked by this claimant? _____
4  Please indicate the claimant's earnings for the last three (3) months (please include an earnings statement).
   _29, 410. 53_
5  Where was the driver scheduled to be at the time of the accident? _home_
6  General Comments: _____

Verified by (print name): _Cindy Jordan_  Signature: _Cindy Jordan_
Date verified: _12-10-03_

Thank you for assisting us by providing the information requested herein  Please feel free to contact our office at (800) 452-7394, should you have any questions

Sent by: _Suzanne Adner_ _____        Date: _11-22-03_

American International Companies®
AIG Life Insurance Company

**PROOF OF LOSS**

A&H Claims Department
P. O. Box 15701
Wilmington, DE 19850-5701
800-551-0824/302-761-3700

| | |
|---|---|
| NAME OF GROUP: | . GOODWIN |
| POLICY NUMBER: | . 8056434 |
| CLAIMANT: | Ollie Godwin |

## OCCUPATIONAL ACCIDENT MEDICAL CLAIM FORM

**INSTRUCTIONS:**
1.) You must have SECTION A fully completed by a designated official of the Participating Organization.
2.) SECTION B is to be completed, signed and dated by the Claimant.
3.) If claimant is treated in the hospital, please attach an itemized hospital bill.
4.) If claimant is treated by a doctor, SECTION C is to be completed, signed and dated by the Attending Physician or attach an itemized bill.
5.) Attach itemized bills for all medical expenses being claimed including the claimant's name, condition being treated (diagnosis), description of services, date of service(s) and the charge made for each service.
6.) Mail completed form to the address indicated above.

The furnishing of this form, or its acceptance by the Company, must not be construed as an admission of any liability on the Company, nor a waiver of any of the conditions of the insurance contract

### SECTION A- PARTICIPATING ORGANIZATION STATEMENT

NAME / ADDRESS OF PARTICIPATING ORGANIZATION

| CLAIMANT'S FULL NAME | | SOCIAL SECURITY NUMBER | DATE OF BIRTH | NAME OF SUPERVISOR |
|---|---|---|---|---|

| DATE OF INJURY | WAS HE/SHE INJURED ON YOUR JOB? ☐ YES  ☐ NO |
|---|---|

DESCRIBE HOW, WHEN AND WHERE ACCIDENT OCCURRED

| DATE CLAIMANT WAS CONTRACTED. | EFFECTIVE DATE OF COVERAGE UNDER PLAN | DATE COVERAGE TERMINATED (IF APPLICABLE) |
|---|---|---|

| PARTICIPATING ORGANIZATION REPRESENTATIVE (PLEASE PRINT OR TYPE) | TITLE | DAYTIME TELEPHONE NUMBER ( ) |
|---|---|---|

| SIGNATURE OF PARTICIPATING ORGANIZATION REPRESENTATIVE | DATE |
|---|---|

### SECTION B- CLAIMANT'S STATEMENT

CLAIMANT'S FULL NAME (PLEASE PRINT)  Ollie Robert Godwin

SOCIAL SECURITY NUMBER  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

STREET ADDRESS  651 Chestnut Rd.    CITY  Honoraville    STATE  AL    ZIP  36042

DATE OF BIRTH  July 24, 1954    TELEPHONE  (334) 537-9506

GIVE FULL DESCRIPTION OF INJURY OR DISEASE FROM WHICH YOU ARE NOW SUFFERING. IF AN INJURY, TELL WHEN IT HAPPENED (DATE AND TIME), PLACE WHERE ACCIDENT OCCURRED, WHAT YOU WERE DOING AND HOW IT HAPPENED   At Icum person working on truck Changing the muffler on Mon. Dec. Burned 11:00am. slipped hit me in Knee Shoulder 4

HAVE YOU EVER HAD THIS, OR A SIMILAR CONDITION, IN THE PAST?  ☐ YES  ☒ NO.

IF YES, STATE THE NATURE OF THE CONDITION, DATES OF TREATMENT AND NAMES AND ADDRESSES OF TREATING DOCTORS, HOSPITALS AND CLINICS.

WHEN DID YOU FIRST CONSULT A PHYSICIAN FOR THIS CONDITION?   12-4-03

HOSPITALS (GIVE COMPLETE NAMES, ADDRESSES AND DATES OF CONFINEMENT)  L V Stabler Memorial Hospital
Dec. 29 & 30 2003    Greenville Al. 36037

GIVE NAMES, ADDRESSES AND TELEPHONE NUMBERS OF ALL ATTENDING PHYSICIANS
Dr. Hood    Same address
Dr. McGowin II    same ave as below

GIVE NAME, ADDRESS AND TELEPHONE NUMBER OF USUAL FAMILY PHYSICIAN    Phone (334)382-6364
Dr. Tommy Hood - 75 Medical Arts Ct. Suite 4 Post Office Box 378 Greenville, Al. 36037

WHAT OTHER ACCIDENT, SICKNESS OR DISABILITY INSURANCE DO YOU CARRY AND WHAT OTHER ORGANIZATIONS OR COMPANIES HAVE PAID YOU BENEFITS FOR SICKNESS OR INJURY?
None

I HEREBY CERTIFY THAT THE ABOVE INFORMATION IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF.

**AUTHORIZATION**

I, the undersigned authorize any hospital or other medical-care institutes, physician or other medical professional, pharmacy, insurance support organization, governmental agency, group policyholder, insurance company, association, employer or benefit plan administrator to furnish to the Insurance Company named above or its representatives, any and all information with respect to any injury or sickness suffered by the, medical history of, or any consultation, prescription or treatment provided to, the person whose death, injury, sickness or loss is the basis of claim and copies of all of that person's hospital or medical records, including information relating to mental illness and use of drugs and alcohol, to determine eligibility for benefit payments under the Policy Number identified above. I authorize the group policyholder, employer or benefit plan administrator to provide the Insurance Company named above with financial and employment-related information. I understand that this authorization is valid for the term of coverage of the Policy identified above and that a copy of this authorization shall be considered as valid as the original. I understand that I or my authorized representative may request a copy of this authorization.

For your protection, California law requires the following to appear on this form:
Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

SIGN YOUR FULL NAME    Ollie Robert Godwin

DATED:    1-8-04

## SECTION C- CLAIMANT'S STATEMENT FOR DISABILITY

CLAIMANT'S FULL NAME (PLEASE PRINT)
Chlie Robert Godwin

SOCIAL SECURITY NUMBER
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

Street Address
651 Otis Faulk Dr.

City
Honoraville

State
Al

Zip
36042

Date Of Birth
1-24-54

Height And Weight
5'11" 241 lbs

Marital Status
Married

Telephone
(334) 537-9506

Occupation
Truck Driver

Duties
Drive 18 wg truck, unload set hed shavel etc Farm

Monthly Earnings
My truck $3,500

Weekly Earnings
mine $300 - Au 9,000

| | | |
|---|---|---|
| (1) | Give Full Description Of Injury Or Disease From Which You Are Now Suffering. If An Injury, Tell When It Happened (Date And Time), Place Where Accident Occurred, What You Were Doing And How It Happened. | On Dec. 22, 2003 about 11:00 A.M. At Home in shop working on my truck, changing a muffler, I was taking it off, standing on floor, dropped, fell hit me in lower stomach. |
| (2A) | Have You Ever Had This, Or A Similar Condition, In The Past? | ☐ Yes ☒ No |
| (B) | If yes, state the nature of the condition, dates of treatment and names and addresses of treating doctors, hospitals and clinics. | |
| (3A) | Give exact date when illness began, or injury occurred. | (A) Date: 11-22-03 |
| (B) | When did you first consult a physician for this condition? | (B) Date: 12-4-03 |
| (C) | When did you become totally disabled (unable to work)? | (C) Date: 12-22-03 |
| (D) | When were you able to again perform part of your occupational duties? | (D) Date: There is no light duty to my Job, someone to help me pickup truck. |
| (E) | When were you able to again perform all of your occupational duties? | (E) Date: 1-31-04 |
| (F) | If still totally disabled, when do you expect your disability to end? | (F) Date: |
| (4) | Hospitals (Give complete names, addresses and dates of confinement.) | Dec. 29 + 30th 2003 - L.V. Stabler Memorial Hospital Greenville, Alabama 36037 |
| (5A) | Give names, addresses and telephone numbers of all attending physicians. | Phone (334)382-6864 45 Medical Arts Ct. Ste 4 Post Office Box 298 Norman C. McGowin III M.D. F.A.C.S Greenville, Al 36037 |
| (B) | Give name, address and telephone number of usual family physician. | Phone (334)382-6864 45 Medical Arts Ct, Suite 4 Dr. Lenny Hurd - Post Office Box 298 Greenville, Al. 36037 |
| (6) | What other accident, sickness or disability insurance do you carry and what other organizations or companies have paid you benefits for sickness or injury? | None |
| (7) | What other medical or surgical treatment has been received during the past 5 years? (Give dates, nature of illness or injury and names and addresses of all treating doctors, hospitals and clinics.) | None |
| (8) | Names, addresses and telephone numbers of employers and length of employment with each? | Phone No. (334) 1-800-348-853 P.O. Box 1216 years Godwin Material Service, Inc. Brantley, Al. 36009 |

### I HEREBY CERTIFY THAT THE ABOVE INFORMATION IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF.

#### AUTHORIZATION

I, the undersigned authorize any hospital or other medical-care institution, physician or other medical professional, pharmacy, insurance support organization, governmental agency, group policyholder, insurance company, association, employer or benefit plan administrator to furnish to the Insurance Company named above or its representatives, any and all information with respect to any injury or sickness suffered by, the medical history of, or any consultation, prescription or treatment provided to, the person whose death, injury, sickness or loss is the basis of claim and copies of all of that person's hospital or medical records, including information relating to mental illness and use of drugs and alcohol, to determine eligibility for benefit payments under the Policy Number identified above. I authorize the group policyholder, employer or benefit plan administrator to provide the Insurance Company named above with financial and employment-related information. I understand that this authorization is valid for the term of coverage of the Policy identified above and that a copy of this authorization shall be considered as valid as the original. I understand that I or my authorized representative may request a copy of this authorization.

For claimants not residing in California, New York, or Pennsylvania: Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

SIGN YOUR FULL NAME
Chle Robert Godwin

DATED:
1-8-04



**AIG Claim Services, Inc.®**
A&H Claims Department
P. O. Box 15701
Wilmington, DE 19850-5701
800.551.0824

On behalf of:
*AIG Life Insurance
Company*

February 27, 2004

Ollie Godwin
656 Ottis Faulk Drive
Honoraville, AL  36042

RE: Ollie Godwin
Member #: R04080009
Policy #: 8056434
Claim #: I061424
DOI: 11/22/03

Dear Mr. Godwin:

We are in receipt of you claim for the above captioned injury and have reviewed same. According to the information we received, you were not under dispatch nor was your truck loaded at the time of the accident. Under the terms of your policy through Godwin Materials this is then considered a non occupational accident. The maximum amount payable under this portion of the policy is $7500.00 in medical expenses and there are no disability benefits.

We have issued a check in the amount of $7500.00 to LV Stabler Hospital for services of 12/29/03 to 12/30/03.

We are glad to communicate with you and to receive any further information that you may provide to aid us in determining your claim. Of course, we must respectfully request that you understand that we reserve all of our rights and defenses under the policy and the law, and none of our communications may be construed so as to waive any of those rights. We appreciate your cooperation.

Sincerely,

Patricia M. Gambino
Claims Examiner
Cc: Palomar

A Member Company of
American Interntaional Group, Inc.

*Godwin Material Service, Inc.*
*P.O. Box 12*
*Brantley, Alabama 36009*
*334-527-3540*

March 17, 2004

Marion Parker
Palomar Insurance Corporation
Benefits Department
P.O. Box 11128
Montgomery, Alabama 36111-0128

RE:    Patient Name: Ollie Godwin
       Patient Account No: A41000/A3CO000P
       Insured ID No: R040480009
       Claim No: I06142402
       Claim Office: 024
       Examiner Code: PGA
       Loss Date: 11/22/2003

Dear Marion:

This letter is confirming Ollie Godwin was tarping a load in late October of 2003 and Ollie slipped off tarp rack and hit his stomach. Ollie reported this verbally to Cindy Jordan, Godwin Material's Safety Director. Ollie remained in pain, but did not seek medical attention.

On November 22, 2003, Ollie was working on his truck and the muffler fell on Ollie's stomach in the same area as the October accident. Ollie received medical attention. This claim was reported to AIG.

AIG has agreed to pay as a non-occupational claim. This decision was based on their opinion that he was not under dispatch.

However, based on the first fact he was maintaining the truck at the direction of Godwin for DOT purposes. This was required before he could proceed again with a load. The second fact is the November accident was reoccurring from the October accident, where Ollie was clearly under dispatch. Therefore, based on these facts, we feel the claim should be paid as an occupational claim.

I will be glad to confirm these facts in any other manner AIG may deem necessary. Thank you in advance for your reconsideration of this matter.

Sincerely,

Cc: Ollie Godwin, 556 Ottis Faulk Drive, Honoraville, AL 36042

**American International Companies®**
AIG Life Insurance Company

A&H Claims Department
P. O. Box 15701
Wilmington, DE 19850-5701
800-551-0824/302-761-3700

**PROOF OF LOSS**

| NAME OF GROUP: | . GODWIN MATERIALS |
| POLICY NUMBER: | . 8056434 |
| CLAIMANT: | Ollie Godwin |

## OCCUPATIONAL ACCIDENT MEDICAL CLAIM FORM

**INSTRUCTIONS:**
1.) You must have SECTION A fully completed by a designated official of the Participating Organization.
2.) SECTION B is to be completed, signed and dated by the Claimant.
3.) If claimant is treated in the hospital, please attach an itemized hospital bill.
4.) If claimant is treated by a doctor, SECTION D is to be completed, signed and dated by the Attending Physician or attach an itemized bill.
5.) Attach itemized bills for all medical expenses being claimed including the claimant's name, condition being treated (diagnosis), description of services, date of service(s) and the charge made for each service.
6.) Mail completed Form to the address indicated above.

The furnishing of this form, or its acceptance by the Company, must not be construed as an admission of any liability on the Company, nor a waiver of any of the conditions of the insurance contract.

### SECTION A- PARTICIPATING ORGANIZATION STATEMENT

NAME / ADDRESS OF PARTICIPATING ORGANIZATION
Ollie Robert Godwin Godwin SD

CLAIMANT'S FULL NAME
Nov. 22 2003

SOCIAL SECURITY NUMBER    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
DATE OF BIRTH    1-24-54
NAME OF SUPERVISOR    @ Jerry Godwin

DATE OF INJURY: Came home to fix muffler on truck
muffler fixit in poor strench

WAS HE/SHE INJURED ON YOUR JOB?    ☑ YES    ☐ NO

DESCRIBE HOW, WHEN AND WHERE ACCIDENT OCCURRED

| DATE CLAIMANT WAS CONTRACTED: | EFFECTIVE DATE OF COVERAGE UNDER PLAN: | DATE COVERAGE TERMINATED (IF APPLICABLE) |

PARTICIPATING ORGANIZATION REPRESENTATIVE (PLEASE PRINT OR TYPE)    TITLE    DAYTIME TELEPHONE NUMBER ( )

SIGNATURE OF PARTICIPATING ORGANIZATION REPRESENTATIVE    DATE

### SECTION B- CLAIMANT'S STATEMENT

CLAIMANT'S FULL NAME (PLEASE PRINT)
Ollie R Godwin

SOCIAL SECURITY NUMBER    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

STREET ADDRESS
656 Otis Faulk Dr.

CITY    Honoraville
STATE    AL.    ZIP    36042

DATE OF BIRTH
1-24-54

TELEPHONE ( )

GIVE FULL DESCRIPTION OF INJURY OR DISEASE FROM WHICH YOU ARE NOW SUFFERING. IF AN INJURY, TELL WHEN IT HAPPENED (DATE AND TIME), PLACE WHERE ACCIDENT OCCURRED, WHAT YOU WERE DOING AND HOW IT HAPPENED. Came home to fix muffler. around
Working on truck muffler hit me in the chest stomach on Nov. 22. 2003. 11:00 am
lower

HAVE YOU EVER HAD THIS, OR A SIMILAR CONDITION, IN THE PAST?    ☐ YES    ☑ NO.

IF YES, STATE THE NATURE OF THE CONDITION, DATES OF TREATMENT AND NAMES AND ADDRESSES OF TREATING DOCTORS, HOSPITALS AND CLINICS.

WHEN DID YOU FIRST CONSULT A PHYSICIAN FOR THIS CONDITION?

HOSPITALS (GIVE COMPLETE NAMES, ADDRESSES AND DATES OF CONFINEMENT.)

GIVE NAMES, ADDRESSES AND TELEPHONE NUMBERS OF ALL ATTENDING PHYSICIANS.

GIVE NAME, ADDRESS AND TELEPHONE NUMBER OF USUAL FAMILY PHYSICIAN.

WHAT OTHER ACCIDENT, SICKNESS OR DISABILITY INSURANCE DO YOU CARRY AND WHAT OTHER ORGANIZATIONS OR COMPANIES HAVE PAID YOU BENEFITS FOR SICKNESS OR INJURY?

I HEREBY CERTIFY THAT THE ABOVE INFORMATION IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF.

**AUTHORIZATION**
I, the undersigned authorize any hospital or other medical-care institution, physician or other medical professional, pharmacy, insurance support organization, governmental agency, group policyholder, insurance company, association, employer or benefit plan administrator to furnish to the Insurance Company named above or its representatives, any and all information with respect to any injury or sickness suffered by, the medical history of, or any consultation, prescription or treatment provided to, the person whose death, injury, sickness or loss is the basis of claim and copies of all of that person's hospital or medical records, including information relating to mental illness and use of drugs and alcohol, to determine eligibility for benefit payments under the Policy Number identified above. I authorize the group policyholder, employer or benefit plan administrator to provide the Insurance Company named above with financial and employment-related information. I understand that this authorization is valid for the term of coverage of the Policy identified above and that a copy of this authorization shall be considered as valid as the original. I understand that I or my authorized representative may request a copy of this authorization.

For your protection, California law requires the following to appear on this form:
Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

SIGN YOUR FULL NAME
Ollie R Godwin Sr

DATED:
2-23-05

## SECTION C- CLAIMANT'S STATEMENT FOR DISABILITY

CLAIMANT'S FULL NAME (PLEASE PRINT)
Ollie R Godwin

SOCIAL SECURITY NUMBER
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

Street Address
656 Otis Faulk Dr.

City
Honoraville

State
Al.

Zip
36042

Date Of Birth
1-24-54

Height And Weight
5'11" 210

Marital Status
Married

Telephone
(334) 537-9506

Occupation
Drive Truck and

Duties
Truck Driver book on trucks Nights

Monthly Earnings
all three - 16,000 to 22,000
my truck. From 6,000 to 11,000
according on work

Weekly Earnings

(1) Give Full Description Of Injury Or Disease From Which You Are Now Suffering. If An Injury, Tell When It Happened (Date And Time), Place Where Accident Occurred, What You Were Doing And How It Happened.

came home to fix truck, muffler hit me in lower stomach.

(2A) Have You Ever Had This, Or A Similar Condition, In The Past?    ☐ Yes   ☒ No

(B) If yes, state the nature of the condition, dates of treatment and names and addresses of treating doctors, hospitals and clinics.

(3A) Give exact date when illness began, or injury occurred.   (A) Date: NOV. 22. 2003

(B) When did you first consult a physician for this condition?   (B) Date: 12-4-03

(C) When did you become totally disabled (unable to work)?   (C) Date: 12-29-03

(D) When were you able to again perform part of your occupational duties?   (D) Date: Feb 2, 2004

(E) When were you able to again perform all of your occupational duties?   (E) Date: Feb 2, 2004

(F) If still totally disabled, when do you expect your disability to end?   (F) Date:

(4) Hospitals (Give complete names, addresses and dates of confinement.)
Greenville Hospital Corp. Highway 10 west. Greenville, Al. Dec 29, 30, Got out on 31  2003

(5A) Give names, addresses and telephone numbers of all attending physicians.
Norman F McGowin III. Greenville Ala. 382-6964

(B) Give name, address and telephone number of usual family physician.
Danny Hood, Greenville Al. 383-6864

(6) What other accident, sickness or disability insurance do you carry and what other organizations or companies have paid you benefits for sickness or injury?
Blue Cross Blue Shield

(7) What other medical or surgical treatment has been received during the past 5 years? (Give dates, nature of illness or injury and names and addresses of all treating doctors, hospitals and clinics.)
Had a wreck. Broke hand - had surgery. 1998

(8) Names, addresses and telephone numbers of employers and length of employment with each?
Been with Godwin Materials for 20 years before that Capital Victorian - 11 years (went out of Busn)

### I HEREBY CERTIFY THAT THE ABOVE INFORMATION IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF.

### AUTHORIZATION

I, the undersigned authorize any hospital or other medical-care institution, physician or other medical professional, pharmacy, insurance support organization, governmental agency, group policyholder, insurance company, association, employer or benefit plan administrator to furnish to the Insurance Company named above or its representatives, any and all information with respect to any injury or sickness suffered by, the medical history of, or any consultation, prescription or treatment provided to, the person whose death, injury, sickness or loss is the basis of claim and copies of all of that person's hospital or medical records, including information relating to mental illness and use of drugs and alcohol, to determine eligibility for benefit payments under the Policy Number identified above. I authorize the group policyholder, employer or benefit plan administrator to provide the Insurance Company named above with financial and employment-related information. I understand that this authorization is valid for the term of coverage of the Policy identified above and that a copy of this authorization shall be considered as valid as the original. I understand that I or my authorized representative may request a copy of this authorization.

For claimants not residing in California, New York, or Pennsylvania: Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

SIGN YOUR FULL NAME
Ollie Roberts Godwin Sr

DATED:
2-23-05

American International Companies®
AIG Life Insurance Company

A&H Claims Department
P. O. Box 15701
Wilmington, DE 19850-5701
800-551-0824/302-761-3700

**PROOF OF LOSS**

| NAME OF GROUP: | . GOODWIN |
| POLICY NUMBER: | . 8056434 |
| CLAIMANT: | . Ollie Godwin |

## OCCUPATIONAL ACCIDENT DISABILITY CLAIM FORM

**INSTRUCTIONS:**
1.) You must have SECTION A fully completed by a designated official of the Participating Organization.
2.) SECTION B is to be completed, signed and dated by the Attending Physician.
3.) SECTION C is to be completed, signed and dated by Claimant.
4.) Mail completed form to the address indicated above.

The furnishing of this form, or its acceptance by the Company, must not be construed as an admission of any liability on the Company, nor a waiver of any of the conditions of the insurance contract.

### SECTION A- PARTICIPATING ORGANIZATION STATEMENT FOR DISABILITY

NAME / ADDRESS OF PARTICIPATING ORGANIZATION

| CLAIMANT'S FULL NAME | SOCIAL SECURITY NUMBER | DATE OF BIRTH | NAME OF SUPERVISOR |
| Ollie Q Godwin | 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 | 1-24-54 | Jerry Godwin |
| DATE OF INJURY | WAS HE/SHE INJURED ON YOUR JOB? | | DESCRIBE HOW, WHEN AND WHERE ACCIDENT OCCURRED |
| Nov. 22, 2003 | ☒ YES   ☐ NO | | Came home to fix truck. Muffler hit me in the lower stomach. |
| DATE CLAIMANT WAS CONTACTED | EFFECTIVE DATE OF COVERAGE UNDER PLAN | DATE LAST WORKED | TIME LAST WORKED |
| date the policy begins | been working for Godwin 12-23-03 | to do pre op | |
| DATE LOSS TIME STARTED | WEEKLY EARNINGS (PLEASE INCLUDE PAYROLL RECORDS FOR THE 3 MONTH PERIOD PRECEDING LOSS DATE) | | |
| Jan 5 2004 | Supose received $500 a week | | |
| WILL CLAIMANT BE REACTIVATED? | | DATE RETURNED TO WORK |
| ☐ YES   ☐ NO | | Feb 2nd 2004 |

| PARTICIPATING ORGANIZATION REPRESENTATIVE (PLEASE PRINT OR TYPE) | TITLE | DAYTIME TELEPHONE NUMBER ( ) |
| SIGNATURE OF PARTICIPATING ORGANIZATION REPRESENTATIVE | | DATE |

### SECTION B- ATTENDING PHYSICIAN'S STATEMENT FOR DISABILITY

PATIENT NAME AND ADDRESS:

WHEN DID SYMPTOMS FIRST APPEAR OR ACCIDENT HAPPEN?     DATE: _____

IF ACCIDENT DESCRIBE, HOW, WHEN AND WHERE ACCIDENT OCCURRED. _____

DIAGNOSIS AND CONCURRENT CONDITIONS (IF FRACTURE OR DISLOCATION, DESCRIBE NATURE AND LOCATION): _____

IS CONDITION DUE TO AN INJURY OR SICKNESS ARISING OUT OF PATIENT'S EMPLOYMENT?     ☐ YES     ☐ NO

IF "YES," EXPLAIN.

WHEN DID PATIENT FIRST CONSULT YOU FOR THIS CONDITION?     DATE: _____

HAS PATIENT EVER HAD THE SAME OR SIMILAR CONDITION?     ☐ YES     ☐ NO

IF "YES," STATE WHEN AND DESCRIBE:

NATURE AND DATE OF SURGICAL PROCEDURE, IF ANY (DESCRIBE FULLY)     _____     DATE: _____

PROVIDE DATES OF OTHER MEDICAL TREATMENT AND DESCRIBE: _____

WHAT OTHER SERVICES, IF ANY, DID YOU PROVIDE OR PRESCRIBE PATIENT? (PROVIDE DATES.) _____

IS PATIENT STILL UNDER YOUR CARE FOR THIS CONDITION?     ☐ YES     ☐ NO

IF "NO," GIVE DATE YOUR SERVICES TERMINATED.     DATE: _____     ( DATES REQUIRED)

HOW LONG WAS OR WILL PATIENT BE CONTINUOUSLY TOTALLY DISABLED (UNABLE TO WORK)? * FROM: _____ * TO: _____

HOW LONG WAS OR WILL PATIENT BE PARTIALLY DISABLED?     FROM: _____     TO: _____

IF PERMANENT PARTIAL DISABILITY, INDICATE PERCENTAGE OF IMPAIRMENT:

TO YOUR KNOWLEDGE, DOES PATIENT HAVE OTHER HEALTH INSURANCE OR HEALTH PLAN COVERAGE?     ☐ YES     ☐ NO

IF "YES" IDENTIFY.

| DATE | SIGNATURE (ATTENDING PHYSICIAN) | DEGREE | TELEPHONE ( ) |
| STREET ADDRESS | CITY OR TOWN | STATE OR PROVINCE | ZIP CODE |



**PALOMAR INSURANCE CORPORATION**
INSURANCE BROKERAGE & RISK MANAGEMENT CONSULTING

**January 06, 2005**

**Insurance Company:**                    **Agency:**

AIG Insurance Corporation, Inc.           Palomar Insurance Corporation
P.O. Box 15701                            P.O. Drawer 11128
Wilmington, DE 19850-5701                 Montgomery, AL 36111-0128  :

**Insured:**

Godwin Material Services
P.O. Box 12
Brantley, AL, 36009

Policy Number: 9056434
Policy Desc: Occupational Accident

Attached is a claim ~~form pertaining to the following:~~

Claimant: ~~illegible~~
SSN: 422-76-~~illegible~~
DOI: 10-27-04

Please process accordingly. If you have any questions or need further information, please do not hesitate to call me at 1-800-482-7394. Thank you for your assistance.

Sincerely,

PALOMAR INSURANCE SPECIAL RISK DEPARTMENT
Suzanne Adger
Claims Coordinator

P.O. BOX 11128 • MONTGOMERY, ALABAMA 36111-0128 • 4525 EXECUTIVE PARK DRIVE • MONTGOMERY, ALABAMA 36116-1600

MAIN TEL: 334-270-0105 • BENEFITS FAX: 270-0340 • COMMERCIAL FAX: 270-8159 • PERSONAL FAX: 271-0499 • TRANSPORTATION FAX: 279-8067 • SPCL RISK FAX: 323-1319

AIG Life Insurance Company

**American International Companies**

A&H Claims Department
P. O. Box 15701
Wilmington, DE 19850-5701
800-551-0824/302-761-3700

RECEIVED
DEC 09 2004

| | |
|---|---|
| **NAME OF GROUP:** | . Godwin Materials |
| **POLICY NUMBER:** | . 9056434 |
| **CLAIMANT:** | . Ollie Godwin |

## OCCUPATIONAL ACCIDENT MEDICAL CLAIM FORM

**INSTRUCTIONS:**
1.) You must have SECTION A fully completed by a designated official of the Participating Organization.
2.) SECTION B is to be completed, signed and dated by the Claimant.
3.) If claimant is treated in the hospital, please attach an itemized hospital bill.
4.) If claimant is treated by a doctor, SECTION C is to be completed, signed and dated by the Attending Physician or attach an itemized bill.
5.) Attach itemized bills for all medical expenses being claimed including the claimant's name, condition being treated (diagnosis), description of services, date of service(s) and the charge made for each service.
6.) Mail completed form to the address indicated above.

The furnishing of this form, or its acceptance by the Company, must not be construed as an admission of any liability on the Company, nor a waiver of any of the conditions of the insurance contract.

### SECTION A- PARTICIPATING ORGANIZATION STATEMENT

NAME / ADDRESS OF PARTICIPATING ORGANIZATION

| CLAIMANT'S FULL NAME | SOCIAL SECURITY NUMBER | DATE OF BIRTH | NAME OF SUPERVISOR |
|---|---|---|---|
| | | | |

| DATE OF INJURY: | WAS HE/SHE INJURED ON YOUR JOB? ☐ YES  ☐ NO |
|---|---|

DESCRIBE HOW, WHEN AND WHERE ACCIDENT OCCURRED

| DATE CLAIMANT WAS CONTRACTED: | EFFECTIVE DATE OF COVERAGE UNDER PLAN: | DATE COVERAGE TERMINATED (IF APPLICABLE) |
|---|---|---|

| PARTICIPATING ORGANIZATION REPRESENTATIVE (PLEASE PRINT OR TYPE) | TITLE | DAYTIME TELEPHONE NUMBER ( ) |
|---|---|---|

| SIGNATURE OF PARTICIPATING ORGANIZATION REPRESENTATIVE | DATE |
|---|---|

### SECTION B- CLAIMANT'S STATEMENT ✗

| CLAIMANT'S FULL NAME (PLEASE PRINT) | SOCIAL SECURITY NUMBER |
|---|---|
| Ollie Robert Godwin, Sr. | 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 |

| STREET ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|
| 656 Otis Faulk Drive | Honoraville | AL | 36042 |

| DATE OF BIRTH | TELEPHONE |
|---|---|
| 01-24-54 | (334)537-9506 |

GIVE FULL DESCRIPTION OF INJURY OR DISEASE FROM WHICH YOU ARE NOW SUFFERING. IF AN INJURY, TELL WHEN IT HAPPENED (DATE AND TIME), PLACE WHERE ACCIDENT OCCURRED, WHAT YOU WERE DOING AND HOW IT HAPPENED.

October 27, 2004; 11:00a.m; Lafarge & Hyundai Blvd. Getting out of truck to open tailgate and fell off step and hurt leg, knee, + hip?

HAVE YOU EVER HAD THIS, OR A SIMILAR CONDITION, IN THE PAST? ☐ YES ☒ NO.
IF YES, STATE THE NATURE OF THE CONDITION, DATES OF TREATMENT AND NAMES AND ADDRESSES OF TREATING DOCTORS, HOSPITALS AND CLINICS.

WHEN DID YOU FIRST CONSULT A PHYSICIAN FOR THIS CONDITION?
November 5, 2004

HOSPITALS (GIVE COMPLETE NAMES, ADDRESSES AND DATES OF CONFINEMENT.)

GIVE NAMES, ADDRESSES AND TELEPHONE NUMBERS OF ALL ATTENDING PHYSICIANS.

Dr. Adams - Referred to Dr. Barrington on Nov. 22, 2004

GIVE NAME, ADDRESS AND TELEPHONE NUMBER OR USUAL FAMILY PHYSICIAN.

Dr. Adams 1323 Mulberry St. Montgomery, AL (334) 264-3434

WHAT OTHER ACCIDENT, SICKNESS OR DISABILITY INSURANCE DO YOU CARRY AND WHAT OTHER ORGANIZATIONS OR COMPANIES HAVE PAID YOU BENEFITS FOR SICKNESS OR INJURY?

4B Blue & Cross Blue Shield Hospital Ins.

I HEREBY CERTIFY THAT THIS ABOVE INFORMATION IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF.

**AUTHORIZATION**

I, the undersigned authorize any hospital or other medical-care institution, physician or other medical professional, pharmacy, insurance support organization, governmental agency, group policyholder, insurance company, association, employer or benefit plan administrator to furnish to the Insurance Company named above or its representatives, any and all information with respect to any injury or sickness suffered by, the medical history of, or any consultation, prescription or treatment provided to, the person whose death, injury, sickness or loss is the basis of claim and copies of all of that person's hospital or medical records, including information relating to mental illness and use of drugs and alcohol, to determine eligibility for benefit payments under the Policy Number identified above. I authorize the group policyholder, employer or benefit plan administrator to provide the Insurance Company named above with financial and employment-related information. I understand that this authorization is valid for the term of coverage of the Policy identified above and that a copy of this authorization shall be considered as valid as the original. I understand that I or my authorized representative may request a copy of this authorization.

For your protection, California law requires the following to appear on this form:

Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

| SIGN YOUR FULL NAME | DATED: |
|---|---|
| Ollie R. Godwin | 12-8-04 |

## SECTION C- CLAIMANT'S STATEMENT FOR DISABILITY

CLAIMANT'S FULL NAME (PLEASE PRINT): **Ollie Robert Godwin, Sr**

SOCIAL SECURITY NUMBER: **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**

Street Address: **1056 Otis Faulk Dr**   City: **Honoraville**   State: **AL**   Zip: **36042**

Date of Birth: **01-24-54**   Height And Weight: **5'11" 215**   Marital Status: **Married**   Telephone: **334 537-9506**

Occupation: **Truck driver**   Duties: **Driving truck; working on TRUCKS**   Monthly Earnings: **$5000 - $12,000 Gross**   Weekly Earnings:

**(1)** Give Full Description Of Injury Or Disease From Which You Are Now Suffering. If An Injury, Tell How It Happened (Date And Time), Place Where Accident Occurred, What You Were Doing And How It Happened.

**October 27, 2004 - 11:00 a.m.; Lafarge & Hyundai Blvd Getting out of the truck to open tailgate, I fell off the step and hurt my leg, hip, and knee.**

**(2A)** Have You Ever Had This, Or A Similar Condition, In The Past?   ☐ Yes   ☒ No

**(B)** If yes, state the nature of the condition, dates of treatment and names and addresses of treating doctors, hospitals and clinics.

**(3A)** Give exact date when illness began, or injury occurred.   (A) Date: **October 27, 2004**

**(B)** When did you first consult a physician for this condition?   (B) Date: **Nov. 5, 2004**

**(C)** When did you become totally disabled (unable to work)?   (C) Date: **Nov. 22, 2004**

**(D)** When were you able to again perform part of your occupational duties?   (D) Date: **don't know - must have surgery**

**(E)** When were you able to again perform all of your occupational duties?   (E) Date: **don't know - must have surgery**

**(F)** If still totally disabled, when do you expect your disability to end?   (F) Date:

**(4)** Hospitals (Give complete names, addresses and dates of confinement.)

**(5A)** Give names, addresses and telephone numbers of all attending physicians.

**(B)** Give name, address and telephone number of usual family physician.   **Dr. Adams 1323 Mulberry St Montgomery, AL 334-264-3434 Referred to Dr. Barrington on Nov. 22**

**(6)** What other accident, sickness or disability insurance do you carry and what other organizations or companies have paid you benefits for sickness or injury?   **Blue Cross/Blue Shield Hospital Insurance**

**(7)** What other medical or surgical treatment has been received during the past 5 years? (Give dates, nature of illness or injury and names and addresses of all treating doctors, hospitals and clinics.)   **Hernia operation - Dec. 29, 2003 Dr. McGowin Stabler Hospital Greenville, AL**

**(8)** Names, addresses and telephone numbers of employers and length of employment with each?   **Godwin Materials - 17 years- Brantley, AL 1-800-624-6467**

## I HEREBY CERTIFY THAT THE ABOVE INFORMATION IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF.

### AUTHORIZATION

I, the undersigned authorize any hospital or other medical-care institution, physician or other medical professional, pharmacy, insurance support organization, governmental agency, group policyholder, insurance company, association, employer or benefit plan administrator to furnish to the Insurance Company named above or its representatives, any and all information with respect to any injury or sickness suffered by, the medical history of, or any consultation, prescription or treatment provided to, the person whose death, injury, sickness or loss is the basis of claim and copies of all of that person's hospital or medical records, including information relating to mental illness and use of drugs and alcohol, to determine eligibility for benefit payments under the Policy Number identified above. I authorize the group policyholder, employer or benefit plan administrator to provide the Insurance Company named above with financial and employment-related information. I understand that this authorization is valid for the term of coverage of the Policy identified above and that a copy of this authorization shall be considered as valid as the original. I understand that I or my authorized representative may request a copy of this authorization.

For claimants not residing in California, New York, or Pennsylvania: Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

SIGN YOUR FULL NAME: *Ollie Robert Godwin*   DATED: **12-8-04**

American _____ Insurance
AIG Life Insurance Company
A&H Claims Department
P. O. Box 15701
Wilmington, DE 19850-5701
800-551-0624/302-761-3700

| | |
|---|---|
| NAME OF GROUP: | Godwin Materials |
| POLICY NUMBER: | 9056434 |
| CLAIMANT: | Ollie Godwin |

## OCCUPATIONAL ACCIDENT DISABILITY CLAIM FORM

**INSTRUCTIONS:**
1.) You must have SECTION A fully completed by a designated official of the Participating Organization.
2.) SECTION B is to be completed, signed and dated by the Attending Physician.
3.) SECTION C is to be completed, signed and dated by Claimant.
4.) Mail completed form to the address indicated above.

The furnishing of this form, or its acceptance by the Company, must not be construed as an admission of any liability on the Company, nor a waiver of any of the conditions of the insurance contract.

### SECTION A- PARTICIPATING ORGANIZATION STATEMENT FOR DISABILITY

NAME / ADDRESS OF PARTICIPATING ORGANIZATION

| CLAIMANT'S FULL NAME | | SOCIAL SECURITY NUMBER | DATE OF BIRTH | NAME OF SUPERVISOR |
|---|---|---|---|---|
| DATE OF INJURY: | WAS HE/SHE INJURED ON YOUR JOB? ☐ YES ☐ NO | DESCRIBE HOW, WHEN AND WHERE ACCIDENT OCCURRED | | |
| DATE CLAIMANT WAS CONTRACTED: | EFFECTIVE DATE OF COVERAGE UNDER PLAN: | DATE LAST WORKED: | TIME LAST WORKED: | |
| DATE LOSS TIME STARTED: | WEEKLY EARNINGS (PLEASE INCLUDE PAYROLL RECORDS FOR THE 3 MONTH PERIOD PRECEDING LOSS DATE) | | | |
| WILL CLAIMANT BE RECONTRACTED? ☐ YES ☐ NO | DATE RETURNED TO WORK: | | | |
| PARTICIPATING ORGANIZATION REPRESENTATIVE (PLEASE PRINT OR TYPE) | TITLE | | DAYTIME TELEPHONE NUMBER ( ) | |
| SIGNATURE OF PARTICIPATING ORGANIZATION REPRESENTATIVE | | DATE | | |

### SECTION B- ATTENDING PHYSICIAN'S STATEMENT FOR DISABILITY

PATIENT NAME AND ADDRESS: Ollie Godwin

WHEN DID SYMPTOMS FIRST APPEAR OR ACCIDENT HAPPEN? DATE: 10/27/04

IF ACCIDENT DESCRIBE, HOW, WHEN AND WHERE ACCIDENT OCCURRED: Stepping out of a big truck (twisted knee).

DIAGNOSIS AND CONCURRENT CONDITIONS (IF FRACTURE OR DISLOCATION, DESCRIBE NATURE AND LOCATION):

IS CONDITION DUE TO AN INJURY OR SICKNESS ARISING OUT OF PATIENT'S EMPLOYMENT? ☐ YES ☐ NO

IF "YES," EXPLAIN.

WHEN DID PATIENT FIRST CONSULT YOU FOR THIS CONDITION? DATE: 11/22/04

HAS PATIENT EVER HAD THE SAME OR SIMILAR CONDITION? ☐ YES ☒ NO

IF "YES," STATE WHEN AND DESCRIBE:

NATURE AND DATE OF SURGICAL PROCEDURE, IF ANY (DESCRIBE FULLY) DATE:

PROVIDE DATES OF OTHER MEDICAL TREATMENT AND DESCRIBE:

WHAT OTHER SERVICES, IF ANY, DID YOU PROVIDE OR PRESCRIBE PATIENT? (PROVIDE DATES.)

IS PATIENT STILL UNDER YOUR CARE FOR THIS CONDITION? ☒ YES ☐ NO

IF "NO," GIVE DATE YOUR SERVICES TERMINATED. DATE: (DATES REQUIRED)

HOW LONG WAS OR WILL PATIENT BE CONTINUOUSLY TOTALLY DISABLED (UNABLE TO WORK)? * FROM: 11-22 * TO: 1-7-05

HOW LONG WAS OR WILL PATIENT BE PARTIALLY DISABLED? FROM: TO:

IF PERMANENT PARTIAL DISABILITY, INDICATE PERCENTAGE OF IMPAIRMENT.

TO YOUR KNOWLEDGE, DOES PATIENT HAVE OTHER HEALTH INSURANCE OR HEALTH PLAN COVERAGE? ☐ YES ☐ NO

IF "YES" IDENTIFY.

| DATE 1/3/05 | SIGNATURE (ATTENDING PHYSICIAN) | DEGREE M.D. | TELEPHONE (574) 274-9000 |
|---|---|---|---|
| STREET ADDRESS 429 J Long St. | CITY OR TOWN Montgomery | STATE OR PROVINCE AL | ZIP CODE 36106 |

| Settlement Date | 11/15/04 | Total Revenue | $14,477.24 |
|---|---|---|---|
| Work Period 10/16/04 – 10/31/04 | | Base Pay | $10,390.52 |
| | | Other Pay | $0.00 |
| | | Total Pay | $14,529.52 |
| Physical Ins | $0.00 | Parts | $1,322.05 |
| | $0.00 | Fuel | $1,678.28 |
| | $0.00 | | $0.00 |
| Accident Ins | $170.00 | Health Ins | $353.00 |
| C# Number: | 71124 | Liability Ins | $516.40 |
| Date: | 11/15/04 | Net | $4,288.45 |

GODWIN MATERIAL SERVICES, INC.

071764

ATTENTION: AMY:

These are the last three months
of my Pay Settlements, Nov. 22.
Last day worked was Nov. 22.

Ollie R. Godwin





## Godwin Material Service, Inc.
### P.O. Box 12 Hwy 331 South
### Brantley, Alabama 36009
### 334-527-3540
### Fax 334-527-8723

Date: 12-8-04

10 Total Pages
Including Cover

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TO: Amy Tillman          FROM: Cindy Jordan

Fax# 323-2372

PLIR - Ollie Godwin

Date: 12/8/2004  Time: 8:38 AM  To: Godwin Materials @ 1334527-8723                    P.4/5

 **AIG**   AMERICAN INTERNATIONAL COMPANIES
ACCIDENT & HEALTH CLAIMS DIVISION
OCCUPATIONAL ACCIDENT UNIT
P.O. Box 11128 • Montgomery, AL • 36111-0128
Phone: (800)423-7364 • (334) 409-3135
Fax: (334) 323-0585

## POLICYHOLDER LOSS INFORMATION REPORT

To: __Palomar Insurance Corporation__          Fax Number: __(334) 323-0585__

Policy Number: __9055434__          Policyholder/Participating Organization: __Godwin__

Driver Name: __Olke Godwin__          Driver Social Security No.: __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__

Driver's Company: __Godwin Materials Service__          Company Location __Brantly, AL__

Dispatcher Name: _____          Dispatcher Phone No.: __334-527-3540__

Unit No.: __G108__          Order No.: _____

Date of Injury: __* 0-27-04__    Time of Injury: _____    Member / Claim Tracking No.: _____

*In addition to the information provided above, if the claimant is a Helper (i.e. Lumper, Casual Laborer, Co-Driver), please provide the following information:*

Helper Name: _____          Helper Social Security No.: _____

Helper Address: _____

Helper Telephone Number: _____

**Please answer the following questions about the listed claimant, and then fax or mail back to the fax number or address above.**

1.  Was the vehicle loaded at the time of the accident?    ☒ Yes    ☐ No
2.  If unloaded, was the driver under dispatch to pick up a load?    ☐ Yes    ☐ No
3.  What was the last day worked by this claimant?  __Unknown__
4.  Please indicate the claimant's earnings for the last three (3) months (please include an earnings statement). __See following sheets__
5.  Where was the driver scheduled to be at the time of the accident? __Montgomery, AL__
6.  General Comments: _____

Verified by (print name): __Cindy Jordan__  Signature: __Cindy Jordan__
Date verified: __12-8-04__

Thank you for assisting us by providing the information requested herein. Please feel free to contact our office at (800) 482-7394, should you have any questions.

Sent by __Suzanne Adoer__          Date: __12-8-04__

# Commission Report / LEASE 106 OLLIE GODWIN Godwin Material Service, Inc.

Wednesday, December 08, 2004

| Date | Ticket | From | Customer | Job Location | Material | Units | Rate | Total | Deduct % | Pay |
|------|--------|------|----------|--------------|----------|-------|------|-------|----------|-----|
| | | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57 GRAVEL | 26 | $3.15 | $81.90 | 0.00% | |
| | | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57 GRAVEL | | $3.15 | | 0.00% | |
| | | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57 GRAVEL | | $3.15 | | 0.00% | |
| | | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57 GRAVEL | | $3.15 | | 0.00% | |
| | | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57 GRAVEL | | $3.15 | | 0.00% | |
| | | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57 GRAVEL | | $3.15 | | 0.00% | |
| | | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57 GRAVEL | | $3.15 | | 0.00% | |
| | | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57 GRAVEL | | $3.15 | | 0.00% | |
| | | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | | $3.15 | | 0.00% | |
| | | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | | $3.15 | | 0.00% | |
| | | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | | $3.15 | | 0.00% | |
| | | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | | $3.15 | | 0.00% | |
| | | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | | $3.15 | | 0.00% | |
| | | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | | $3.15 | | 0.00% | |
| | | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57 GRAVEL | | $3.15 | | 0.00% | |
| | | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | | $3.15 | | 90.00% | |
| | | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57 GRAVEL | | $3.15 | | 90.00% | |
| | | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57 GRAVEL | | $3.15 | | 90.00% | |
| | | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57 GRAVEL | | $3.15 | | 90.00% | |
| | | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57 GRAVEL | | $3.15 | | 90.00% | |
| | | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57 GRAVEL | | $3.15 | | 90.00% | |
| | | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | | $3.15 | | 90.00% | |
| | | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | | $3.15 | | 90.00% | |
| | | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE AGG BLEN | | $3.15 | | 90.00% | |
| | | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE AGG BLEN | | $3.15 | | 90.00% | |
| | | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57 GRAVEL | | $3.15 | | 90.00% | |
| | | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57 GRAVEL | | $3.15 | | 90.00% | |
| | | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | | $3.15 | | 90.00% | |
| | | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | | $3.15 | | 90.00% | |
| | | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | | $3.15 | | 90.00% | |
| | | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | | $3.15 | | 90.00% | |
| | | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57 GRAVEL | | $3.15 | | 90.00% | |
| | | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57 GRAVEL | | $3.15 | | 90.00% | |
| | | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57 GRAVEL | | $3.15 | | 90.00% | |

Page 1 of 43

**Commission Report / LEASE**    186    OLLIE GODWIN    Godwin Material Service, Inc.

Effective March 15th, paychecks WILL NOT be ready until AFTER 11:00 am on paydays.

Wednesday, December 08, 2004

Page 6 of 43

DEC-69-2004 09:31 AM GODWIN MATERIAL SERVICE 2345278726

JAN. 6. 2005  4:40PM  PALOMAR INSURANCE  NO. 424  P. 12

P. 05

| Date | Ticket | From | Customer | Job Location | Material | Units | Rate | Total | Driver % | Pay |
|---|---|---|---|---|---|---|---|---|---|---|
| 10/1/04 | 420914 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 5767 GRAVEL | 28.98 | $3.15 | $90.28 | 90.00% | $81.25 |
| 10/1/04 | 5114304S | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.33 | $3.15 | $92.39 | 90.00% | $83.15 |
| 10/1/04 | 51143086 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 5767 GRAVEL | 28.42 | $3.15 | $92.67 | 90.00% | $83.40 |
| 10/1/04 | 5114310B | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.39 | $3.15 | $92.58 | 90.00% | $83.32 |
| 10/4/04 | 74987 | ANDERSON | APAC | GREENVILLE | 89 SHOT | 29.58 | $5.00 | $147.80 | 90.00% | $133.02 |
| 10/4/04 | 5114320B | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.55 | $3.15 | $89.93 | 90.00% | $80.94 |
| 10/4/04 | 51143221 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.02 | $3.15 | $88.26 | 90.00% | $79.43 |
| 10/4/04 | 51143237 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.4 | $3.15 | $92.61 | 90.00% | $83.35 |
| 10/4/04 | 5114325B | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 5767 GRAVEL | 28.42 | $3.15 | $92.67 | 90.00% | $83.49 |
| 10/4/04 | 51143253 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 5767 GRAVEL | 28.37 | $3.15 | $92.52 | 90.00% | $83.27 |
| 10/4/04 | 51143278 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 5767 GRAVEL | 29.12 | $3.15 | $91.73 | 90.00% | $82.56 |
| 10/4/04 | 51143287 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 5767 GRAVEL | 29.33 | $3.15 | $92.39 | 90.00% | $83.15 |
| 10/5/04 | 51212764 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 28.92 | $3.15 | $91.10 | 90.00% | $81.99 |
| 10/5/04 | 51212775 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 28.76 | $3.15 | $90.59 | 90.00% | $81.53 |
| 10/5/04 | 51212783 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 28.31 | $3.15 | $89.18 | 90.00% | $80.26 |
| 10/5/04 | 51212794 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 28.43 | $3.15 | $89.55 | 90.00% | $80.60 |
| 10/5/04 | 51212804 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 28.86 | $3.15 | $90.91 | 90.00% | $81.82 |
| 10/5/04 | 51212815 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 28.81 | $3.15 | $92.75 | 90.00% | $81.68 |
| 10/7/04 | 51212816 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 29.92 | $3.15 | $93.30 | 90.00% | $83.97 |
| 10/7/04 | 51212823 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 28.44 | $3.15 | $89.59 | 90.00% | $80.63 |
| 10/7/04 | 51212828 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 29.54 | $3.15 | $93.05 | 90.00% | $83.75 |
| 10/7/04 | 51212841 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 29.35 | $3.15 | $92.48 | 90.00% | $83.27 |
| 10/7/04 | 51212855 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 28.81 | $3.15 | $90.75 | 90.00% | $81.68 |
| 10/7/04 | 51212878 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 29.48 | $3.15 | $92.80 | 90.00% | $83.52 |
| 10/7/04 | 51212880 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 28.83 | $3.15 | $90.81 | 90.00% | $81.73 |
| 10/7/04 | 51212889 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 28.7 | $3.15 | $90.41 | 90.00% | $81.37 |
| 10/8/04 | 51212904 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 29.62 | $3.15 | $93.30 | 90.00% | $83.97 |
| 10/8/04 | 51212919 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 28.8 | $3.15 | $90.72 | 90.00% | $81.65 |
| 10/8/04 | 51212931 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 29.03 | $3.15 | $91.44 | 90.00% | $82.30 |
| 10/8/04 | 51212944 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 28.68 | $3.15 | $90.34 | 90.00% | $81.31 |
| 10/8/04 | 51212956 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.64 | $3.15 | $90.22 | 90.00% | $81.20 |
| 10/11/04 | 424821 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.65 | $3.15 | $90.88 | 90.00% | $81.79 |
| 10/11/04 | 425728 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.38 | $3.15 | $92.55 | 90.00% | $83.30 |
| 10/11/04 | 425732 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.39 | $3.15 | $89.43 | 90.00% | $80.49 |
| 10/11/04 | 51143581 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.53 | $3.15 | $93.02 | 90.00% | $83.72 |
| 10/11/04 | 51212982 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 28.37 | $3.15 | $89.37 | 90.00% | $80.43 |
| 10/12/04 | 51212988 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.42 | $3.15 | $89.52 | 90.00% | $80.57 |
| 10/12/04 | 51143617 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.42 | $3.15 | $92.67 | 90.00% | $83.46 |
| 10/12/04 | 51143626 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.79 | $3.15 | $93.84 | 90.00% | $84.46 |

Wednesday, December 08, 2004

Page 7 of 34

| Commission Report / LEASE | 105 | | | OLLIE GODWIN | Godwin Material Service, Inc. | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 10/12/04 | 51143630 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.73 | $3.15 | $93.65 | 90.00% | $84.29 |
| 10/12/04 | 51143645 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.3 | $3.15 | $92.32 | 90.00% | $83.07 |
| 10/12/04 | 51143656 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 28.63 | $3.15 | $90.18 | 90.00% | $81.16 |
| 10/12/04 | 51212982 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.9 | $3.15 | $93.87 | 90.00% | $84.48 |
| 10/13/04 | 51213018 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 28.21 | $3.15 | $80.86 | 90.00% | $73.97 |
| 10/13/04 | 51213025 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 28.72 | $3.15 | $90.47 | 90.00% | $81.42 |
| 10/13/04 | 51213031 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 28.69 | $3.15 | $90.37 | 90.00% | $81.33 |
| 10/13/04 | 51213040 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 29.52 | $3.15 | $93.04 | 90.00% | $88.85 |
| 10/13/04 | 51213053 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 29.8 | $3.15 | $93.87 | 90.00% | $84.48 |
| 10/13/04 | 51213066 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 29.55 | $3.15 | $93.08 | 90.00% | $83.77 |
| 10/13/04 | 51213075 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 29.44 | $3.15 | $92.74 | 90.00% | $83.47 |
| 10/14/04 | 76221 | ANDERSON | *APAC | GREENVILLE | 89 SHOT | 29.13 | $5.00 | $145.65 | 90.00% | $131.09 |
| 10/14/04 | 51213976 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 29.64 | $3.15 | $93.37 | 90.00% | $84.03 |
| 10/14/04 | 51213087 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 29.76 | $3.15 | $93.74 | 90.00% | $84.37 |
| 10/14/04 | 51213098 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 29.64 | $3.15 | $93.37 | 90.00% | $84.03 |
| 10/14/04 | 51213108 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 29.4 | $3.15 | $92.61 | 90.00% | $83.35 |
| 10/14/04 | 51213120 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 29.02 | $3.15 | $91.41 | 90.00% | $82.27 |
| 10/14/04 | 51213133 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 28.96 | $3.15 | $91.22 | 90.00% | $82.10 |
| 10/14/04 | 51213146 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 29.39 | $3.15 | $92.58 | 90.00% | $83.32 |
| 10/15/04 | 51213151 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 29.76 | $3.15 | $93.74 | 90.00% | $84.37 |
| 10/15/04 | 51213163 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 29.11 | $3.15 | $91.70 | 90.00% | $82.53 |
| 10/15/04 | 51213173 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 29.09 | $3.15 | $91.63 | 90.00% | $82.47 |
| 10/15/04 | 51213193 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 29.25 | $3.15 | $92.14 | 90.00% | $82.93 |
| 10/15/04 | 51213209 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.09 | $3.15 | $91.60 | 90.00% | $82.44 |
| 10/15/04 | 51213221 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.79 | $3.15 | $90.69 | 90.00% | $81.62 |
| 10/15/04 | 51213223 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 28.6 | $3.15 | $90.09 | 90.00% | $81.08 |
| 10/15/04 | 51213231 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 28.38 | $3.15 | $89.40 | 90.00% | $80.46 |
| 10/15/04 | 51213238 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 29.8 | $3.15 | $93.87 | 90.00% | $84.48 |
| 10/15/04 | 51213247 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 29.22 | $3.15 | $92.04 | 90.00% | $82.84 |
| 10/15/04 | 51213253 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.46 | $3.15 | $92.80 | 90.00% | $83.52 |
| 10/15/04 | 51213258 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.5 | $3.15 | $88.78 | 90.00% | $80.00 |
| 10/15/04 | 51213265 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.2 | $3.15 | $91.98 | 90.00% | $82.78 |
| 10/15/04 | 51213274 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.58 | $3.15 | $93.49 | 90.00% | $84.14 |
| 10/15/04 | 51213288 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.45 | $3.15 | $92.77 | 90.00% | $83.49 |
| 10/15/04 | 51213294 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.73 | $3.15 | $93.65 | 90.00% | $84.29 |
| 10/19/04 | 51143561 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 29.55 | $3.15 | $93.08 | 90.00% | $83.77 |
| 10/19/04 | 51143654 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 29.41 | $3.15 | $92.64 | 90.00% | $83.38 |
| 10/19/04 | 51143662 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 29.58 | $3.15 | $93.18 | 90.00% | $83.86 |
| 10/19/04 | 51143674 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 29.41 | $3.15 | $92.64 | 90.00% | $83.38 |
| 10/19/04 | 51143687 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 7 GRAVEL | 29.37 | $3.15 | $92.62 | 90.00% | $83.27 |
| 10/19/04 | 51143695 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 29.11 | $3.15 | $91.70 | 90.00% | $82.53 |

| Commission Report / LEASE | 106 | OLLIE GODWIN | | | Godwin Material Service, Inc. |
|---|---|---|---|---|---|

| Date | Invoice | Pit | Lease | Road | Material | Qty | Rate | Amount | % | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 10/28/04 | 51144801 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 25.75 | $3.15 | $48.55 | 90.00% | $81.50 |
| 10/28/04 | 51144845 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 29.52 | $3.15 | $93.19 | 90.00% | $93.99 |
| 10/28/04 | 51143942 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 28.28 | $3.15 | $89.01 | 90.00% | $84.43 |
| 10/28/04 | 51143942 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 67 GRAVEL | 28.73 | $3.15 | $90.65 | 90.00% | $84.29 |
| 10/28/04 | 51143985 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 28.57 | $3.16 | $90.15 | 90.00% | $83.24 |
| 10/28/04 | 51143952 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.55 | $3.15 | $91.19 | 90.00% | $83.37 |
| 10/21/04 | 51144611 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 28.6 | $3.16 | $93.24 | 90.00% | $83.32 |
| 10/21/04 | 51144028 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 29.4 | $3.16 | $92.61 | 90.00% | $83.35 |
| 10/21/04 | 51144078 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 67 GRAVEL | 29.4 | $3.16 | $92.81 | 90.00% | $83.35 |
| 10/21/04 | 51144482 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 29.25 | $3.16 | $92.45 | 90.00% | $83.21 |
| 10/21/04 | 51213986 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.4 | $3.15 | $92.61 | 90.00% | $83.35 |
| 10/22/04 | 51144423 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.24 | $3.16 | $92.11 | 90.00% | $82.98 |
| 10/22/04 | 51144409 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.75 | $3.15 | $90.58 | 90.00% | $81.49 |
| 10/22/04 | 51144607 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 29.65 | $3.15 | $93.43 | 90.00% | $83.33 |
| 10/22/04 | 51144691 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 28.42 | $3.15 | $89.87 | 90.00% | $83.40 |
| 10/22/04 | 51144866 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 29.41 | $3.16 | $92.64 | 90.00% | $83.38 |
| 10/25/04 | 51144651 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 29.5 | $3.15 | $92.93 | 90.00% | $83.64 |
| 10/25/04 | 51144975 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 29.48 | $3.15 | $92.88 | 90.00% | $83.57 |
| 10/25/04 | 51144104 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.13 | $3.15 | $91.78 | 90.00% | $82.59 |
| 10/25/04 | 51144147 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 29.39 | $3.15 | $92.59 | 90.00% | $83.32 |
| 10/25/04 | 51144145 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 28.95 | $3.15 | $91.60 | 90.00% | $82.44 |
| 10/25/04 | 51144185 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.31 | $3.15 | $89.23 | 90.00% | $83.10 |
| 10/25/04 | 51144194 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.03 | $3.15 | $91.54 | 90.00% | $82.39 |
| 10/25/04 | 51144195 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 28.75 | $3.16 | $90.71 | 90.00% | $84.34 |
| 10/25/04 | 51144039 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 7 GRAVEL | 29.55 | $3.15 | $93.08 | 90.00% | $83.77 |
| 10/25/04 | 51144233 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 29.58 | $3.16 | $93.02 | 90.00% | $83.77 |
| 10/26/04 | 51144291 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.63 | $3.15 | $91.13 | 90.00% | $82.02 |
| 10/26/04 | 51144548 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28 | $3.16 | $88.20 | 90.00% | $79.38 |
| 10/27/04 | 51144661 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 7 GRAVEL | 29.37 | $3.15 | $92.52 | 90.00% | $83.27 |
| 10/27/04 | 51144275 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 27.62 | $3.15 | $87.00 | 90.00% | $78.30 |
| 10/27/04 | 51144566 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 29.11 | $3.15 | $91.70 | 90.00% | $82.63 |
| 10/27/04 | 51144367 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 29.14 | $3.15 | $91.79 | 90.00% | $82.61 |
| 10/27/04 | 51144319 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.37 | $3.15 | $91.26 | 90.00% | $82.13 |
| 10/27/04 | 51144356 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 28.71 | $3.15 | $90.44 | 90.00% | $81.40 |
| 10/28/04 | 51144359 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 28.77 | $3.15 | $90.62 | 90.00% | $84.40 |
| 10/28/04 | 51144368 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 23.56 | $3.15 | $73.88 | 90.00% | $71.58 |
| 10/28/04 | 51144340 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.45 | $3.16 | $92.77 | 90.00% | $82.48 |
| 10/28/04 | 51144352 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 28.51 | $3.15 | $90.08 | 90.00% | $83.06 |
| 10/28/04 | 51144356 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.34 | $3.15 | $89.27 | 90.00% | $80.34 |
| 10/28/04 | 51144396 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.39 | $3.15 | $92.59 | 90.00% | $83.32 |

Wednesday, December 08, 2004

Page 9 of 16

## Commission Report / LEASE    106    OLLIE GODWIN    Godwin Material Service, Inc.

*Effective March 15th, purchases WILL NOT be ready until AFTER 11:00 am on paydays.*

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1022601 | 91142506 | DOZIER PMT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.57 | $3.15 | $90.16 90.00% $81.04 |
| 1020001 | 91142503 | DOZIER Pmt | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 5767 GRAVEL | 28.57 | $3.15 | $90.15 90.00% $83.04 |
| 1022601 | 91144407 | DOZIER PVT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 5767 GRAVEL | 24.68 | $3.15 | $78.82 90.00% $70.76 |
| | | | | | | | $11,477.24 | $10,329.50 |

Wednesday, December 08, 2004

DEC-08-2004 09:23 AM GODWIN MATERIAL SERVICE 3345278726 P.09

JAN. 6, 2005 4:42PM PALOMAR INSURANCE NO. 424 P. 16

## Commission Report / LEASE    108     OLLIE GODWEN     Godwin Material Service, Inc.

| Date | Ticket | From | Customer | Job Location | Material | Units | Rate | Total | Deliver % | Pay |
|---|---|---|---|---|---|---|---|---|---|---|
| 11/9/04 | 51144963 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 29.95 | $3.15 | $93.40 | 90.00% | $84.06 |
| 11/9/04 | 51144764 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 29.51 | $3.15 | $92.96 | 90.00% | $83.66 |
| 11/9/04 | 51144710 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.98 | $3.15 | $91.29 | 90.00% | $82.16 |
| 11/9/04 | 51144716 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.8 | $3.15 | $93.24 | 90.00% | $83.92 |
| 11/9/04 | 51144721 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.15 | $3.15 | $88.67 | 90.00% | $79.80 |
| 11/9/04 | 51144815 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 29.57 | $3.15 | $93.15 | 90.00% | $83.84 |
| 11/9/04 | 51144827 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 25.68 | $3.15 | $93.43 | 90.00% | $84.09 |
| 11/9/04 | 51144837 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.93 | $3.15 | $91.13 | 90.00% | $82.02 |
| 11/9/04 | 51144848 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.51 | $3.15 | $92.96 | 90.00% | $83.66 |
| 11/9/04 | 51144858 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 7 GRAVEL | 29.55 | $3.15 | $93.06 | 90.00% | $83.77 |
| 11/9/04 | 51144868 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 7 GRAVEL | 29.51 | $3.15 | $92.96 | 90.00% | $83.66 |
| 11/9/04 | 51144877 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 7 GRAVEL | 29.55 | $3.15 | $93.11 | 90.00% | $83.80 |
| 11/9/04 | 51144887 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 29.43 | $3.15 | $92.70 | 90.00% | $83.43 |
| 11/9/04 | 51144897 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 25.62 | $3.15 | $90.78 | 90.00% | $81.70 |
| 11/10/04 | 26302 | RED BLUFF | *APAC | GREENVILLE | 1/2" | 26.8 | $5.80 | $144.00 | 90.00% | $129.60 |
| 11/10/04 | 51144911 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.32 | $3.15 | $92.38 | 90.00% | $83.12 |
| 11/10/04 | 51144914 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.6 | $3.15 | $93.24 | 90.00% | $83.92 |
| 11/10/04 | 51144918 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.14 | $3.15 | $91.79 | 90.00% | $82.61 |
| 11/10/04 | 51144923 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.05 | $3.15 | $91.51 | 90.00% | $82.36 |
| 11/10/04 | 51144930 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.33 | $3.15 | $89.24 | 90.00% | $80.32 |
| 11/10/04 | 51144936 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.46 | $3.15 | $92.80 | 90.00% | $83.52 |
| 11/11/04 | 26415 | RED BLUFF | *APAC | GREENVILLE | 1/2" | 28.35 | $5.00 | $141.75 | 90.00% | $127.58 |
| 11/11/04 | 51144940 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.18 | $3.15 | $91.92 | 90.00% | $82.73 |
| 11/11/04 | 51144964 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.75 | $3.15 | $90.56 | 90.00% | $81.50 |
| 11/11/04 | 51144995 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.31 | $3.15 | $92.33 | 90.00% | $83.10 |
| 11/15/04 | 51145073 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.46 | $3.15 | $92.80 | 90.00% | $83.52 |
| 11/15/04 | 51145091 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 29.6 | $3.15 | $93.24 | 90.00% | $83.92 |
| 11/15/04 | 51145111 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 29.47 | $3.15 | $92.83 | 90.00% | $83.55 |
| 11/15/04 | 51145128 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 29.43 | $3.15 | $92.70 | 90.00% | $83.43 |
| 11/15/04 | 51145144 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.6 | $3.15 | $92.98 | 90.00% | $83.94 |
| 11/15/04 | 51145159 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 29.6 | $3.15 | $93.24 | 90.00% | $83.92 |
| 11/16/04 | 51145162 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.41 | $3.15 | $89.49 | 90.00% | $80.54 |
| 11/16/04 | 51145177 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 29.41 | $3.15 | $92.64 | 90.00% | $83.36 |
| 11/16/04 | 51213738 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 29.72 | $3.15 | $93.62 | 90.00% | $84.26 |
| 11/17/04 | 51145215 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 27.58 | $3.15 | $86.88 | 90.00% | $78.19 |
| 11/17/04 | 51145222 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.05 | $3.15 | $91.51 | 90.00% | $82.36 |
| 11/17/04 | 51145228 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 29.24 | $3.15 | $92.11 | 90.00% | $82.90 |
| 11/17/04 | 51145235 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.23 | $3.15 | $92.07 | 90.00% | $82.86 |
| 11/19/04 | 51145887 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 29.18 | $2.15 | $91.92 | 90.00% | $82.73 |
| 11/19/04 | 51145599 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.93 | $3.15 | $94.12 | 90.00% | $84.71 |
| 11/23/04 | 51145512 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 29.04 | $3.15 | $91.48 | 90.00% | $82.33 |

Commission Report / LEASE    166        *OLLIE GODWIN*        *Godwin Material Service, Inc.*

| 11/23/04 | 9/1/2008 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEMPLE ROAD | CONCRETE SAND | 20.84 | 33.16 | $0.01 | $0.00% | $81.62 |
| 11/23/04 | 9/1/2008 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEMPLE ROAD | CONCRETE SAND | 79.18 | 33.16 | $91.82 | $0.00% | $82.73 |

*Effective March 15th, paychecks WILL NOT be ready until AFTER 11:00 am on paydays.*

$4,068.27    $3,984.72

Wednesday, December 08, 2004

Page 6 of 26

PO BOX 11128
MONTGOMERY, AL. 36111-0128
PHONE 800-482-7394
DIRECT 334-409-3136
FAX 334-323-0585
EMAIL SuzanneA@Palomarlns.com



PALOMAR INSURANCE
CORPORATION
SPECIAL RISK
DEPARTMENT

# Fax

| To: | **Carolyn Manley** | From: | SUZANNE ADGER |
|---|---|---|---|
| Fax: | 302-830-4521 | Pages: | 17 |
| Phone: | | Date: | 1-6-05 , 1·10·05 |
| Re: | | CC: | |

*Ollie Godwin / Godwin Materials*

X Urgent    x For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

● **Comments:** Carolyn, CCF, PLIR on the above mentioned claimant. This claimant hand delivered his claim forms today, he told me that he is having knee surgery soon, I printed out supplemental forms for him to take to the Ortho to have updated ASAP.

Thanks,

Suzanne Adger



**PALOMAR INSURANCE CORPORATION**
INSURANCE BROKERAGE & RISK MANAGEMENT CONSULTING

**January 06, 2005**

Insurance Company:                              Agency:

AIG Insurance Corporation, Inc.                 Palomar Insurance Corporation
P.O. Box 15701                                  P.O. Drawer 11128
Wilmington, DE 19850-5701                       Montgomery, AL 36111-0128   :

Insured:

Godwin Material Services
P.O. Box 12
Brantley, AL, 36009

Policy Number: 9056434
Policy Desc: Occupational Accident

Attached is a claim

Claimant:
SSN: 422-7
DOI: 10-27-04

Please process accordingly. If you have any questions or need further information, please do not
hesitate to call me at 1-800-482-7394. Thank you for your assistance.

Sincerely,

PALOMAR INSURANCE SPECIAL RISK DEPARTMENT
Suzanne Adger
Claims Coordinator

P.O. BOX 11128 • MONTGOMERY, ALABAMA 36111-0128 • 4525 EXECUTIVE PARK DRIVE • MONTGOMERY, ALABAMA 36116-1600

MAIN TEL: 334-270-0105 • BENEFITS FAX: 270-0340 • COMMERCIAL FAX: 270-8159 • PERSONAL FAX: 271-0499 • TRANSPORTATION FAX: 279-8067 • SPCL RISK FAX: 323-1319

American Casualty Companies?
AIG Life Insurance Company
A&H Claims Department
P. O. Box 15701
Wilmington, DE 19850-5701
800-551-0824/302-761-3700

RECEIVED DEC 0 9 2004

**NAME OF GROUP:** . Godwin Materials
**POLICY NUMBER:** . 9056434
**CLAIMANT:** , Ollie Godwin

### OCCUPATIONAL ACCIDENT MEDICAL CLAIM FORM

**INSTRUCTIONS:**
1.) You must have SECTION A fully completed by a designated official of the Participating Organization.
2.) SECTION B is to be completed, signed and dated by the Claimant.
3.) If claimant is treated in the hospital, please attach an itemized hospital bill.
4.) If claimant is treated by a doctor, SECTION C is to be completed, signed and dated by the Attending Physician or attach an itemized bill.
5.) Attach itemized bills for all medical expenses being claimed including the claimant's name, condition being treated (diagnosis), description of services, date of service(s) and the charge made for each service.
6.) Mail completed form to the address indicated above.

The furnishing of this form, or its acceptance by the Company, must not be construed as an admission of any liability on the Company, nor a waiver of any of the conditions of the insurance contract.

### SECTION A- PARTICIPATING ORGANIZATION STATEMENT

NAME / ADDRESS OF PARTICIPATING ORGANIZATION

| CLAIMANT'S FULL NAME | | SOCIAL SECURITY NUMBER | DATE OF BIRTH | NAME OF SUPERVISOR |
|---|---|---|---|---|

DATE OF INJURY: | WAS HE/SHE INJURED ON YOUR JOB? ☐ YES ☐ NO

DESCRIBE HOW, WHEN AND WHERE ACCIDENT OCCURRED

DATE CLAIMANT WAS CONTRACTED: | EFFECTIVE DATE OF COVERAGE UNDER PLAN: | DATE COVERAGE TERMINATED (IF APPLICABLE)

PARTICIPATING ORGANIZATION REPRESENTATIVE (PLEASE PRINT OR TYPE) | TITLE | DAYTIME TELEPHONE NUMBER ( )

SIGNATURE OF PARTICIPATING ORGANIZATION REPRESENTATIVE | DATE

### SECTION B- CLAIMANT'S STATEMENT

CLAIMANT'S FULL NAME (PLEASE PRINT)
Ollie Robert Godwin, Sr.

SOCIAL SECURITY NUMBER
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

STREET ADDRESS
656 Otis Faulk Drive

CITY
Honoraville

STATE
AL

ZIP
36042

DATE OF BIRTH
01-24-54

TELEPHONE
(334) 537-9506

GIVE FULL DESCRIPTION OF INJURY OR DISEASE FROM WHICH YOU ARE NOW SUFFERING. IF AN INJURY, TELL WHEN IT HAPPENED (DATE AND TIME), PLACE WHERE ACCIDENT OCCURRED, WHAT YOU WERE DOING AND HOW IT HAPPENED.
October 27, 2004; 11:00 a.m. : LaRange & Hyundai Blvd. Getting out of truck to open tailgate and fell off step and hurt leg, knee, + hip.

HAVE YOU EVER HAD THIS, OR A SIMILAR CONDITION, IN THE PAST? ☐ YES ☑ NO:
IF YES, STATE THE NATURE OF THE CONDITION, DATES OF TREATMENT AND NAMES AND ADDRESSES OF TREATING DOCTORS, HOSPITALS AND CLINICS.

WHEN DID YOU FIRST CONSULT A PHYSICIAN FOR THIS CONDITION?
November 5, 2004

HOSPITAL (GIVE COMPLETE NAMES, ADDRESSES AND DATES OF CONFINEMENT.)

GIVE NAMES, ADDRESSES AND TELEPHONE NUMBERS OF ALL ATTENDING PHYSICIANS.
Dr. Adams - Referred to Dr. Barrington on Nov. 22, 2004

GIVE NAME, ADDRESS AND TELEPHONE NUMBER OR USUAL FAMILY PHYSICIAN.
Dr. Adams 1333 Mulberry St., Montgomery, AL (334) ___-3434

WHAT OTHER ACCIDENT, SICKNESS OR DISABILITY INSURANCE DO YOU CARRY AND WHAT OTHER ORGANIZATIONS OR COMPANIES HAVE PAID YOU BENEFITS FOR SICKNESS OR INJURY?
1) Blue Cross /Blue Shield Hospital Ins.

I HEREBY CERTIFY THAT THE ABOVE INFORMATION IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF.

### AUTHORIZATION

I, the undersigned authorize any hospital or other medical-care institution, physician or other medical professional, pharmacy, insurance support organization, governmental agency, group policyholder, insurance company, association, employer or benefit plan administrator to furnish to the Insurance Company named above or its representatives, any and all information with respect to any injury or sickness suffered by, the medical history of, or any consultation, prescription or treatment provided to, the person whose death, injury, sickness or loss is the basis of claim and copies of all of that person's hospital or medical records, including information relating to mental illness and use of drugs and alcohol, to determine eligibility for benefit payments under the Policy Number identified above. I authorize the group policyholder, employer or benefit plan administrator to provide the Insurance Company named above with financial and employment-related information. I understand that this authorization is valid for the term of coverage of the Policy identified above and that a copy of this authorization shall be considered as valid as the original. I understand that I or my authorized representative may request a copy of this authorization.

For your protection, California law requires the following to appear on this form:
Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

SIGN YOUR FULL NAME
Ollie R Godwin

DATED:
12-8-04

**CLAIMANT'S STATEMENT FOR DISABILITY**

| CLAIMANT'S FULL NAME (PLEASE PRINT) | SOCIAL SECURITY NUMBER |
|---|---|
| Ollie Robert Godwin, Sr. | 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 |

| Street Address | City | State | Zip |
|---|---|---|---|
| 1056 Otis Faulk Dr | Honoraville | AL | 36042 |

| Date Of Birth | Height And Weight | Marital Status | Telephone |
|---|---|---|---|
| 01-24-54 | 5'11" 215 | Married | 334 537-9506 |

| Occupation | Duties | Monthly Earnings | Weekly Earnings |
|---|---|---|---|
| Truck driver | Driving truck; working on trucks | #5,000 - #12,000 Gross | |

(1) Give Full Description Of Injury Or Disease From Which You Are Now Suffering. If An Injury, Tell When It Happened (Date And Time), Place Where Accident Occurred, What You Were Doing And How It Happened.

October 27, 2004 - 11:00 a.m.; LaFarge & Hyundai Blvd. Getting out of the truck to open tailgate, I fell off the step and hurt my leg, hip, and knee.

(2A) Have You Ever Had This, Or A Similar Condition, In The Past? ☐ Yes ☒ No

(B) If yes, state the nature of the condition, dates of treatment and names and addresses of treating doctors, hospitals and clinics.

| | | | |
|---|---|---|---|
| (3A) | Give exact date when illness began, or injury occurred. | (A) Date: | October 27, 2004 |
| (B) | When did you first consult a physician for this condition? | (B) Date: | Nov. 5, 2004 |
| (C) | When did you become totally disabled (unable to work)? | (C) Date: | Nov. 22, 2004 |
| (D) | When were you able to again perform part of your occupational duties? | (D) Date: | don't know - must have surgery |
| (E) | When were you able to again perform all of your occupational duties? | (E) Date: | don't know - must have surgery |
| (F) | If still totally disabled, when do you expect your disability to end? | (F) Date: | |

(4) Hospitals (Give complete names, addresses and dates of confinement.)

(5A) Give names, addresses and telephone numbers of all attending physicians.

(B) Give name, address and telephone number of usual family physician.

Dr. Adams 1323 Mulberry St Montgomery, AL 334-264-3434 Referred to Dr. Barrington on Nov. 22

(6) What other accident, sickness or disability insurance do you carry and what other organizations or companies have paid you benefits for sickness or injury?

Blue Cross/Blue Shield Hospital Insurance

(7) What other medical or surgical treatment has been received during the past 5 years? (Give dates, nature of illness or injury and names and addresses of all treating doctors, hospitals and clinics.)

Hernia operation - Dec. 29, 2003
Dr. McGowin
Stabler Hospital Greenville, AL

(8) Names, addresses and telephone numbers of employers and length of employment with each?

Godwin Materials - 17 years - Brantley, AL 1-800-624-6467

I HEREBY CERTIFY THAT THE ABOVE INFORMATION IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF.

**AUTHORIZATION**

I, the undersigned authorize any hospital or other medical-care institution, physician or other medical professional, pharmacy, insurance support organization, governmental agency, group policyholder, insurance company, association, employer or benefit plan administrator to furnish to the insurance Company named above or its representatives, any and all information with respect to any injury or sickness suffered by, the medical history of, or any consultation, prescription or treatment provided to, the person whose death, injury, sickness or loss is the basis of claim and copies of all of that person's hospital or medical records, including information relating to mental illness and use of drugs and alcohol, to determine eligibility for benefit payments under the Policy Number identified above. I authorize the group policyholder, employer or benefit plan administrator to provide the insurance Company named above with financial and employment-related information. I understand that this authorization is valid for the term of coverage of the Policy identified above and that a copy of this authorization shall be considered as valid as the original. I understand that I or my authorized representative may request a copy of this authorization.

For claimants not residing in California, New York, or Pennsylvania: Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

| SIGN YOUR FULL NAME | Ollie Robert Godwin | DATED: | 12-8-04 |
|---|---|---|---|

Ame... **AIG Life Insurance Company**

A&H Claims Department
P. O. Box 15701
Wilmington, DE 19850-5701
800-551-0824/302-761-3700

**PROOF OF LOSS**

| NAME OF GROUP: | . Godwin Materials |
| POLICY NUMBER: | . 9056434 |
| CLAIMANT: | . Ollie Godwin |

## OCCUPATIONAL ACCIDENT DISABILITY CLAIM FORM

**INSTRUCTIONS:**
1.) You must have SECTION A fully completed by a designated official of the Participating Organization.
2.) SECTION B is to be completed, signed and dated by the Attending Physician.
3.) SECTION C is to be completed, signed and dated by Claimant.
4.) Mail completed form to the address indicated above.

The furnishing of this form, or its acceptance by the Company, must not be construed as an admission of any liability on the Company, nor a waiver of any of the conditions of the insurance contract.

### SECTION A- PARTICIPATING ORGANIZATION STATEMENT FOR DISABILITY

NAME / ADDRESS OF PARTICIPATING ORGANIZATION

| CLAIMANT'S FULL NAME | | SOCIAL SECURITY NUMBER | DATE OF BIRTH | NAME OF SUPERVISOR |

| DATE OF INJURY: | WAS HE/SHE INJURED ON YOUR JOB? ☐ YES ☐ NO | DESCRIBE HOW, WHEN AND WHERE ACCIDENT OCCURRED |

| DATE CLAIMANT WAS CONTRACTED: | EFFECTIVE DATE OF COVERAGE UNDER PLAN: | DATE LAST WORKED: | TIME LAST WORKED: |

| DATE LOSS TIME STARTED: | WEEKLY EARNINGS (PLEASE INCLUDE PAYROLL RECORDS FOR THE 3 MONTH PERIOD PRECEDING LOSS DATE) |

| WILL CLAIMANT BE RECONTRACTED? ☐ YES ☐ NO | DATE RETURNED TO WORK: |

| PARTICIPATING ORGANIZATION REPRESENTATIVE (PLEASE PRINT OR TYPE) | TITLE | DAYTIME TELEPHONE NUMBER ( ) |

| SIGNATURE OF PARTICIPATING ORGANIZATION REPRESENTATIVE | DATE |

### SECTION B- ATTENDING PHYSICIAN'S STATEMENT FOR DISABILITY

PATIENT NAME AND ADDRESS: _Ollie Godwin_

WHEN DID SYMPTOMS FIRST APPEAR OR ACCIDENT HAPPEN? DATE: _10/27/04_

IF ACCIDENT DESCRIBE, HOW, WHEN AND WHERE ACCIDENT OCCURRED. _Stepping out of a big truck (twisted knee)._

DIAGNOSIS AND CONCURRENT CONDITIONS (IF FRACTURE OR DISLOCATION, DESCRIBE NATURE AND LOCATION):

IS CONDITION DUE TO AN INJURY OR SICKNESS ARISING OUT OF PATIENT'S EMPLOYMENT?  ☐ YES  ☐ NO

IF "YES," EXPLAIN.

WHEN DID PATIENT FIRST CONSULT YOU FOR THIS CONDITION?  DATE: _11/22/04_

HAS PATIENT EVER HAD THE SAME OR SIMILAR CONDITION?  ☐ YES  ☑ NO

IF "YES," STATE WHEN AND DESCRIBE:

NATURE AND DATE OF SURGICAL PROCEDURE, IF ANY (DESCRIBE FULLY)     DATE:

PROVIDE DATES OF OTHER MEDICAL TREATMENT AND DESCRIBE:

WHAT OTHER SERVICES, IF ANY, DID YOU PROVIDE OR PRESCRIBE PATIENT? (PROVIDE DATES.)

IS PATIENT STILL UNDER YOUR CARE FOR THIS CONDITION?  ☑ YES  ☐ NO

IF "NO," GIVE DATE YOUR SERVICES TERMINATED.  . DATE:                    ( DATES REQUIRED)

HOW LONG WAS OR WILL PATIENT BE CONTINUOUSLY TOTALLY DISABLED (UNABLE TO WORK)? * FROM: _1-22_ * TO: _1-7-05_

HOW LONG WAS OR WILL PATIENT BE PARTIALLY DISABLED?  FROM:            TO:

IF PERMANENT PARTIAL DISABILITY, INDICATE PERCENTAGE OF IMPAIRMENT:

TO YOUR KNOWLEDGE, DOES PATIENT HAVE OTHER HEALTH INSURANCE OR HEALTH PLAN COVERAGE?  ☐ YES  ☐ NO

IF "YES" IDENTIFY.

| DATE _3/3/05_ | SIGNATURE ATTENDING PHYSICIAN | DEGREE _M.D._ | TELEPHONE (334) 274-9000 |
| STREET ADDRESS _429 J Long St._ | CITY OR TOWN _Montgomery_ | STATE OR PROVINCE _AL_ | ZIP CODE _36106_ |

| Settlement Date | 11/15/04 Total Revenue | | $11,477.24 |
|---|---|---|---|
| Work Period 10/1/04 - 10/31/04 | | Base Pay | $10,378.52 |
| | | Other Pay | $0.00 |
| | | Total Pay | $10,388.52 |
| Physical Ins | $0.00 | Perm | $3,322.85 |
| | $0.00 | Flat | $1,976.24 |
| | $0.00 | | $0.00 |
| Avanbrd Ins | $175.86 | Health Ins | $303.00 |
| | | Liability Ins | $910.40 |
| Collection: | 71764 | | |
| Date: | 11/15/04 | Net | $4,286.88 |

GOODWIN MATERIAL SERVICES, INC.

071764

Attention! Amy:

These are the last three months of my pay settlements. Last day worked was Nov. 22.

Ollie R. Goodwin

JAN. 10. 2005 9:36AM    3rd PALOMAR INSURANCE    GODWIN    NO. 445    P. 7 / 82



071297

071536



*Godwin Material Service, Inc.*
*P.O. Box 12    Hwy 331 South*
*Brantley, Alabama 36009*
*334-527-3540*
*Fax 334-527-8723*

Date: **12-8-04**

**10** Total Pages
Including Cover

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TO: **Amy Tillman**         FROM: **Cindy Jordan**

Fax# **323-2372**

**PLIR - Ollie Godwin**

Date: 12/8/2004  Time: 8:38 AM  To: Godwin Materials @ 1334527-8723     P.4/5



**AMERICAN INTERNATIONAL COMPANIES**
**ACCIDENT & HEALTH CLAIMS DIVISION**
**OCCUPATIONAL ACCIDENT UNIT**
P.O. Box 11139 • Montgomery, AL • 36111-0139
Phone: (800)483-73945 • (334) 409-3136
Fax: (334) 323-0555

## POLICYHOLDER LOSS INFORMATION REPORT

To: _Palomar Insurance Corporation_     Fax Number: _(334) 323-0555_

Policy Number: _9055434_     Policyholder/Participating Organization: _Godwin_

Driver Name: _Ollie Godwin_     Driver Social Security No.: _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_

Driver's Company: _Godwin Materials Service_     Company Location _Brantly, AL_

Dispatcher Name: _____     Dispatcher Phone No.: _334-527-8540_

Unit No.: _G106_     Order No.: _____

Date of Injury: _10-27-04_  Time of Injury: _____  Member / Claim Tracking No. _____

In addition to the information provided above, if the claimant is a Helper (i.e. Lumper, Casual Laborer, Co-Driver), please provide the following information:

Helper Name: _____     Helper Social Security No.: _____

Helper Address: _____

Helper Telephone Number: _____

**Please answer the following questions about the listed claimant, and then fax or mail back to the fax number or address above.**

1. Was the vehicle loaded at the time of the accident?  ☒ Yes  ☐ No
2. If unloaded, was the driver under dispatch to pick up a load?  ☐ Yes  ☐ No
3. What was the last day worked by this claimant?  _Unknown_
4. Please indicate the claimant's earnings for the last three (3) months (please include an earnings statement). _See following sheets_
5. Where was the driver scheduled to be at the time of the accident?  _Montgomery, AL_
6. General Comments: _____

Verified by (print name): _Cindy Jordan_  Signature: _Cindy Jordan_
Date verified: _12-8-04_

Thank you for assisting us by providing the information requested herein. Please feel free to contact our office at (800) 482-7394, should you have any questions.

Sent by _Suzanne Adger_     Date 12-8-04

# Commission Report / LEASE    106    OILIE   GODWIN    Godwin Material Service, Inc.

| Date | Ticket | From | Customer | Job Location | Material | Units | Rate | Total | Driver % | Pay |
|---|---|---|---|---|---|---|---|---|---|---|
| 9/1/04 | 5716109 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57167 GRAVEL | 29 | $3.16 | $91.35 | 90.00% | $82.22 |
| 9/1/04 | 5716127 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57167 GRAVEL | 29.34 | $3.15 | $92.42 | 90.00% | $83.18 |
| 9/1/04 | 5716152 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57167 GRAVEL | 29.09 | $3.15 | $91.64 | 90.00% | $82.44 |
| 9/1/04 | 5716162 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57167 GRAVEL | 28.32 | $3.15 | $89.38 | 90.00% | $83.12 |
| 9/1/04 | 5716180 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 5267 GRAVEL | 28.15 | $3.15 | $90.43 | 90.00% | $85.21 |
| 9/1/04 | 5716189 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57267 GRAVEL | 28.65 | $3.15 | $90.25 | 90.00% | $91.23 |
| 9/1/04 | 5716192 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57267 GRAVEL | 29.02 | $3.15 | $91.41 | 90.00% | $82.27 |
| 9/1/04 | 5716203 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57267 GRAVEL | 28.13 | $3.15 | $91.76 | 90.00% | $82.58 |
| 9/1/04 | 5716223 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57167 GRAVEL | 28.68 | $3.15 | $90.87 | 90.00% | $81.82 |
| 9/1/04 | 5716243 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57167 GRAVEL | 28.78 | $3.15 | $90.59 | 90.00% | $81.53 |
| 9/1/04 | 5716254 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57167 GRAVEL | 28.80 | $3.15 | $91.63 | 90.00% | $82.47 |
| 9/1/04 | 5716271 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57167 GRAVEL | 28.71 | $3.15 | $90.44 | 90.00% | $81.40 |
| 9/1/04 | 5712272 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.7 | $3.16 | $90.56 | 90.00% | $81.57 |
| 9/1/04 | 5712273 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.08 | $3.15 | $91.54 | 90.00% | $82.39 |
| 9/1/04 | 5716123 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.29 | $3.15 | $90.28 | 90.00% | $83.03 |
| 9/1/04 | 5716137 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.19 | $3.15 | $91.95 | 90.00% | $82.76 |
| 9/1/04 | 5716167 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 5267 GRAVEL | 29.00 | $3.15 | $91.54 | 90.00% | $82.39 |
| 9/1/04 | 5712306 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.5 | $3.15 | $89.78 | 90.00% | $80.80 |
| 9/1/04 | 5712308 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57267 GRAVEL | 28.10 | $3.15 | $90.96 | 90.00% | $82.76 |
| 9/1/04 | 5716171 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.14 | $3.15 | $91.78 | 90.00% | $82.61 |
| 9/1/04 | 5716207 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.19 | $3.15 | $91.92 | 90.00% | $82.73 |
| 9/1/04 | 5716234 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.92 | $3.15 | $91.10 | 90.00% | $81.99 |
| 9/1/04 | 5716204 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.43 | $3.15 | $90.03 | 90.00% | $85.50 |
| 9/1/04 | 5712272 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57267 GRAVEL | 29.25 | $3.15 | $92.14 | 90.00% | $82.93 |
| 9/1/04 | 5716208 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57267 GRAVEL | 29.02 | $3.15 | $91.41 | 92.00% | $82.27 |
| 9/1/04 | 5716295 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57267 GRAVEL | 29.15 | $3.15 | $94.54 | 90.00% | $82.99 |
| 9/1/04 | 5716256 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.6 | $3.15 | $90.09 | 90.00% | $81.08 |
| 9/1/04 | 5714207 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57267 GRAVEL | 28.57 | $3.15 | $90.15 | 90.00% | $83.04 |
| 9/1/04 | 5714224 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.45 | $3.15 | $92.77 | 90.00% | $83.49 |
| 9/1/04 | 5714256 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57267 GRAVEL | 29.58 | $3.16 | $93.18 | 90.00% | $83.26 |
| 9/1/04 | 5714217 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57267 GRAVEL | 29.64 | $3.15 | $91.48 | 90.00% | $82.33 |
| 9/1/04 | 5714227 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.6 | $3.15 | $93.34 | 90.00% | $83.92 |
| 9/1/04 | 5714417 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57267 GRAVEL | 28.27 | $3.15 | $92.81 | 90.00% | $82.98 |
| 9/1/04 | 5213424 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 28.74 | $3.15 | $90.23 | 90.00% | $81.43 |
| 9/1/04 | 5712044 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 29.3 | $3.15 | $92.30 | 90.00% | $83.07 |
| 9/1/04 | 5714324 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57267 GRAVEL | 29.34 | $3.15 | $92.42 | 90.00% | $83.18 |
| 9/1/04 | 5714242 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57267 GRAVEL | 28.64 | $3.15 | $90.22 | 90.00% | $91.20 |
| 9/1/04 | 5714262 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.83 | $3.15 | $92.62 | 90.00% | $83.72 |
| 9/1/04 | 5714280 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.07 | $3.15 | $91.87 | 90.00% | $82.41 |
| 9/1/04 | 5714072 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57167 GRAVEL | 29.41 | $3.16 | $92.04 | 90.00% | $83.38 |

Wednesday, December 01, 2004

Page 3 of 43

Wednesday, December 08, 2004

## Commission Report / LEASE   106        OLLIE GODWIN                        Graham Material Service, Inc.

| Date | Code | | Location | | Material | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 6/12/04 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 20.07 | $3.15 | $91.57 | 100.0% | $82.41 |
| 6/12/04 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 5787 GRAVEL | 26.48 | $3.15 | $92.20 | 100.0% | $83.52 |
| 6/12/04 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.05 | $3.16 | $91.51 | 100.0% | $82.35 |
| 6/12/04 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 26.44 | $3.15 | $92.74 | 100.0% | $83.47 |
| 6/12/04 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 5787 GRAVEL | 26.51 | $3.15 | $92.37 | 100.0% | $83.14 |
| 6/12/04 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 26.32 | $3.16 | $92.38 | 100.0% | $83.12 |
| 6/12/04 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 26.8 | $3.15 | $93.24 | 100.0% | $83.92 |
| 6/14/04 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 26.57 | $3.15 | $93.39 | 100.0% | $84.05 |
| 6/14/04 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 5787 GRAVEL | 29.14 | $3.15 | $101.48 | 100.0% | $94.11 |
| 6/14/04 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 5787 GRAVEL | 29.54 | $3.15 | $93.85 | 100.0% | $83.75 |
| 6/14/04 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 5787 GRAVEL | 20.29 | $3.15 | $92.28 | 100.0% | $83.01 |
| 6/14/04 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.39 | $3.15 | $93.18 | 100.0% | $83.90 |
| 6/14/04 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 5787 GRAVEL | 28.32 | $3.15 | $101.10 | 100.0% | $91.00 |
| 6/14/04 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 5787 GRAVEL | 29.23 | $3.15 | $92.07 | 100.0% | $82.86 |
| 6/14/04 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 27.76 | $3.15 | $87.54 | 100.0% | $78.79 |
| 6/14/04 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 5787 GRAVEL | 28.11 | $3.15 | $91.70 | 100.0% | $82.53 |
| 6/14/04 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 5787 GRAVEL | 28.05 | $3.15 | $88.67 | 100.0% | $79.80 |
| 6/14/04 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 5787 GRAVEL | 28.15 | $3.15 | $90.60 | 100.0% | $82.55 |
| 6/14/04 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.05 | $3.15 | $90.31 | 100.0% | $81.28 |
| 6/14/04 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.68 | $3.15 | $92.03 | 100.0% | $81.82 |
| 6/14/04 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 5787 GRAVEL | 29.55 | $3.15 | $93.08 | 100.0% | $83.77 |
| 6/14/04 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 5787 GRAVEL | 28.96 | $3.15 | $91.07 | 100.0% | $81.87 |
| 6/14/04 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 5787 GRAVEL | 29.32 | $3.15 | $92.35 | 100.0% | $83.12 |
| | | | | | | | $3,664.44 | | $9,118.78 |

*Effective March 15th, paychecks WILL NOT be ready until AFTER 11:00 am on paydays.*

DEC-08-2004 09:31 AM GODWIN MATERIAL SERVICE 3348278723 P. 05

JAN. 10. 2005 9:38AM PALUMAK INSUKANCE NO. 442 P. 12

| Commission Report / LEASE | 106 | | OLLIE GODWIN | | | | Godwin Material Service, Inc. | |
|---|---|---|---|---|---|---|---|---|

| Date | Ticket | From | Customer | Job Location | Material | Units | Rate | Total | Driver's % | Pay |
|---|---|---|---|---|---|---|---|---|---|---|
| 10/1/04 | 420914 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57X7 GRAVEL | 28.66 | $3.15 | $90.28 | 90.00% | $81.25 |
| 10/1/04 | 51143046 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.33 | $3.15 | $92.38 | 90.00% | $83.15 |
| 10/1/04 | 51143006 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57X7 GRAVEL | 29.42 | $3.15 | $92.67 | 90.00% | $83.40 |
| 10/1/04 | 51143199 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.39 | $3.15 | $92.68 | 90.00% | $83.32 |
| 10/4/04 | 74807 | ANDERSON | *APAC | GREENVILLE | 89 SHOT | 29.58 | $5.00 | $147.80 | 90.00% | $133.02 |
| 10/8/04 | 51143208 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.55 | $3.15 | $89.93 | 90.00% | $80.94 |
| 10/8/04 | 51143021 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.02 | $3.15 | $88.26 | 90.00% | $79.43 |
| 10/4/04 | 51143237 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.4 | $3.15 | $92.61 | 90.00% | $83.35 |
| 10/4/04 | 51143258 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57X7 GRAVEL | 29.42 | $3.15 | $92.67 | 90.00% | $83.40 |
| 10/4/04 | 51143263 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57X7 GRAVEL | 29.37 | $3.15 | $92.52 | 90.00% | $83.27 |
| 10/4/04 | 51143276 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57X7 GRAVEL | 28.12 | $3.15 | $91.73 | 90.00% | $82.56 |
| 10/4/04 | 51143287 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57X7 GRAVEL | 29.33 | $3.15 | $92.38 | 90.00% | $83.15 |
| 10/6/04 | 51212764 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 28.92 | $3.15 | $91.10 | 90.00% | $81.99 |
| 10/6/04 | 51212775 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 28.76 | $3.15 | $90.59 | 90.00% | $81.53 |
| 10/6/04 | 51212783 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 28.31 | $3.15 | $89.18 | 90.07% | $80.26 |
| 10/6/04 | 51212794 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 28.43 | $3.15 | $89.55 | 90.03% | $80.60 |
| 10/6/04 | 51212804 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 28.86 | $3.15 | $90.91 | 90.00% | $81.82 |
| 10/6/04 | 51212815 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 28.81 | $3.15 | $90.75 | 90.00% | $81.68 |
| 10/7/04 | 51212846 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 29.62 | $3.15 | $93.30 | 90.00% | $83.97 |
| 10/7/04 | 51212823 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 28.44 | $3.15 | $89.59 | 90.00% | $80.63 |
| 10/7/04 | 51212828 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 29.54 | $3.15 | $93.05 | 90.90% | $83.76 |
| 10/7/04 | 51212841 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 29.38 | $3.15 | $92.48 | 90.00% | $83.23 |
| 10/7/04 | 51212856 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 28.81 | $3.15 | $90.75 | 90.00% | $81.68 |
| 10/7/04 | 51212878 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 28.48 | $3.15 | $92.88 | 90.00% | $83.52 |
| 10/7/04 | 51212890 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 28.83 | $3.15 | $90.81 | 90.00% | $81.73 |
| 10/7/04 | 51212890 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 28.7 | $3.15 | $90.41 | 90.00% | $81.37 |
| 10/8/04 | 51212904 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 29.62 | $3.15 | $93.30 | 90.00% | $83.97 |
| 10/8/04 | 51212918 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 28.8 | $3.15 | $90.72 | 90.00% | $81.65 |
| 10/8/04 | 51212931 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 29.03 | $3.15 | $91.44 | 90.00% | $82.30 |
| 10/8/04 | 51212944 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 28.68 | $3.15 | $90.34 | 90.00% | $81.31 |
| 10/8/04 | 51212950 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.64 | $3.15 | $90.22 | 90.00% | $81.20 |
| 10/11/04 | 436921 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.65 | $3.15 | $90.83 | 90.00% | $81.75 |
| 10/11/04 | 425728 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.38 | $3.15 | $92.55 | 90.00% | $83.30 |
| 10/11/04 | 425732 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.39 | $3.15 | $89.43 | 90.00% | $80.49 |
| 10/11/04 | 51143581 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.53 | $3.15 | $93.02 | 90.00% | $83.72 |
| 10/11/04 | 51212982 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 28.37 | $3.15 | $89.37 | 90.00% | $80.43 |
| 10/11/04 | 51212989 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.42 | $3.15 | $89.52 | 90.00% | $80.57 |
| 10/12/04 | 51143617 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.42 | $3.15 | $92.67 | 90.00% | $83.40 |
| 10/12/04 | 51143625 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.79 | $3.15 | $93.84 | 90.00% | $84.46 |

Wednesday, December 08, 2004

DEC-09-2004 09:52 AM GODWIN MATERIAL SERVICE 3345278723 P.06

NO. 442   JAN. 10. 2005   9:38AM   PALOMAR INSURANCE

| Commission Report / LEASE | | 105 | | OLLIE GODWIN | | | Godwin Material Service, Inc. | | |
|---|---|---|---|---|---|---|---|---|---|
| 12/12/04 | 51143530 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.73 | $3.15 | 93.95 | 90.00% | $84.29 |
| 14/12/04 | 51143548 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.3 | $3.15 | 92.30 | 90.00% | $85.07 |
| 10/12/04 | 51143659 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 5787 GRAVEL | 28.63 | $3.15 | 90.18 | 90.00% | $81.16 |
| 10/12/04 | 51213392 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.8 | $3.15 | 93.87 | 90.00% | $84.48 |
| 10/13/04 | 51213016 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 28.21 | $3.15 | 88.86 | 90.00% | $79.97 |
| 10/13/04 | 51213025 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 28.72 | $3.15 | 90.47 | 90.00% | $81.42 |
| 10/13/04 | 51215031 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 28.59 | $3.15 | 90.37 | 90.00% | $81.33 |
| 10/13/04 | 51213040 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 28.52 | $3.15 | 89.84 | 90.00% | $80.85 |
| 10/13/04 | 61213053 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 29.8 | $3.15 | 93.87 | 90.00% | $84.48 |
| 10/13/04 | 51213064 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 29.55 | $3.15 | 93.08 | 90.00% | $83.77 |
| 10/13/04 | 51215076 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 29.44 | $3.15 | 92.74 | 90.00% | $83.47 |
| 10/14/04 | 78221 | ANDERSON | *APAC | GREENVILLE | 89 SHOT | 29.13 | $5.00 | $145.65 | 90.00% | $131.09 |
| 10/14/04 | 54213578 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 29.64 | $3.15 | 93.37 | 90.00% | $84.03 |
| 10/14/04 | 51213067 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 29.76 | $3.15 | 93.74 | 90.00% | $84.37 |
| 10/14/04 | 51213098 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 29.64 | $3.15 | 93.37 | 90.00% | $84.03 |
| 10/14/04 | 51213108 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 28.4 | $3.15 | 92.61 | 90.00% | $83.55 |
| 10/14/04 | 51213120 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 29.02 | $3.15 | 91.41 | 90.00% | $82.27 |
| 10/14/04 | 61213133 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 28.96 | $3.15 | 91.22 | 90.00% | $82.10 |
| 10/14/04 | 51213145 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 29.39 | $3.15 | 92.58 | 90.00% | $83.32 |
| 10/15/04 | 51213151 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 29.76 | $3.15 | 93.74 | 90.00% | $84.37 |
| 10/15/04 | 31213165 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 29.11 | $3.15 | 91.70 | 90.00% | $82.53 |
| 10/15/04 | 56213173 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 29.09 | $3.15 | 91.63 | 90.00% | $82.47 |
| 10/15/04 | 51213185 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 29.25 | $3.15 | 92.14 | 90.00% | $82.93 |
| 10/15/04 | 51213209 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.08 | $3.15 | 91.60 | 90.00% | $82.44 |
| 10/15/04 | 51213221 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.79 | $3.15 | 90.89 | 90.00% | $81.62 |
| 10/15/04 | 51213223 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 28.6 | $3.15 | 90.09 | 90.00% | $81.08 |
| 10/15/04 | 51213231 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 28.38 | $3.15 | 89.40 | 90.00% | $80.46 |
| 10/15/04 | 51213238 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 29.8 | $3.15 | 93.87 | 90.00% | $84.48 |
| 10/15/04 | 51213247 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 29.22 | $3.15 | 92.04 | 90.00% | $82.84 |
| 10/15/04 | 31213255 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.46 | $3.15 | 92.80 | 90.00% | $83.52 |
| 10/15/04 | 51213258 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.5 | $3.15 | 89.78 | 90.00% | $80.80 |
| 10/15/04 | 51213285 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.2 | $3.15 | 91.98 | 90.00% | $82.78 |
| 10/15/04 | 61213224 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.58 | $3.15 | 93.49 | 90.00% | $84.14 |
| 10/15/04 | 61213285 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.45 | $3.15 | 92.77 | 90.00% | $83.49 |
| 10/15/04 | 51213294 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.73 | $3.15 | 93.65 | 90.00% | $84.29 |
| 10/19/04 | 51143844 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 5787 GRAVEL | 29.56 | $3.15 | 93.08 | 90.00% | $83.77 |
| 10/19/04 | 51143854 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 5787 GRAVEL | 29.41 | $3.15 | 92.64 | 90.00% | $83.38 |
| 10/19/04 | 51143862 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 5787 GRAVEL | 29.98 | $3.15 | 93.16 | 90.00% | $83.86 |
| 10/19/04 | 51143874 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 5787 GRAVEL | 29.41 | $3.15 | 92.64 | 90.00% | $83.38 |
| 10/19/04 | 51143897 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 7 GRAVEL | 28.37 | $3.15 | 92.52 | 90.00% | $83.27 |
| 10/19/04 | 51143985 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 5787 GRAVEL | 29.11 | $3.15 | 91.70 | 90.00% | $82.53 |

# Commission Report / LEASE

| | 106 | QLIBE GODWIN | | | Godwin Material Service, Inc. |
|---|---|---|---|---|---|
| 10Z3004  5114-0361 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 23.75 | $3.15 | $74.76 | 90.00% | $81.50 |
| 10Z8004  5114-0875 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57R7 GRAVEL | 22.52 | $3.15 | $81.07 | 90.00% | $83.69 |
| 10Z8004  5114-0250 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57R7 GRAVEL | 24.28 | $3.15 | $90.81 | 90.00% | $85.43 |
| 1024004  5114-0242 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57R7 GRAVEL | 26.73 | $3.15 | $86.66 | 90.00% | $84.29 |
| 10Z3004  5114-0253 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57R7 GRAVEL | 24.57 | $3.15 | $93.15 | 90.00% | $83.04 |
| 10Z4004  5114-0822 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 23.85 | $3.15 | $91.19 | 90.00% | $82.07 |
| 10Z4004  5114-0911 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57R7 GRAVEL | 23.5 | $3.15 | $99.24 | 88.00% | $83.12 |
| 10Z4004  5114-0842 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57R7 GRAVEL | 23.4 | $3.15 | $92.61 | 87.00% | $83.25 |
| 10Z4004  5114-0870 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57R7 GRAVEL | 23.4 | $3.15 | $92.61 | 90.00% | $83.25 |
| 10Z1004  5112-0307 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57R7 GRAVEL | 23.25 | $3.15 | $90.40 | 90.00% | $83.21 |
| 10Z1004  5114-0801 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57R7 GRAVEL | 23.4 | $3.15 | $72.11 | 90.00% | $83.35 |
| 10Z3004  5114-0824 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 23.24 | $3.15 | $92.11 | 90.00% | $82.93 |
| 10Z3004  5114-0482 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 22.75 | $3.15 | $91.03 | 90.00% | $81.50 |
| 10Z3004  5114-0844 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57R7 GRAVEL | 24.75 | $3.15 | $93.43 | 90.00% | $94.09 |
| 10Z4004  5114-0104 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 22.13 | $3.15 | $87.78 | 90.00% | $82.66 |
| 10Z4004  5114-0351 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57R7 GRAVEL | 22.39 | $3.15 | $82.59 | 90.00% | $83.52 |
| 10Z8004  5114-0143 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57R7 GRAVEL | 22.88 | $3.15 | $91.88 | 88.00% | $82.44 |
| 10Z8004  5114-0155 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57R7 GRAVEL | 23.31 | $3.15 | $90.33 | 88.00% | $83.10 |
| 10Z8004  5114-0184 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 23.9 | $3.15 | $84.54 | 90.00% | $82.30 |
| 10Z1004  5114-0100 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 7 GRAVEL | 22.75 | $3.15 | $83.71 | 90.00% | $84.34 |
| 10Z3004  5114-0820 | LAFARGE-SOUTH MONTGO | | TEAGUE ROAD | 7 GRAVEL | 23.55 | $3.15 | $83.01 | 90.00% | $83.77 |
| 10Z6004  5114-0235 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57R7 GRAVEL | 22.53 | $3.15 | $91.13 | 90.00% | $83.72 |
| 10Z4004  5114-0245 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 24.83 | $3.15 | $91.13 | 90.00% | $83.82 |
| 10Z3004  5114-0265 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 23 | $3.15 | $88.20 | 88.00% | $73.39 |
| 10Z4004  5114-0142 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 7 GRAVEL | 24.37 | $3.15 | $92.52 | 90.00% | $83.27 |
| 10Z7004  5114-0275 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 27.82 | $3.15 | $97.00 | 90.00% | $78.30 |
| 10Z7004  5114-0282 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57R7 GRAVEL | 22.11 | $3.15 | $91.75 | 90.00% | $82.63 |
| 10Z8004  5114-0297 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57R7 GRAVEL | 23.14 | $3.15 | $91.79 | 61.00% | $82.51 |
| 10Z7004  5114-0282 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 23.17 | $3.15 | $97.00 | 90.00% | $82.51 |
| 10Z6004  5114-0319 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57R7 GRAVEL | 22.71 | $3.15 | $91.28 | 90.00% | $82.13 |
| 10Z5004  5114-0325 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57R7 GRAVEL | 23.15 | $3.15 | $90.44 | 90.00% | $81.40 |
| 10Z4004  5114-0340 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57R7 GRAVEL | 23.77 | $3.15 | $90.72 | 90.00% | $84.47 |
| 10Z9004  5114-0340 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 20.46 | $3.15 | $75.66 | 90.00% | $73.59 |
| 10Z9004  5114-0352 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 25.38 | $3.15 | $88.77 | 90.00% | $83.40 |
| 10Z3004  5114-0358 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57R7 GRAVEL | 20.51 | $3.15 | $86.05 | 90.00% | $81.00 |
| 10Z9004  5114-0266 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 20.34 | $3.15 | $91.27 | 90.00% | $80.34 |
| 10Z9004  5114-0282 | DOZER PIT | LAFARGE-SOUTH MONTGO | CONCRETE SAND | 20.59 | $3.15 | $92.56 | 90.00% | $83.52 |

Page 8 of 56

**Commission Report / LEASE**

| | | 106 | | OLLIE GODWIN | | | | | Godwin Material Service, Inc. | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 102003 | 5114078 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEASLIE ROAD | CONCRETE SAND | 26.57 | $3.15 | | $83.15 | 90.00% | $83.84 | |
| 102004 | 5114078 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEASLIE ROAD | SENY GRAVEL | 26.57 | $3.15 | | $86.15 | 96.00% | $83.84 | |
| 102005 | 5114487 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEASLIE ROAD | SENY GRAVEL | 24.98 | $3.15 | | $78.82 | 96.00% | $72.76 | |
| | | | | | | | | | $11,477.34 | | $18,328.38 | |

*Effective March 15th, paychecks WILL NOT be ready until AFTER 11:00 am on paydays.*

Wednesday, December 01, 2004

DEC-08-2004 09:53 AM GODWIN MATERIAL SERVICE 3345278728 P.09

## Commission Report / LEASE  105     OLLIE GODWEN     Godwin Material Service, Inc.

| Date | Ticket | From | Customer | Job Location | Material | Units | Rate | Total | Driver % | Pay |
|---|---|---|---|---|---|---|---|---|---|---|
| 11/4/04 | 51144023 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 29.85 | $3.15 | $93.40 | 90.00% | $84.06 |
| 11/4/04 | 51144704 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 29.51 | $3.15 | $92.95 | 90.00% | $83.65 |
| 11/4/04 | 51144710 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.98 | $3.15 | $91.29 | 90.00% | $82.16 |
| 11/4/04 | 51144715 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.5 | $3.15 | $93.24 | 90.00% | $83.92 |
| 11/4/04 | 51144721 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.15 | $3.15 | $88.67 | 90.00% | $79.80 |
| 11/4/04 | 51144815 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 29.57 | $3.15 | $93.15 | 90.00% | $38.94 |
| 11/4/04 | 51144827 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.68 | $3.15 | $93.43 | 90.00% | $84.09 |
| 11/4/04 | 51144837 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.93 | $3.15 | $91.13 | 90.00% | $82.02 |
| 11/5/04 | 51144848 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.51 | $3.15 | $92.96 | 90.00% | $83.66 |
| 11/5/04 | 51144859 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 7 GRAVEL | 29.56 | $3.15 | $93.08 | 90.00% | $83.77 |
| 11/5/04 | 51144868 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 7 GRAVEL | 29.51 | $3.15 | $92.96 | 90.00% | $83.66 |
| 11/5/04 | 51144877 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 7 GRAVEL | 29.56 | $3.15 | $93.11 | 90.00% | $83.80 |
| 11/5/04 | 51144887 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 29.43 | $3.15 | $92.70 | 90.00% | $83.43 |
| 11/5/04 | 51144997 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.82 | $3.15 | $90.78 | 90.00% | $81.70 |
| 11/10/04 | 26302 | RED BLUFF | *APAC | GREENVILLE | 1/2" | 28.8 | $5.00 | $144.00 | 90.00% | $129.60 |
| 11/10/04 | 51144911 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.32 | $3.15 | $92.35 | 90.00% | $83.12 |
| 11/10/04 | 51144914 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.5 | $3.15 | $93.24 | 90.00% | $83.92 |
| 11/10/04 | 51144915 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.14 | $3.15 | $91.79 | 90.00% | $82.61 |
| 11/10/04 | 51144923 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.05 | $3.15 | $91.51 | 90.00% | $82.36 |
| 11/10/04 | 51144930 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.33 | $3.15 | $88.24 | 90.00% | $80.32 |
| 11/10/04 | 51144938 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.48 | $3.15 | $92.80 | 90.00% | $83.52 |
| 11/11/04 | 26415 | RED BLUFF | *APAC | GREENVILLE | 1/2" | 28.35 | $5.00 | $141.75 | 90.00% | $127.58 |
| 11/11/04 | 51144949 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.18 | $3.15 | $91.92 | 90.00% | $82.73 |
| 11/11/04 | 51144951 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.75 | $3.15 | $90.55 | 90.00% | $81.50 |
| 11/11/04 | 51144975 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.31 | $3.15 | $92.33 | 90.00% | $83.10 |
| 11/15/04 | 51145073 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.48 | $3.15 | $92.80 | 90.00% | $83.52 |
| 11/15/04 | 51145091 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 29.6 | $3.15 | $93.24 | 90.00% | $83.92 |
| 11/15/04 | 51145111 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 29.47 | $3.15 | $92.83 | 90.00% | $83.55 |
| 11/15/04 | 51145126 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 29.43 | $3.15 | $92.70 | 90.00% | $83.43 |
| 11/15/04 | 51145144 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.5 | $3.15 | $92.93 | 90.00% | $83.64 |
| 11/15/04 | 51145159 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 29.6 | $3.15 | $93.24 | 90.00% | $83.92 |
| 11/16/04 | 51145162 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.41 | $3.15 | $89.49 | 90.00% | $80.54 |
| 11/16/04 | 51145177 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 29.41 | $3.15 | $92.64 | 90.00% | $83.38 |
| 11/16/04 | 51213738 | CITY PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | COURSE AGG BLEN | 29.72 | $3.15 | $93.62 | 90.00% | $84.26 |
| 11/17/04 | 51145215 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 27.56 | $3.15 | $86.86 | 90.00% | $78.18 |
| 11/17/04 | 51145222 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.05 | $3.15 | $91.51 | 90.00% | $82.36 |
| 11/17/04 | 51145228 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 29.24 | $3.15 | $92.11 | 90.00% | $82.90 |
| 11/17/04 | 51145235 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 28.23 | $3.15 | $82.07 | 90.00% | $82.86 |
| 11/18/04 | 51145367 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 29.18 | $3.15 | $91.92 | 90.00% | $82.73 |
| 11/19/04 | 51145389 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | CONCRETE SAND | 29.88 | $3.15 | $94.12 | 90.00% | $84.71 |
| 11/23/04 | 51145512 | DOZIER PIT | LAFARGE-SOUTH MONTGO | TEAGUE ROAD | 57/67 GRAVEL | 29.04 | $3.15 | $91.48 | 90.00% | $82.33 |

Wednesday, December 08, 2004

## Commission Report / LEASE 196     *OLLIE GODWIN*     *Godwin Material Service, Inc.*

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 112262 | E714879 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGLE ROAD | CONCRETE SAND | 26.66 | $3.15 | $83.97 | 99.00% | $83.92 |
| 112264 | E714658 | DOZER PIT | LAFARGE-SOUTH MONTGO | TEAGLE ROAD | CONCRETE SAND | 25.18 | $3.15 | $81.92 | 99.00% | $82.73 |

*Effective March 15th, paychecks WILL NOT be ready until AFTER 11:00 am on paydays.*

$840,017.77     $3,504.72



**AIG Claim Services, Inc.**
*A&H Claims Department*
P. O. Box 15701
Wilmington, DE 19850-5701
800.551.0824

**To:** STEVEN A. BARRINGTON, M.D.
**Company:** ALABAMA ORTHOPAEDIC SPECIALISTS
**Phone:** 334 274 9000
**Fax:** 334 274 0857

**From:** STEPHANIE PINE
**Company:** AIG--A&H CLAIMS-- OCCUPATIONAL ACCIDENT UNIT
**Phone:** 302 661 8865
**Fax:** 302 661 8962

**Date:** 1/25/2005
**Pages including this cover page:** 1 INCLUDING COVER SHEET

## Comments:

Dear Dr. Barrington,

In order to complete our review of Mr. Ollie Godwin's claim for Temporary Total Disability and Medical Benefits we need to request the following information. Please provide us with priority handling and return your replies by fax.

Is the claimant's disability due to injuries he sustained on 10/27/2004? If no, please explain in detail.

Is the claimant's disability due to a congenital and/or degenerative disease? If yes, please explain.

Please submit medical records and office notes for the period 1/1/2004 to present.

Thank you for giving our request your expeditious attention.

Sincerely, Stephanie Pine/ Claims Examiner

A Member Company of
American International Group, Inc.

**AIG**

AIG Claim Services, Inc.
A&H Claims Department
P. O. Box 15701
Wilmington, DE 19850-5701
800.551.0824

# 84328

*Attn:*
*Stephanie Pine*
*6 pages thanks, too*
*for 334-273-9*
*9624*

**To:** STEVEN A. BARRINGTON, M.D.
**Company:** ALABAMA ORTHOPAEDIC SPECIALISTS
**Phone:** 334 274 9000
**Fax:** 334 274 0857

**From:** STEPHANIE PINE
**Company:** AIG--A&H CLAIMS-- OCCUPATIONAL ACCIDENT UNIT
**Phone:** 302 661 8865
**Fax:** 302 661 8962

**Date:** 1/25/2005
**Pages including this cover page:** 1 INCLUDING COVER SHEET

## Comments:

Dear Dr. Barrington,

In order to complete our review of Mr. Ollie Godwin's claim for Temporary Total Disability and Medical Benefits we need to request the following information. Please provide us with priority handling and return your replies by fax.

Is the claimant's disability due to injuries he sustained on 10/27/2004? If no, please explain in detail. *See attached notes*

Is the claimant's disability due to a congenital and/or degenerative disease? If yes, please explain. *See attached notes*

Please submit medical records and office notes for the period 1/1/2004 to present. *Attached —*

Thank you for giving our request your expeditious attention.

Sincerely, Stephanie Pine/ Claims Examiner

A Member Company of
American International Group, Inc.



GODWIN, OLLIE R.
84328
12-03-04
DR. BARRINGTON
C

HISTORY OF PRESENT ILLNESS: Mr. Godwin is here for followup for his MRI of the left knee and both hips. The left knee MRI showed some mild patellar chondromalacia with an osteochondral lesion of the lateral femoral condyle. The MRI of the hip showed osteonecrosis of both femoral heads with collapse on the left. He notes he had not had any difficulty with these prior to an injury about 6 weeks ago at work. That was on October 27. He noticed it then and it has been bothering him since. He is to the point now where he has a great deal of difficulty getting around. He has fallen a couple of times, in fact, because it gives way on him and it collapses.

PHYSICAL EXAMINATION: Today does reveal significant tenderness with internal and external rotation of the hip. This is of the left hip. He has less tenderness in the right hip and he does have some knee pain as well. The bulk of his pain seems to be coming from the left hip and going down the leg.

ASSESSMENT:
1. Avascular necrosis both hips with collapse on the left.
2. Left knee pain with a lateral femoral condyle osteochondral lesion.

PLAN: We discussed it with him. I do think it appears that this is work related. We will see about getting it preapproved for total hip arthroplasty on the left. We also talked to him about the possibility of doing a core decompression or being involved the Hedrocel rod study for the right hip to try to prevent collapse on that. He is to the point where he really cannot get around with the left hip and so we need to address that before we can reasonably address the right hip. We will see about getting that set up. We did discuss risks, benefits, and options in detail including risk of infection, bleeding, damaged to tendons, blood vessels and nerves, risk of continued pain, risk of deep venous thrombosis, pulmonary embolus, myocardial infarction, CVA, pneumonia, death, blood transfusion reaction or transmission of disease including hepatitis and AIDS. He appears to understand and would like to see about getting it set up so he can get back to activity and we will go from there.
SAB/llm            12-06-04

GODWIN, OLLIE R.
84328
11-22-04
DR. BARRINGTON (DICTATED BY P.A. WOODS)
C

Mr. Godwin is here with a complaint of pain in the left leg and hip. He says that he has not had any specific injury to the hip. 3 weeks ago he was stepping out of his truck, he does drive the big rig trucks, and he had a twisting injury and he started to have pain on the lateral aspect of the left knee. He denies any effusion to it. He says that it does not click or catch on him and it does not give way. He says that walking makes it worse. The date of injury was approximately 10-27-04. His doctor is Dr. K. Adams and he is the referring physician.

## ALLERGIES: HE HAS NO KNOWN DRUG ALLERGIES.

CURRENT MEDICATIONS: Zocor, Lisinopril, HCTZ, Naproxen, and Ultracet.

PAST SURGICAL HISTORY: He has had surgery on his hand and surgery on a hernia. No dates are given.

SOCIAL HISTORY: He is married and his wife is with him today. He has 3 children and 1 pet. He occasionally drinks alcohol. He is right hand dominant.

FAMILY HISTORY: he has a family history of high blood pressure and stroke, heart trouble, and diabetes.

PAST MEDICAL HISTORY: He has a past medical history of high blood pressure.

REVIEW OF SYSTEMS: His review of systems is pertinent only for the joint pain.

PHYSICAL EXAM: Patient is alert and oriented x 3 and has an appropriate affect. Cranial nerves are grossly intact. Sensation is grossly intact. Scleras are nonicteric. Pupils are equal, round and reactive to light. Hearing is grossly intact with no drainage from the auditory canal. Neck is supple and non-tender with full range of motion. The patient breathes without wheezes or use of accessory muscles. Skin exam reveals no rashes, lesions, or abrasions.

MUSCULOSKELETAL EXAM: The musculoskeletal exam shows that he has pain with internal and external rotation of the left hip in the inguinal region. He does not have tenderness over the iliotibial band and greater trochanteric bursa. The left knee has pain over the lateral joint line and lateral collateral ligaments although a varus stress does not elicit pain, valgus stress does elicit pain along the lateral joint line. There is no effusion today. He has excellent range of motion. Anterior and posterior drawer are negative. His straight leg raise is negative and his lumbosacral spine has no tenderness to palpation. There are no trigger points.

54328 11-22-04
SB cont

RADIOGRAPHIC EXAM: AP, pelvis, and lateral of the left hip show flattening of the left femoral head. The left knee series appears normal. The lumbosacral spine series shows minimal degenerative joint change.

ASSESSMENT:
1. Low back pain.
2. Left hip pain.
3. Left knee pain.

PLAN: We are going to get a MRI of the left knee and bilateral hips. The bilateral hips are to rule out AVN. He is going to follow up with us post MRI. This patient was seen in the clinic with Dr. Barrington.
SAB:rg          11-23-04
CC: Dr. Kynard Adams – Thank You

·30·04 - MRI BILAT HIPS + LEFT KNEE COMPLETED AT AOS-
12-3-04 SB                                                          BP

AOS Billing Department - Precert section
Procedure: L THA @ Jay
Scheduled Procedure Date: TBA per Jackie
Insurance Co.: Palomar
Precert Required:  Y or (N.)    Precert Approved:  Y or (N)
Precert Number: N/A
Insurance Co Rep name & phone: Palomar - Amy @ 800-482-7394
Patient Notified:  Y or N      Note made to computer system: (Y) or N
AOS Precert Clerk initials: NS
Date: 12/1/04

# A.O.S

## ALABAMA ORTHOPAEDIC SPECIALISTS, P.A.

4294 Lomac Street   Montgomery, Alabama  36123-5003
Telephone: (334) 274-9000   Fax: (334) 274-0857
www.aosonline.net

---

**PATIENT NAME: GODWIN, OLLIE**          **DOB: 1-24-54**          **CHART # 84328**
**DATE: 11-30-04**
**REFERRING PHYSICIAN:  DR. BARRINGTON**
**EXAM:  MRI LEFT KNEE W/O CONTRAST**
**DIAGNOSIS: TWISTING INJURY TO LEFT KNEE**

### X-RAY REPORT

TECHNIQUE:
Multi planar, multi echo MR of the left knee.

There is a metallic low signal artifact in the anterior medial aspect of the knee that extends into the medial femoral condyle on the fat suppressed images.

The bone marrow signal appears unremarkable. There is an 8mm osteochondral lesion in the anterior aspect of the lateral femoral condyle. The extensor mechanism appears within normal limits. There is thinning of the articular cartilage in the medial and lateral patellar facets. There is a small knee effusion. The medial and lateral meniscus appear normal. The ACL and PCL appear normal.

**IMPRESSION:**
PATELLAR CHONDROMALACIA. SMALL OSTEOCHONDRAL LESION ON THE LATERAL FEMORAL CONDYLE.

SIGNED: JEFFREY ADAMS, M.D.
Transcribed: EDA
Technologist: Betsy Powers, RT (R) (MR)

# A.O.S

## ALABAMA ORTHOPAEDIC SPECIALISTS, P.A.
4294 Lomac Street   Montgomery, Alabama 36123-5003
Telephone: (334) 274-9000   Fax: (334) 274-0857
www.aosonline.net

**PATIENT NAME: GODWIN, OLLIE**          **DOB: 1-24-54**          **CHART #
84328**
**DATE: 11-30-04**
**REFERRING PHYSICIAN:  DR. BARRINGTON**
**EXAM:  MRI HIPS W/O CONTRAST**
**DIAGNOSIS:  HIP AND LEG PAIN**

### X-RAY REPORT

TECHNIQUE:
Axial T1 weighted and proton density fat suppressed images performed. Coronal T1
weighted inversion recovery images performed of both hips.

FINDINGS:
There are areas of serpiginous low signal involving a large portion of the anterior and
superior aspect of both femoral heads consistent with osteonecrosis. There is a small right
hip effusion.

There is a moderate sized left hip effusion. Also there is ill defined bone marrow edema in
the base of the left femoral head and extend into the femoral head and extend into the
femoral neck and inter trochanteric region near the lesser trochanter. There are also a few
areas of patchy bone marrow edema in the acetabulum. I see no linear signal abnormalities
to suggest a fracture line. There is ill defined edema within the musculature of the
quadratus femoris.

IMPRESSION:
OSTEONECROSIS OF BOTH FEMORAL HEADS.

BONE MARROW EDEMA IN THE LEFT FEMORAL HEAD AND NECK.

BILATERAL HIP EFFUSIONS GREATER ON THE LEFT.

EDEMA IN THE LEFT QUADRATUS FEMORIS MUSCULATURE.

SIGNED: JEFFREY ADAMS, M.D.
Transcribed: EDA
Technologist: Betsy Powers, RT (R) (MR)



**AIG Claim Services, Inc.®**
*A&H Claims Department*
P. O. Box 15701
Wilmington, DE 19850-5701
800.551.0824

On behalf of:
**National Union Fire
Insurance Company of
Pittsburgh, Pa.**

February19, 2005

Ollie Godwin
656 Ottis Faulk Drive
Honoraville, AL 36042

RE:     Policy Number:     **9056434**
        Member ID:         **R043430028**
        Claim Number:      **A-977302**
        Claimant:          **Same**
        Date of Loss       **10/27/2004**

Dear Mr. Godwin:

We have completed our review of the claim submitted for occupational accident benefits
under the above captioned policy.

This policy provides benefits for covered losses when an insured sustains a bodily injury
caused by an occupational accident resulting directly from and independent of all other
causes. Pertinent provisions include:

*SECTION I*                    *GENERAL DEFINITIONS*

*Injury means bodily injury to an Insured Person caused by an Occupational accident
while coverage is in force under this Policy, which results directly and independently of all
other causes in a Covered Loss. All Injuries sustained by an Insured Person in any one
accident shall be considered a single Injury.*

*SECTION VI*                   *EXCLUSIONS*

*This Policy does not cover any losses caused in whole or in part by, or resulting in whole
or in part from, the following:*

A Member Company of
American International Group, Inc.

2. *sickness, disease or infections of any kind, except bacterial infections due to an accidental cut or wound, botulism or ptomaine poisoning;*

The disability claim form completed by Dr. Barrington on 1/7/2005 indicated Avascular Necrosis of both hips with collapse on left side. When we corresponded with Dr. Barrington's office to clarify the reason for your disability, we were provided office records that state; 11/22/04 "Mr. Godwin is here with a complaint of pain in the left leg and hip. He says that he has not had any specific injury to the hip." When we spoke with Dr. Barrington directly he stated that your condition was an underlying condition that was aggravated by work. He states that you had this condition but were not aware of it.

Based upon this information we must decline your claim for Temporary Total Disability and Accident Medical Expense benefits as your loss does not appear to be due to an occupational accidental injury. While we believe our position to be correct, we understand that you may disagree with our decision. If you have any new or additional information in support of your position that this loss is an occupational accident according to the terms and conditions of the policy, you should furnish our office with that information with your request for reconsideration of this decision.

Of course, we must respectfully request that you understand that we reserve all of our rights and defenses under the policy and the law, and none of our communications may be construed so as to waive any of those rights.

Sincerely,


Stephanie Pine
Claims Examiner



ALABAMA ORTHOPAEDIC
SPECIALISTS, P.A.

THOMAS G. WELLS, M.D.
Orthopaedic Surgery and Arthroscopic Surgery
D.D.THORNBURY, M.D.
Foot & Ankle and Orthopaedic Surgery
EDWARD E. PALMER, JR., M.D.
Hand Surgery and Orthopaedic Surgery
STEVEN A. BARRINGTON, M.D.
Joint Replacement and Orthopaedic Surgery

RECEIVED

MAR 15 2005

A&H CLAIMS
AIGCS

CHARLES W. HARTZOG, JR., M.D.
Sports Medicine and Arthroscopic Surgery
G. DEXTER WALCOTT, JR., M.D.
Sports Medicine and Arthroscopic Surgery
MICHAEL E. DAVIS, M.D.
Spine Surgery and Orthopaedic Surgery
RONALD P. O'NEAL, MPH, CHE
Administrator
W. SCOTT GULLEY, CPA
Controller

Marcy 2, 2005

AIG
Stephanie Pine
P.O. Box 15701
Wilmington, DE 19850-5701

Re: Ollie Robert Godwin
Chart #: 84328

9 056434 RO 43430028

Dear Ms. Pine:

As you know we have treated Mr. Godwin for avascular necrosis with collapse of AC
his left hip. He related to me that he injured it when he was stepping out of his truck
back in November and has had basically increased pain in that left side since then.
Probably he had an aggravation of a previously unknown underlying condition, which
was the avascular necrosis. The injury probably caused him to collapse it and therefore
have the pain that resulted in his need for the hip replacement operation.

If you need any further clarification, do not hesitate to contact my office.

Sincerely,

Steven A. Barrington, M.D.

SAB/aw



**AIG Claim Services, Inc.®**
*A&H Claims Department*
P. O. Box 15701
Wilmington, DE 19850-5701
800.551.0824

On behalf of:
**National Union Fire
Insurance Company of
Pittsburgh, Pa.**

May 03, 2005

Ollie Godwin
656 Ottis Faulk Drive
Honoraville, AL 36042

RE: Policy Number: **9056434**
   Member ID:  **R043430028**
   Claim Number: **A-977302**
   Claimant:   **Same**
   Date of Loss:  **10/27/2004**

Dear Mr. Godwin:

We have received the attached letter dated March 2, 2205 from Dr. Barrington, and although it does not add anything new or additional, we did re-examine your claim in light of Dr. Barrington's comments.

As you know, your claim was denied for two reasons: 1) you did not incur an Injury, as defined by your policy; 2) your loss was caused in whole or in part by sickness or disease, and is therefore specifically excluded from coverage.

Dr. Barrington's letter does not indicate that you suffered an Injury. He does state that your underlying condition was aggravated by your work activity and his records note that you reported that your pain began after you twisted in getting out of your cab around October 27, 2004. This twisting in the course of routine activity is not a bodily injury caused by an accident. Dr. Barrington also concludes that this incident aggravated the underlying condition of avascular necrosis. The medical records document that significant avascular necrosis was present in both hips. The avascular necrosis appears to be the medical cause of the collapse of your hip joint and the pain that required an operation to replace your hip Certainly, this significant underlying disease was at least the partial cause of your loss.

As explained in our letter dated February 19, 2005, these facts cause us to conclude that your loss is not due to Injury, and was caused in whole or in part by sickness or disease.

A Member Company of
American International Group, Inc.

Unfortunately, upon reconsideration of your record, and considering Dr. Barrington's additional remarks, we find no reason to change our original decision.

Of course, we must respectfully request that you understand that we reserve all of our rights and defenses under the policy and the law, and none of our communications may be construed so as to waive any of those rights.

Sincerely,


Stephanie Pine
Claims Examiner



**ALABAMA ORTHOPAEDIC SPECIALISTS, P.A.**

THOMAS G. WELLS, M.D.
Orthopaedic Surgery and Arthroscopic Surgery
D.D. THORNBURY, M.D.
Foot & Ankle and Orthopaedic Surgery
EDWARD E. PALMER, JR., M.D.
Hand Surgery and Orthopaedic Surgery
STEVEN A. BARRINGTON, M.D.
Joint Replacement and Orthopaedic Surgery

CHARLES W. HARTZOG, JR., M.D.
Sports Medicine and Arthroscopic Surgery
G. DEXTER WALCOTT, JR., M.D.
Sports Medicine and Arthroscopic Surgery
MICHAEL E. DAVIS, M.D.
Spine Surgery and Orthopaedic Surgery
RONALD P. O'NEAL, MPH, CHE
Administrator
W. SCOTT GULLEY, CPA
Controller

Marcy 2, 2005

AIG
Stephanie Pine
P.O. Box 15701
Wilmington, DE 19850-5701

Re: Ollie Robert Godwin
Chart #: 84328

Dear Ms. Pine:

As you know we have treated Mr. Godwin for avascular necrosis with collapse of his left hip. He related to me that he injured it when he was stepping out of his truck back in November and has had basically increased pain in that left side since then. Probably he had an aggravation of a previously unknown underlying condition, which was the avascular necrosis. The injury probably caused him to collapse it and therefore have the pain that resulted in his need for the hip replacement operation.

If you need any further clarification, do not hesitate to contact my office.

Sincerely,

Steven A. Barrington, M.D.

SAB/aw

4294 Lomac Street (36106) • Post Office Box 235003 • Montgomery, Alabama 36123-5003
Telephone: (334) 274-9000 • Fax: (334) 274-0857 • Website: www.aosonline.net

ATTORNEYS AT LAW
RICHARDSON LEGAL CENTER, L.L.C.

May 12, 2005

RECEIVED

MAY 13 2005

A&H CLAIMS
AIGCS

AIG Claim Services, Inc.
Stephanie Pine, Claims Examiner
A & H Claims Department
P.O. Box 15701
Wilmington, DE 19850-5701

Re:    Claimant:    Ollie Godwin
                    656 Ottis Faulk Dr.
                    Honoraville, AL 36042
       Policy:      9056434
       Member ID:   R043430028
       Date Of Loss: 10/27/2004

Dear Ms. Pine:

I have been retained by Ollie Godwin to dispute your decision of February 19, 2005 in which you deny his claim for the above referenced injury. We disagree with your decision that this injury is not work related and to quote Dr. Barrington, in his correspondence to you dated March 2, 2005, "The injury probably caused him to collapse it and therefore have the pain that resulted in his need for the hip replacement operation." Dr. Barrington also states in his medical notes dated 12-06-04, "I do think it appears that this is work related." "It is undisputed that Mr. Godwin injured his knee on or about October 27, 2004 during the time that he was on dispatch for Godwin Materials which clearly indicates an occupational injury. As of this date, Mr. Godwin's expenses for treatment of his injury are still outstanding and he has not received any disability benefits pursuant to the policy's §IV titled Temporary Total Disability Benefit.

It is well settled law in Alabama that:

Insurance companies have a right to limit their liability and to write policies with narrow coverage. However, an insurance contract containing ambiguous language will be construed liberally in favor of the insured and strictly against the insurance company. Furthermore, provisions of insurance policies must be construed in light of the interpretation that ordinary men would place on language used therein.

National Union Fire Ins. Co. v. Leeds, 530 So. 2d 205 (Ala., 1988)

Where there is any doubt or confusion as to the meaning of a term in an insurance policy, the general rule of contracts applies to the policy, so that the contract is interpreted against the party which drafted the contract. Any language of an insurance contract that is susceptible to more than one interpretation must be construed in favor of coverage for the insured.

United Servs. Auto. Ass'n v. Vogel, 733 So. 2d 401, (Ala. Civ. App., July 24, 1998)

133 Hayneville Plaza • Hayneville, AL 36040 • ph: 334.548.5660 • fx: 334.548.5661
Mailing Address: P.O. Box 971, Hayneville, AL 36040

Insurance contracts, like other contracts, are not to be construed so technically as to defeat the intention of the parties, but are to be given a rational and practical construction. The court is not at liberty to make a new contract for the parties by a tortured construction. On the other hand, the rule is too well settled by the court's decisions to require citation of authority that where provisions of an insurance policy are **susceptible** of plural constructions, consistent with the object of the obligation, that construction will be adopted which is **favorable to the insured.**

Crossett v. St. Louis Fire & Marine Ins. Co., 289 Ala. 598, (Ala. 1972)

Mr. Godwin also filed a claim with you in October/November of 2003 which your company classified as non-occupational and only paid a portion of medical expenses amounting to approximately $7,500.00 and no disability benefits. Mr. Godwin has a letter from Godwin Materials which states that he was under dispatch during the time of the injury. This particular injury was for hernia surgery for which there is special coverage under the Hernia Coverage Rider which became effective May 1, 2004 under AIG policy 9056434. As of this date, your company has not reconsidered your decision to pay that claim as non-occupational.

**PLEASE SEE BELOW FOR ITEMIZED LIST OF DAMAGES FOR BOTH CLAIMS MADE BY MR. OLLIE GODWIN AS OF THE DATE OF THIS LETTER:** [1]

| | |
|---|---|
| **Total outstanding charges for 10/03 injury:** | **$ 7,875.50** |
| **Includes Disability benefits for 6 weeks period** | |
| | |
| **Medical expenses to date on Oct. 04 injury:** | **$ 51,705.94** |
| **Includes Disability benefits 11/04/04 to 05/14/04** | |
| | |
| **TOTAL DAMAGES:** | **$ 59,581.44** |

Mr. Godwin is hereby demanding that AIG reconsider his claim number 106142402 in reference to his loss of November 22, 2003 and classify that claim as occupational and pay all damages due under the occupational classification. He is also requesting that you acknowledge and pay the above referenced claim dated October 27, 2004 as occupational classification. Mr. Godwin has assured me that he is willing to take advantage of all legal avenues available to him in regards to the above referenced claims. Please contact my office **within 10 days** of receipt of this demand in order to settle Mr. Godwin's claim of Oct/Nov-2003, begin settlement of Mr. Godwin's claim pursuant to his injury on or about October 2004, and to avoid further expense associated with legal action against you.

Your prompt attention is required.

Yours truly,

Arlene M. Richardson,
Attorney at Law

---

[1] Please note that Mr. Godwin's medical treatment, for injury sustained on October 27, 2004, is on going at this time and amounts shown for damages are outstanding charges through the date of this correspondence. Medical charges will accrue daily until such time as Mr. Godwin is released from all medical treatments.

# AIGLIFE

Policyholder:  Crestar Bank, N.A. as Trustee of the
WorkGuard Trust
Policy Number:  TRK 805 6434
Participating Organization:  Godwin Materials

**AIG LIFE INSURANCE COMPANY**
600 KING STREET
WILMINGTON, DELAWARE 19801
(302) 594-2000
(Herein called the Company)

## TRUCKERS OCCUPATIONAL ACCIDENT INSURANCE

This Policy is a legal contract between the Policyholder and the Company. The Company agrees to insure eligible persons of the Policyholder (herein called Insured Person(s)) against loss covered by this Policy, subject to its provisions, limitations and exclusions. The persons eligible to be Insured Persons are all persons described in the Description of Eligible Persons section of the Master Application.

This Policy is issued in consideration of the payment of the required premium when due and the statements set forth in the signed Master Application, which is attached to and made part of this Policy and in the individual enrollment forms, if any.

This Policy begins on the Policy Effective Date shown in the Master Application. This Policy will continue in effect, provided premiums are paid when due, until the Policy Termination Date shown in the Master Application, unless otherwise terminated as further provided in this Policy, or renewed.

## IMPORTANT NOTICE

**THIS IS NOT A WORKERS' COMPENSATION POLICY AND IS NOT A SUBSTITUTE FOR WORKERS' COMPENSATION COVERAGE.**

This Policy is governed by the laws of the state in which it is delivered.

The President and Secretary of AIG Life Insurance Company witness this Policy:

President

Secretary

## PLEASE READ THIS POLICY CAREFULLY

C22382

## TABLE OF CONTENTS

| | | |
|---|---|---|
| **Section I** | **General Definitions** ............................................................ | **3** |
| **Section II** | **Effective and Termination Dates** ................................... | **5** |
| | Policy Effective Date ............................................................ | 5 |
| | Policy Termination Date ........................................................ | 5 |
| | Owner-Operator's Effective Date ....................................... | 5 |
| | Owner-Operator's Termination Date.................................... | 5 |
| | Contract Driver's Effective Date.......................................... | 5 |
| | Contract Driver's Termination Date..................................... | 6 |
| **Section III** | **Premium** .......................................................................... | **7** |
| | Premiums ............................................................................ | 7 |
| | Insured Person's Premium................................................... | 7 |
| | Grace Period ........................................................................ | 7 |
| | Waiver of Premium............................................................... | 7 |
| **Section IV** | **Benefits** ........................................................................... | **8** |
| | Principal Sum ....................................................................... | 8 |
| | Deductible............................................................................ | 8 |
| | Accidental Death Benefit..................................................... | 8 |
| | Survivor's Benefit ................................................................ | 8 |
| | Exposure and Disappearance.............................................. | 8 |
| | Accidental Dismemberment Benefit...................................... | 9 |
| | Paralysis Benefit.................................................................. | 9 |
| | Temporary Total Disability Benefit....................................... | 10 |
| | Continuous Total Disability Benefit...................................... | 11 |
| | Accident Medical Expense Benefit....................................... | 12 |
| **Section V** | **Limits of Liability** ........................................................... | **15** |
| **Section VI** | **Exclusions** ....................................................................... | **15** |
| **Section VII** | **Claims Provisions** ......................................................... | **16** |
| **Section VIII** | **General Provisions** ........................................................ | **18** |

## SECTION I                         GENERAL DEFINITIONS

**Administrator** means the Administrator named in the Schedule.

**Co-Owner** means a person who has partial ownership of a vehicle which is being operated by an Owner-Operator for the purpose of performing Occupational services .

**Combined Single Limit** means, with respect to any one Insured Person, the total amount of benefits that are payable under this Policy for or in connection with Injury sustained as the result of any one accident. When the Combined Single Limit has been reached, no further benefits shall be payable under this Policy, with respect to that Insured Person, for or in connection with Injury sustained as the result of that one accident.

**Contract Driver** means a person who: (1) drives a vehicle owned or leased by an Owner-Operator for the purpose of performing Occupational services; (2) is on file with the Company; (3) is not an employee of the Policyholder; and (4) is not an employee of an Owner-Operator, unless otherwise permitted by law.

**Covered Loss(es)** means one or more of the losses or expenses described in Section IV of this Policy.

**Dependent Child(ren)** means the Insured Person's unmarried children, including natural children from the moment of birth, step or foster children, or adopted children, from the moment of placement in the home of the Insured Person, under age 19 (25 if attending an accredited institution of higher learning on a full-time basis) and primarily dependent on the Insured Person for support and maintenance. It also includes any unmarried Dependent Child(ren) of the Insured Person who are incapable of self-sustaining employment by reason of mental or physical incapacity, and who are primarily dependent on the Insured Person for support and maintenance.

The Company may require proof of the Dependent Child(ren)'s incapacity and dependency within 60 days before the Dependent Child(ren) reach the age limit specified above. The Company may request that satisfactory proof of the Dependent Child(ren)'s continued incapacity and dependency be submitted to the Company on an annual basis. If the requested proof is not furnished within 31 days of the request, such child(ren) shall no longer be considered Dependent Child(ren) as of the end of that 31 day period.

**Dispatch** means the period of time during which an Insured operates his or her vehicle, or performs vehicle repair, while being en route to pick up a load, picking up a load, en route to deliver a load, and unloading a load.

**Immediate Family Member** means a person who is related to the Insured Person in any of the following ways:   Spouse, brother-in-law, sister-in-law, son-in-law, daughter-in-law, mother-in-law, father-in-law, parent (includes stepparent), brother or sister (includes stepbrother or stepsister), or child (includes legally adopted or placed for adoption, or stepchild).

**Injury** means bodily injury to an Insured Person caused by an Occupational accident while coverage is in force under this Policy, which results directly from and independently of all other causes in a Covered Loss. All Injuries sustained by an Insured Person in any one accident shall be considered a single Injury.

**Insured** means a person who: (1) is a member of an eligible class as described in the Description of Eligible Persons section of the Master Application; (2) has enrolled for coverage; and (3) has paid the required premium.

**Insured Person** means an Insured.

C22382                                         3

## GENERAL DEFINITIONS (Continued)

**Occupational** means, with respect to an activity, accident, incident, circumstance or condition involving an Insured, that the activity, accident, incident, circumstance or condition occurs or arises out of or in the course of the Insured performing services within the course and scope of contractual obligations for the Policyholder, while under Dispatch. Occupational does not encompass any period of time during the course of everyday travel to and from work.

**Occupational Cumulative Trauma** means bodily injury to an Insured caused by the combined effect of repetitive physical Occupational activities extending over a period of time, where:  (1) such condition is diagnosed by a Physician; (2) the Insured's last day of last performance of the activities causing the injury occurred during the Policy Period; and (3) such activities resulted directly and independently of all other causes in a Covered Loss.

**Occupational Disease** means a sickness which results in disability or death, and is caused by exposure to environmental or physical hazards during the course of the Insured's Occupational activities, where:  (1) such condition is diagnosed by a Physician, and is generally accepted by the National Centers for Disease Control to be a disease caused by such hazards; (2) exposure to such hazards is not an accident but is caused or aggravated by the conditions under which the Insured performs Occupational services; (3) the Insured's last day of last exposure to the environmental or physical hazards causing such condition occurs during the Policy Period; and (4) such exposure results directly and independently of all other causes in a Covered Loss.

**Owner-Operator** means a person who: (1) owns or leases a vehicle which he or she is operating for the purpose of performing Occupational services; (2) is an independent contractor as defined by law; and (3) is not an employee of the Policyholder. The term Owner-Operator will include a Co-Owner if the Co-Owner otherwise meets the definition of Owner-Operator.

**Physician** means a practitioner of the healing arts acting within the scope of his or her license who is not: (1) the Insured Person; or (2) an Immediate Family Member; or (3) a practitioner retained by the Policyholder.

**Pre-Existing Condition** means a condition for which an Insured Person has sought or received medical advice or treatment during the twelve months immediately preceding his or her effective date of coverage under this Policy.

**Schedule** means the Schedule shown in the Master Application for this Policy which is attached to and made a part of this Policy.

**Spouse** means the Insured Person's legal spouse.

**SECTION II**                    EFFECTIVE AND TERMINATION DATES

### Policy Effective and Termination Dates

**Policy Effective Date.** This Policy begins on the Policy Effective Date shown in the Master Application at 12:01 A.M. Standard Time at the address of the Policyholder where this Policy is delivered.

**Policy Termination Date.** This Policy may, at any time, be terminated by mutual written consent of the Company and the Policyholder. Otherwise, this Policy will terminate at 12:01 A.M. Standard Time at the Policyholder's address on the earliest of:
1. the Policy Termination Date shown in the Master Application, unless renewed;
2. the premium due date if premiums are not paid when due subject to the Grace Period;
3. the date specified in the written notice of the Company's intent to terminate this Policy, which will be at least 31 days after the date the Company sends such notice to the Policyholder's last known recorded address; or
4. the date specified in the written notice of the Policyholder's intent to terminate this Policy, which will be at least 31 days after the date the Policyholder sends such notice to the Company.

If the Company terminates this Policy, any unearned premium will be returned on a pro-rata basis. If the Policyholder requests termination, the Company will return any unearned premium paid on a short-rate basis. Termination will not affect any claim for a Covered Loss occurring prior to the effective date of termination.

### Owner-Operator's Effective and Termination Dates

**Owner-Operator's Effective Date.** An Owner-Operator's coverage under this Policy begins on the latest of:
1. the Policy Effective Date;
2. the date the person becomes a member of an eligible class of persons as described in the Description of Eligible Persons section of the Master Application;
3. if individual enrollment is required, the date written enrollment is received by the Policyholder; or
4. the date on which the first premium payment is paid when due.

**Owner-Operator's Termination Date.** An Owner-Operator's coverage under this Policy ends on the earliest of:
1. the date this Policy is terminated;
2. the premium due date if premiums are not paid when due;
3. the date the Owner-Operator requests, in writing, that his or her coverage be terminated; or
4. the date the Owner-Operator ceases to be a member of any eligible class(es) of persons as described in the Description of Eligible Persons section of the Master Application.

### Contract Driver's Effective and Termination Dates

**Contract Driver's Effective Date.** A Contract Driver's coverage under this Policy begins on the latest of:
1. the Policy Effective Date;
2. the date the person becomes a member of an eligible class of persons as described in the Description of Eligible Persons section of the Master Application;
3. if individual enrollment is required, the date written enrollment is received by the Policyholder; or
4. the date on which the first premium payment is paid when due.

**EFFECTIVE AND TERMINATION DATES (Continued)**

**Contract Driver's Termination Date.** A Contract Driver's coverage under this Policy ends on the earliest of:

1. the date this Policy is terminated;
2. the premium due date if premiums are not paid when due;
3. the date the Contract Driver requests, in writing, that his or her coverage be terminated;
4. the date the Contract Driver ceases to be a member of any eligible class(es) of persons as described in the Description of Eligible Persons section of the Master Application; or
5. the date the Owner-Operator with respect to whom the Contract Driver is under contract ceases to be a member of any eligible class(es) of persons as described in the Schedule of the Master Application.

A change in an Insured Person's coverage under this Policy due to a change in his or her eligible class or benefit selection becomes effective on the later of: (1) the date the change in his or her eligible class or benefit selection occurs; or (2) if the change requires a change in premium, the date the first changed premium is paid. However, a change in coverage applies only with respect to accidents that occur after the change becomes effective.

Termination of coverage will not affect a claim for a Covered Loss that occurs either before or after such termination if that loss results from an accident that occurred while the Insured Person's coverage was in force under this Policy.

## SECTION III                           PREMIUM

**Premiums.** Premiums are payable to the Company at the rates and in the manner described in the Premiums section of the Master Application. The Company may change the required premiums due on any Policy anniversary date, as measured annually from the Policy Effective Date, by giving the Policyholder at least 31 days advance written notice. The Company may change the required premiums as a condition of any renewal of this Policy. The Company may also change the required premiums at any time when any change affecting premiums is made in this Policy.

**Insured Person's Premium.** The Premium Rate for coverage under this Policy for each Insured Person is shown in the Schedule, and shall be payable as follows:

1.  Insured Persons who are enrolled on or prior to the fifteenth of the month shall pay an amount equal to the full monthly premium. No premium shall be payable for the last full or partial month of coverage.

2.  Insured Persons who are enrolled after the fifteenth of the month shall pay a premium equal to the full monthly premium beginning on the first of the month following the month during which coverage becomes effective. With respect to the last full or partial month of coverage, Insured Persons shall pay an amount equal to the monthly premium.

**Grace Period.** A Grace Period of 31 days will be provided for the payment of any premium due after the first premium. This Policy will not be terminated for nonpayment of premium during the Grace Period if the Policyholder pays all premiums due by the last day of the Grace Period. This Policy will terminate on the last day of the period for which all premiums have been paid if all premiums due are not paid by the last day of the Grace Period.

If the Company expressly agrees to accept late payment of a premium without terminating this Policy, the Company does so in accordance with the Noncompliance With Policy Requirements provision in Section VIII of this Policy. In such case, the Policyholder will be liable to the Company for any unpaid premiums for the time this Policy is in force, plus all costs and expenses (including, but not limited to, reasonable attorney fees, collection fees and court costs) incurred by the Company in the collection of all overdue amounts.

No Grace Period will be provided if the Company receives notice to terminate this Policy prior to a premium due date.

**Waiver of Premium.** Subject to this Policy remaining in force, all premiums due under this Policy with respect to an Insured Person who is receiving either a Temporary Total Disability Benefit or Continuous Total Disability Benefit under this Policy will be waived. Premiums will be waived from the first premium due date on or after the date the disability begins. Premium payments must be resumed on the premium due date next following the date the Insured Person's Temporary Total Disability Benefit or Continuous Total Disability Benefit ceases. If premium payments are not resumed on that date, the Insured Person's coverage under this Policy shall end on that date.

## SECTION IV                            **BENEFITS**

**Principal Sum.** As applicable to each Insured Person, Principal Sum means the amount of insurance in force under this Policy on the date of the accident, as described in the Schedule.

**Deductible.** The applicable per accident Deductible Amounts shown in the Schedule per Covered Loss apply to each Insured Person sustaining a particular type of Covered Loss. For accidents where more than one Covered Loss applies, each deductible amount is applied to the total benefits payable.

### Accidental Death Benefit

If Injury to the Insured Person results in death within the Incurral Period shown in the Schedule, the Company will pay the Principal Sum, subject to any applicable Deductible Amount for the Accidental Death Covered Loss shown in the Schedule. The Incurral Period starts on the date of the accident that caused such Injury.

### Survivor's Benefit

If the Insured Person suffers accidental death such that an Accidental Death Benefit is payable under this Policy, the Company will pay a monthly Survivor's Benefit to the surviving Spouse, up to the Principal Sum shown in the Schedule. The Monthly Benefit Amount shall be determined by multiplying the Principal Sum by the Monthly Benefit Percentage.

If the Insured Person is not survived by a Spouse, or if the Insured Person's Spouse dies or remarries, the Company will pay or continue to pay the Survivor's Benefit to the Insured Person's surviving Dependent Children, if any. If there is more than one surviving Dependent Child, the Survivor's Benefit will be distributed equally among the surviving Dependent Children. The payment of the monthly Survivor's Benefit will end on the earliest of the following dates:

1. the date the Spouse dies or remarries, if there are no Dependent Children;
2. the date the last Dependent Child dies or is no longer eligible as defined in Section I of this Policy; or
3. the date the Principal Sum has been paid.

If the Insured Person is not survived by a Spouse or any Dependent Children, the Company will pay only the Accidental Death Benefit in accordance with the Payment of Claims provision of this Policy.

### Exposure and Disappearance

If, by reason of an accident, an Insured Person is unavoidably exposed to the elements and as a result of such exposure suffers a loss which is otherwise covered under this Policy, the loss will be considered a Covered Loss under the terms of this Policy.

If the body of an Insured Person has not been found within one year after the disappearance, forced landing, stranding, sinking or wrecking of a conveyance in which that person was an occupant, then it will be deemed, subject to all other terms and provisions of this Policy, that the Insured Person has suffered Accidental Death within the meaning of this Policy.

**BENEFITS (Continued)**

**Accidental Dismemberment Benefit**

If Injury to the Insured Person results in any one of the Losses specified below, within the Incurral Period shown in the Schedule (as measured from the date of the accident that caused such Injury), the Company will pay the Percentage of the Principal Sum shown below for that Loss, subject to any applicable Deductible Amount for the Accidental Dismemberment Covered Loss shown in the Schedule.

| For Loss of: | Percentage of the Principal Sum: |
|---|---|
| Both Hands or Both Feet | 100% |
| Sight of Both Eyes | 100% |
| One Hand and One Foot | 100% |
| One Hand and the Sight of One Eye | 100% |
| One Foot and the Sight of One Eye | 100% |
| Speech and Hearing in Both Ears | 100% |
| One Arm or One Leg | 75% |
| One Hand or One Foot | 50% |
| Sight of One Eye | 50% |
| Speech or Hearing in Both Ears | 50% |
| Four Fingers of Same Hand | 25% |
| Hearing in One Ear | 25% |
| Thumb and Index Finger of Same Hand | 25% |

"Loss" of a hand or foot means complete severance through or above the wrist or ankle joint. "Loss" of sight of an eye means total and irrecoverable loss of the entire sight in that eye."Loss" of hearing in an ear means total and irrecoverable loss of the entire ability to hear in that ear. "Loss" of speech means total and irrecoverable loss of the entire ability to speak. "Loss" of an arm or leg means complete severance through or above the shoulder or hip joint. "Loss" of four fingers means complete severance through or above the metacarpophalangeal joint of all four digits. "Loss" of thumb and index finger means complete severance through or above the metacarpophalangeal joint of both digits.

If more than one Loss is sustained by an Insured Person as a result of the same accident, only one amount, the largest, will be paid.

**Paralysis Benefit**

If Injury to the Insured Person results in any Type of Paralysis specified below, within the Incurral Period shown in the Schedule (as measured from the date of the accident that caused such Injury), the Company will pay the Percentage of the Principal Sum shown below for that Type of Paralysis, subject to any applicable Deductible Amount for the Paralysis Covered Loss shown in the Schedule.

| Type of Paralysis: | Percentage of the Principal Sum: |
|---|---|
| Quadriplegia | 100% |
| Paraplegia | 75% |
| Hemiplegia | 50% |
| Uniplegia | 25% |

"Quadriplegia" means the complete and irreversible paralysis of both upper and both lower limbs. "Paraplegia" means the complete and irreversible paralysis of both lower limbs. "Hemiplegia" means the

C22382                                          9

**BENEFITS (Continued)**

complete and irreversible paralysis of the upper and lower limbs of the same side of the body. "Uniplegia" means the complete and irreversible paralysis of one limb. "Limb" means entire arm or entire leg.

If the Insured Person sustains more than one Type of Paralysis as a result of the same accident, only the largest single amount will be considered a Covered Loss.

**Temporary Total Disability Benefit**

If Injury to the Insured Person results in Temporary Total Disability within the Commencement Period shown in the Schedule, and if the Insured Person is under age 70 on the day the Temporary Total Disability begins, the Company will pay the Temporary Total Disability Benefit specified below, subject to satisfaction of any applicable Waiting Period shown in the Schedule. The Commencement Period starts on the date of the accident that caused such Injury.

The Temporary Total Disability Benefit with respect to each week of an Insured Person's Temporary Total Disability during a Single Period of Total Disability is equal to the lesser of:
1. the Participation Percentage (as shown in the Schedule) of the Insured Person's Average Weekly Earnings; or
2. the Maximum Weekly Benefit Amount shown in the Schedule.

The Temporary Total Disability Benefit shall cease on the earliest of the following dates:
1. the date the Insured Person is no longer Temporarily Totally Disabled;
2. the date the Insured Person dies;
3. the date the Insured Person attains age 70; or
4. the date the Maximum Benefit Period shown in the Schedule has been reached.

The Temporary Total Disability Benefit with respect to less than a full Benefit Week of Temporary Total Disability equals 1/7th of the weekly Covered Loss for each day of Temporary Total Disability.

As used above in this Temporary Total Disability benefit:

**Average Weekly Earnings** means one-third (1/3) of the Insured Person's weekly income for Occupational services as reported to the Internal Revenue Service on the applicable federal tax document.

**Benefit Week** means a 7-day period of time that begins on the first day of Temporary Total Disability after the Waiting Period shown in the Schedule for Temporary Total Disability and on the same day of each week thereafter.

**Maximum Benefit Period** means, with respect to Temporary Total Disability, the maximum period for which benefits shall be payable for a Temporary Total Disability Covered Loss during a Single Period of Total Disability. The length of the Maximum Benefit Period for Temporary Total Disability is shown in the Schedule.

**Single Period of Total Disability** means all periods of Temporary Total Disability due to the same or related causes (whether or not insurance has been interrupted) except any of the following which are considered separate periods of disability: (1) successive periods of Temporary Total Disability, due to entirely different and unrelated causes, separated by at least one full day during which the Insured Person is not Temporarily Totally Disabled; (2) successive periods of Temporary Total Disability, due to the same or related causes, separated by at least 6 months during which the Insured Person is not Temporarily Totally Disabled.

C22382                                10

**BENEFITS (Continued)**

**Temporary Total Disability, Temporarily Totally Disabled** means disability that:  (1) prevents an Insured Person from performing the duties of his or her regular, primary occupation; and (2) requires that, and results in, the Insured Person receiving Continuous Care.

**Continuous Care** means monthly monitoring and/or evaluation of the disabling condition by a Physician. The Company must receive proof of continuing Temporary Total Disability on a monthly basis.

**Continuous Total Disability Benefit**

If injury to the Insured Person, resulting in Temporary Total Disability, subsequently results in Continuous Total Disability, the Company will pay the Continuous Total Disability Benefit specified below, provided:

1. benefits payable for a Temporary Total Disability Covered Loss ceased solely because the Maximum Benefit Period shown in the Schedule for Temporary Total Disability has been reached, but the Insured Person remains disabled;
2. the Insured Person is under age 70 on the day after the Maximum Benefit Period shown in the Schedule for Temporary Total Disability has been reached;
3. the Insured Person has been granted a Social Security Disability Award for their disability; and
4. their disability is reasonably expected to continue without interruption until the Insured Person dies.

The Continuous Total Disability Benefit with respect to each month of an Insured Person's Continuous Total Disability is equal to four and three-tenths (4.3) times the weekly benefit for Temporary Total Disability, less the Insured Person's primary Social Security Disability Award.

The Continuous Total Disability Benefit with respect to less than a full Benefit Week of Continuous Total Disability equals 1/7th of the weekly Benefit for Temporary Total Disability for each day of Continuous Total Disability.

Benefits payable under the Temporary Total Disability Benefit before the Maximum Benefit Period shown in the Schedule for Temporary Total Disability has been reached, will not be considered a Continuous Total Disability Benefit.

The Continuous Total Disability Benefit shall cease on the earliest of the following dates:

1. the date the Insured Person is no longer Continuously Totally Disabled.
2. the date the Insured Person dies.
3. the date the Insured Person's Social Security Disability Award ceases.
4. the date the Insured Person attains age 70.
5. the date the Maximum Benefit Period shown in the Schedule for Continuous Total Disability has been reached.

As used above in this Continuous Total Disability benefit:

**Benefit Week** means a one-week period of time that begins on the day after the Maximum Benefit Period for Temporary Total Disability has been reached and on the same day of each week thereafter.

**Maximum Benefit Period** means, with respect to Continuous Total Disability, the maximum period for which benefits shall be payable for a Continuous Total Disability Covered Loss(es).  The length of the Maximum Benefit Period for Continuous Total Disability is shown in the Schedule.

**Continuous Total Disability, Continuously Totally Disabled** means disability that:  (1) prevents an Insured Person from performing the duties of any occupation for which he or she is qualified by reason of education, training or experience; and (2) requires that, and results in, the Insured Person receiving Continuous Care.

C22382                                               11

**BENEFITS (Continued)**

**Continuous Care** means at least quarterly monitoring and/or evaluation of the disabling condition by a Physician. The Company must receive proof of continuing Continuous Total Disability on a quarterly basis.

Terms used in this Continuous Total Disability benefit, but which refer to Temporary Total Disability and are defined in the Temporary Total Disability benefit, are to be interpreted as defined in that benefit.

**Accident Medical Expense Benefit**

If an Insured Person suffers an Injury that requires him or her to be treated by a Physician, within the Commencement Period shown in the Schedule, the Company will pay the Usual and Customary Charges incurred for Medically Necessary Covered Accident Medical Services received due to that Injury, up to the Maximum Benefit Amount and Maximum Benefit Period shown in the Schedule per Insured Person for all Injuries caused by a single accident, subject to any applicable Deductible Amount. The Commencement Period starts on the date of the accident that caused such Injury. The Deductible Amount for the Accident Medical Expense Benefit is the Deductible Amount shown in the Schedule, if any, which must be met from Usual and Customary Charges for Medically Necessary Covered Accident Medical Services incurred due to Injuries sustained by the Insured Person in that accident.

As used in this Accident Medical Expense Benefit provision:

**Ambulatory Medical Center** means a licensed public establishment with an organized staff of Physicians and permanent facilities that are equipped and operated primarily for the purpose of providing medical services or performing surgical procedures. Such establishment must provide continuous Physician and registered nursing (RN) services whenever a patient is in the facility. An Ambulatory Medical Center does not include a Hospital, a Physician's office, or a clinic.

**Covered Accident Medical Service(s)** means any of the following services:
1. Hospital semi-private room and board (or room and board in an intensive care unit); Hospital ancillary services (including, but not limited to, use of the operating room or emergency room); or use of an Ambulatory Medical Center;
2. services of a Physician or a registered nurse (RN);
3. ambulance service to or from a Hospital;
4. laboratory tests;
5. radiological procedures;
6. anesthetics and the administration of anesthetics;
7. blood, blood products and artificial blood products, and the transfusion thereof;
8. physical therapy, Occupational therapy, and chiropractic care, up to the Physical Therapy, Occupational Therapy and Chiropractic Care Maximum, if any, shown in the Schedule;
9. rental of Durable Medical Equipment, up to the actual purchase price of such equipment;
10. artificial limbs, artificial eyes or other prosthetic appliances; or
11. medicines or drugs administered by a Physician or that can be obtained only with a Physician's written prescription; or
12. repair or replacement of Sound Natural Teeth damaged or lost as a result of Injury, up to the Dental Maximum, if any, shown in the Schedule.

**Custodial Services** means any services which are not intended primarily to treat a specific Injury. Custodial Services include, but shall not be limited to services: (1) related to watching or protecting the Insured Person; (2) related to performing or assisting the Insured Person in performing any activities of daily living, such as: (a) walking; (b) grooming; (c) bathing; (d) dressing; (e) getting in or out of bed; (f) toileting; (g) eating; (h) preparing foods; or (i) taking medications that can usually be self-administered; and (3) that are not required to be performed by trained or skilled medical or paramedical personnel.

C22382

**BENEFITS (Continued)**

**Durable Medical Equipment** refers to equipment of a type that is designed primarily for use, and used primarily, by people who are injured (for example, a wheelchair or a hospital bed). It does not include items commonly used by people who are not injured, even if the items can be used in the treatment of injury or can be used for rehabilitation or improvement of health (for example, a stationary bicycle or a spa).

**Hospital** means a facility that: (1) is operated according to law for the care and treatment of injured people; (2) has organized facilities for diagnosis and surgery on its premises or in facilities available to it on a prearranged basis; (3) has 24-hour nursing service by registered nurses (RN), on duty or on call; and (4) is supervised by one or more Physicians. A Hospital does not include: (1) a nursing, convalescent or geriatric unit of a hospital when a patient is confined mainly to receive nursing care; (2) a facility that is, other than incidentally, a rest home, nursing home, convalescent home or home for the aged; nor does it include any ward, room, wing or other section of the hospital that is used for such purposes; or (3) any military or veterans hospital or soldiers home or any hospital contracted for or operated by any national government or government agency for the treatment of members or ex-members of the armed forces.

**Maximum Benefit Period** means, with respect to Accident Medical Expense, the maximum period for which benefits shall be payable for Covered Accident Medical Services for or in connection with a single Accident Medical Expense Covered Loss. The length of the Maximum Benefit Period for Accident Medical Expense is shown in the Schedule.

**Medically Necessary** means that a Covered Accident Medical Service: (1) is essential for diagnosis, treatment or care of the Occupational Injury for which it is prescribed or performed; (2) meets generally accepted standards of medical practice; and (3) is ordered by a Physician and performed under his or her care, supervision or order.

**Personal Comfort or Convenience Item(s)** means those items that are not Medically Necessary for the care and treatment of the Insured Person's Occupational Injury. The term Personal Comfort or Convenience Item(s) includes, but is not limited to: (1) a private Hospital room, unless Medically Necessary; (2) television rental; and (3) Hospital telephone charges.

**Sound Natural Teeth** means natural teeth that either are unaltered or are fully restored to their normal function and are disease free, have no decay, and are not more susceptible to injury than unaltered natural teeth.

**Usual and Customary Charge(s)** means a charge that: (1) is made for a Covered Accident Medical Service; (2) does not exceed the usual level of charges for similar treatment, services or supplies in the locality where the expense is incurred (for a Hospital room and board charge, other than for a Medically Necessary stay in an intensive care unit, does not exceed the Hospital's most common charge for semi-private room and board); and (3) does not include charges that would not have been made if no insurance existed.

In addition to the Exclusions in Section VI of this Policy, Usual and Customary Charges for Covered Accident Medical Services do not include, and benefits are not payable with respect to, any expense for or resulting from:
1.  repair or replacement of existing artificial limbs, artificial eyes or other prosthetic appliances or repair of existing Durable Medical Equipment unless for the purpose of modifying the item because Injury has caused further impairment in the underlying bodily condition;
2.  new, or repair or replacement of, dentures, bridges, dental implants, dental bands or braces or other dental appliances, crowns, caps, inlays or onlays, fillings or any other treatment of the teeth or gums;

**BENEFITS (Continued)**

3. new eye glasses or contact lenses or eye examinations related to the correction of vision or related to the fitting of glasses or contact lenses, unless Injury has caused impairment of sight; or repair or replacement of existing eyeglasses or contact lenses unless for the purpose of modifying the item because Injury has caused further impairment of sight;

4. new hearing aids or hearing examinations unless Injury has caused impairment of hearing; or repair or replacement of existing hearing aids unless for the purpose of modifying the item because Injury has caused further impairment of hearing;

5. rental of Durable Medical Equipment where the total rental expense exceeds the usual purchase expense for similar equipment in the locality where the expense is incurred (but if, in the Company's sole judgment, Accident Medical Expense Benefits for rental of Durable Medical Equipment are expected to exceed the usual purchase expense for similar equipment in the locality where the expense is incurred, the Company may, but is not required to, choose to consider such purchase expense as a Usual and Customary Covered Accident Medical Expense Benefit in lieu of such rental expense);

6. Custodial Services; or

7. Personal Comfort or Convenience Items.

## SECTION V                                  LIMITS OF LIABILITY

**Per-Insured Person Limit of Liability.** The Per-Insured Person Limit of Liability (Combined Single Limit) stated in the Schedule will be the total limit of the Company's liability for all benefits payable under this Policy with respect to any one Insured Person arising out of injury sustained by such individual as the result of any one accident.

**Aggregate Limit of Liability.** The Aggregate Limit of Liability stated in the Schedule will be the total limit of the Company's liability for all benefits payable under this Policy with respect to all Insured Persons arising out of injury sustained by one or more Insured Person(s) as the result of any one accident.

If the total of such benefits exceeds the Aggregate Limit of Liability, the Company shall not be liable to any Insured Person for a greater proportion of such Insured Person's benefits than said Aggregate Limit of Liability bears to the total benefits afforded all such Insured Persons under this Policy.

## SECTION VI                                  EXCLUSIONS

This Policy does not cover any losses caused in whole or in part by, or resulting in whole or in part from, the following:

1. suicide or any attempt at suicide; intentionally self-inflicted injury or any attempt at intentionally self-inflicted injury;
2. sickness, disease or infections of any kind, except bacterial infections due to an accidental cut or wound, botulism or ptomaine poisoning;
3. any Pre-Existing Condition, until the Insured Person has been continuously covered under this Policy for twelve consecutive months;
4. Occupational Cumulative Trauma, unless (and to the extent as) specifically provided by this Policy;
5. Occupational Disease, unless (and to the extent as) specifically provided by this Policy;
6. hernia of any kind, unless (and to the extent as) specifically provided by this Policy;
7. hemorrhoids of any kind, unless (and to the extent as) specifically provided by this Policy;
8. performing, learning to perform or instructing others to perform as a master or crew member of any vessel while covered under the Jones Act or the United States Longshore and Harbor Workers' Act, or similar coverage;
9. declared or undeclared war, or any act of declared or undeclared war;
10. full-time active duty in the armed forces of any country or international authority, except the National Guard or organized reserve corps duty;
11. any injury for which the Insured Person is entitled to benefits pursuant to any workers' compensation law or other similar legislation;
12. any loss insured by employers' liability insurance;
13. accidents occurring while the Insured is working for or under contract with an entity other than the Policyholder;
14. the Insured Person being under the influence of drugs or intoxicants, unless taken under the advice of his or her Physician; or
15. the Insured Person's commission of or attempt to commit a felony; or
16. travel or flight in or on (including getting in or out of, or on or off of) any vehicle used for aerial navigation, if the Insured Person is:
    a. riding as a passenger in any aircraft not intended or licensed for the transportation of passengers; or
    b. performing, learning to perform or instructing others to perform as a pilot or crew member of any aircraft; or
    c. riding as a passenger in an aircraft owned, leased or operated by the Policyholder; or
17. any union "stop work" action

C22382                                        15

## SECTION VII                         CLAIMS PROVISIONS

**Notice of Claim.** Written notice of claim must be given to the Company within 20 days after an Insured Person's loss, or as soon thereafter as reasonably possible. Notice given by or on behalf of the claimant to the Company at American International Companies®, Accident and Health Claims Division, P. O. Box 15701, Wilmington, DE 19850-5701, with information sufficient to identify the Insured Person, is deemed notice to the Company.

**Claim Forms.** The Company will send claim forms to the claimant upon receipt of a written notice of claim. If such forms are not sent within 15 days after the giving of notice, the claimant will be deemed to have met the proof of loss requirements upon submitting, within the time fixed in this Policy for filing proofs of loss, written proof covering the occurrence, the character and the extent of the loss for which claim is made. The notice should include the Insured's name, the Policyholder's name and the Policy number.

**Proof of Loss.** Written proof of loss must be furnished to the Company within 90 days after the date of the loss. If the loss is one for which this Policy requires continuing eligibility for periodic benefit payments, subsequent written proofs of eligibility must be furnished at such intervals as the Company may reasonably require. Failure to furnish proof within the time required neither invalidates nor reduces any claim if it was not reasonably possible to give proof within such time, provided such proof is furnished as soon as reasonably possible and in no event, except in the absence of legal capacity of the claimant, later than one year from the time proof is otherwise required.

**Payment of Claims.** Upon receipt of due written proof of death, payment for loss of life of an Insured Person will be made to the Insured Person's beneficiary as described in the Beneficiary Designation and Change provision of the General Provisions section. Upon receipt of due written proof of loss, payments for all losses, except loss of life, will be made to (or on behalf of, if applicable) the Insured Person suffering the loss. If an Insured Person dies before all payments due have been made, the amount still payable will be paid to his or her beneficiary as described in the Beneficiary Designation and Change provision of the General Provisions section.

If any payee is a minor or is not competent to give a valid release for the payment, the payment will be made to the legal guardian of the payee's property. If the payee has no legal guardian for his or her property, a payment not exceeding $1,000 may be made, at the Company's option, to any relative by blood or connection by marriage of the payee, who, in the Company's opinion, has assumed the custody and support of the minor or responsibility for the incompetent person's affairs.

The Company may pay benefits directly to any Hospital or person rendering covered services, unless the Insured Person requests otherwise in writing. Such request must be made no later than the time proof of loss is filed. Any payment the Company makes in good faith fully discharges the Company's liability to the extent of the payment made.

**Time of Payment of Claims.** Benefits payable under this Policy for any loss other than loss for which this Policy provides any periodic payment will be paid immediately upon the Company's receipt of due written proof of the loss. Subject to the Company's receipt of due written proof of loss, all accrued benefits for loss for which this Policy provides periodic payment will be paid at the expiration of each month during the continuance of the period for which the Company is liable and any balance remaining unpaid upon termination of liability will be paid immediately upon receipt of such proof.

**CLAIMS PROVISIONS (Continued)**

**Commutation of Losses.** It is agreed that, at the Company's option, at any time later than two years from the date of any accident resulting in a claim under this Policy, the Company may advise the Insured Person of its desire to be released from liability with respect to any such claim. In that event, the Company will appoint an actuary or appraiser to investigate, determine and capitalize such claim, and the payment by the Company of the capitalized value of such claim will constitute a complete and final release of the Company with respect to such claim.

**Sunset.** No claim made for losses sustained by Insured Persons will be considered valid and collectible in accordance with this Policy unless full details of such claim are presented to the Company within three years from the date of the accident which is the basis of such claim.

## SECTION VIII                    GENERAL PROVISIONS

**Entire Contract; Changes.**    This Policy, together with any riders, endorsements, amendments, applications, enrollment forms, and attached papers, if any, make up the entire contract between the Policyholder and the Company. In the absence of fraud, all statements made by the Policyholder or any Insured Person will be considered representations and not warranties. No written statement made by an Insured Person will be used in any contest unless a copy of the statement is furnished to the Insured Person or his or her beneficiary or personal representative.

No change in this Policy will be valid until approved by an officer of the Company. The approval must be noted on or attached to this Policy. No agent may change this Policy or waive any of its provisions.

**Incontestability.** The validity of this Policy will not be contested after it has been in force for two year(s) from the Policy Effective Date, except as to nonpayment of premiums.

After an Insured Person has been insured under this Policy for two year(s) during his lifetime, no statement made by the Insured Person, except a fraudulent one, will be used to contest a claim under this Policy. The Company may only contest coverage if the misstatement is made in a written instrument signed by the Insured Person and a copy is given to the Policyholder, the Insured Person or the beneficiary.

**Beneficiary Designation and Change.**  The Insured Person's designated beneficiary(ies) is (are) the person(s) so named by the Insured Person as shown on the Administrator's records kept on this Policy.

A legally competent Insured Person over the age of majority may change his or her beneficiary designation at any time, unless an irrevocable designation has been made. The change may be executed, without the consent of the designated beneficiary(ies), by providing the Company or, if agreed upon in advance by the Company, the Administrator with a written request for change. When the request is received by the Company or, if agreed upon in advance by the Company, the Administrator, whether the Insured Person is then living or not, the change of beneficiary will relate back to and take effect as of the date of execution of the written request, but without prejudice to the Company on account of any payment which is made prior to receipt of the request.

Except with regard to the Survivor's Benefit described in Section IV of this Policy, if applicable, in the event that there is no designated beneficiary, or if no designated beneficiary is living after the Insured Person's death, the benefits will be paid, in equal shares, to the survivors in the first surviving class of those that follow: The Insured Person's: (1) Spouse; (2) children; (3) parents; or (4) brothers and sisters. If no class has a survivor, the beneficiary is the Insured Person's estate.

**Physical Examination and Autopsy.** The Company has the right, at its own expense, to examine the person of any Insured Person whose Injury is the basis of a claim, when and as often as it may be reasonably required during the pendency of the claim. The Company may also require an autopsy where it is not prohibited by law.

**Legal Actions.** No legal action for a claim can be brought against the Company until 60 days after receipt of proof of loss. No legal action for a claim can be brought against the Company more than three years after the time for giving proof of loss.

**Noncompliance With Policy Requirements.** Any express waiver by the Company of any requirements of this Policy will not constitute a continuing waiver of such requirements. Any failure by the Company to insist upon compliance with any Policy provision will not operate as a waiver or amendment of that provision.

C22362                              18

**GENERAL PROVISIONS (Continued)**

**Conformity With State Statutes.** Any provision of this Policy which, on its effective date, is in conflict with the statutes of the state in which the Policy was delivered, is hereby amended to conform to the minimum requirements of such laws.

**Clerical Error.** Clerical error, whether by the Policyholder, the Administrator, or the Company in keeping records pertaining to this Policy, will not: (1) invalidate coverage otherwise validly in force, or (2) continue coverage otherwise validly terminated.

**Data Required.** The Policyholder and the Administrator must maintain adequate records acceptable to the Company and provide any information required by the Company relating to this insurance.

**Audit.** The Company will have the right to inspect and audit, at any reasonable time, all records and procedures of the Policyholder, and the Administrator that may have a bearing on this insurance.

**Assignment.** This Policy is non-assignable.

**Subrogation.** To the total extent the Company pays for losses incurred, the Company may assume the rights and remedies of the Insured Person relating to such loss. The Insured Person agrees to assist the Company in preserving its rights against those responsible for such loss, including but not limited to, signing subrogation forms supplied by the Company.

**Right to Recover Overpayments.** In addition to any rights of recovery, reimbursement or subrogation provided to the Company herein, when payments have been made by the Company with respect to a Covered Loss in an amount in excess of the maximum amount of payment necessary to satisfy an obligation under the terms of this Policy, the Company shall have the right to recover such excess payment, from any one or more of the following: Any person to whom such payments were made (*i.e.* medical providers, etc.), the Insured Person, any insurance company, or any other organization(s) which received, or should have received, the payment.

**Conditional Claim Payment.** If an Insured Person suffers a Covered Loss(es) as the result of injuries for which, in the opinion of the Company, a third party may be liable, the Company will pay the amount of benefits otherwise payable under this Policy. However, if the Insured Person receives payment from the third party, the Insured Person agrees to refund to the Company the lesser of: (1) the amount actually paid by the Company for such Covered Loss(es); or (2) an amount equal to the sum actually received from the third party for such Covered Loss(es). If the Insured Person does not receive payment from the third party for such Covered Loss(es), the Company reserves the right to subrogate under the Subrogation clause of this Policy.

At the time such third party liability is determined and satisfied, this amount shall be paid whether determined by settlement, judgment, arbitration or otherwise. This provision shall not apply where prohibited by law.

**Offset.** The Company will have, and may exercise at any time, the right to offset any balance or balances, whether on account of premiums or otherwise, due from the Policyholder to the Company against any balance or balances, whether on account of losses or otherwise, due from the Company to the Policyholder.

**Other Insurance.** If the Insured Person incurs losses for which benefits are payable under more than one like policy issued by the Company or one of its affiliates, the coverage under this Policy is in excess of such other insurance, and will not contribute to such a loss with such other insurance. This condition does not apply to other insurance which the Insured Person has procured to apply in excess of the coverage under this Policy.

C22382                                    19

**GENERAL PROVISIONS (Continued)**

**Plan and Exposure Changes.** The Policyholder must notify the Company of any subsidiary or affiliated company that is to be covered under this Policy. Such notice must be sent within 30 days of the acquisition of such subsidiary or affiliated company. If such notice is not provided, the newly acquired entity will not be considered a part of the Policyholder , or a covered affiliate or subsidiary, and the Insured Persons from the newly acquired entity will not be considered as Insured Persons of the Policyholder , or a covered affiliate or subsidiary for Policy purposes, until the date that notice is provided. The Company has the right to adjust premium based on the changing exposure.

**Non–Duplication of Workers' Compensation Benefits.** No benefits shall be payable under this Policy for any loss for which the Insured Person claims coverage under any workers' compensation, employers' liability, occupational disease or similar law. The Company reserves the right to recover, from the Insured Person, any benefits paid under this Policy which are subsequently claimed under any workers' compensation, employers' liability, occupational disease or similar law.



**AIG LIFE INSURANCE COMPANY**
600 KING STREET
WILMINGTON, DELAWARE 19801
(302) 594-2000
(Herein called the Company)

Policyholder: Crestar Bank, N.A. as Trustee of the
WorkGuard Trust
Policy Number: TRK 805 6434
Participating Organization: Godwin Materials

### HEMORRHOIDS COVERAGE RIDER

This Rider is attached to and made part of the Policy as of the Policy Effective Date shown in the Policy's Master Application. It applies only with respect to Hemorrhoids provided such Injury is sustained on or after that date. It is subject to all of the provisions, limitations and exclusions of the Policy except as they are specifically modified by this Rider.

Hemorrhoids Coverage. Exclusion 7 in Section VI of the Policy is hereby waived with respect to the following benefit(s): Temporary Total Disability and Accident Medical Expense.

Any reference to an Injury or accident as defined in the policy is hereby deemed to include Hemorrhoids. Benefits shall be payable for a Covered Loss caused in whole or in part by, contributed to in whole or in part by, or resulting in whole or in part from, the Insured Person's Hemorrhoids, provided such Hemorrhoids are surgically repaired while the Insured Person's coverage is in force under this Policy, subject to the following:

1. With respect to the Temporary Total Disability Benefit the period for which such indemnity shall be payable for all periods of disability, subject to the Temporary Total Disability Benefit Waiting Period, shall not exceed the Hemorrhoids Lifetime Maximum Benefit Period shown in the Schedule.

2. With respect to the Accident Medical Expense Benefit, benefits payable for or in connection with the Insured Person's Hemorrhoids, subject to the Accident Medical Expense Deductible Amount, if any, shall not exceed the Hemorrhoids Lifetime Maximum Benefit Amount shown in the Schedule.

Hemorrhoid(s) - as used in this Rider, means a mass of dilated veins in swollen tissue at the margin of the anus or nearby within the rectum.

The President and Secretary of AIG Life Insurance Company witness this Rider.

President                                    Secretary

C22390

# AIGLIFE

**AIG LIFE INSURANCE COMPANY**
600 KING STREET
WILMINGTON, DELAWARE 19801
(302) 594-2000
(Herein called the Company)

Policyholder: Crestar Bank, N.A. as Trustee of the
WorkGuard Trust
Policy Number: TRK 805 6434
Participating Organization: Godwin Materials

## HERNIA COVERAGE RIDER

This Rider is attached to and made part of the Policy as of the Policy Effective Date shown in the Policy's Master Application. It applies only with respect to Hernia provided such Injury is sustained on or after that date. It is subject to all of the provisions, limitations and exclusions of the Policy except as they are specifically modified by this Rider.

Hernia Coverage. Exclusion 6 in Section VI of the Policy is hereby waived with respect to the following benefit(s): Temporary Total Disability and Accident Medical Expense.

Any reference to an Injury or accident as defined in the policy is hereby deemed to include Hernia. Benefits shall be payable for a Covered Loss caused in whole or in part by, contributed to in whole or in part by, or resulting in whole or in part from, the Insured Person's Hernia, provided such Hernia is surgically repaired while the Insured Person's coverage is in force under this Policy, subject to the following:

1.  With respect to the Temporary Total Disability Benefit, the period for which such indemnity shall be payable for all periods of disability, subject to the Temporary Total Disability Benefit Waiting Period, shall not exceed the Hernia Lifetime Maximum Benefit Period shown in the Schedule.

2.  With respect to the Accident Medical Expense Benefit, benefits payable for or in connection with the Insured Person's Hernia, subject to the Accident Medical Expense Deductible Amount, if any, shall not exceed the Hernia Lifetime Maximum Benefit Amount shown in the Schedule.

Hernia - as used in this Rider, means a protrusion of an organ or part through connective tissue or through a wall of the cavity in which it is normally enclosed. Hernia does not include diaphragmatic (hiatal) hernia.

The President and Secretary of AIG Life Insurance Company witness this Rider.

President                                              Secretary

C22391



**AIG LIFE INSURANCE COMPANY**
600 KING STREET
WILMINGTON, DELAWARE 19801
(302) 594-2000
(Herein called the Company)

Policyholder:  Crestar Bank, N.A. as Trustee of the
          WorkGuard Trust
Policy Number:  TRK 805 6434
Participating Organization:  Godwin Materials

### PRE-EXISTING CONDITIONS COVERAGE RIDER

This Rider is attached to and made part of the Policy as of the Policy Effective Date shown in the Policy's Master Application.   It applies only with respect to Covered Losses that occur on or after that date.  It is subject to all of the provisions, limitations and exclusions of the Policy except as they are specifically modified by this Rider.

**Pre-Existing Conditions Coverage.**   Exclusion 3 in Section VI of the Policy is hereby waived for a Covered Loss described in Section IV of the Policy, however, in no event will benefits be payable for any Covered Losses caused in whole or in part by, or resulting in whole or in part from, any Pre-Existing Conditions, exceeding the Maximum Benefit Amount shown in the Schedule.

The President and Secretary of AIG Life Insurance Company witness this Rider.

President                                    Secretary

C22396

# AIGLIFE

**AIG LIFE INSURANCE COMPANY**
600 KING STREET
WILMINGTON, DELAWARE 19801
(302) 594-2000
(Herein called the Company)

Policyholder: Crestar Bank, N.A. as Trustee of the
WorkGuard Trust
Policy Number: TRK 805 6434
Participating Organization: Godwin Materials

## NON-OCCUPATIONAL COVERAGE RIDER

This Rider is attached to and made part of the Policy as of the Policy Effective Date shown in the Policy's Master Application. It applies only with respect to accidents that occur on or after that date. It is subject to all of the provisions, limitations and exclusions of the Policy except as they are specifically modified by this Rider.

**Non-Occupational Coverage.** References in the Policy to an Injury or accident, where applicable, are hereby deemed to include Non-Occupational Injury and Non-Occupational accident, respectively.

Benefits shall be payable for only those Covered Losses listed in the Schedule under Non-Occupational Accident Benefits, and shall be subject to the Non-Occupational Accident Benefit limitations shown therein.

**Non-Occupational -** as used in this Rider, means, with respect to an activity, accident, incident, circumstance or condition involving an Insured Person, that it does not occur or arise out of or in the course of the Insured Person performing Occupational services for the Policyholder, while under Dispatch.

**Non-Occupational Injury -** as used in this Rider, means, bodily Injury caused by a Non-Occupational accident occurring while this Policy is in force as to the person whose injury is the basis of claim and resulting directly and independently of all other causes in a Covered Loss.

All Injuries sustained by an Insured Person in any one accident shall be considered a single Injury.

The President and Secretary of AIG Life Insurance Company witness this Rider.

President

Secretary

C22393

# AIGLIFE

**AIG LIFE INSURANCE COMPANY**
600 KING STREET
WILMINGTON, DELAWARE 19801
(302) 594-2000
(Herein called the Company)

Policyholder:  Crestar Bank, N.A. as Trustee of the
WorkGuard Trust
Policy Number:  TRK 805 6434
Participating Organization:  Godwin Materials

## PARTICIPATING ORGANIZATION ENDORSEMENT

This Endorsement is attached to and made part of the Policy as of the Policy Effective Date shown in the Policy's Master Application. It applies only with respect to accidents that occur on or after that date. It is subject to all of the provisions, limitations and exclusions of the Policy except as they are specifically modified by this Endorsement.

The following definition is added to the Definitions section of the Policy:

**Participating Organization** - means an organization:  (1) which elects to offer coverage under this Policy by completing a Participation Organization Application that has been accepted by the Company; (2) which completes a participation agreement with the Policyholder; (3) which remits the required premium when due; and (4) while coverage through the Participating Organization is available under this Policy.

The following provisions are added to the Effective and Termination Dates section of the Policy:

**Participating Organization Effective Date.** A Participating Organization's coverage under this Policy begins on the later of:  (1) the Participating Organization Effective Date shown in the Participating Organization Application at 12:01 A.M. Standard Time at the address of the Participating Organization shown in the Participating Organization Application; or (2) the Policy Effective Date shown in the Master Application.

**Participating Organization Termination Date.** The Participating Organization's coverage under this Policy may, at any time, be terminated by mutual written consent of the Company and the Participating Organization. Otherwise, the Participating Organization's coverage under this Policy will terminate at 12:01 A.M. Standard Time at the Participating Organization's address on:

1. the Participating Organization Termination Date shown in the Participating Organization Application, unless renewed;
2. the date required premiums are not paid when due, subject to the Grace Period;
3. the date specified in the written notice of the Company's intent to terminate the Participating Organization's coverage under this Policy, which will be at least 31 days after the date the Company sends such notice to the Participating Organization's last known recorded address;
4. the date specified in the written notice of the Participating Organization's intent to terminate coverage under this Policy, which will be at least 31 days after the date the Participating Organization sends such notice; or
5. the date the Policy terminates.

If the Company terminates this Policy, any unearned premium will be returned on a pro-rata basis. If the Participating Organization requests termination, the Company will return any unearned premium paid on a short-rate basis. Termination will not affect any claim for loss occurring prior to the effective date of termination.

The references in the Policy to "this Policy/coverage under this Policy", "Master Application" and "Policyholder" may also, where applicable, mean "a Participating Organization's coverage under this Policy", "Participating Organization's Application" and "Participating Organization", respectively.

C22400

The following language applies to each Rider attached to the Policy:

Any Riders attached to this Policy apply only with respect to accidents that occur on or after the later of: (1) the effective date of each Rider; or (2) the effective date of the Participating Organization's coverage under each Rider. Each Rider applies with respect to a Participating Organization's coverage under this Policy only if the Participating Organization has elected the coverage described in each Rider as indicated in the Participating Organization Application.

The President and Secretary of AIG Life Insurance Company witness this Endorsement:

President                                    Secretary

C22400



Policyholder: Crestar Bank N.A. as Trustee of
the Workguard Trust
Policy Number: TRK 805 6434
Participating Organization: Godwin Materials

AIG LIFE INSURANCE COMPANY
600 KING STREET
WILMINGTON, DELAWARE 19801.
(302) 594-2000
(Herein called the Company)

## TRUCKERS OCCUPATIONAL ACCIDENT INSURANCE

Policy Amendment No. 4

This Policy Amendment is attached to and made part of the Policy effective May 1, 2003 at 12:01A.M.,
Standard Time at the address of the Policyholder. Any changes in coverage apply only with respect to
accidents and Covered Losses that occur on or after that date. Any changes in premium apply as of
the first premium due date on or after the effective date of this Amendment.

### Application 22384

It is hereby agreed and understood that, in consideration of timely payment of the required premium,
that the policy is amended as follows:

Item 7 of the Schedule, Policy Period and Signatures, is hereby amended to change the Policy Period
Effective and Termination Dates to be as follows:

| Policy Period: | From: | Policy Effective Date | May 1, 2003 |
| | To: | Policy Termination Date | May 1, 2004 |

Item 3 of the Schedule Premium Rates, is hereby amended as follows:

Premium Rates for the period May 1, 2003 to May 1, 2004:
Class 1: ...........................................................$150.00 (per Insured Person per Month)
Class 2: ...........................................................$150.00 (per Insured Person per Month)

This Policy Amendment expires concurrently with the Policy and is subject to all of the provisions,
limitations and conditions of the Policy except as they are specifically modified by this Policy
Amendment.

C22385                                          1



**AIG LIFE INSURANCE COMPANY**
600 KING STREET
WILMINGTON, DELAWARE 19801
(302) 594-2000
(Herein called the Company)

Policyholder:  Crestar Bank, N.A. as Trustee of
the Workguard Trust
Policy Number: TRK 805 6434
Participating Organization: Godwin Materials Inc.

## TRUCKERS OCCUPATIONAL ACCIDENT INSURANCE
Policy Amendment 3

This Policy Amendment is attached to and made part of the Policy effective May 1, 2002 at 12:01 A.M., Standard Time at the address of the Policyholder.  Any changes in coverage apply only with respect to accidents and Covered Losses that occur on or after that date.  Any changes in premium apply as of the first premium due date on or after the effective date of this Amendment.

### Application 805 5836

It is hereby agreed and understood that, in consideration of timely payment of the required premium, that the policy is amended as follows:

Item 7 of the Schedule, Policy Period and Signatures, is hereby amended to change the Policy Period Effective and Termination Dates to be as follows:

Policy Period:    From:  Policy Effective Date       May 1, 2002
                To:     Policy Termination Date    May 1, 2003

Item 3 of the Schedule Premium Rates, is hereby amended as follows:

Premium Rates for the period May 1, 2002 through June 1, 2002:
Class 1:.......................................................... $115.00 (per Insured Person per Month)
Class 2:.......................................................... $115.00 (per Insured Person per Month)

Premium Rates for the period June 1, 2002 through May 1, 2003:
Class 1:.......................................................... $138.00 (per Insured Person per Month)
Class 2:.......................................................... $138.00 (per Insured Person per Month)

This Policy Amendment expires concurrently with the Policy and is subject to all of the provisions, limitations and conditions of the Policy except as they are specifically modified by this Policy Amendment.

C22385                        1



**AIG LIFE INSURANCE COMPANY**
600 KING STREET
WILMINGTON, DELAWARE 19801
(302) 594-2000
(Herein called the Company)

Policyholder: Crestar Bank, N.A. as Trustee of
the Workguard Trust
Policy Number: TRK 805 6434
Participating Organization: Godwin Materials Inc.

## TRUCKERS OCCUPATIONAL ACCIDENT INSURANCE
Policy Amendment 2

This Policy Amendment is attached to and made part of the Policy effective May 1, 2001 at 12:01 A.M., Standard Time at the address of the Policyholder. Any changes in coverage apply only with respect to accidents and Covered Losses that occur on or after that date. Any changes in premium apply as of the first premium due date on or after the effective date of this Amendment.

### Application 805 5836

It is hereby agreed and understood that, in consideration of timely payment of the required premium, that the policy is amended as follows:

Item 7 of the Schedule, Policy Period and Signatures, is hereby amended to change the Policy Period Effective and Termination Dates to be as follows:

| Policy Period: | From: | Policy Effective Date | May 1, 2001 |
|---|---|---|---|
| | To: | Policy Termination Date | May 1, 2002 |

Item 3 of the Schedule Premium Rates, is hereby amended as follows:

Premium Rates for the period May 1, 2001 through August 1, 2001:
Class 1:......................................................... $107.00 (per Insured Person per Month)
Class 2:......................................................... $107.00 (per Insured Person per Month)

Premium Rates for the period August 1, 2001 through May 1, 2002:
Class 1:......................................................... $115.00 (per Insured Person per Month)
Class 2:......................................................... $115.00 (per Insured Person per Month)

This Policy Amendment expires concurrently with the Policy and is subject to all of the provisions, limitations and conditions of the Policy except as they are specifically modified by this Policy Amendment.

C22385                                                    1



AIG LIFE INSURANCE COMPANY
600 KING STREET
WILMINGTON. DELAWARE 19801
(302) 594-2000
(Herein called the Company)

Policyholder: Crestar Bank, N.A. as Trustee of
the Workguard Trust
Policy Number: TRK 805 6434
Participating Organization: Godwin Materials.
Inc.

### TRUCKERS OCCUPATIONAL ACCIDENT INSURANCE
Policy Amendment No. 1

This Policy Amendment is attached to and made part of the Policy effective 5/1/2000 at 12:01 A.M., Standard Time at the address of the Policyholder. Any changes in coverage apply only with respect to accidents and Emergency Sicknesses and Covered Losses that occur on or after that date. Any changes in premium apply as of the first premium due date on or after the effective date of this Amendment.

### Application C22384

It is hereby agreed and understood that, in consideration of timely payment of the required premium, item 7 of the Schedule, Policy Period and Signatures, is hereby amended to change the Policy Period Effective and Termination Dates to be as follows:

Policy Period:    From:  Policy Effective Date                    5/1/2000
                  To:    Policy Termination Date                  5/1/2001

This Policy Amendment expires concurrently with the Policy and is subject to all of the provisions, limitations and conditions of the Policy except as they are specifically modified by this Policy Amendment.

C22385



**AIG LIFE INSURANCE COMPANY**
600 KING STREET
WILMINGTON, DELAWARE 19801
(302) 594-2000
(Herein called the Company)

### PARTICIPATING ORGANIZATION APPLICATION FOR
### TRUCKERS OCCUPATIONAL ACCIDENT INSURANCE

Application is hereby made for a policy of accident insurance based upon the following statements and representations:

### SCHEDULE

1.  Name of Policyholder:                Crestar Bank, N.A. as Trustee of the WorkGuard Trust
    Address:                         1445 New York Avenue, N.W., Washington, D.C.  20005-2108
    Type of Business or Organization:      Bank
    Covered Affiliates(s) or Subsidiary(ies):   None
    Policy Number:                 TRK 805 6434
    Identification of Participating Organization:

    Name of Participating Organization:    Godwin Materials, nc.
    Address of Participating Organization:   PO Box 680958  Prattville, AL   36104
    Type of Business or Organization:      Trucking
    Covered Affiliates(s) or Subsidiary(ies):   None

    Name and Address of Administrator (If None, So Indicate):      Palomar Insurance
                                                                   PO Drawer  11128
                                                                   Montgomery AL   36111-0128

2.  Description of Eligible Persons:

    Class        Description of Class

    1            All Owner-Operators of Godwin Materials, Inc. or any of its Covered Affiliates or Subsidiaries,
    provided they are:  (a) under age 70; (b) driving 30 or more hours per week; and (c) under a
    long-term lease agreement of 30 days or more, or who have entered into a contract, to provide
    Occupational services for the Policyholder.

    2            All Independent Contractors of Godwin Materials, Inc. or any of its Covered Affiliates or
    Subsidiaries, provided they are:  (a) under age 70; (b) driving 30 or more hours per week; and
    (c) under a long-term lease agreement of 30 days or more, or who have entered into a contract,
    to provide Occupational services for the Owner Operator.

3.  Premium Rates:
    Class 1& 2 ............................................................. $107.00 (per Insured Person per month)

C22384                                            1

4. Benefits ("X" indicates coverage is applicable; "NIL" indicates coverage does not apply):

A. Occupational Accident Benefits:

CLASS 1 & 2

(1) **X** Accidental Death Benefit
    Principal Sum ...........................................................................................$50,000
    Incurral Period ........................................................................................365 days
    Deductible Amount ........................................................................................$0

(2) **X** Survivor's Benefit
    Principal Sum .........................................................................................$200,000
    Monthly Benefit Percentage ...............................................................1.0%
    Monthly Benefit Amount ...................................................................$2,000

(3) **X** Accidental Dismemberment Benefit
    Principal Sum .........................................................................................$250,000
    Incurral Period ........................................................................................365 days
    Deductible Amount ........................................................................................$0

(4) **X** Paralysis Benefit
    Principal Sum .........................................................................................$250,000
    Incurral Period ........................................................................................365 days
    Deductible Amount ........................................................................................$0

(5) **X** Temporary Total Disability Benefit
    Commencement Period (Initial Disability) ...........................90 days
    Waiting Period ...........................................................................................7 days
    Participation Percentage ...................................................................70%
    Maximum Weekly Benefit Amount ..................................................$500
    Maximum Benefit Period ...............................................................104 weeks

(6) **X** Continuous Total Disability Benefit (not a Covered Loss until the day after the Temporary Total Disability Maximum Benefit Period has been reached)
    Participation Percentage ...................................................................70%
    Maximum Weekly Benefit Amount ..................................................$500
    Maximum Benefit Period ...............................................................to age 70

(7) **X** Accident Medical Expense Benefit (Primary)
    Commencement Period...................................................................90 days
    Deductible Amount ........................................................................................$0
    Maximum Benefit Period ...............................................................104 weeks
    Dental Maximum ...........................................................$1,000 per accident
    Maximum Benefit Amount ...................................................$1,000,000

(8) **X** Hemorrhoids Coverage
    Lifetime Maximum Benefit Period ...............................................90 days
    Lifetime Maximum Benefit Amount ...........................................$10,000

(9) **X** Hernia Coverage
    Lifetime Maximum Benefit Period ...............................................90 days
    Lifetime Maximum Benefit Amount ...........................................$10,000

(10) **X** Pre-existing Condition
    Maximum Benefit Amount ...........................................................$25,000

C22384        2

A.    Non-Occupational Accident Benefits:

CLASS 1 & 2

(1)  X  Accidental Death Benefit
            Principal Sum .............................................................................................$10,000
            Incurral Period ......................................................................................... 365 days
            Deductible Amount ............................................................................................$0

(2)  X  Accidental Dismemberment Benefit
            Principal Sum .............................................................................................$10,000
            Incurral Period ......................................................................................... 365 days
            Deductible Amount ............................................................................................$0

(3)  X  Accident Medical Expense Benefit (Primary)
            Commencement Period............................................................................... 90 days
            Deductible Amount ............................................................................................$0
            Maximum Benefit Period ........................................................................ 104 weeks
            Dental Maximum ..........................................................................$1,000 per accident
            Maximum Benefit Amount ...............................................................................$7,500

5.   Limits of Liability

      A.    Occupational Coverage

            Per-Insured Person Limit of Liability (Combined Single Limit) ...................................$1,000,000
            (all Covered Losses with respect to
            any one Occupational accident)

            Aggregate Limit of Liability ..................................................................................$2,000,000
            (all Covered Losses with respect to all Insured
            Persons in any one Occupational accident)

      B.    Non-Occupational Coverage

            Per-Insured Person Limit of Liability (Combined Single Limit) ........................................$10,000
            (all Covered Losses with respect to
            any one Occupational accident)

            Aggregate Limit of Liability ..................................................................................$20,000
            (all Covered Losses with respect to all Insured
            Persons in any one Occupational accident)

6.    Benefits, Riders and Endorsements

The following Riders and Endorsements are attached to and made part of the Policy as of the Policy Effective Date, and apply only to Eligible Persons in a class shown in that row. Each Rider and Endorsement is subject to all provisions, limitations and exclusions of the Policy that are not specifically modified by the Rider and Endorsement.

| Class(es) | Benefit Rider(s) | Other Rider(s) and Endorsement(s) |
|---|---|---|
| 1 & 2 | Hemorrhoids Coverage; Hernia Coverage | Pre-existing conditions rider |

Other Riders and Endorsements to the Policy: Participating Organization Endorsement

7.    Policy Period and Signature(s)

| Policy Period: | From: | Policy Effective Date | 05/01/1999 |
|---|---|---|---|
| | To: | Policy Termination Date | 05/01/2000 |

Signed by: _____

Title: _____

Signed at _____ on _____

Witness _____
            *(licensed agent where required by law)*

 **AMERICAN INTERNATIONAL COMPANIES®**

# NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.

Executive Offices: 70 Pine Street, New York, NY 10270
(212) 770-7000
(a capital stock company, herein referred to as the Company)

Policyholder:    **Godwin Materials, Inc.**
Policy Number:   **TRK 9056434**

## TRUCKERS OCCUPATIONAL ACCIDENT INSURANCE

This Policy is a legal contract between the Policyholder and the Company. The Company agrees to insure eligible persons of the Policyholder (herein called Insured Person(s)) against loss covered by this Policy, subject to its provisions, limitations and exclusions. The persons eligible to be Insured Persons are all persons described in the Description of Eligible Persons section of the Master Application.

This Policy is issued in consideration of the payment of the required premium when due and the statements set forth in the signed Master Application, which is attached to and made part of this Policy and in the individual enrollment forms, if any.

This Policy begins on the Policy Effective Date shown in the Master Application. This Policy will continue in effect, provided premiums are paid when due, until the Policy Termination Date shown in the Master Application, unless otherwise terminated as further provided in this Policy, or renewed.

## IMPORTANT NOTICE

**THIS IS NOT A WORKERS' COMPENSATION POLICY AND IS NOT A SUBSTITUTE FOR WORKERS' COMPENSATION COVERAGE.**

This Policy is governed by the laws of the state in which it is delivered.

The President and Secretary of National Union Fire Insurance Company of Pittsburgh, Pa. witness this Policy:

President                                          Secretary

### PLEASE READ THIS POLICY CAREFULLY

C22382DBG(REV.11-99)

## TABLE OF CONTENTS

**Section I**      **General Definitions**..............................................................................3

**Section II**     **Effective and Termination Dates** ...........................................5-6
                   Policy Effective Date...............................................................5
                   Policy Termination Date..........................................................5
                   Owner-Operator's Effective Date.............................................5
                   Owner-Operator's Termination Date .......................................5
                   Contract Driver's Effective Date..............................................5
                   Contract Driver's Termination Date..........................................6

**Section III**    **Premium** ..............................................................................7
                   Premiums ................................................................................7
                   Insured Person's Premium.......................................................7
                   Grace Period ...........................................................................7
                   Waiver of Premium ..................................................................7

**Section IV**     **Benefits** ........................................................................8-14
                   Principal Sum ..........................................................................8
                   Deductible................................................................................8
                   Accidental Death Benefit ........................................................8
                   Survivor's Benefit....................................................................8
                   Exposure and Disappearance...................................................8
                   Accidental Dismemberment Benefit.........................................8
                   Paralysis Benefit......................................................................9
                   Temporary Total Disability Benefit .........................................10
                   Continuous Total Disability Benefit ........................................11
                   Accident Medical Expense Benefit..........................................12

**Section V**      **Limits of Liability** .........................................................15

**Section VI**     **Exclusions**.....................................................................15

**Section VII**    **Claims Provisions**...................................................16-17

**Section VIII**   **General Provisions** ................................................18-20

## SECTION I                          GENERAL DEFINITIONS

**Administrator** means the Administrator named in the Schedule.

**Co-Owner** means a person who has partial ownership of a vehicle which is being operated by an Owner-Operator for the purpose of performing Occupational services .

**Combined Single Limit** means, with respect to any one Insured Person, the total amount of benefits that are payable under this Policy for or in connection with Injury sustained as the result of any one accident. When the Combined Single Limit has been reached, no further benefits shall be payable under this Policy, with respect to that Insured Person, for or in connection with Injury sustained as the result of that one accident.

**Contract Driver** means a person who: (1) drives a vehicle owned or leased by an Owner-Operator for the purpose of performing Occupational services; (2) is on file with the Company; (3) is not an employee of the Policyholder; and (4) is not an employee of an Owner-Operator, unless otherwise permitted by law.

**Contractee** means the person, firm or other entity with whom the Owner-Operator has contracted to provide Occupational services.

**Covered Loss(es)** means one or more of the losses or expenses described in Section IV of this Policy.

**Dependent Child(ren)** means the Insured Person's unmarried children, including natural children from the moment of birth, step or foster children, or adopted children, from the moment of placement in the home of the Insured Person, under age 19 (25 if attending an accredited institution of higher learning on a full-time basis) and primarily dependent on the Insured Person for support and maintenance. It also includes any unmarried Dependent Child(ren) of the Insured Person who are incapable of self-sustaining employment by reason of mental or physical incapacity, and who are primarily dependent on the Insured Person for support and maintenance.

The Company may require proof of the Dependent Child(ren)'s incapacity and dependency within 60 days before the Dependent Child(ren) reach the age limit specified above. The Company may request that satisfactory proof of the Dependent Child(ren)'s continued incapacity and dependency be submitted to the Company on an annual basis. If the requested proof is not furnished within 31 days of the request, such child(ren) shall no longer be considered Dependent Child(ren) as of the end of that 31 day period.

**Dispatch** means the period of time during which an Insured operates his or her vehicle, or performs vehicle repair, while being en route to pick up a load, picking up a load, en route to deliver a load, and unloading a load.

**Functional Capacity Examination (FCE)** means a test performed by a physical therapy professional to evaluate and estimate physical limitations.

**Immediate Family Member** means a person who is related to the Insured Person in any of the following ways: Spouse, brother-in-law, sister-in-law, son-in-law, daughter-in-law, mother-in-law, father-in-law, parent (includes stepparent), brother or sister (includes stepbrother or stepsister), or child (includes legally adopted or placed for adoption, or stepchild).

**Injury** means bodily Injury to an Insured Person caused by an Occupational accident while coverage is in force under this Policy, which results directly and independently of all other causes in a Covered Loss. All Injuries sustained by an Insured Person in any one accident shall be considered a single Injury.

**Insured** means a person who: (1) is a member of an eligible class as described in the Description of Eligible Persons section of the Master Application; (2) has enrolled for coverage; and (3) has paid the required premium.

C22382DBG(REV.11-99)                3

## GENERAL DEFINITIONS (Continued)

**Insured Person** means an insured.

**Occupational** means, with respect to an activity, accident, incident, circumstance or condition involving an insured, that the activity, accident, incident, circumstance or condition occurs or arises out of or in the course of the insured performing services within the course and scope of contractual obligations for the Policyholder, while under Dispatch. Occupational does not encompass any period of time during the course of everyday travel to and from work.

**Occupational Assessment** means a test of vocational capabilities. The process includes a review of medical records, Injury and treatment, history and background (education, military, previous occupation(s)), evaluation of basic skills such as reading, understanding, spelling and/or math capabilities, and vocational alternatives.

**Occupational Cumulative Trauma** means bodily Injury to an insured caused by the combined effect of repetitive physical Occupational activities extending over a period of time, where: (1) such condition is diagnosed by a Physician; (2) the Insured's last day of last performance of the activities causing the Injury occurred during the Policy Period; and (3) such activities resulted directly and independently of all other causes in a Covered Loss.

**Occupational Disease** means a sickness which results in disability or death, and is caused by exposure to environmental or physical hazards during the course of the Insured's Occupational activities, where: (1) such condition is diagnosed by a Physician, and is generally accepted by the National Centers for Disease Control to be a disease caused by such hazards; (2) exposure to such hazards is not an accident but is caused or aggravated by the conditions under which the insured performs Occupational services; (3) the Insured's last day of last exposure to the environmental or physical hazards causing such condition occurs during the Policy Period; and (4) such exposure results directly and independently of all other causes in a Covered Loss.

**Owner-Operator** means a person who: (1) owns or leases a vehicle which he or she is operating for the purpose of performing Occupational services; (2) is an independent contractor as defined by law; and (3) is not an employee of the Policyholder. The term Owner-Operator will include a Co-Owner if the Co-Owner otherwise meets the definition of Owner-Operator.

**Physician** means a practitioner of the healing arts acting within the scope of his or her license who is not: (1) the Insured Person; or (2) an Immediate Family Member; or (3) a practitioner retained by the Policyholder or Contractee.

**Pre-Existing Condition** means a condition for which an Insured Person has sought or received medical advice or treatment during the twelve months immediately preceding his or her effective date of coverage under this Policy.

**Schedule** means the Schedule shown in the Master Application for this Policy which is attached to and made a part of this Policy.

**Spouse** means the Insured Person's legal spouse.

**SECTION II**               **EFFECTIVE AND TERMINATION DATES**

### Policy Effective and Termination Dates

**Policy Effective Date.** This Policy begins on the Policy Effective Date shown in the Master Application at 12:01 A.M. Standard Time at the address of the Policyholder where this Policy is delivered.

**Policy Termination Date.** This Policy may, at any time, be terminated by mutual written consent of the Company and the Policyholder. Otherwise, this Policy will terminate at 12:01 A.M. Standard Time at the Policyholder's address on the earliest of:
1. the Policy Termination Date shown in the Master Application, unless renewed;
2. the premium due date if premiums are not paid when due subject to the Grace Period;
3. the date specified in the written notice of the Company's intent to terminate this Policy, which will be at least 31 days after the date the Company sends such notice to the Policyholder's last known recorded address; or
4. the date specified in the written notice of the Policyholder's intent to terminate this Policy, which will be at least 31 days after the date the Policyholder sends such notice to the Company.

If the Company terminates this Policy, any unearned premium will be returned on a pro-rata basis. If the Policyholder requests termination, the Company will return any unearned premium paid on a short-rate basis. Termination will not affect any claim for a Covered Loss occurring prior to the effective date of termination.

### Owner-Operator's Effective and Termination Dates

**Owner-Operator's Effective Date.** An Owner-Operator's coverage under this Policy begins on the latest of:
1. the Policy Effective Date;
2. the date the person becomes a member of an eligible class of persons as described in the Description of Eligible Persons section of the Master Application;
3. if individual enrollment is required, the date written enrollment is received by the Policyholder; or
4. the date on which the first premium payment is paid when due.

**Owner-Operator's Termination Date.** An Owner-Operator's coverage under this Policy ends on the earliest of:
1. the date this Policy is terminated;
2. the premium due date if premiums are not paid when due;
3. the date the Owner-Operator requests, in writing, that his or her coverage be terminated; or
4. the date the Owner-Operator ceases to be a member of any eligible class(es) of persons as described in the Description of Eligible Persons section of the Master Application.

### Contract Driver's Effective and Termination Dates

**Contract Driver's Effective Date.** A Contract Driver's coverage under this Policy begins on the latest of:
1. the Policy Effective Date;
2. the date the person becomes a member of an eligible class of persons as described in the Description of Eligible Persons section of the Master Application;
3. if individual enrollment is required, the date written enrollment is received by the Policyholder; or
4. the date on which the first premium payment is paid when due.

C22382DBG(REV.11-99)                                    5

**EFFECTIVE AND TERMINATION DATES (Continued)**

**Contract Driver's Termination Date.** A Contract Driver's coverage under this Policy ends on the earliest of:
1. the date this Policy is terminated;
2. the premium due date if premiums are not paid when due;
3. the date the Contract Driver requests, in writing, that his or her coverage be terminated;
4. the date the Contract Driver ceases to be a member of any eligible class(es) of persons as described in the Description of Eligible Persons section of the Master Application; or
5. the date the Owner-Operator with respect to whom the Contract Driver is under contract ceases to be a member of any eligible class(es) of persons as described in the Schedule of the Master Application.

A change in an Insured Person's coverage under this Policy due to a change in his or her eligible class or benefit selection becomes effective on the later of: (1) the date the change in his or her eligible class or benefit selection occurs; or (2) if the change requires a change in premium, the date the first changed premium is paid. However, a change in coverage applies only with respect to accidents that occur after the change becomes effective.

Termination of coverage will not affect a claim for a Covered Loss that occurs either before or after such termination if that loss results from an accident that occurred while the Insured Person's coverage was in force under this Policy.

**SECTION III**                         **PREMIUM**

**Premiums.** Premiums are payable to the Company at the rates and in the manner described in the Premiums section of the Master Application. The Company may change the required premiums due on any Policy anniversary date, as measured annually from the Policy Effective Date, by giving the Policyholder at least 31 days advance written notice. The Company may change the required premiums as a condition of any renewal of this Policy. The Company may also change the required premiums at any time when any change affecting premiums is made in this Policy.

**Insured Person's Premium.** The Premium Rate for coverage under this Policy for each Insured Person is shown in the Schedule, and shall be payable as follows:

1. Insured Persons who are enrolled on or prior to the fifteenth of the month shall pay an amount equal to the full monthly premium. No premium shall be payable for the last full or partial month of coverage.

2. Insured Persons who are enrolled after the fifteenth of the month shall pay a premium equal to the full monthly premium beginning on the first of the month following the month during which coverage becomes effective. With respect to the last full or partial month of coverage; Insured Persons shall pay an amount equal to the monthly premium.

**Grace Period.** A Grace Period of 31 days will be provided for the payment of any premium due after the first premium. This Policy will not be terminated for nonpayment of premium during the Grace Period if the Policyholder pays all premiums due by the last day of the Grace Period. This Policy will terminate on the last day of the period for which all premiums have been paid if all premiums due are not paid by the last day of the Grace Period.

If the Company expressly agrees to accept late payment of a premium without terminating this Policy, the Company does so in accordance with the Noncompliance With Policy Requirements provision in Section VIII of this Policy. In such case, the Policyholder will be liable to the Company for any unpaid premiums for the time this Policy is in force, plus all costs and expenses (including, but not limited to, reasonable attorney fees, collection fees and court costs) incurred by the Company in the collection of all overdue amounts.

No Grace Period will be provided if the Company receives notice to terminate this Policy prior to a premium due date.

**Waiver of Premium.** Subject to this Policy remaining in force, all premiums due under this Policy with respect to an Insured Person who is receiving either a Temporary Total Disability Benefit or Continuous Total Disability Benefit under this Policy will be waived. Premiums will be waived from the first premium due date on or after the date the disability begins. Premium payments must be resumed on the premium due date next following the date the Insured Person's Temporary Total Disability Benefit or Continuous Total Disability Benefit ceases. If premium payments are not resumed on that date, the Insured Person's coverage under this Policy shall end on that date.

## SECTION IV                                   BENEFITS

**Principal Sum.** As applicable to each Insured Person, Principal Sum means the amount of insurance in force under this Policy on the date of the accident, as described in the Schedule.

**Deductible.** The applicable per accident Deductible Amounts shown in the Schedule per Covered Loss apply to each Insured Person sustaining a particular type of Covered Loss. For accidents where more than one Covered Loss applies, each deductible amount is applied to the total benefits payable.

### Accidental Death Benefit

If Injury to the Insured Person results in death within the Incurral Period shown in the Schedule, the Company will pay the Principal Sum, subject to any applicable Deductible Amount for the Accidental Death Covered Loss shown in the Schedule. The Incurral Period starts on the date of the accident that caused such Injury.

### Survivor's Benefit

If the Insured Person suffers accidental death such that an Accidental Death Benefit is payable under this Policy, the Company will pay a monthly Survivor's Benefit to the surviving Spouse, up to the Principal Sum shown in the Schedule. The Monthly Benefit Amount shall be determined by multiplying the Principal Sum by the Monthly Benefit Percentage.

If the Insured Person is not survived by a Spouse, or if the Insured Person's Spouse dies or remarries, the Company will pay or continue to pay the Survivor's Benefit to the Insured Person's surviving Dependent Children, if any. If there is more than one surviving Dependent Child, the Survivor's Benefit will be distributed equally among the surviving Dependent Children. The payment of the monthly Survivor's Benefit will end on the earliest of the following dates:
1. the date the Spouse dies or remarries, if there are no Dependent Children;
2. the date the last Dependent Child dies or is no longer eligible as defined in Section I of this Policy; or
3. the date the Principal Sum has been paid.

If the Insured Person is not survived by a Spouse or any Dependent Children, the Company will pay only the Accidental Death Benefit in accordance with the Payment of Claims provision of this Policy.

### Exposure and Disappearance

If, by reason of an accident, an Insured Person is unavoidably exposed to the elements and as a result of such exposure suffers a loss which is otherwise covered under this Policy, the loss will be considered a Covered Loss under the terms of this Policy.

If the body of an Insured Person has not been found within one year after the disappearance, forced landing, stranding, sinking or wrecking of a conveyance in which that person was an occupant, then it will be deemed, subject to all other terms and provisions of this Policy, that the Insured Person has suffered Accidental Death within the meaning of this Policy.

### Accidental Dismemberment Benefit

If Injury to the Insured Person results in any one of the Losses specified below, within the Incurral Period shown in the Schedule (as measured from the date of the accident that caused such Injury), the Company will pay the Percentage of the Principal Sum shown below for that Loss, subject to any applicable Deductible Amount for the Accidental Dismemberment Covered Loss shown in the Schedule.

## SECTION IV                                    BENEFITS

| For Loss of: | Percentage of the Principal Sum: |
|---|---|
| Both Hands or Both Feet | 100% |
| Sight of Both Eyes | 100% |
| One Hand and One Foot | 100% |
| One Hand and the Sight of One Eye | 100% |
| One Foot and the Sight of One Eye | 100% |
| Speech and Hearing in Both Ears | 100% |
| One Arm or One Leg | 75% |
| One Hand or One Foot | 50% |
| Sight of One Eye | 50% |
| Speech or Hearing in Both Ears | 50% |
| Four Fingers of Same Hand | 25% |
| Hearing in One Ear | 25% |
| Thumb and Index Finger of Same Hand | 25% |

"Loss" of a hand or foot means complete severance through or above the wrist or ankle joint. "Loss" of sight of an eye means total and irrecoverable loss of the entire sight in that eye. "Loss" of hearing in an ear means total and irrecoverable loss of the entire ability to hear in that ear. "Loss" of speech means total and irrecoverable loss of the entire ability to speak. "Loss" of an arm or leg means complete severance through or above the shoulder or hip joint. "Loss" of four fingers means complete severance through or above the metacarpophalangeal joint of all four digits.    "Loss" of thumb and index finger means complete severance through or above the metacarpophalangeal joint of both digits.

If more than one Loss is sustained by an Insured Person as a result of the same accident, only one amount, the largest, will be paid.

### Paralysis Benefit

If Injury to the Insured Person results in any Type of Paralysis specified below, within the Incurral Period shown in the Schedule (as measured from the date of the accident that caused such Injury), the Company will pay the Percentage of the Principal Sum shown below for that Type of Paralysis, subject to any applicable Deductible Amount for the Paralysis Covered Loss shown in the Schedule.

| Type of Paralysis: | Percentage of the Principal Sum: |
|---|---|
| Quadriplegia | 100% |
| Paraplegia | 75% |
| Hemiplegia | 50% |
| Uniplegia | 25% |

"Quadriplegia" means the complete and irreversible paralysis of both upper and both lower limbs. "Paraplegia" means the complete and irreversible paralysis of both lower limbs. "Hemiplegia" means the complete and irreversible paralysis of the upper and lower limbs of the same side of the body. "Uniplegia" means the complete and irreversible paralysis of one limb. "Limb" means entire arm or entire leg.

If the Insured Person sustains more than one Type of Paralysis as a result of the same accident, only the largest single amount will be considered a Covered Loss.

C22382DBG(REV.11-99)                              9

## SECTION IV                              **BENEFITS**

**Temporary Total Disability Benefit**

If Injury to the Insured Person results in Temporary Total Disability within the Commencement Period shown in the Schedule, and if the Insured Person is under age 70 on the day the Temporary Total Disability begins, the Company will pay the Temporary Total Disability Benefit specified below, subject to satisfaction of any applicable Waiting Period shown in the Schedule. The Commencement Period starts on the date of the accident that caused such Injury.

The Temporary Total Disability Benefit with respect to each week of an Insured Person's Temporary Total Disability during a Single Period of Total Disability is equal to the lesser of:

1. the Participation Percentage (as shown in the Schedule) of the Insured Person's Average Weekly Earnings; or
2. the Maximum Weekly Benefit Amount shown in the Schedule.

The Temporary Total Disability Benefit shall cease on the earliest of the following dates:
1. the date the Insured Person is no longer Temporarily Totally Disabled;
2. the date the Insured Person dies;
3. the date the Insured Person attains age 70; or
4. the date the Maximum Benefit Period shown in the Schedule has been reached.

The Temporary Total Disability Benefit with respect to less than a full Benefit Week of Temporary Total Disability equals 1/7th of the weekly Covered Loss for each day of Temporary Total Disability.

As used above in this Temporary Total Disability benefit:

**Average Weekly Earnings** means the Insured Person's average weekly compensation earned for performing Occupational services less any amounts withheld by or otherwise returned to the Policyholder, including but not limited to taxes, overhead and fuel charges. If the Insured Person is paid wholly or in part by commissions, Average Weekly Earnings also include commissions based on an average of the commissions paid to the Insured Person for performing Occupational services during the 104 weeks immediately preceding the onset of Temporary Total Disability. If the Insured Person was not performing such services for the Policyholder during the entire 104 week period, commissions are based on an average of the total number of weeks the Insured Person was performing such services for the Policyholder.

**Benefit Week** means a 7-day period of time that begins on the first day of Temporary Total Disability after the Waiting Period shown in the Schedule for Temporary Total Disability and on the same day of each week thereafter.

**Maximum Benefit Period** means, with respect to Temporary Total Disability, the maximum period for which benefits shall be payable for a Temporary Total Disability Covered Loss during a Single Period of Total Disability. The length of the Maximum Benefit Period for Temporary Total Disability is shown in the Schedule.

**Single Period of Total Disability** means all periods of Temporary Total Disability due to the same or related causes (whether or not insurance has been interrupted) except any of the following which are considered separate periods of disability: (1) successive periods of Temporary Total Disability, due to entirely different and unrelated causes, separated by at least one full day during which the Insured Person is not Temporarily Totally Disabled; (2) successive periods of Temporary Total Disability, due to the same or related causes, separated by at least 6 months during which the Insured Person is not Temporarily Totally Disabled.

## SECTION IV                     BENEFITS

**Temporary Total Disability, Temporarily Totally Disabled** means disability that: (1) prevents an Insured Person from performing the duties of his or her regular, primary occupation; and (2) requires that, and results in, the Insured Person receiving Continuous Care.

**Continuous Care** means weekly monitoring and/or evaluation of the disabling condition by a Physician. The Company must receive proof of continuing Temporary Total Disability on a weekly basis.

### Continuous Total Disability Benefit

If Injury to the Insured Person, resulting in Temporary Total Disability, subsequently results in Continuous Total Disability, the Company will pay the Continuous Total Disability Benefit specified below, provided:
1. benefits payable for a Temporary Total Disability Covered Loss ceased solely because the Maximum Benefit Period shown in the Schedule for Temporary Total Disability has been reached, but the Insured Person remains disabled;
2. the Insured Person is under age 70 on the day after the Maximum Benefit Period shown in the Schedule for Temporary Total Disability has been reached;
3. the Insured Person has been granted a Social Security Disability Award for their disability; and
4. their disability is reasonably expected to continue without interruption until the Insured Person dies.

The Continuous Total Disability Benefit with respect to each month of an Insured Person's Continuous Total Disability is equal to four and three-tenths (4.3) times the weekly benefit for Temporary Total Disability, less the Insured Person's primary Social Security Disability Award.

The Continuous Total Disability Benefit with respect to less than a full Benefit Week of Continuous Total Disability equals 1/7th of the weekly Benefit for Temporary Total Disability for each day of Continuous Total Disability.

Benefits payable under the Temporary Total Disability Benefit before the Maximum Benefit Period shown in the Schedule for Temporary Total Disability has been reached, will not be considered a Continuous Total Disability Benefit.

The Continuous Total Disability Benefit shall cease on the earliest of the following dates:
1. the date the Insured Person is no longer Continuously Totally Disabled.
2. the date the Insured Person dies.
3. the date the Insured Person's Social Security Disability Award ceases.
4. the date the Insured Person attains age 70.
5. the date the Maximum Benefit Period shown in the Schedule for Continuous Total Disability has been reached.

As used above in this Continuous Total Disability benefit:

**Benefit Week** means a one-week period of time that begins on the day after the Maximum Benefit Period for Temporary Total Disability has been reached and on the same day of each week thereafter.

**Maximum Benefit Period** means, with respect to Continuous Total Disability, the maximum period for which benefits shall be payable for a Continuous Total Disability Covered Loss(es). The length of the Maximum Benefit Period for Continuous Total Disability is shown in the Schedule.

**Continuous Total Disability, Continuously Totally Disabled** means disability that: (1) prevents an Insured Person from performing the duties of any occupation for which he or she is qualified by reason of education, training or experience; and (2) requires that, and results in, the Insured Person receiving Continuous Care.

C22382DBG(REV.11-99)                     11

## SECTION IV                         BENEFITS

**Continuous Care** means at least monthly monitoring and/or evaluation of the disabling condition by a Physician. The Company must receive proof of continuing Continuous Total Disability on a quarterly basis.

Terms used in this Continuous Total Disability benefit, but which refer to Temporary Total Disability and are defined in the Temporary Total Disability benefit, are to be interpreted as defined in that benefit.

### Accident Medical Expense Benefit

If an Insured Person suffers an Injury that requires him or her to be treated by a Physician, within the Commencement Period shown in the Schedule, the Company will pay the Usual and Customary Charges incurred for Medically Necessary Covered Accident Medical Services received due to that Injury, up to the Maximum Benefit Amount and Maximum Benefit Period shown in the Schedule per Insured Person for all Injuries caused by a single accident, subject to any applicable Deductible Amount. The Commencement Period starts on the date of the accident that caused such Injury. The Deductible Amount for the Accident Medical Expense Benefit is the Deductible Amount shown in the Schedule, if any, which must be met from Usual and Customary Charges for Medically Necessary Covered Accident Medical Services incurred due to Injuries sustained by the Insured Person in that accident.

As used in this Accident Medical Expense Benefit provision:

**Ambulatory Medical Center** means a licensed public establishment with an organized staff of Physicians and permanent facilities that are equipped and operated primarily for the purpose of providing medical services or performing surgical procedures. Such establishment must provide continuous Physician and registered nursing (RN) services whenever a patient is in the facility. An Ambulatory Medical Center does not include a Hospital, a Physician's office, or a clinic.

**Covered Accident Medical Service(s)** means any of the following services:
1. Hospital semi-private room and board (or room and board in an intensive care unit); Hospital ancillary services (including, but not limited to, use of the operating room or emergency room); or use of an Ambulatory Medical Center;
2. services of a Physician or a registered nurse (RN);
3. ambulance service to or from a Hospital;
4. laboratory tests;
5. radiological procedures;
6. anesthetics and the administration of anesthetics;
7. blood, blood products and artificial blood products, and the transfusion thereof;
8. physical therapy, Occupational therapy, and chiropractic care, up to the Physical Therapy, Occupational Therapy and Chiropractic Care Maximum, if any, shown in the Schedule;
9. rental of Durable Medical Equipment, up to the actual purchase price of such equipment;
10. artificial limbs, artificial eyes or other prosthetic appliances;
11. medicines or drugs administered by a Physician or that can be obtained only with a Physician's written prescription; or
12. repair or replacement of Sound Natural Teeth damaged or lost as a result of Injury, up to the Dental Maximum, if any, shown in the Schedule.

**Custodial Services** means any services which are not intended primarily to treat a specific Injury. Custodial Services include, but shall not be limited to services: (1) related to watching or protecting the Insured Person; (2) related to performing or assisting the Insured Person in performing any activities of daily living, such as: (a) walking; (b) grooming; (c) bathing; (d) dressing; (e) getting in or out of bed; (f) toileting; (g) eating; (h) preparing foods; or (i) taking medications that can usually be self-administered; and (3) that are not required to be performed by trained or skilled medical or paramedical personnel.

## SECTION IV                      BENEFITS

**Durable Medical Equipment** refers to equipment of a type that is designed primarily for use, and used primarily, by people who are injured (for example, a wheelchair or a hospital bed). It does not include items commonly used by people who are not injured, even if the items can be used in the treatment of injury or can be used for rehabilitation or improvement of health (for example, a stationary bicycle or a spa).

**Hospital** means a facility that: (1) is operated according to law for the care and treatment of injured people; (2) has organized facilities for diagnosis and surgery on its premises or in facilities available to it on a prearranged basis; (3) has 24-hour nursing service by registered nurses (RN), on duty or on call; and (4) is supervised by one or more Physicians. A Hospital does not include: (1) a nursing, convalescent or geriatric unit of a hospital when a patient is confined mainly to receive nursing care; (2) a facility that is, other than incidentally, a rest home, nursing home, convalescent home or home for the aged; nor does it include any ward, room, wing or other section of the hospital that is used for such purposes; or (3) any military or veterans hospital or soldiers home or any hospital contracted for or operated by any national government or government agency for the treatment of members or ex-members of the armed forces.

**Maximum Benefit Period** means, with respect to Accident Medical Expense, the maximum period for which benefits shall be payable for Covered Accident Medical Services for or in connection with a single Accident Medical Expense Covered Loss. The length of the Maximum Benefit Period for Accident Medical Expense is shown in the Schedule.

**Medically Necessary** means that a Covered Accident Medical Service: (1) is essential for diagnosis, treatment or care of the Occupational Injury for which it is prescribed or performed; (2) meets generally accepted standards of medical practice; and (3) is ordered by a Physician and performed under his or her care, supervision or order.

**Personal Comfort or Convenience Item(s)** means those items that are not Medically Necessary for the care and treatment of the Insured Person's Occupational Injury. The term Personal Comfort or Convenience Item(s) includes, but is not limited to: (1) a private Hospital room, unless Medically Necessary; (2) television rental; and (3) Hospital telephone charges.

**Sound Natural Teeth** means natural teeth that either are unaltered or are fully restored to their normal function and are disease free, have no decay, and are not more susceptible to injury than unaltered natural teeth.

**Usual and Customary Charge(s)** means a charge that: (1) is made for a Covered Accident Medical Service; (2) does not exceed the usual level of charges for similar treatment, services or supplies in the locality where the expense is incurred (for a Hospital room and board charge, other than for a Medically Necessary stay in an intensive care unit, does not exceed the Hospital's most common charge for semi-private room and board); and (3) does not include charges that would not have been made if no insurance existed.

In addition to the Exclusions in Section VI of this Policy, Usual and Customary Charges for Covered Accident Medical Services do not include, and benefits are not payable with respect to, any expense for or resulting from:
1. repair or replacement of existing artificial limbs, artificial eyes or other prosthetic appliances or repair of existing Durable Medical Equipment unless for the purpose of modifying the item because Injury has caused further impairment in the underlying bodily condition;
2. new, or repair or replacement of, dentures, bridges, dental implants, dental bands or braces or other dental appliances, crowns, caps, inlays or onlays, fillings or any other treatment of the teeth or gums;
3. new eye glasses or contact lenses or eye examinations related to the correction of vision or related to the fitting of glasses or contact lenses, unless Injury has caused impairment of sight; or repair or

C22382DBG(REV.11-99)                      13

**SECTION IV**                                    **BENEFITS**

    replacement of existing eyeglasses or contact lenses unless for the purpose of modifying the item because Injury has caused further impairment of sight;

4.  new hearing aids or hearing examinations unless Injury has caused impairment of hearing; or repair or replacement of existing hearing aids unless for the purpose of modifying the item because Injury has caused further impairment of hearing;

5.  rental of Durable Medical Equipment where the total rental expense exceeds the usual purchase expense for similar equipment in the locality where the expense is incurred (but if, in the Company's sole judgment, Accident Medical Expense Benefits for rental of Durable Medical Equipment are expected to exceed the usual purchase expense for similar equipment in the locality where the expense is incurred, the Company may, but is not required to, choose to consider such purchase expense as a Usual and Customary Covered Accident Medical Expense Benefit in lieu of such rental expense);

6.  Custodial Services; or

7.  Personal Comfort or Convenience Items.

## SECTION V                                    LIMITS OF LIABILITY

**Per-insured Person Limit of Liability.** The Per-insured Person Limit of Liability (Combined Single Limit) stated in the Schedule will be the total limit of the Company's liability for all benefits payable under this Policy with respect to any one Insured Person arising out of Injury sustained by such individual as the result of any one accident.

**Aggregate Limit of Liability.** The Aggregate Limit of Liability stated in the Schedule will be the total limit of the Company's liability for all benefits payable under this Policy with respect to all Insured Persons arising out of Injury sustained by one or more Insured Person(s) as the result of any one accident.

If the total of such benefits exceeds the Aggregate Limit of Liability, the Company shall not be liable to any Insured Person for a greater proportion of such Insured Person's benefits than said Aggregate Limit of Liability bears to the total benefits afforded all such Insured Persons under this Policy.

## SECTION VI                                    EXCLUSIONS

This Policy does not cover any losses caused in whole or in part by, or resulting in whole or in part from, the following:

1. suicide or any attempt at suicide; intentionally self-inflicted injury or any attempt at intentionally self-inflicted injury;
2. sickness, disease or infections of any kind, except bacterial infections due to an accidental cut or wound, botulism or ptomaine poisoning;
3. any Pre-Existing Condition;
4. Occupational Cumulative Trauma, unless (and to the extent as) specifically provided by this Policy;
5. Occupational Disease, unless (and to the extent as) specifically provided by this Policy;
6. hernia of any kind, unless (and to the extent as) specifically provided by this Policy;
7. hemorrhoids of any kind, unless (and to the extent as) specifically provided by this Policy;
8. performing, learning to perform or instructing others to perform as a master or crew member of any vessel while covered under the Jones Act or the United States Longshore and Harbor Workers' Act, or similar coverage;
9. declared or undeclared war, or any act of declared or undeclared war;
10. full-time active duty in the armed forces, National Guard or organized reserve corps of any country or international authority. (Unearned premium for any period for which the Insured Person is not covered due to his or her active duty status will be refunded.) (Loss caused while on short-term National Guard or reserve duty for regularly scheduled training purposes is not excluded.)
11. any Injury for which the Insured Person is entitled to benefits pursuant to any workers' compensation law or other similar legislation;
12. any loss insured by employers' liability insurance;
13. accidents occurring while the Insured is working for or under contract with an entity other than the Policyholder;
14. the Insured Person being under the influence of drugs or intoxicants, unless taken under the advice of his or her Physician; or
15. the Insured Person's commission of or attempt to commit a felony; or
16. travel or flight in or on (including getting in or out of, or on or off of) any vehicle used for aerial navigation, if the Insured Person is:
    a. riding as a passenger in any aircraft not intended or licensed for the transportation of passengers; or
    b. performing, learning to perform or instructing others to perform as a pilot or crew member of any aircraft; or
    c. riding as a passenger in an aircraft owned, leased or operated by the Policyholder; or
17. any union "stop work" action

C22382DBG(REV.11-99)                        15

## SECTION VII                    CLAIMS PROVISIONS

**Notice of Claim.** Written notice of claim must be given to the Company within 20 days after an Insured Person's loss, or as soon thereafter as reasonably possible. Notice given by or on behalf of the claimant to the Company at American International Companies®, Accident and Health Claims Division, P. O. Box 15701, Wilmington, DE 19850-5701, with information sufficient to identify the Insured Person, is deemed notice to the Company.

**Claim Forms.** The Company will send claim forms to the claimant upon receipt of a written notice of claim. If such forms are not sent within 15 days after the giving of notice, the claimant will be deemed to have met the proof of loss requirements upon submitting, within the time fixed in this Policy for filing proofs of loss, written proof covering the occurrence, the character and the extent of the loss for which claim is made. The notice should include the Insured's name, the Policyholder's name and the Policy number.

**Proof of Loss.** Written proof of loss must be furnished to the Company within 90 days after the date of the loss. If the loss is one for which this Policy requires continuing eligibility for periodic benefit payments, subsequent written proofs of eligibility must be furnished at such intervals as the Company may reasonably require. Failure to furnish proof within the time required neither invalidates nor reduces any claim if it was not reasonably possible to give proof within such time, provided such proof is furnished as soon as reasonably possible and in no event, except in the absence of legal capacity of the claimant, later than one year from the time proof is otherwise required.

**Payment of Claims.** Upon receipt of due written proof of death, payment for loss of life of an Insured Person will be made to the Insured Person's beneficiary as described in the Beneficiary Designation and Change provision of the General Provisions section. Upon receipt of due written proof of loss, payments for all losses, except loss of life, will be made to (or on behalf of, if applicable) the Insured Person suffering the loss. If an Insured Person dies before all payments due have been made, the amount still payable will be paid to his or her beneficiary as described in the Beneficiary Designation and Change provision of the General Provisions section.

If any payee is a minor or is not competent to give a valid release for the payment, the payment will be made to the legal guardian of the payee's property. If the payee has no legal guardian for his or her property, a payment not exceeding $1,000 may be made, at the Company's option, to any relative by blood or connection by marriage of the payee, who, in the Company's opinion, has assumed the custody and support of the minor or responsibility for the incompetent person's affairs.

The Company may pay benefits directly to any Hospital or person rendering covered services, unless the Insured Person requests otherwise in writing. Such request must be made no later than the time proof of loss is filed. Any payment the Company makes in good faith fully discharges the Company's liability to the extent of the payment made.

**Time of Payment of Claims.** Benefits payable under this Policy for any loss other than loss for which this Policy provides any periodic payment will be paid immediately upon the Company's receipt of due written proof of the loss. Subject to the Company's receipt of due written proof of loss, all accrued benefits for loss for which this Policy provides periodic payment will be paid at the expiration of each month during the continuance of the period for which the Company is liable and any balance remaining unpaid upon termination of liability will be paid immediately upon receipt of such proof.

**CLAIMS PROVISIONS (Continued)**

**Commutation of Losses.** It is agreed that, at the Company's option, at any time later than two years from the date of any accident resulting in a claim under this Policy, the Company may advise the Insured Person of its desire to be released from liability with respect to any such claim. In that event, the Company will appoint an actuary or appraiser to investigate, determine and capitalize such claim, and the payment by the Company of the capitalized value of such claim will constitute a complete and final release of the Company with respect to such claim.

**Sunset.** No claim made for losses sustained by Insured Persons will be considered valid and collectible in accordance with this Policy unless full details of such claim are presented to the Company within three years from the date of the accident which is the basis of such claim.

## SECTION VIII                    GENERAL PROVISIONS

**Entire Contract; Changes.** This Policy, together with any riders, endorsements, amendments, applications, enrollment forms, and attached papers, if any, make up the entire contract between the Policyholder and the Company. In the absence of fraud, all statements made by the Policyholder or any Insured Person will be considered representations and not warranties. No written statement made by an Insured Person will be used in any contest unless a copy of the statement is furnished to the Insured Person or his or her beneficiary or personal representative.

No change in this Policy will be valid until approved by an officer of the Company. The approval must be noted on or attached to this Policy. No agent may change this Policy or waive any of its provisions.

**Incontestability.** The validity of this Policy will not be contested after it has been in force for two year(s) from the Policy Effective Date, except as to nonpayment of premiums.

After an Insured Person has been insured under this Policy for two year(s) during his lifetime, no statement made by the Insured Person, except a fraudulent one, will be used to contest a claim under this Policy. The Company may only contest coverage if the misstatement is made in a written instrument signed by the Insured Person and a copy is given to the Policyholder, the Insured Person or the beneficiary.

**Beneficiary Designation and Change.** The Insured Person's designated beneficiary(ies) is (are) the person(s) so named by the Insured Person as shown on the Policyholder's records kept on this Policy.

A legally competent Insured Person over the age of majority may change his or her beneficiary designation at any time, unless an irrevocable designation has been made. The change may be executed, without the consent of the designated beneficiary(ies), by providing the Company or, if agreed upon in advance by the Company, the Policyholder with a written request for change. When the request is received by the Company or, if agreed upon in advance by the Company, the Policyholder, whether the Insured Person is then living or not, the change of beneficiary will relate back to and take effect as of the date of execution of the written request, but without prejudice to the Company on account of any payment which is made prior to receipt of the request.

Except with regard to the Survivor's Benefit described in Section IV of this Policy, if applicable, in the event that there is no designated beneficiary, or if no designated beneficiary is living after the Insured Person's death, the benefits will be paid, in equal shares, to the survivors in the first surviving class of those that follow: The Insured Person's: (1) Spouse; (2) children; (3) parents; or (4) brothers and sisters. If no class has a survivor, the beneficiary is the Insured Person's estate.

**Physical Examination and Autopsy.** The Company has the right, at its own expense, to examine the person of any Insured Person whose injury is the basis of a claim, when and as often as it may be reasonably required during the pendency of the claim. In the case of a disability claim, the Company also has the right to require the Insured Person, at the Company's expense, to submit to an Occupational Assessment and/or a Functional Capacity Examination. The Company may also require an autopsy where it is not prohibited by law.

**Legal Actions.** No legal action for a claim can be brought against the Company until 60 days after receipt of proof of loss. No legal action for a claim can be brought against the Company more than three years after the time for giving proof of loss.

**Noncompliance With Policy Requirements.** Any express waiver by the Company of any requirements of this Policy will not constitute a continuing waiver of such requirements. Any failure by the Company to insist upon compliance with any Policy provision will not operate as a waiver or amendment of that provision.

C22382DBG(REV.11-99)                    18

## GENERAL PROVISIONS (Continued)

**Conformity With State Statutes.** Any provision of this Policy which, on its effective date, is in conflict with the statutes of the state in which the Policy was delivered, is hereby amended to conform to the minimum requirements of such laws.

**Clerical Error.** Clerical error, whether by the Policyholder, the Administrator, or the Company in keeping records pertaining to this Policy, will not: (1) invalidate coverage otherwise validly in force, or (2) continue coverage otherwise validly terminated.

**Data Required.** The Policyholder and the Administrator must maintain adequate records acceptable to the Company and provide any information required by the Company relating to this insurance.

**Audit.** The Company will have the right to inspect and audit, at any reasonable time, all records and procedures of the Policyholder, and the Administrator that may have a bearing on this insurance.

**Assignment.** This Policy is non-assignable. An insured Person may not assign any of his or her rights, privileges or benefits under the Policy.

**Subrogation.** To the total extent the Company pays for losses incurred, the Company may assume the rights and remedies of the Insured Person relating to such loss. The Insured Person agrees to assist the Company in preserving its rights against those responsible for such loss, including but not limited to, signing subrogation forms supplied by the Company.

**Right to Recover Overpayments.** In addition to any rights of recovery, reimbursement or subrogation provided to the Company herein, when payments have been made by the Company with respect to a Covered Loss in an amount in excess of the maximum amount of payment necessary to satisfy an obligation under the terms of this Policy, the Company shall have the right to recover such excess payment, from any one or more of the following: Any person to whom such payments were made (i.e. medical providers, etc.), the Insured Person, any insurance company, or any other organization(s) which received, or should have received, the payment.

**Conditional Claim Payment.** If an Insured Person suffers a Covered Loss(es) as the result of Injuries for which, in the opinion of the Company, a third party may be liable, the Company will pay the amount of benefits otherwise payable under this Policy. However, if the Insured Person receives payment from the third party, the Insured Person agrees to refund to the Company the lesser of: (1) the amount actually paid by the Company for such Covered Loss(es); or (2) an amount equal to the sum actually received from the third party for such Covered Loss(es). If the Insured Person does not receive payment from the third party for such Covered Loss(es), the Company reserves the right to subrogate under the Subrogation clause of this Policy.

At the time such third party liability is determined and satisfied, this amount shall be paid whether determined by settlement, judgment, arbitration or otherwise. This provision shall not apply where prohibited by law.

**Offset.** The Company will have, and may exercise at any time, the right to offset any balance or balances, whether on account of premiums or otherwise, due from the Policyholder to the Company against any balance or balances, whether on account of losses or otherwise, due from the Company to the Policyholder.

**Other Insurance.** If the Insured Person incurs losses for which benefits are payable under more than one like policy issued by the Company or one of its affiliates, the coverage under this Policy is in excess of such other insurance, and will not contribute to such a loss with such other insurance. This condition does not apply to: (1) the Accident Medical Expense benefit described in Section IV of this Policy; or (2) other insurance which the Insured Person has procured to apply in excess of the coverage under this Policy.

C22382DBG(REV.11-99)                    19

**GENERAL PROVISIONS (Continued)**

**Plan and Exposure Changes.** The Policyholder must notify the Company of any subsidiary or affiliated company that is to be covered under this Policy. Such notice must be sent within 30 days of the acquisition of such subsidiary or affiliated company. If such notice is not provided, the newly acquired entity will not be considered a part of the Policyholder, or a covered affiliate or subsidiary, and the Insured Persons from the newly acquired entity will not be considered as Insured Persons of the Policyholder, or a covered affiliate or subsidiary for Policy purposes, until the date that notice is provided. The Company has the right to adjust premium based on the changing exposure.

**Non-Duplication of Workers' Compensation Benefits.** No benefits shall be payable under this Policy for any loss for which the Insured Person claims coverage under any workers' compensation, employers' liability, occupational disease or similar law. The Company reserves the right to recover, from the Insured Person, any benefits paid under this Policy which are subsequently claimed under any workers' compensation, employers' liability, occupational disease or similar law.



**AIG Domestic Accident & Health Division**

A Division of American International Companies®

# NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.

Executive Offices: 70 Pine Street, New York, NY 10270
(212) 770-7000
(a capital stock company, herein referred to as the Company)

Policyholder:   **Godwin Materials, Inc.**
Policy Number: **TRK 9056434**

### HEMORRHOIDS COVERAGE RIDER

This Rider is attached to and made part of the Policy effective May 1, 2004. It applies only with respect to Hemorrhoids provided such Injury is sustained on or after that date. It is subject to all of the provisions, limitations and exclusions of the Policy except as they are specifically modified by this Rider.

**Hemorrhoids Coverage.** Exclusion 7 in Section VI of the Policy is hereby waived with respect to the following benefit(s): Temporary Total Disability and Accident Medical Expense.

Any reference to an injury or accident as defined in the policy is hereby deemed to include Hemorrhoids. Benefits shall be payable for a Covered Loss caused in whole or in part by, contributed to in whole or in part by, or resulting in whole or in part from, the Insured Person's Hemorrhoids, provided such Hemorrhoids are surgically repaired while the Insured Person's coverage is in force under this Policy, subject to the following:

1.    With respect to the Temporary Total Disability Benefit the period for which such indemnity shall be payable for all periods of disability, subject to the Temporary Total Disability Benefit Waiting Period, shall not exceed the Hemorrhoids Lifetime Maximum Benefit Period shown in the Schedule.

2.    With respect to the Accident Medical Expense Benefit, benefits payable for or in connection with the Insured Person's Hemorrhoids, subject to the Accident Medical Expense Deductible Amount, if any, shall not exceed the Hemorrhoids Lifetime Maximum Benefit Amount shown in the Schedule.

**Hemorrhoid(s)** - as used in this Rider, means a mass of dilated veins in swollen tissue at the margin of the anus or nearby within the rectum.

The President and Secretary of National Union Fire Insurance Company of Pittsburgh, Pa. witness this Rider.

President                                                        Secretary

C22390DBG

# AIG

**AIG Domestic Accident & Health Division**

A Division of American International Companies®

## NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.

Executive Offices: 70 Pine Street, New York, NY 10270
(212) 770-7000
(a capital stock company, herein referred to as the Company)

Policyholder:   **Godwin Materials, Inc.**
Policy Number: **TRK 9056434**

### HERNIA COVERAGE RIDER

This Rider is attached to and made part of the Policy effective May 1, 2004. It applies only with respect to Hernia provided such Injury is sustained on or after that date. It is subject to all of the provisions, limitations and exclusions of the Policy except as they are specifically modified by this Rider.

**Hernia Coverage.** Exclusion 6 in Section VI of the Policy is hereby waived with respect to the following benefit(s): Temporary Total Disability and Accident Medical Expense.

Any reference to an injury or accident as defined in the policy is hereby deemed to include Hernia. Benefits shall be payable for a Covered Loss caused in whole or in part by, contributed to in whole or in part by, or resulting in whole or in part from, the Insured Person's Hernia, provided such Hernia is surgically repaired while the Insured Person's coverage is in force under this Policy, subject to the following:

1.   With respect to the Temporary Total Disability Benefit, the period for which such indemnity shall be payable for all periods of disability, subject to the Temporary Total Disability Benefit Waiting Period, shall not exceed the Hernia Lifetime Maximum Benefit Period shown in the Schedule.

2.   With respect to the Accident Medical Expense Benefit, benefits payable for or in connection with the Insured Person's Hernia, subject to the Accident Medical Expense Deductible Amount, if any, shall not exceed the Hernia Lifetime Maximum Benefit Amount shown in the Schedule.

**Hernia** - as used in this Rider, means a protrusion of an organ or part through connective tissue or through a wall of the cavity in which it is normally enclosed. Hernia does not include diaphragmatic (hiatal) hernia.

The President and Secretary of National Union Fire Insurance Company of Pittsburgh, Pa. witness this Rider.

President

Secretary

C22391DBG

 **AMERICAN INTERNATIONAL COMPANIES®**

# NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.

Executive Offices: 70 Pine Street, New York, NY 10270
(212) 770-7000
(a capital stock company, herein referred to as the Company)

Policyholder:  **Godwin Materials, Inc.**
Policy Number:  **TRK 9056434**

### NON-OCCUPATIONAL COVERAGE RIDER

This Rider is attached to and made part of the Policy effective May 1, 2004. It applies only with respect to accidents that occur on or after that date. It is subject to all of the provisions, limitations and exclusions of the Policy except as they are specifically modified by this Rider.

**Non-Occupational Coverage.** References in the Policy to an Injury or accident, where applicable, are hereby deemed to include Non-Occupational Injury and Non-Occupational accident, respectively.

Benefits shall be payable for only those Covered Losses listed in the Schedule under Non-Occupational Accident Benefits, and shall be subject to the Non-Occupational Accident Benefit limitations shown therein.

**Non-Occupational** - as used in this Rider, means, with respect to an activity, accident, incident, circumstances or condition involving an Insured Person, that it does not occur or arise out of or in the course of the Insured Person performing Occupational services for the Policyholder, while under Dispatch.

**Non-Occupational Injury** - as used in this Rider, means, bodily Injury caused by a Non-Occupational accident occurring while this Policy is in force as to the person whose Injury is the basis of claim and resulting directly and independently of all other causes in a Covered Loss.

All Injuries sustained by an Insured Person in any one accident shall be considered a single Injury.

The President and Secretary of National Union Fire Insurance Company of Pittsburgh, Pa. witness this Rider.

President                          Secretary

C22393DBG



## AIG Domestic Accident & Health Division

A Division of American International Companies®

# NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.

Executive Offices: 70 Pine Street, New York, NY 10270

(212) 770-7000

(a capital stock company, herein referred to as the Company)

Policyholder:  **Godwin Materials, Inc.**
Policy Number: **TRK 9056434**

### PRE-EXISTING CONDITIONS COVERAGE RIDER

This Rider is attached to and made part of the Policy effective May 1, 2004.   It applies only with respect to Covered Losses that occur on or after that date.   It is subject to all of the provisions, limitations and exclusions of the Policy except as they are specifically modified by this Rider.

**Pre-Existing Conditions Coverage.**   Exclusion 3 in Section VI of the Policy is hereby waived for a Covered Loss described in Section IV of the Policy, however, in no event will benefits be payable for any Covered Losses caused in whole or in part by, or resulting in whole or in part from, any Pre-Existing Conditions, exceeding the Maximum Benefit Amount shown in the Schedule.

The President and Secretary of National Union Fire Insurance Company of Pittsburgh, Pa. witness this Rider.

President

Secretary

C22396DBG

**AIG** AIG Domestic Accident & Health Division

## Privacy Notice
### Administrative Offices
### 600 King Street, Wilmington, DE 19801

## Our Customer's Privacy is Important to Us

We are committed to providing individuals covered by our accident and health insurance policies (our "Customers") with top-notch products backed by top-quality customer service. While information is fundamental to our ability to do this, we recognize the great importance of keeping our Customers' non-public personal information secure. Accordingly, we, the Domestic Accident and Health Division of the American International Companies* listed below, have established practices and procedures with respect to the collection and sharing of our current and former Customers' non-public personal financial and health information ("Customer Information").

## Information Collection

We may collect information about our Customers from enrollment forms, applications, transactions, and other interactions with us or our affiliates, as well as from credit reporting agencies and other third parties. We will collect and disclose this information only in accordance with applicable laws or regulations or in response to our Customer's request for a product or service from us. The information we gather helps us identify who our Customers are, manage our relationship with them, and develop products and services that meet their needs.

## Information Sharing

We may share Customer Information with third parties under the following circumstances:

- **Affiliates:** We may share Customer Information with our affiliates. These affiliates may include providers of financial services such as other insurance companies, banks, securities, broker-dealers, and insurance agents and agencies. They may also include affiliated non-financial entities such as marketing companies, e-commerce service providers, and companies providing administrative services.

  We will not share our Customer's non-public personal *financial* information with our affiliates, other than transaction or experience-related information, without first providing our Customer an opportunity to direct that such information not be shared. Furthermore, we will not share our Customer's non-public personal *health* information with affiliates except as directed or authorized by our Customer.

- **Non-Affiliates:** We may also share Customer Information with non-affiliated companies for administrative purposes, the purposes of risk management, underwriting, to detect and prevent fraud, as directed or authorized by our Customer, or as otherwise permitted or required by law.

  From time to time, we may also enter into joint marketing and/or service agreements to share Customer non-public personal *financial* information with non-affiliated third parties as permitted by law. These third parties may include providers of financial products or services such as insurance companies, financial institutions, and securities firms.

The types of information we may share in these circumstances include identifying information (e.g., name or address), application information (e.g., income or assets), transactional information (e.g., premium history), and/or information received from a consumer reporting agency (e.g., credit history). Because we do not share Customer Information in any other way, there is no need for an opt-out process in our privacy procedures.

## Information Protection

We maintain physical, electronic, and procedural safeguards designed to protect Customer Information and permit only authorized insurance agents, administrators, and employees who are trained in the proper handling of Customer Information, to have access to that information.

We expect any non-affiliated third party that serves our Customers on our behalf to adhere to our privacy policy. Those third parties are legally bound to use our Customers' information only for the purposes for which it was provided, and to not disclose it or use it in any way. These third parties are also subject to and governed by federal and state privacy laws and regulations, and we are not responsible for their misuse of information.

## Our Customers Can Depend on Us

We are committed to maintaining our trusted relationship with our Customers. We consider it our privilege to serve our Customers' insurance and financial needs and we value the trust they have placed in us. Our Customers' privacy is a top priority with us and thus we will continue to monitor our privacy practices in order to protect and respect that privacy and will comply with state privacy laws that require more restrictive practices than those set out in this notice.

**AIG** AIG Domestic Accident & Health Division

- National Union Fire Insurance Company of Pittsburgh, Pa. • The Insurance Company of the State of Pennsylvania
- American International South Insurance Company • American Home Assurance Company • Illinois National Insurance Company
- AIG Life Insurance Company • American International Life Assurance Company of New York
Members of American International Group, Inc.

0009.030a (3/15/02)



**AIG Domestic Accident & Health
Division**

A Division of American International Companies®

# NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.

Executive Offices: 70 Pine Street, New York, NY 10270

(212) 770-7000

(a capital stock company, herein referred to as the Company)

**MASTER APPLICATION FOR
TRUCKERS OCCUPATIONAL ACCIDENT INSURANCE**

Application is hereby made for a policy of accident insurance based upon the following statements and representations:

**SCHEDULE**

1. Name of Policyholder:     **Godwin Materials, Inc.**
   Address:                  PO Box 680958
                             Prattville, AL 36104

   Type of Business or Organization:        Trucking
   Covered Affiliates(s) or Subsidiary(ies): N/A

   Policy Number:     **TRK 9056434**

   Name and Address of Administrator:     Palomar Insurance Corporation
                                          P.O. Box 11128
                                          Montgomery, AL 36111-0128

2. Description of Eligible Persons:

   | Class | Description of Class |
   |---|---|
   | 1 | All Owner-Operators of **Godwin Materials, Inc.** or any of its Covered Affiliates or Subsidiaries, who are under age 70, driving 30 or more hours per week and who are under a long-term lease agreement of 30 days or more, or who have entered into a contract, to provide Occupational services for the Policyholder. |
   | 2 | All Contract Drivers of **Godwin Materials, Inc.** or any of its Covered Affiliates or Subsidiaries, who are under age 70, driving 30 or more hours per week and who are under a long-term lease agreement of 30 days or more, or who have entered into a contract, to provide Occupational services for the Owner-Operator. |

3. Premium Rates:
   Class 1 ....................................................$165.00 (per Insured Person per month)
   Class 2 ....................................................$165.00 (per Insured Person per month)

4. Benefits ("X" indicates coverage is applicable; "NIL" indicates coverage does not apply):

   A. Occupational Accident Benefits:

   CLASSES 1 and 2

   (1)  X  Accidental Death Benefit:
        Principal Sum ..........................................................$50,000.
        Incurral Period ........................................................365 days

   (2)  X  Survivor's Benefit:
        Principal Sum ..........................................................$200,000.
        Monthly Benefit Percentage ....................................1%
        Monthly Benefit Amount ..........................................$2,000.

   (3)  X  Accidental Dismemberment Benefit:
        Principal Sum ..........................................................$250,000.
        Incurral Period ........................................................365 days

   (4)  X  Paralysis Benefit:
        Principal Sum ..........................................................$250,000.
        Incurral Period ........................................................365 days

   (5)  X  Temporary Total Disability Benefit:
        Commencement Period (Initial Disability) ...............90 days
        Waiting Period ........................................................7 days
        Participation Percentage ........................................70%
        Maximum Weekly Benefit Amount ..........................$500.
        Maximum Benefit Period ..........................................104 weeks

   (6)  X  Continuous Total Disability Benefit (not a Covered Loss until the day after the
        Temporary Total Disability Maximum Benefit Period has been reached):
        Participation Percentage ........................................70%
        Maximum Weekly Benefit Amount ..........................$500.
        Maximum Benefit Period ..........................................to age 70

   (7)  X  Accident Medical Expense Benefit (Primary):
        Commencement Period ..........................................90 days
        Deductible Amount ..................................................$0
        Maximum Benefit Period ..........................................104 weeks
        Dental Maximum ....................................................$1,000.
        Maximum Benefit Amount ........................................$1,000,000.

   (8)  X  Hemorrhoids Coverage
        Lifetime Maximum Benefit Period ..........................90 days
        Lifetime Maximum Benefit Amount ..........................$10,000.

   (9)  X  Hernia Coverage
        Lifetime Maximum Benefit Period ..........................90 days
        Lifetime Maximum Benefit Amount ..........................$10,000.

   (10) X  Pre-existing Conditions Coverage
        Maximum Benefit Amount ........................................$25,000.

3. Non-Occupational Accident Benefits:

   CLASSES 1 and 2

   (1)  X  Accidental Death Benefit:
           Principal Sum ................................................................................................$10,000.
           Incurral Period ..............................................................................................365 days

   (2)  X  Accidental Dismemberment Benefit:
           Principal Sum ................................................................................................$10,000.
           Incurral Period ..............................................................................................365 days

   (3)  X  Accident Medical Expense Benefit:
           Commencement Period .................................................................................90 days
           Deductible Amount ..............................................................................................$0
           Maximum Benefit Period ...............................................................................52 weeks
           Dental Maximum ...........................................................................................$1,000.
           Maximum Benefit Amount .............................................................................$7,500.


5. Limits of Liability

   A.  Occupational Coverage

       Per-Insured Person Limit of Liability (Combined Single Limit)...................................$1,000,000.
       (all Covered Losses with respect to any one Occupational accident)

       Aggregate Limit of Liability ...................................................................................$2,000,000.
       (all Covered Losses with respect to all Insured Persons in any one Occupational accident)

   B.  Non-Occupational Coverage

       Per-Insured Person Limit of Liability (Combined Single Limit)........................................$10,000.
       (all Covered Losses with respect to any one accident)
       Aggregate Limit of Liability ......................................................................................$20,000.
       (all Covered Losses with respect to all Insured Persons in any one accident)


6. Benefits, Riders and Endorsements

   The following Riders and Endorsements are attached to and made part of the Policy as of the Policy Effective
   Date, and apply only to Eligible Persons in a class shown in that row. Each Rider and Endorsement is subject
   to all provisions, limitations and exclusions of the Policy that are not specifically modified by the Rider and
   Endorsement.

| Classes | Benefit Riders | Other Riders and Endorsements |
|---|---|---|
| 1 | Hemorrhoids Coverage; Hernia Coverage | Non-Occupational Coverage Rider; Pre-existing Conditions Coverage Rider |
| 2 | Hemorrhoids Coverage; Hernia Coverage | Non-Occupational Coverage Rider; Pre-existing Conditions Coverage Rider |


Other Riders and Endorsements to the Policy

N/A

. **Policy Period and Signature(s)**

| Policy Period: | From:<br>To: | Policy Effective Date<br>Policy Termination Date | 5/1/04<br>5/1/05 |

Signed by: _____

Title: _____

Signed at _____ on _____

Witness _____
          *(licensed agent where required by law)*

**WARNING:**     It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

OLLIE GODWIN,                              )
                                          )
      PLAINTIFF,                      )
                                          )
V.                                        )      CASE NO: 2:05-cv-00783-SRW
                                          )
NATIONAL UNION FIRE INSURANCE             )      From Circuit Court of Crenshaw County
COMPANY OF PITTSBURGH, INC.,              )      Case No: CV05-69
ET AL.,                                   )
                                          )
      DEFENDANTS.                     )
                                          )

## DEFENDANT PALOMAR INSURANCE CORPORATION'S RESPONSE TO PLAINTIFF'S FIRST REQUEST FOR INTERROGATORIES AND FIRST REQUEST FOR PRODUCTION

COMES NOW the defendant, Palomar Insurance Corporation (hereinafter "Palomar"),

by and through counsel and responds to the Plaintiff's First Request for Interrogatories and First

Request for Production as follows:

### GENERAL OBJECTIONS

To the extent possible, Palomar is responding to Plaintiff's interrogatories and requests for production pursuant to the Federal Rules of Civil Procedure and, in responding, is interpreting words used by Plaintiff according to their ordinary and normal meaning.

Palomar objects to Plaintiff's instructions, definitions, interrogatories and requests for production to the extent they call for the production of information and/or documents which are protected, in whole or in part, by the attorney-client privilege, attorney work product doctrine, and/or were prepared in anticipation of litigation. Palomar also objects to the interrogatories and requests for production to the extent they request information which is not at issue in this case.

Palomar objects to Plaintiff's interrogatories and requests for production to the extent they call for information regarding claims handling and/or claims files. Such information is confidential and proprietary, and Alabama law clearly provides that Plaintiff is not entitled to information regarding claims files until Plaintiff have shown that he is entitled to a judgment as a matter of law with the

breach of contract claim.

Palomar objects to Plaintiff's interrogatories and requests for production to the extent they are immaterial, irrelevant, overly broad, unduly burdensome, vague, ambiguous, not sufficiently limited in scope, and are not reasonably calculated to lead to the discovery of admissible evidence. Palomar limits its production to those documents relating to Plaintiff or the Policy at issue.

In responding to these interrogatories and requests for production, Palomar expressly reserves the right to challenge the relevancy, materiality, admissibility and probative value of the information contained in the responses. Should Plaintiff decide to clarify and/or narrow any of his interrogatories and requests for production based on the factual and liability issues in this case, Palomar will review its objections and, if necessary, provide supplemental responses.

## INTERROGATORIES

1.    Please state the name, address, phone number, title and association to the Defendant Palomar Insurance Corporation, of the person answering these interrogatories.

**RESPONSE:**    **Ms. Sonya Berryman, c/o Ferguson, Frost & Dodson, LLP, 2500 Acton Road, Suite 200, Birmingham, AL 35243, 205-879-8722; claims manager.**

2.    Please state, in specific detail, the steps taken to determine the cause of the Plaintiff's injuries of October/November 2004 and October 27, 2004.

**OBJECTION:**    **This request is overly broad, vague and ambiguous. Furthermore, this calls for information beyond the scope of Palomar's knowledge.**

**RESPONSE:**    **Without waiving said objections, Palomar did not undertake an investigation of the causes of the Plaintiff's injuries.**

3.    Please state the title, name, address, phone number, and qualifications of the person who investigated the Plaintiff's claims.

**OBJECTION:**    **This request is overly broad, vague and ambiguous. Furthermore,**

this calls for information beyond the scope of Palomar's knowledge.

**RESPONSE:** Without waiving said objections, Palomar did not undertake an investigation of the causes of the Plaintiff's injuries.

4. Please state the specific date and time of the aforementioned investigations.

**OBJECTION:** This request is overly broad, vague and ambiguous. Furthermore, this calls for information beyond the scope of Palomar's knowledge.

**RESPONSE:** Without waiving said objections, Palomar did not undertake an investigation of the causes of the Plaintiff's injuries.

5. Please state the usual and customary procedure that Palomar Insurance uses to investigate and determine whether or not claims are paid.

**OBJECTION:** This request is overly broad, vague, ambiguous and not reasonably calculated to lead to discovery of admissible evidence.

6. Please state the specific details as to how Palomar Insurance Corporation came to issue an Occupational Accident policy to Godwin Inc.

**RESPONSE:** Palomar Insurance Corporation did not issue an Occupational Accident Policy to Godwin Material Services, Inc.

7. Please state the name, address, and phone number of each and every person who contacted Ollie Godwin and/or Godwin, Inc., in regards to the Plaintiff's claims.

**OBJECTION:** This request is overly broad, vague and ambiguous. Furthermore, this calls for information beyond the scope of Palomar's knowledge.

**RESPONSE:** Without waiving said objections, Ms. Sonya Berryman and Ms. Suzanne Adger, both c/o Ferguson, Frost & Dodson, LLP, 2500 Acton Road, Suite 200, Birmingham, AL 35243, 205-879-8722 contacted the

**Plaintiff on behalf of Palomar.**

8.     Have you been advised that your answers are made under oath, and may be used as material testimony in the event of a hearing, and must be updated in writing if your aforementioned responses change?

**RESPONSE:**     Yes.

## REQUEST FOR PRODUCTION

1.     Please produce a copy of the signed policy of insurance issued to Godwin Material Services, Inc.

**RESPONSE:**     **Please see documents attached as Exhibit 1 to Defendant National Union Fire Insurance Company of Pittsburgh, Pa.'s Response to Plaintiff's First Request for Interrogatories and First Request for Production.**

2.     Please produce a copy of your investigator's report in reference to the Plaintiff's claims.

**RESPONSE:**     **Palomar did not undertake an investigation of the causes of the Plaintiff's injuries; consequently, there is no Palomar investigator's report.**

3.     Please produce all documents, reports, pictures, video recordings, witness statements, notes, writings, memorandums, tape recordings of interview with Plaintiff, or any and all other things including, but not limited to, all investigation reports, relating to the Plaintiff's claims of October/November 2003 and October 27, 2004.

**OBJECTION:**     **This request is overly broad, vague, ambiguous and not reasonably calculated to lead to discovery of admissible evidence.   Palomar**

Page 4 of 7

further objects to the extent this request calls for documents protected by the attorney-client privilege, attorney work product doctrine and/or prepared in anticipation of litigation.

RESPONSE:    Without waiving said objections, please see documents attached hereto as Exhibit 1.

4.    Please produce the name, address, and phone number of any expert witness retained by you in the defense of this case.

OBJECTION:    Palomar has not made a determination regarding which, if any, expert witnesses it intends to retain.    This response will be supplemented when such a determination is made.

5.    Please produce any and all documents, photographs, audio/video recordings, or other evidence obtained by you, whether or not such evidence is intended to be introduced at the trial of this cause.

OBJECTION:    This request is overly broad, vague, ambiguous, and Plaintiff not reasonably calculated to lead to discovery of admissible evidence. Palomar further objects to the extent this request calls for documents protected by the attorney-client privilege, attorney work product doctrine and/or prepared in anticipation of litigation.

RESPONSE:    Without waiving said objections, please see documents previously produced herein.

DATED this the _30_ day of December, 2005.

Palomar Insurance Corporation
By: Sonya Berryman
Its: claims manager

State of ___Alabama___ )
County of ___Montgomery___ )

BEFORE ME, a Notary Public in and for said County and State personally appeared Sonya Berryman, who is known to me, and who read and understands the foregoing Responses to Interrogatories and states that the facts therein are true and correct to the best of her knowledge and belief, and that in her capacity as claims manager with Palomar Insurance Corporation signed the forgoing document on the same bears date.

SWORN TO and subscribed before me on this the _30_ day of December 2005.

___Donna Mack___
NOTARY PUBLIC
My Commission Expires: 11/21/09

AS TO THE OBJECTIONS:

John W. Dodson          (DOD012)
Michelle L .Crunk        (CRU017)
*Attorneys for AIG d/b/a National Union Fire Insurance Company of Pittsburgh, Inc., Palomar Insurance Corporation, and Godwin Material Services, Inc.*

OF COUNSEL:
**FERGUSON, FROST & DODSON, LLP**
Post Office Box 430189
Birmingham, AL 35243-0189

Page 6 of 7

## CERTIFICATE OF SERVICE

This is to certify that on this the 3rd day of ~~December~~ January 6, 200~~5~~, a copy of the foregoing document has been served upon counsel for all parties to this proceeding by the following method:

      **X**            mailing the same by first-class United States mail, properly addressed and postage pre-paid

                     hand delivery

                     via facsimile

Arlene M. Richardson
RICHARDSON LEGAL CENTER, LLC
P.O. Box 971
Hayneville, Alabama 36040-0971

_Michelle L. Crunk_
OF COUNSEL

OF COUNSEL:
**FERGUSON FROST & DODSON, LLP**
Post Office Box 430189
Birmingham, AL 35243-0189

Page 7 of 7

# EXHIBIT 1

Sonya,

I still haven't received a check yet, I know you said it was being process. Could you check in to it and see what is the hold up. It's been 5½ weeks since I turn in the paper work.

Thanks

Ollie Godwin

Fax NO.
(334) 537-9506



**PALOMAR INSURANCE CORPORATION**
Insurance Brokerage & Risk Management Consulting

July 1, 2004

Mr. Ollie Godwin
656 Ottis Faulk Drive
Honorville, AL.  36042

Re:  Claim Forms

Dear Mr. Godwin,

Please complete the enclosed claim forms for consideration to be given to your claim with regards to your accident on 10/7/03.

For Accident Medical Expenses or Accident/Dismemberment or Paralysis of the following needs to be fully completed by you: **Section B of the Accident Medical Claim form.**  Please remember to date and sign this form at the bottom.  Your medical bills will be denied and will become your responsibility unless this form is returned.

For Temporary, Total Disability weekly Accident Indemnity benefits you will need to ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~Occupational **Accident Disability**~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~ **Accident Cl**~~~~~~~~~~~~~~~~~~~~~~~~~~needs to be completed ~~~~~~~~for making sure that ~~~~~~~~that you will be unable to ~~~~~~~~~~onto this form.  Pl~~~~~~~~a copy of your most recent 1099, or 3 month earnings statement, ~~~will need this to tabulate any disability that you may be entitled to after your 7 day waiting period.  If this injury was the result of a motor vehicle accident AIG will require a copy of the police report.

Please send claims forms back to me as soon as possible in the envelope provided.  You may also fax them to me @ 334-323-0585.  If you have any questions my toll free number is 800-482-7394.

**\*This is not a guarantee of coverage and should not be construed as one.**

Please call me if you have any questions or need any assistance with the attached forms.

Yours truly,

PALOMAR SPECIAL RISK CLAIMS

Suzanne Adger

P.O. Box 11126 • Montgomery, Alabama 36111-0126 • 4325 Executive Park Drive • Montgomery, Alabama 36116-1600
Main Tel: 334-270-0105 • Benefits Fax: 270-0540 • Commercial Fax: 270-8159 • Personal Fax: 271-0499 • Transportation Fax: 279-8067 • Spcl Risk Fax: 323-1319

MAR. 1. 2005 9:12AM    PALOMAR INSURANCE    NO. 231    P. 15

AIG Life Insurance Company
A&H Claims Department
P. O. Box 15701
Wilmington, DE 19850-5701
800-551-0824/302-761-3700

| NAME OF GROUP: | GODWIN MATERIALS |
| POLICY NUMBER: | 8056434 |
| CLAIMANT: | Ollie Godwin |

## OCCUPATIONAL ACCIDENT MEDICAL CLAIM FORM

**INSTRUCTIONS:**
1.) You must have SECTION A fully completed by a designated official of the participating Organization.
2.) SECTION B is to be completed, signed and dated by the Claimant.
3.) If claimant is treated in the hospital, please attach an itemized hospital bill.
4.) If claimant is treated by a doctor, SECTION C is to be completed, signed and dated by the Attending Physician or attach an itemized bill.
5.) Attach itemized bills for all medical expenses being claimed including the claimant's name, condition being treated (diagnosis), description of services, date of service(s) and the charge made for each service.
6.) Mail completed form to the address indicated above.

The furnishing of this form, or its acceptance by the Company, must not be construed as an admission of any liability on the Company, nor a waiver of any of the conditions of the insurance contract.

### SECTION A- PARTICIPATING ORGANIZATION STATEMENT

NAME / ADDRESS OF PARTICIPATING ORGANIZATION

| CLAIMANT'S FULL NAME | | SOCIAL SECURITY NUMBER | DATE OF BIRTH | NAME OF SUPERVISOR |

| DATE OF INJURY: | WAS HE/SHE INJURED ON YOUR JOB? ☐ YES ☐ NO |

DESCRIBE HOW, WHEN AND WHERE ACCIDENT OCCURRED

| DATE CLAIMANT WAS CONTRACTED: | EFFECTIVE DATE OF COVERAGE UNDER PLAN: | DATE COVERAGE TERMINATED (IF APPLICABLE) |

| PARTICIPATING ORGANIZATION REPRESENTATIVE (PLEASE PRINT OR TYPE) | TITLE | DAYTIME TELEPHONE NUMBER ( ) |

| SIGNATURE OF PARTICIPATING ORGANIZATION REPRESENTATIVE | DATE |

### SECTION B- CLAIMANT'S STATEMENT

| CLAIMANT'S FULL NAME (PLEASE PRINT) | | SOCIAL SECURITY NUMBER |

| STREET ADDRESS | CITY | STATE | ZIP |

| DATE OF BIRTH | TELEPHONE ( ) |

GIVE FULL DESCRIPTION OF INJURY OR DISEASE FROM WHICH YOU ARE NOW SUFFERING. IF AN INJURY, TELL WHEN IT HAPPENED (DATE AND TIME, PLACE WHERE ACCIDENT OCCURRED, WHAT YOU WERE DOING AND HOW IT HAPPENED.

HAVE YOU EVER HAD THIS, OR A SIMILAR CONDITION IN THE PAST?   ☐ YES ☐ NO.
IF YES, STATE THE NATURE OF THE CONDITION, DATES OF TREATMENT AND NAMES AND ADDRESSES OF TREATING DOCTORS, HOSPITALS AND CLINICS.

WHEN DID YOU FIRST CONSULT A PHYSICIAN FOR THIS CONDITION?

HOSPITALS (GIVE COMPLETE NAMES, ADDRESSES AND DATES OF CONFINEMENT.)

GIVE NAMES, ADDRESSES AND TELEPHONE NUMBERS OF ALL ATTENDING PHYSICIANS.

GIVE NAME, ADDRESS AND TELEPHONE NUMBER OF USUAL FAMILY PHYSICIAN.

WHAT OTHER ACCIDENT, SICKNESS OR DISABILITY INSURANCE DO YOU CARRY AND WHAT OTHER ORGANIZATIONS OR COMPANIES HAVE PAID YOU BENEFITS FOR SICKNESS OR INJURY?

I HEREBY CERTIFY THAT THE ABOVE INFORMATION IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF.

**AUTHORIZATION**

I, the undersigned authorize any hospital or other medical-care institution, physician or other medical professional, pharmacy, insurance support organization, governmental agency, group policyholder, insurance company, association, employer or benefit plan administrator to furnish to the Insurance Company named above or its representatives, any and all information with respect to any injury or sickness suffered by, the medical history of, or any consultation, prescription of treatment provided to, the person whose death, injury, sickness or loss is the basis of claim and copies of all of that person's hospital or medical records, including information relating to mental illness and use of drugs and alcohol, to determine eligibility for benefit payments under the Policy Number identified above. I authorize the group policyholder, employer or benefit plan administrator to provide the Insurance Company named above with financial and employment-related information. I understand that this authorization is valid for the term of coverage of the Policy identified above and that a copy of this authorization shall be considered as valid as the original. I understand that I or my authorized representative may request a copy of this authorization.

For your protection, California law requires the following to appear on this form:
Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

SIGN YOUR FULL NAME                                      DATED:

AIG Life Insurance Company
A&H Claims Department
P. O. Box 15701
Wilmington, DE 19850-5701
800-551-0624/302-761-3700

| NAME OF GROUP: | GOODWIN |
| POLICY NUMBER: | 8056434 |
| CLAIMANT: | Ollie Godwin |

## OCCUPATIONAL ACCIDENT DISABILITY CLAIM FORM

**INSTRUCTIONS:**
1.) You must have SECTION A fully completed by a designated official of the Participating Organization.
2.) SECTION B is to be completed, signed and dated by the Attending Physician.
3.) SECTION C is to be completed, signed and dated by Claimant.
4.) Mail completed form to the address indicated above.

The furnishing of this form, or its acceptance by the Company, must not be construed as an admission of any liability on the Company, nor a waiver of any of the conditions of the insurance contract.

### SECTION A: PARTICIPATING ORGANIZATION STATEMENT FOR DISABILITY

NAME / ADDRESS OF PARTICIPATING ORGANIZATION

| CLAIMANT'S FULL NAME | SOCIAL SECURITY NUMBER | DATE OF BIRTH | NAME OF SUPERVISOR |
|---|---|---|---|
| | | | |

DATE OF INJURY:    WAS HE/SHE INJURED ON YOUR JOB?   ☐ YES   ☐ NO    DESCRIBE HOW, WHEN AND WHERE ACCIDENT OCCURRED

| DATE CLAIMANT WAS CONTRACTED: | EFFECTIVE DATE OF COVERAGE UNDER PLAN | DATE LAST WORKED: | TIME LAST WORKED: |
|---|---|---|---|

DATE LOSS TIME STARTED:    WEEKLY EARNINGS (PLEASE INCLUDE PAYROLL RECORDS FOR THE 3 MONTH PERIOD PRECEDING LOSS DATE)

WILL CLAIMANT BE RECONTRACTED?   ☐ YES   ☐ NO   DATE RETURNED TO WORK:

PARTICIPATING ORGANIZATION REPRESENTATIVE (PLEASE PRINT OR TYPE)    TITLE    DAYTIME TELEPHONE NUMBER ( )

SIGNATURE OF PARTICIPATING ORGANIZATION REPRESENTATIVE    DATE

### SECTION B: ATTENDING PHYSICIAN'S STATEMENT FOR DISABILITY

PATIENT NAME AND ADDRESS:

WHEN DID SYMPTOMS FIRST APPEAR OR ACCIDENT HAPPEN?    DATE _____

IF ACCIDENT DESCRIBE, HOW, WHEN AND WHERE ACCIDENT OCCURRED.

DIAGNOSIS AND CONCURRENT CONDITIONS (IF FRACTURE OR DISLOCATION, DESCRIBE NATURE AND LOCATION)

IS CONDITION DUE TO AN INJURY OR SICKNESS ARISING OUT OF PATIENT'S EMPLOYMENT?   ☐ YES    ☐ NO

IF "YES," EXPLAIN.

WHEN DID PATIENT FIRST CONSULT YOU FOR THIS CONDITION?    DATE _____

HAS PATIENT EVER HAD THE SAME OR SIMILAR CONDITION?   ☐ YES    ☐ NO

IF "YES," STATE WHEN AND DESCRIBE.

NATURE AND DATE OF SURGICAL PROCEDURE, IF ANY (DESCRIBE FULLY)    DATE _____

PROVIDE DATES OF OTHER MEDICAL TREATMENT AND DESCRIBE:

WHAT OTHER SERVICES, IF ANY, DID YOU PROVIDE OR PRESCRIBE PATIENT? (PROVIDE DATES)

IS PATIENT STILL UNDER YOUR CARE FOR THIS CONDITION?   ☐ YES    ☐ NO

IF "NO," GIVE DATE YOUR SERVICES TERMINATED.    DATE: _____    ( DATES REQUIRED )

HOW LONG WAS OR WILL PATIENT BE CONTINUOUSLY TOTALLY DISABLED (UNABLE TO WORK)?    FROM: _____ TO: _____

HOW LONG WAS OR WILL PATIENT BE PARTIALLY DISABLED?    FROM: _____ TO: _____

IF PERMANENT PARTIAL DISABILITY, INDICATE PERCENTAGE OF IMPAIRMENT:

TO YOUR KNOWLEDGE, DOES PATIENT HAVE OTHER HEALTH INSURANCE OR HEALTH PLAN COVERAGE?   ☐ YES    ☐ NO

IF "YES" IDENTIFY.

| DATE | SIGNATURE (ATTENDING PHYSICIAN) | DEGREE | TELEPHONE ( ) |
|---|---|---|---|

| STREET ADDRESS | CITY OR TOWN | STATE OR PROVINCE | ZIP CODE |
|---|---|---|---|

SECTION OF CLAIMANT'S STATEMENT

| CLAIMANT'S FULL NAME (PLEASE PRINT) | | SOCIAL SECURITY NUMBER | |
|---|---|---|---|
| Street Address | City | State | Zip |
| Date Of Birth | Height And Weight | Marital Status | Telephone ( ) |
| Occupation | Duties | Monthly Earnings | Weekly Earnings |

| (1) | Give Full Description Of Injury Or Disease From Which You Are Now Suffering. If An Injury, Tell When It Happened (Date And Time), Place Where Accident Occurred, What You Were Doing And How It Happened. | |
|---|---|---|
| (2A) | Have You Ever Had This, Or A Similar Condition, In The Past? | ☐ Yes   ☐ No |
| (B) | If yes, state the nature of the condition, dates of treatment and names and addresses of treating doctors, hospitals and clinics. | |

| (3A) | Give exact date when illness began, or injury occurred. | (A) Date: |
|---|---|---|
| (B) | When did you first consult a physician for this condition? | (B) Date: |
| (C) | When did you become totally disabled (unable to work)? | (C) Date: |
| (D) | When were you able to again perform part of your occupational duties? | (D) Date: |
| (E) | When were you able to again perform all of your occupational duties? | (E) Date: |
| (F) | If still totally disabled, when do you expect your disability to end? | (F) Date: |

| (4) | Hospitals (Give complete names, addresses and dates of confinement.) | |
|---|---|---|
| (5A) | Give names, addresses and telephone numbers of all attending physicians. | |
| (B) | Give name, address and telephone number of usual family physician. | |
| (6) | What other accident, sickness or disability insurance do you carry and what other organizations or companies have paid you benefits for sickness or injury? | |
| (7) | What other medical or surgical treatment has received during the past 5 years? (Give dates, nature of illness or injury and names and addresses of all treating doctors, hospitals and clinics.) | |
| (8) | Names, addresses and telephone numbers of employers and length of employment with each? | |

I HEREBY CERTIFY THAT THE ABOVE INFORMATION IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF.

AUTHORIZATION

I, the undersigned authorize any hospital or other medical-care institution, physician or other medical professional, pharmacy, insurance support organization, governmental agency, group policyholder, insurance company, association, employer or benefit plan administrator to furnish to the Insurance Company named above or its representatives, any and all information with respect to any injury or sickness suffered by, the medical history of, or any consultation, prescription or treatment provided to, the person whose death, injury, sickness or loss is the basis of claim and copies of all of that person's hospital or medical records, including information relating to mental illness and use of drugs and alcohol, to determine eligibility for benefit payments under the Policy Number identified above. I authorize the group policyholder, employer or benefit plan administrator to provide the Insurance Company named above with financial and employment-related information. I understand that this authorization is valid for the term of coverage of the Policy identified above and that a copy of this authorization shall be considered as valid as the original. I understand that I or my authorized representative may request a copy of this authorization.

For claimants not residing in California, New York, or Pennsylvania: Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

| SIGN YOUR FULL NAME | DATED: |
|---|---|



**PALOMAR INSURANCE CORPORATION**
INSURANCE BROKERAGE & RISK MANAGEMENT CONSULTING

July 1, 2004

Mr. Ollie Godwin
656 Ottis Faulk Drive
Honorville, AL. 36042

Mr. Godwin,

I have attached the letter that Godwin Materials sent on your behalf regarding your 1st injury in late October 2003. AIG will review this for Disability since Godwin confirmed that you were under dispatch at this time. I have to start an entirely new claim on you for this date of accident so I will need an exact date in October, and the city and state you were in at the time of injury. AIG will send you to complete a new set of claim forms attached for this new claim.

If you have any questions please feel free to contact me.

Thank you,

*1954 - 2004*

Suzanne Adger

**PALOMAR SPECIAL RISK CLAIMS**
800-482-7394

Cc; Godwin

P.O. Box 11128 • Montgomery, Alabama 36111-0128 • 4525 Executive Park Drive • Montgomery, Alabama 36116-1600
Main Tel: 334-270-0105 • Benefits Fax: 270-0340 • Commercial Fax: 270-8139 • Personal Fax: 271-0499 • Transportation Fax: 279-8067 • Spcl. Risk Fax: 323-1319

*Godwin Material Service, Inc.*
*P.O. Box 12*
*Brantley, Alabama 36009*
*334-527-3540*

March 17, 2004

Marion Parker
Palomar Insurance Corporation
Benefits Department
P.O. Box 11128
Montgomery, Alabama 36111-0128

RE:     Patient Name: Ollie Godwin
        Patient Account No: A41000/A3CO000P
        Insured ID No: R040480009
        Claim No: 106142402
        Claim Office: 024
        Examiner Code: PGA
        Loss Date: 11/22/2003

Dear Marion:

This letter is confirming Ollie Godwin was tarping a load in late October of 2003 and Ollie slipped off tarp rack and hit his stomach. Ollie reported this verbally to Cindy Jordan, Godwin Material's Safety Director. Ollie remained in pain, but did not seek medical attention.

On November 22, 2003, Ollie was working on his truck and the muffler fell on Ollie's stomach in the same area as the October accident. Ollie received medical attention. This claim was reported to AIG.

AIG has agreed to pay as a non-occupational claim. This decision was based on their opinion that he was not under dispatch.

However, based on the first fact he was maintaining the truck at the direction of Godwin for DOT purposes. This was required before he could proceed again with a load. The second fact is the November accident was reoccurring from the October accident, where Ollie was clearly under dispatch. Therefore, based on these facts, we feel the claim should be paid as an occupational claim.

I will be glad to confirm these facts in any other manner AIG may deem necessary. Thank you in advance for your reconsideration of this matter.

Sincerely,

*Jerry Godwin*

Cc: Ollie Godwin, 556 Ottis Faulk Drive, Honoraville, AL 36042

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

OLLIE GODWIN                )
                                 )
    Plaintiff,            )
                                 )
v.                             )    Case No.: 2:05-cv-00783-SRW
                               )    From Circuit Court Crenshaw Co.
NATIONAL UNION FIRE INSURANCE  )    Case No: CV-05-69
COMPANY OF PITTSBURGH, INC., et al.,  )
                               )
    Defendant.         )

### PLAINTIFF ANSWERS TO INTERROGATORIES AND REQUEST FOR PRODUCTION PROPOUNDED BY DEFENDANT

**COMES NOW**, the Plaintiff, Ollie Godwin, by and through his attorney of record and submits the following answers to the discovery propounded by the Defendant:

1. Describe in detail any and all contact between you and the defendants regarding policies 8056434 and 9056434 and any claims made thereunder.

**A. Letters from Suzanne Adger (Palomar Ins.) and Stephanie Pines at the main office. The letters were produced in Plaintiffs Initial disclosures.**

2. Identify any and all documents you received from the defendants pertaining to Policies 8056434 and 9056434 or any claims made thereunder.

**A. All documents received from the defendants have been disclosed in Plaintiffs initial disclosures and are self explanatory.**

3. Describe in detail the nature and amount of damages alleged in your Complaint.

**A. I should have received disability payments of $500.00 per week for six months under the insurance policy while I was injured and recovering. The policy should**

have paid for my surgery and treatment therefore I am asking for the amount of my medical bills injury, mileage to and from treatment and other incidentals.

### November 2003 Medical Expenses

| | |
|---|---|
| Hernia Injury: | $12,315.50 |
| AIG paid: | 7500.00 |
| Balance owed: | 4815.50 |
| Incidentals: | 60.00 |
| | $4,875.00 |

Disability payments not made: 3,000.00

### October 2004 Medical Expenses

| | |
|---|---|
| Hip Injury | $36,590.00 |
| Prescriptions: | 97.46 |
| Medical Supply: | 144.55 |
| Incidentals | 525.00 |
| | $39,016.62 |

Disability payments not made:    26 weeks + 3 days =13,000.00

4.    Provide the names of any and all physicians you have seen in the last ten (10) years.

A.    Dr. Danny Hood, Dr. Norman McGowin, Dr. Kyhard Adams, Dr. Steven Barrington

5.    Provide the name, dates of policy and policy number for any health insurance you had in 2003 through the present.

A.    Blue Cross Blue Shield XAA887493378 (contract #) 05543 (group #) effective date 12/01/2003

Occupational Accident Insurance – Palomar Ins. Corp. TRK 805 6434 this policy was issued 17 or 18 years ago.

Occupational Accident Insurance –Philadelphia American Life Ins. Company #00001 Group # 0000571103, Issued 10/22/05 ( obtained after Palomar Ins. cancelled)

6.   Did you make any claims under the policy(ies) identified in the proceeding interrogatory?

A.   I did make a claim for benefits with Blue Cross Blue Shield.

7.   Identify each and every expert witness which you expect to call to testify in this case as well as

a)   the subject matter upon which said expert will testify;

b)   a summary of the expert's facts and opinions; and

c)   said expert's qualifications which you contend enable him or her to render opinions pertaining to matters in this case.

A.   No determination of an expert has been made at this time.

8.   Identify by name, address, and phone number any and all individuals who possess knowledge of discoverable information regarding the events described in your Complaint.

A.   Dr. Barrington.

Steve Pritcble – 256-234-0461 Godwin Materials

Robert Watkins – 334-462-7233 Godwin Materials

Doug Sin – 1-800-624-6467 Godwin Materials

Cindy Jordan – 1-800-624-6467 Godwin Materials

Marilyn Godwin – 334-537-4978

Arnold Dunn –334- 365-7438

Godwin immediate family members.

    9.    Identify by name, address, and phone number each and every relative living in Autauga, Barbour, Bullock, Butler, Chambers, Chilton, Coffee, Coosa, Covington, Crenshaw, Dale, Elmore, Geneva, Henry, Houston, Lee, Lowndes, Macon, Montgomery, Pike, Randolph, Russell, and Tallapoosa Counties.

    A.    Objection: This Interrogatory is unduly burdensome and not calculated to lead to discoverable evidence. Without waiving said objection the Plaintiff states as follows:

> John and Connie Wood 335-6737 Luverne, AL.
> Donnie and April Wood 335-4039 Luverne, AL
> Ben & Tracy Elmore unknown Autauga
> Elbert & Joanne McCarthy- 335-5718 Luverne, AL
> Walley & Janette Williams- unknown Luverne, AL\
> Jackie Godwin    - 335-3471 Luverne, AL
> Stafford & Hazel Stephens 335-3766 Rutledge, AL
> Elzora & Grady Stephens 335-3766, Rutledge, AL
> Margaret & David Penn- 537-9211 Honoraville, AL
> Eddie & Freddie Paulk – 537-4681 Honoraville, AL
> Woodrow & Faye Faye – 537-9506 Honoraville, AL
> Teresa Samply – unknown – Honoraville, AL
> John & Teresa Stovall – Honoraville, AL 537-4772
> Bryan Penn – unknown - Montgomery
> Mandy Penn – 537-9211 Honoraville, AL
> Michele & Tray Moseley 537-9311 Honoraville, AL
> Kim & Westley Boyd 537-4408 Highland Home, AL
> Tina & Ron McGough 537-4870 Honoraville, AL
> Brandie & Ollie Godwin Jr. 335-6902 Honoraville, AL
> Joey Godwin 537-9506 Honoraville, AL

Ann & Ken Stephens 537-4910 Panola, AL

Calvin & Michiele Stephens 335-2458 Luverne, AL.

Keith Stephens 335-4261 Luverne, AL

Danny & Angie Stephens 335-5215 Luverne, AL

Donnie & Wanda Stephens 335-3548

Mark & Karen Morgan 335-4262 Rutledge, AL

Russell Faulk 288-5867 Montgomery, AL

Robert Harris no phone Honoraville, AL

Robert Keith Sexton 537-4993 Honoraville, AL

Kenneth & Stephanie Godwin unknown Coffee County

STATE OF ALABAMA )

LOWNDES COUNTY )

Personally appeared before me, the undersigned and Notary Public in and for the State of Alabama at Large, Ollic Godwin, being by me and first duly sworn, does depose and says that the statement contained in the foregoing complaint are true and correct.

**SUBSCRIBED AND SWORN TO** before me this ____ day of _____ 2006.

_____
Notary Public
My Commission Expires: _____

## REQUEST FOR PRODUCTION

1.    Produce any and all documents received from the defendants regarding Policies 8056434 and 9056434, benefits received therefrom, and claims made thereunder.

**A.    All documents in my possession have been produced.**

2.    Produce any and all medical bills, statements, receipts, or other documents relating to the injuries fro which you made claims under Policies 8056434 and 9056434.

**A.    All documents in my possession have been produced.**

3. Produce any and all documents which you have provided to any expert(s), including but not limited to correspondence, any and all written documents said experts have created in relation to this matter, a summary of each opinion each such expert has reached or expects to render at trial, and a copy of the expert's curriculum vitae.

**A. Objection: This Request for Production seeks material which is attorney work product and not discoverable. Without waiving this objection plaintiff states that no expert has been obtained at this time.**

4. Produce all documents supporting any damages you are claiming in this case.

**A. In addition to Rule 26 Disclosures see Exhibit 1.**

5. To the extent not heretofore requested herein, produce any and all documents which you have consulted, reviewed, or relied upon in drafting responses to these interrogatories and Requests for Production.

**A. Objection: This Request for Production seeks material which is privileged or attorney work product and not discoverable. Without waiving said objection all documents in the possession of the plaintiff have been produced.**

Respectfully submitted this 9 day of Feb. 2006.

Arlene M. Richardson, (RIC045)

**RICHARDSON LEGAL CENTER, LLC**
Attorney for the Plaintiff
Post Office Box 971
Hayneville, AL 36040
Telephone: (334) 548-5660
Fax: (561) 228-5810

## CERTIFICATE OF SERVICE

This is to certify that on this the 9 day of *Feb* 2006 a copy of the foregoing document has been served upon counsel for all parties to this proceeding via United States Mail.

Michelle L. Crunk. Esq.
Ferguson, Frost & Dodson, LLP
2500 Acton Road, Suite 200
P.O. Box 430189
Birmingham, AL 35243-0189

Arlene M. Richardson

**NON NEGOTIABLE**

PROC1A

**INSURED:**

# EXPLANATION OF BENEFITS

OLLIE GODWIN
856 OTTIS FAULK DRIVE
HONORAVILLE          AL   36042

Policy Holder: GODWIN MATERIALS, INC.
Policy No: 000090564340

Patient Name: OLLIE GODWIN
Patient Account Number: 84328
Insured ID Number: R043430028
Claim Number: A87730224
Claim Office: 024
Date Paid: 07/12/2005
Examiner Code: SNP
Loss Date: 10/27/2004
RW

| Provider | Service From Thru | # Of SVC | Benefit Code | Total Charged | Non Covered | Deductible | Amount Considered | % | Amount Paid | Remark Code |
|---|---|---|---|---|---|---|---|---|---|---|
| ALA ORTHOP | 0509 050905 | 01 | 81 | 50.00 | 50.00 | | .00 | 000 | .00 | R2 |
| ALA ORTHOP | 0509 050905 | 01 | A7 | 75.00 | 75.00 | | .00 | 000 | .00 | R2 |
| ALA ORTHOP | 0509 050905 | 01 | A7 | 75.00 | 75.00 | | .00 | 000 | .00 | R2 |
| **Totals** | | | | $200.00 | $200.00 | | $0.00 | | $0.00 | |

Reduced Because of Other Insurance

## Checks Issued

| Payee Name | Amount |
|---|---|
| | |

Total Amount Paid This Claim

## Broker/Agent

PALOMAR INSURANCE CORPORA
4525  EXECUTIVE PARK DR
MONTGOMERY                    AL 36116

## Description of Remark Codes*

R2-POLICY COVERS ACCIDENTS ONLY, SICKNESS NOT COVERED.

## Description of Benefit Codes

81 - PHYSICIAN VISIT
A7 - X-RAY

**Thank you for the opportunity to service this claim.**
**Please call (800)551-0824  with any questions you have.**

The AIG Life Companies,Accident and Health Claims Department,P.O.Box 15701,
Wilmington,DE 19850-5701



**BlueCross BlueShield of Alabama**

An Independent Licensee of the
Blue Cross and Blue Shield Association.

450 Riverchase Parkway East
Birmingham, Alabama 35244-2858

# Claims Processed Report

THIS IS NOT A BILL.

Keep this summary for your records or
review at www.bcbsal.com

05543-000

OLLIE R. GODWIN
656 OTIS FAULK DR
HONORAVILLE,      AL 36042-3736

Date:   AUGUST 4, 2005
Contract Number:  XAA887493378
GODWIN MATERIAL SERVICES, INC.

Summary of Claim Number: 555-2081842

If you have questions about
this report, please call
1-800-292-8868.

| | |
|---|---|
| Total charges for OLLIE R. GODWIN: | $541.00 |
| Amount paid to Provider: | $33.60 |
| You owe HAYNES AMBULANCE SERVICE: | $507.40 |

(This amount may have been paid at time of visit or may
be covered by other insurance.)
You have met  $400.00 of your  $400.00 2005 deductible.

## Itemization

| Date of Service | Services | Submitted Charges | Eligible Charges | Noncovered Charges | Coverage Percentage | Copay | Deductible | Benefits Paid |
|---|---|---|---|---|---|---|---|---|
| 02/15/2005 | AMBULANCE SERVICE | $275.00 | $275.00 | | | | $275.00 | $0.00 |
| 02/15/2005 | AMBULANCE SERVICE | $266.00 | $152.00[1] | $114.00 | 80% | $8.40 | $110.00 | $33.60 |
| TOTALS | | $541.00 | $427.00 | $114.00 | | $8.40 | $385.00 | $33.60 |

[1] THE SUBMITTED CHARGE EXCEEDS THE ELIGIBLE CHARGE WHICH IS THE MAXIMUM ALLOWANCE FOR THIS SERVICE.

For Your Health
Exercise is an important aspect of a healthy lifestyle.
Visit www.bcbsal.com and select "For your Health Wellness Tools
For You" to learn more about how exercise can improve your health.

**NON NEGOTIABLE**

PROC1A

# EXPLANATION OF BENEFITS

INSURED:

OLLIE GODWIN
856 OTTIS FAULK DRIVE
HONORAVILLE            AL  36042

Policy Holder: GODWIN MATERIALS, INC.
Policy No: 000090564340

Patient Name: OLLIE GODWIN
Patient Account Number: 10720739
Insured ID Number: R043430028
Claim Number: A97730227
Claim Office: 024
Date Paid: 08/23/2005
Examiner Code: SNP
Loss Date: 10/27/2004
RW

| Provider | Service From Thru | # Of SVC | Benefit Code | Total Charged | Non Covered | Deductible | Amount Considered | % | Amount Paid | Remark Code* |
|---|---|---|---|---|---|---|---|---|---|---|
| JACKSON | 0607 060705 | 01 | 73 | 9,425.50 | 9,425.50 | | .00 | 000 | .00 | R2 |
| | | | | | | | | | | |
| **Totals** | | | | $9,425.50 | $9,425.50 | | $0.00 | | $0.00 | |

Reduced Because of Other Insurance  _____

Total Amount Paid This Claim  _____

## Checks Issued

| Payee Name | Amount |
|---|---|
| | |
| | |

### Broker/Agent

PALOMAR INSURANCE CORPORA
4525  EXECUTIVE PARK DR
MONTGOMERY                AL 36116

## Description of Remark Codes*

R2-POLICY COVERS ACCIDENTS ONLY, SICKNESS NOT COVERED.

## Description of Benefit Codes

73 - ADD'L ACC EXP

# Thank you for the opportunity to service this claim.
# Please call (800)551-0824   with any questions you have.

The AIG Life Companies,Accident and Health Claims Department,P.O.Box 15701,
Wilmington,DE 19850-5701

IN THE AMOUNT OF                    ,387 00 PAYABLE TO
AMEDISYS OF MONTGOMERY
ALABAMA
11100 MEAD RD STE 300
BARON ROGUE                    LA 70816

# NON NEGOTIABLE

PROC14

# EXPLANATION OF BENEFITS

INSURED:

OLLIE GODWIN
656 OTTIS FAULK DRIVE
HONORAVILLE                    AL  36042

Policy Holder: GODWIN MATERIALS, INC.
Policy No:  000090584340

Patient Name: OLLIE GODWIN
Patient Account Number: W1000319
Insured ID Number: R043430028
Claim Number: A97730226
Claim Office: 024
Date Paid: 07/28/2005
Examiner Code: STT
Loss Date: 10/27/2004
RW

| Provider | Service From Thru | # Of SVC | Benefit Code | Total Charged | Non Covered | Deductible | Amount Considered | % | Amount Paid | Remark Code* |
|----------|-------------------|----------|--------------|---------------|-------------|------------|-------------------|---|-------------|--------------|
| AMEDISYS OF | 0323 032305 | 04 | 83 | 129.00 | | | 129.00 | 100 | 129.00 | |
| AMEDISYS OF | 0330 033005 | 04 | 83 | 129.00 | | | 129.00 | 100 | 129.00 | |
| AMEDISYS OF | 0406 040805 | 04 | 83 | 129.00 | | | 129.00 | 100 | 129.00 | |
| | **Totals** | | | $387.00 | | | $387.00 | | $387.00 | |

Reduced Because of Other Insurance

Total Amount Paid This Claim              $387.00

## Checks Issued

| Payee Name | Amount |
|------------|--------|
| AMEDISYS OF MONTGOMERY | $387.00 |

### Broker/Agent

PALOMAR INSURANCE CORPORA
4525  EXECUTIVE PARK DR
MONTGOMERY                    AL 36116

## Description of Remark Codes*

## Description of Benefit Codes

83 - PHYS THERAPY

# Thank you for the opportunity to service this claim.
# Please call (800)551-0824  with any questions you have.

The AIG Life Companies,Accident and Health Claims Department,P.O.Box 15701,
Wilmington.DE 19850-5701

**NON NEGOTIABLE**

# EXPLANATION OF BENEFITS

**INSURED:**

OLLIE GODWIN
656 OTTIS FAULK DRIVE
HONORAVILLE                    AL   36042

Policy Holder: GODWIN MATERIALS, INC.
Policy No: 000090584340

Patient Name: OLLIE GODWIN
Patient Account Number: 84328
Insured ID Number: R043430028
Claim Number: A97730225
Claim Office: 024
Date Paid: 07/14/2005
Examiner Code: SNP
Loss Date: 10/27/2004
RW

| Provider | Service From Thru | # Of SVC | Benefit Code | Total Charged | Non Covered | Deductible | Amount Considered | % | Amount Paid | Remark Code* |
|----------|-------------------|----------|--------------|---------------|-------------|------------|-------------------|---|-------------|--------------|
| ALA ORTHOP | 0516 051605 | 01 | A7 | 740.00 | 740.00 | | .00 | 000 | .00 | R2 |
| **Totals** | | | | **$740.00** | **$740.00** | | **$0.00** | | **$0.00** | |

Reduced Because of Other Insurance  _____

Total Amount Paid This Claim  _____

## Checks Issued

| Payee Name | Amount |
|------------|--------|
| | |
| | |

## Broker/Agent

PALOMAR INSURANCE CORPORA
4525  EXECUTIVE PARK DR
MONTGOMERY                        AL 36116

## Description of Remark Codes*

R2-POLICY COVERS ACCIDENTS ONLY, SICKNESS NOT COVERED.

## Description of Benefit Codes

A7 - X-RAY

hank you for the opportunity to service this claim.
ease call (800)551-0824   with any questions you have.

The AIG Life Companies,Accident and Health Claims Department,P.O.Box 15701,
Wilmington,DE 19850-5701

**SAM'S CLUB**   (334) 277-5454                    $16.64
**Pharmacy**   1080 EASTERN BLVD.
             MONTGOMERY,AL 36117 -0000

GODWIN,OLLIE                  11/28/2005   REFILL
656 OTISFAULK DR  HONORAVILLE,AL 36042
RX: 4411733   Ref # 3   QTY: 30   DAW: 0   DS: 30
NDC: 59762-3718-04   TRIAZOLAM 0.25MG   TAB GRE
ADAMS,KYNARD L            NABP: 0129038
053323486387006999
BAL                 Patient Pay    $9.73

**SAM'S CLUB**   (334) 277-5454                    $16.64
**Pharmacy**   1080 EASTERN BLVD.
             MONTGOMERY,AL 36117 -0000

GODWIN,OLLIE                  11/28/2005   REFILL
656 OTISFAULK DR  HONORAVILLE,AL 36042
RX: 4411733   Ref # 3   QTY: 30   DAW: 0   DS: 30
NDC: 59762-3718-04   TRIAZOLAM 0.25MG   TAB GRE
ADAMS,KYNARD L            NABP: 0129038
053323486387006999
BAL                 Patient Pay    $9.73

**GODWIN**
**OLLIE**

Ollie
11-28-05
Sleeping pill

Signature Required   Y
11/28/2005 11.14.24 AM

Page No : 1

GODWIN
OLLIE
659 OTISFAULK DR
HONORAVILLE, AL 36042
        (334) 537-9506
11/28/2005   (334) 277-5454
RX: 4411733    REF = 3
BAL

OC# 955 923 883 576 592 384 107 659 238

4  79311 91550  9

Copay:    $9.73
          TOTAL:  $9.73

Priority: Will Pickup

---

**SAM'S CLUB**   (334) 277-5454                    $16.64
**Pharmacy**   1080 EASTERN BLVD.
             MONTGOMERY,AL 36117 -0000

GODWIN,OLLIE                  10/27/2005   REFILL
656 OTISFAULK DR  HONORAVILLE,AL 36042
RX: 4411733   Ref # 4   QTY: 30   DAW: 0   DS: 30
NDC: 59762-3718-04   TRIAZOLAM 0.25MG   TAB GRE
ADAMS,KYNARD L            NABP: 0129038
053006042108005999
BAL                 Patient Pay    $9.73

**SAM'S CLUB**   (334) 277-5454                    $16.64
**Pharmacy**   1080 EASTERN BLVD.
             MONTGOMERY,AL 36117 -0000

GODWIN,OLLIE                  10/27/2005   REFILL
656 OTISFAULK DR  HONORAVILLE,AL 36042
RX: 4411733   Ref # 4   QTY: 30   DAW: 0   DS: 30
NDC: 59762-3718-04   TRIAZOLAM 0.25MG   TAB GRE
ADAMS,KYNARD L            NABP: 0129038
053006042108005999
BAL                 Patient Pay    $9.73

**GODWIN**
**OLLIE**

Ollie
10-22-05
Sleeping pill

Signature Required   Y
10/27/2005 04:57:21 PM

Page No : 1

GODWIN
OLLIE
656 OTISFAULK DR
HONORAVILLE, AL 36042
        (334) 537-9506
10/27/2005   (334) 277-5454
RX: 4411733    REF = 4
BAL

OC# 955 923 883 576 592 384 107 659 238

4  79311 87054  9

Copay:    $9.73
          TOTAL:  $9.73

Priority: Will Pickup

53. Information Expires 06/18/2006

**SAM'S CLUB**  (334) 277-5454                $13.88
**Pharmacy**  1080 EASTERN BLVD.
MONTGOMERY, AL 36117-0000
GODWIN, MARILYN R.        07/14/2005    REFILL
656 OTIS FAULK DR  HONORAVILLE, AL 36042
RX: 4410731    Ref # 3   QTY: 30    DAW: 0    DS: 30
NDC: 59762-3718-04    TRIAZOLAM 0.25MG    TAB GRE
ADAMS, KYNARD L              NABP: 0129038
051955705590002999
BAL                    Patient Pay    $9.73

GODWIN
MARILYN R.

*Marilyn 7-14-05 Signed $11*

Signature Required    Y
07/14/2005 04:03:09 PM

Page No : 1

**SAM'S CLUB**  (334) 277-5454                $13.88
**Pharmacy**  1080 EASTERN BLVD.
MONTGOMERY, AL 36117-0000
GODWIN, MARILYN R.        07/14/2005    REFILL
656 OTIS FAULK DR  HONORAVILLE, AL 36042
RX: 4410731    Ref # 3   QTY: 30    DAW: 0    DS: 30
NDC: 59762-3718-04    TRIAZOLAM 0.25MG    TAB GRE
ADAMS, KYNARD L              NABP: 0129038
051955705590002999
BAL                    Patient Pay    $9.73

GODWIN
MARILYN R.
656 OTIS FAULK DR
HONORAVILLE, AL 36042
(334) 537-9506
07/14/2005    (334) 277-5454
RX: 4410731    REF = 3
BAL

OC# 955 923 883 576 592 384 107 659 238

4  79311 71875  9

Copay:  $9.73

TOTAL:  $9.73

Priority: Will Pick

---

44  Information Expires 12/16/2004

**SAM'S CLUB**  (334) 277-5454                $8.46
**Pharmacy**  1080 EASTERN BLVD.
MONTGOMERY, AL 36117-0000
GODWIN, OLLIE          12/13/2004    NEW
656 OTISFAULK DR  HONORAVILLE, AL 36042
RX: 4409616    Ref # 0   QTY: 33    DAW: 0    DS: 5
NDC: 00406-0357-05    HYDROCO/APAP5-500MG TAB MAL
BARRINGTON, STEVE A          NABP: 0129038
043486153208007999
BAL                    Patient Pay    $4.81

GODWIN
OLLIE

*12-2004*

*Paid*

Signature Required    Y
12/13/2004 06.20.09 PM

Page No : 1 of 2

**SAM'S CLUB**  (334) 277-5454                $8.46
**Pharmacy**  1080 EASTERN BLVD.
MONTGOMERY, AL 36117-0000
GODWIN, OLLIE          12/13/2004    NEW
656 OTISFAULK DR  HONORAVILLE, AL 36042
RX: 4409616    Ref # 0   QTY: 33    DAW: 0    DS: 5
NDC: 00406-0357-05    HYDROCO/APAP5-500MG TAB MAL
BARRINGTON, STEVE A          NABP: 0129038
043486153208007999
BAL                    Patient Pay    $4.81

GODWIN
OLLIE
656 OTISFAULK DR
HONORAVILLE, AL 36042
(334) 537-9506
12/13/2004    (334) 277-5454
RX: 4409616    REF = 0
BAL

OC# 455 923 868 776 592 384 107 659 238

4  79311 43154  2

Copay:  $4.81

TOTAL:  $4.81

Priority: Dr Call In

Case 2:05-cv-00873-SRW   Document 12-22   Filed 09/06/2006   Page 15 of 17

# STATEMENT

MONTGOMERY ANESTHESIA ASSOC PC
PO BOX 934462
ATLANTA GA 31193-4462

| | SHOW AMOUNT PAID HERE | $ |
|---|---|---|

| (334)279-1450 | 12/06/05 | 66642 | 01 | 1065.00 |
|---|---|---|---|---|
| OFFICE PHONE NUMBER | CLOSING DATE | YOUR ACCOUNT NUMBER | PAGE NO | NEW BALANCE |

OLLIE GODWIN                          175
656 OTIS FAULK DR
HONORAVILLE AL 36042

MONTGOMERY ANESTHESIA ASSOC PC
PO BOX 934462
ATLANTA GA 31193-4462

NOTE: Charges and payments not appearing on this
statement will appear on next month's statement.

**RETURN THIS PORTION WITH PAYMENT**

CHARGES APPEARING ON THIS STATEMENT ARE **NOT** INCLUDED ON ANY HOSPITAL BILL OR STATEMENT

| DATE | DOCTOR NAME | EXPLANATION OF ACTIVITY | PATIENT NAME/ CLAIM ACTIVITY | CHARGES AND DEBITS | PAYMENTS AND CREDITS |
|---|---|---|---|---|---|
| | | SERVICES RENDERED | | | |
| 021005 | HARING | TOTAL HIP REPLACEMENT | OLLIE | 1140.00 | |
| 021005 | HARING | INJECT SPINE L/S (CD) | OLLIE | 525.00 | |
| 021605 | | BILLED:PALOMAR SPECIAL RISK | | | |
| 022105 | | BILLED:PALOMAR SPECIAL RISK | | | |
| 041805 | | BILLED:PALOMAR SPECIAL RISK | | | |
| 042505 | | BILLED:PALOMAR SPECIAL RISK | | | |
| 050405 | | BILLED:BLUE CROSS BLUE SHIE | | | |
| 062005 | | BILLED:BLUE CROSS BLUE SHIE | | | |
| 071105 | | BCBS ERA PAYMENT | | | 840.00- |
| 071105 | | BCBS ERA PAYMENT | | | 225.00- |
| 071105 | | BCBS ERA ADJ | | | 300.00- |
| 071105 | | BCBS ERA ADJ | | | 300.00- |
| 120605 | | RECOUPMENT | | 840.00 | |
| 120605 | | RECOUPMENT | | 225.00 | |
| 120605 | | BC RECOUPMENT | | 0.00 | |

IMPORTANT NOTE:   PAYMENT DUE IN FULL UPON RECEIPT OF
STATEMENT.
THIS BILL IS FOR PROFESSIONAL ANESTHESIA SERVICES.
THERE WILL BE A $26.00 ASSESSMENT FOR RETURNED CHECK FEES.

| STATEMENT CLOSING DATE 12/06/05 | | PLEASE INDICATE YOUR ACCOUNT NUMBER WHEN CALLING OUR OFFICE: | | | | | 66642 |
|---|---|---|---|---|---|---|---|
| BALANCE FORWARD | PAYMENTS & CREDITS | NEW CHARGES | BALANCE OVER 30 DAYS | BALANCE OVER 60 DAYS | BALANCE OVER 90 DAYS | BALANCE OVER 120 DAYS | NEW BALANCE PAY THIS AMOUNT |
| 0.00 | 1665.00- | 2730.00 | 0.00 | 0.00 | 1065.00 | 0.00 | 1065.00 |

SEND INQUIRIES TO
(334)279-1450
MONTGOMERY ANESTHESIA ASSOC PC
PO BOX 934462
ATLANTA GA 31193-4462

Case 2:05-cv-00783-SRW Document 22-2 Filed 08/08/2006 Page 166 of 177

------------------------------------------------------------------------------

@ HOME MEDICAL, INC.
324 ST.LUKES DRIVE
MONTGOMERY, AL 36117

(334) 274-0088

-----------------------------------------------------------------------

ACCOUNT  :  OLLIE R GODWIN                    PHONE:    (334) 537-'
            656 OTIS FAULK DRIVE              ACCT NO:  R00501596
            HONORAVILLE, AL 36042

-----------------------------------------------------------------

INVOICE   SERVICE   ITEM      DESCRIPTION                      AI
NUMBER    DATE                                                 (P
-----------------------------------------------------------------
01-022969  02/12/05 E0163     COMODE CHAIR STAT FA
01-022969  02/12/05 E0143     WALKER, FOLDING/WHEELED
                              W/O SEAT
01-022969  02/12/05 K0103     TRANSFER BOARD
-----------------------------------------------------------------

ACCOUNT BALANCE

INSURANCE COMPANY NAMES:
     PALAMA - PALAMAR SPECIAL RISK

          THE BALANCE SHOWN IS THE AMOUNT DUE FROM YC
          AT HOME MEDICAL, 324 ST LUKES DRIVE, MONTG'

Feb. 7 2006 4:18PM Bales M Richardson No. 1933 P. 18
Case 2:05-cv-00733-SRW Document 23-2 Filed 03/20/2006 Page 17 of 17 53

| FROM | | BILLING DATE | BALANCE DUE | DUE DATE |
|---|---|---|---|---|
| MULBERRY DIAGNOSTIC CENTER<br>2100 CHESTNUT STREET<br>MONTGOMERY      AL 36106 | | 11-30-05 | 190.00 | 12-15-2005 |
| | | ACCOUNT NO. 0101821 | AMOUNT PAID | YOUR CHECK NO. |

☐ CHECK HERE TO NOTE BILLING ADDRESS CHANGE ON REVERSE SIDE OF STUB.

| REMIT TO | BILLING TO |
|---|---|
| MULBERRY DIAGNOSTIC CENTER<br>2100 CHESTNUT STREET<br>MONTGOMERY      AL 36106 | OLLIE R GODWIN<br>656 OTIS FAULK DR<br>HONORAVILLE      AL  36042 |

**PLEASE DETACH THIS STUB AND RETURN REMITTANCE PORTION (LEFT) WITH YOUR PAYMENT**

*DETACH HERE AND RETURN WITH PAYMENT*

## MESSAGES

IF PAYMENTS ARE BEING MADE REGULARLY DISREGARD
MESSAGE - 264-9729

## SERVICES SUMMARY

------ Y o u r   R e s p o n s i b i l i t y ------

| Date | Patient/Check | Description | Provider | Amount |
|---|---|---|---|---|
| 10-31-05 | | Balance Forward From 10-31-05 | | 190.00 |

190.00

**BALANCE DUE ➤**

## ACCOUNT SUMMARY

| BILLING DATE | ACCOUNT NO. | BALANCE DUE | 1 - 30 DAYS | 31 - 60 DAYS | 61 - 90 DAYS | OVER 90 DAYS |
|---|---|---|---|---|---|---|
| 11-30-05 | 0101821 | 190.00 | 0.00 | 0.00 | 0.00 | 190.00 |

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| OLLIE GODWIN, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| V. | ) | CASE NO: 2:05-cv-00783-SRW |
| | ) | |
| NATIONAL UNION FIRE INSURANCE | ) | From Circuit Court of Crenshaw Co. |
| COMPANY OF PITTSBURGH, INC., | ) | Case No: CV05-69 |
| ET AL., | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| | ) | |

## AFFIDAVIT OF DR. DANIEL W. MICHAEL

| | |
|---|---|
| STATE OF ALABAMA | ) |
| COUNTY OF JEFFERSON | ) |

My name is Dr. Daniel W. Michael. I am over the age of nineteen years and have personal knowledge of the facts set forth herein.

1. I am a medical doctor practicing in the State of Alabama. A copy of my curriculum vitae outlining my educational and professional background is attached hereto as Exhibit A.

2. I reviewed the medical records of Mr. Godwin subpoenaed in the course of the above-styled lawsuit as well as the x-rays and MRIs of Mr. Godwin maintained in Dr. Barrington's office.

3. The x-rays and MRIs reveal bilateral avascular necrosis of the hips – a disease process that was definitely present prior to Mr. Godwin's alleged injury on October 27, 2004.

4. Avascular necrosis is a disease resulting from loss of blood supply to the bones.

5. The first x-rays and MRIs I reviewed are dated early November 2004, and on review, there is apparent avascular necrosis of the left hip with no collapse of the femoral head. Although on the x-ray film the right hip appears normal, the MRI shows avascular necrosis in the right hip as well.

6. Because of the normal time that it takes for avascular necrosis to develop, particularly to the point it had developed in his left hip, it is my opinion that there is no relationship between the alleged October 2004 accident and the onset and subsequent problems Mr. Godwin had in both hips from the avascular necrosis of the femoral heads.

Further affiant saith not:

_____
Dr. Daniel W. Michael

STATE OF ALABAMA            )
COUNTY OF JEFFERSON        )

BEFORE ME, the undersigned Notary Public in and for said County and State, personally appeared Dr. Daniel W. Michael, whose name is signed to the foregoing Affidavit, and who is known to me and who, being by me first duly sworn, on oath deposes and says that he has personal knowledge of the statements contained in the foregoing Affidavit and that they are true and correct.

SWORN TO and subscribed before me on this the 4th day of October, 2006.

_____
NOTARY PUBLIC

My Commission Expires: 6/7/09

137388

ORTHOPEDIC SURGEONS, P.C.
4181 HIGHLAND AVENUE
SUITE 300
BIRMINGHAM, ALABAMA 03205

DANIEL W. MICHAEL M.D.

TELEPHONE
(205) 909-1000

## Daniel W. Michael, M. D.

### Curriculum Vitae

| | |
|---|---|
| Auburn University-B.S. Degree-Cum Laude | -1973 |
| University of Alabama, Birmingham-M.D. Degree | -1977 |
| Internship-Surgical-Carraway Methodist Medical Center | -1977-1978 |
| Residency-Orthopedic Surgery-Medical Center, University of Alabama | -1978-1982 |
| Private Practice | -1982-Present |
| Licensed by: Alabama State Board of Medical examiners | -1977 |
| Board Certified-American Board of Orthopedic Surgery | -1984 |
| Clinical Instructor, Div of Orthopedic Surgery University of Alabama in Birmingham | -1982-Present |
| Consultant, Kerner-Quarterback Sports Medicine Institute of Alabama, Birmingham, Alabama | -1982-Present |

MEDICAL ORGANIZATIONS AND SOCIETIES:

Alabama Orthopedic Society, Inc.

American Medical Association

Medical Association of the State of Alabama

Jefferson County Medical Society

Jefferson County Orthopedic Surgical Society

Fellowship American College of Surgeons



EXHIBIT

A