IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| OLLIE GODWIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:07cv167-SRW |
| | ) | (WO) |
| NATIONAL UNION FIRE | ) | |
| INSURANCE COMPANY OF | ) | |
| PITTSBURGH, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

In this diversity action, plaintiff Ollie Godwin brings bad faith and breach of contract claims against defendant National Union Fire Insurance Company of Pittsburgh, Inc. ("NUFIC") arising from defendant's failure to pay benefits pursuant to an occupational accident insurance policy.   Plaintiff seeks compensatory damages in the amount of $59,581.44 and punitive damages. This action is presently before the court on defendant's motion for summary judgment.  Upon consideration of the motion, the court concludes that it is due to be granted in part and denied in part.

## THE SUMMARY JUDGMENT STANDARD

A party seeking summary judgment bears the initial burden of demonstrating to the court the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions that it believes show an absence of any genuine issue of material fact.  Hairston v. Gainesville Publishing Co., 9 F.3d 913 (11th Cir. 1993).

For summary judgment purposes, an issue of fact is "material" if it is a legal element of the claim, as identified by the substantive law governing the case, such that its presence or absence might affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. Matsushita Electrical Industrial Company v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The court must view the evidence, and all factual inferences properly drawn from the evidence, in the light most favorable to the nonmoving party. Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992); Rollins v. TechSouth, Inc., 833 F.2d 1525, 1528 (11th Cir. 1987). It is improper for this court to weigh conflicting evidence or make credibility determinations; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255. Where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment." Barfield v. Brierton, 883 F.2d 923, 933-34 (11th Cir. 1989) (citation omitted).

## DISCUSSION

### Evidentiary Issues

NUFIC moves to strike several of the exhibits filed by plaintiff in opposition to the motion for summary judgment (Plaintiff's Exhibits 2, 3, 4, 5, 8, 13, 14, 15, 18, 19, and 21), arguing that they are "hearsay, unauthenticated, and not placed in proper evidentiary form as would be admissible." (Doc. # 13, p. 12). Plaintiff argues that the exhibits are not

hearsay.  As to authentication, he responds that the challenged exhibits "will be admissible at trial upon certification of the custodian or a proper foundation," (as to Exhibits 2, 5, and 18); "will be admissible at trial upon certification or a proper foundation" (as to Exhibits 3, 4, 13, 14, 15, and 21); and "can be authenticated by the Palamar [sic] Agent who produced the document pursuant to a Subpoena."  (Doc. # 14, ¶¶ 2-4).

In support of his argument that authentication is not necessary at this stage of the proceedings, plaintiff relies on the following language from <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986):

> [W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the "pleadings, depositions, answers to interrogatories, and admissions on file." Such a motion, whether or not accompanied by affidavits, will be "made and supported as provided in this rule," and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."
>
> *We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment.*

<u>Id</u>., at 324 (emphasis added)(<u>see</u> plaintiff's response, Doc. # 14, pp. 1-2).  However, as defendant argues in reply, immediately following the sentence on which plaintiff relies, the <u>Catrett</u> court states:

> Obviously, Rule 56 does not require the nonmoving party to depose her own witnesses. *Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which we have*

*referred.*

<u>Id</u>. (emphasis added).[1]  Rule 56(c) provides, in part that "[t]he judgment sought shall be rendered forthwith if the *pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,* show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Fed. R. Civ. P. 56(c)(emphasis added).

Plaintiff does not argue that the exhibits at issue are self-authenticating (<u>see</u> F.R.E. 902), and the court concludes that they are not.  Because the exhibits identified by defendant are not authenticated, the court may not consider them on summary judgment.[2]  <u>Shanklin v. Fitzgerald</u>, 397 F.3d 596, 602 (8th Cir. 2005)(failure to authenticate exhibits precludes their

---

[1]  Rule 56(e) provides:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, *by affidavits or as otherwise provided in this rule*, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e)(emphasis added).

[2]  Thus, the court need not consider plaintiff's hearsay arguments.  <u>See</u> <u>Taylor v. Principi</u>, 141 Fed. Appx. 705, 2005 WL 1519099, * 3 (10th Cir. Jun. 28, 2005)(upholding district court's refusal to consider unauthenticated documents, even if the documents were admissible under the business records exception to the hearsay rule).

consideration on summary judgment); <u>Orr v. Bank of America</u>, 285 F.3d 764, 773 (9th Cir. 2002)("We have repeatedly held that unauthenticated documents cannot be considered in a motion for summary judgment."); <u>Carmona v. Toledo</u>, 215 F.3d 124, 131 (1st Cir. 2000)("We agree that the supervisors' failure to authenticate precludes consideration of their supporting documents. Documents supporting or opposing summary judgment must be properly authenticated."); <u>Wells v. Xpedx</u>, 2007 WL 2696566, *2 (M.D. Fla. Sep. 11, 2007)("[T]o be considered for or against summary judgment, a document must be authenticated, either by an affidavit that meets the requirements of Rule 56(e) . . . or in accord with the Federal Rules of Evidence."); 10A Fed. Prac. & Proc. Civ. 3d § 2722 ("To be admissible, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e)."); <u>Moore's Federal Practice 3d</u>, § 56.14[2][c]("Unauthenticated documents, once challenged, may not be considered by a court in determining a summary judgment motion."). Because the challenged exhibits are not properly authenticated, defendant's motion to strike is due to be granted.[3]

Defendant challenges plaintiff's affidavit (Plaintiff's Exhibit 7) as hearsay because, on its face, the affidavit states that the notary's commission was expired. (Doc. # 13, p. 3). However, the court allowed plaintiff to correct this deficiency in the affidavit, which was due to a clerical error. (<u>See</u> Docs. ## 37 and 39 in Civil Action No. 2:05cv783-SRW). Thus,

---

[3] Although the court is granting the motion to strike plaintiff's exhibits, it will consider the following, as these are included in defendant's evidentiary submission: Dr. Barrington's medical notes and correspondence (Defendant's Exhibits 2I and 2K), and Jerry Godwin's letter of March 17, 2004 (Defendant's Exhibit 2D).

defendant's hearsay objection is due to be overruled.  Additionally, defendant argues that plaintiff's testimony in his affidavit – that he was en route to deliver a load when he went home to repair a truck and was injured – is conclusory and lacks evidentiary support. However, the court has determined that the testimony is not conclusory and that the testimony by affidavit is itself evidence which may be considered on summary judgment. Defendant further argues that plaintiff's affidavit testimony is "in direct opposition to his testimony through deposition taken on July 10, 2006."  (Doc. # 13, p. 2).  To the extent defendant challenges this testimony as a "sham," pursuant to Van T. Junkins & Associates v. U.S. Industries, Inc., 736 F.2d 656 (11th Cir. 1984), the objection is due to be overruled. Plaintiff's deposition testimony regarding whether he had made any deliveries on the day of his November 2003 injury was equivocal – he responded, "No.  It's been a while back.  I don't believe so." – and his later testimony by affidavit that he had made three deliveries that day and was en route to make another delivery does not present the direct and inherent conflict required to find the affidavit testimony to be a "sham."[4]

_____

[4] Not every discrepancy between deposition testimony and an affidavit requires the court to disregard the affidavit as a sham:

> A definite distinction must be made between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence. . . . . The purpose of summary judgment is to separate real, genuine issues from those which are formal or pretended.  To allow every failure of memory or variation in a witness's testimony to be disregarded as a sham would require far too much from lay witnesses and would deprive the trier of fact of the traditional opportunity to determine which point in time and with which words the witness (in this case, the affiant) was stating the truth.

Tippens v. Celotex Corporation, 805 F.2d 949, 953-54 (11th Cir. 1986).

6

**Background**

Plaintiff Ollie Godwin owns and leases three trucks exclusively to Godwin Material Services, Inc. ("Godwin Materials").  Plaintiff and two contract drivers drive plaintiff's three trucks.  Godwin Materials purchased a group occupational accident policy with AIG Life Insurance Company ("AIG Life") and NUFIC[5] through Palomar Insurance Corporation ("Palomar"), an insurance broker, and deducted premiums from the leased truck drivers' earnings.  Plaintiff became an insured on the Godwin Materials policy in 1999.  As of May 1, 2003, Godwin Materials' policy was issued by AIG Life.  (Godwin depo., pp. 36, 48-50; Pine aff., ¶ 1-2 and Exhibit 2N; Godwin aff., p. 1).  Godwin Materials' standard procedure is that drivers sustaining an injury are to notify Cindy Jordan at Godwin Materials.  (Godwin aff., p. 1).

On October 25, 2003, plaintiff had just dumped a load and was storing his tarp at the front of the truck.  While climbing down from the truck, plaintiff slipped and hit his side on the tarp bracket.  Plaintiff went home and called Cindy Jordan.  He told her that he had fallen on the tarp rack and hurt his stomach.  Jordan responded that she would make a note of it and put it in the file.  Plaintiff worked the next day.  Plaintiff did not seek medical attention and did not ask Jordan to fill out a claim for him. (Godwin depo., pp. 65-73).

---

[5] NUFIC is the sole defendant.  In the style of his first amendment to the complaint, filed in state court after remand of this action, plaintiff lists NUFIC and Blue Cross Blue Shield as the defendants.  Blue Cross was subsequently dismissed.  In the body of the complaint, plaintiff refers to "defendant, AIG d/b/a/ National Union Insurance Company."  In its answer, NUFIC responds that it is "National Union Fire Insurance Company of Pittsburgh, PA (incorrectly named in the First Amendment to the Complaint as 'AIG d/b/a National Union Insurance Company.'"

On November 22, 2003, plaintiff made three deliveries for Godwin Materials.  One of the trucks he owns blew an exhaust pipe and had to be repaired to comply with DOT regulations.  Plaintiff has a shop at his home, which was on the way to the Hyundai plant where plaintiff and his other driver were delivering rock.  Plaintiff met the driver of the broken truck at plaintiff's home shop.  The other driver took plaintiff's truck to deliver its load.  Plaintiff intended to repair the broken truck and deliver its load.  While plaintiff was removing the muffler, he fell backward and the muffler landed on his stomach, on the same place where he had earlier hit the tarp rack.  The next day, plaintiff called Jordan and reported that the muffler had fallen on him and hit him in the same place as had the tarp rack. (Godwin aff., p. 1; Godwin depo., pp. 76-86).

On December 9, 2003, AIG received a call reporting a stomach injury to plaintiff which had occurred on November 22, 2003.  On December 10, 2003, Jordan completed a Policyholder Loss Information Report and forwarded it to AIG Life through Palomar.  On the form, Jordan indicated that plaintiff was injured on November 22, 2003, that the vehicle was not loaded at the time of the accident, that plaintiff was not under dispatch to pick up a load, and that he was scheduled to be at home at the time of the accident.  (Pine aff., ¶¶ 3-4 and Exhibit 2A).  Jordan has never seen the AIG policy and is not familiar with the policy or its definition of "under dispatch."  (Jordan depo., p. 20).  On December 29-30, 2003, plaintiff had surgery for a hernia.  (Godwin depo., pp. 87-88, 102; Exhibit 2B to Pine aff.).  On January 9, 2004, plaintiff signed a proof of loss form and forwarded it to AIG Life.  On the form, he reported that "[o]n Nov. 22, 2003 around 11:00 a.m. at home in shop working

on my truck. Changing a muffler, I was taking it off, standing on floor, drop it, fell hit me in lower stomach." He stated that he first consulted a doctor on December 4, 2003 and that he was hospitalized at L.V. Stabler Memorial Hospital on December 29 and 30, 2003. One of the blocks on the form asks whether the claimant had ever had "this, or a similar condition, in the past" and, if so, "the nature of the condition, dates of treatment and names and addresses of treating doctors, hospitals and clinics." Plaintiff checked the block to indicate that he had not had "this, or a similar condition, in the past." (Pine aff., ¶ 5 and Exhibit 2B).

By letter dated February 27, 2004, AIG Life advised plaintiff as follows:

> We are in receipt of you[r] claim for the above captioned injury and have reviewed same. According to the information we received you were not under dispatch nor was your truck loaded at the time of the accident. Under the terms of your policy through Godwin Materials this is then considered a non[-] occupational accident. The maximum amount payable under this portion of the policy is $7500.00 in medical expenses and there are no disability benefits.

(Pine aff., ¶ 6 and Exhibit 2C). After he received this letter, plaintiff contacted Hank Strother at Palomar and told him that the truck on which he was working was loaded and was under dispatch. He also spoke with "some lady" at AIG and explained that the information in the denial letter was incorrect. (Godwin depo., pp. 94-100).[6] On March 17, 2004, Jerry Godwin

---

[6] Defendant argues that plaintiff testified in his deposition that Strother was the only person, besides Jordan and Jerry Godwin, that plaintiff spoke with about the truck being loaded and under dispatch. (Motion for Summary Judgment, pp. 4-5, ¶ 21). However, the court is obligated to construe the evidence in the light most favorable to plaintiff. Plaintiff's testimony could be construed to mean that Strother was the only person *at Palomar* with whom plaintiff spoke regarding the incorrect information in AIG's February 27, 2004 denial letter. Plaintiff testified as follows:

> Q. Did you ever tell anybody at AIG that this information [in the letter – that plaintiff was not under dispatch and the truck was not loaded] was incorrect?

9

of Godwin Materials sent a letter to Marion Parker at Palomar.  He stated:

> This letter is confirming Ollie Godwin was tarping a load in late October of 2003 and Ollie slipped off tarp rack and hit his stomach.  Ollie reported this verbally to Cindy Jordan, Godwin Material's Safety Director.  Ollie remained in pain but did not seek medical attention.
>
> On November 22, 2003, Ollie was working on his truck and the muffler fell on Ollie's stomach in the same area as the October accident.  Ollie received medical attention.  This claim was reported to AIG.
>
> AIG has agreed to pay as a non-occupational claim.  This decision was based

---

A.  Yes, I told them it was incorrect.

Q.  Who did you tell at AIG that this information was incorrect?

A.  I don't know who.  It was some lady.

\* \* \* \* \*

Q.  Did you speak with anyone besides Mr. Strot[her] at Palomar regarding your hernia claim?

A.  Yes.  One girl named Suzanne, I think.

Q.  Did you tell Suzanne anything about AIG stating you were not loaded at the time of the accident and you said you were?

A.  I don't recall.

Q.  So as far as you know, Mr. Strot[her] at Palomar is the only person you had a conversation with regarding this misinformation in the letter?

A.  Yes.

Q.  Besides Jerry Godwin or Cindy Jordan, did you have any conversations with anybody else at Godwin Material about your hernia claim?

A.  No.

(Godwin depo., pp. 97-100).

on their opinion that he was not under dispatch.

However, based on the first fact he was maintaining the truck at the direction of Godwin for DOT purposes. This was required before he could proceed again with a load. The second fact is the November accident was reoccurring from the October accident, where Ollie was clearly under dispatch. Therefore, based on these facts, we feel the claim should be paid as an occupational claim.

(Pine aff., ¶ 7 and Exhibit 2D). Palomar sent additional claims form to plaintiff; plaintiff completed the forms on February 23, 2005, again reporting information only about the November 22, 2003 injury. (Pine aff., ¶¶ 7-8 and Exhibit 2E).

In May 2004, Godwin Materials' occupational accident insurance was issued through NUFIC. (Pine aff., ¶ 9 and Exhibit 2O). In October 2004, plaintiff was delivering a load of sand. When he stepped out of his truck, the front wheel of the truck was on a mound so that the bottom step was about two feet off of the ground. Plaintiff misjudged the distance and fell, twisting his knee. His knee continued to hurt, and plaintiff sought medical treatment from his physician, Dr. Adams. When plaintiff failed to improve, Dr. Adams referred him to Dr. Barrington. (Godwin depo., pp. 115-24). Before the October 2004 injury, plaintiff did not have any pain or problem with his hip. (Godwin aff., p. 2). On December 7, 2004, NUFIC received a telephone call reporting the injury incurred by plaintiff on October 27, 2004. On January 6, 2005, Palomar sent NUFIC a claim form signed by plaintiff on December 8, 2004; a claim form signed by Dr. Barrington on January 3, 2005; a Policyholder Loss Information Report signed by Jordan on December 8, 2004; and information regarding plaintiff's earnings. (Pine aff., ¶¶ 9-10 and Exhibit 2F). On January 25, 2005, Stephanie

Pine – the claims examiner for plaintiff's claims under the occupational accident policies with AIG Life and NUFIC – sent Dr. Barrington a fax requesting information regarding plaintiff's claim. The fax stated:

> Is the claimant's disability due to injuries he sustained on 10/27/2004? If no, please explain in detail.
>
> Is the claimant's disability due to a congenital and/or degenerative disease? If yes, please explain?
>
> Please submit medical records and office notes for the period 1/1/2004 to present.

(Pine aff., ¶¶ 1, 12 and Exhibit 2H). Dr. Barrington's office responded by sending treatment notes. The notes reflect that plaintiff visited Dr. Barrington on November 22, 2004 complaining of pain in his left leg and hip. He reported that he had not had any specific injury to his hip and that he had injured his left knee when he twisted it as he stepped out of his truck. Dr. Barrington ordered MRIs of plaintiff's hips, to rule out avascular necrosis, and his left knee. Plaintiff returned to Dr. Barrington for follow-up on December 3, 2004, after the MRIs. Dr. Barrington diagnosed "[l]eft knee pain with a lateral femoral condyle osteochondral lesion" and "avascular necrosis both hips with collapse on the left." Plaintiff told Dr. Barrington that he had not experienced any difficulty prior to his injury on October 27, 2004, but that he noticed it then and it had bothered him since. Dr. Barrington noted:

> I do think it appears that this is work related. We will see about getting it preapproved for total hip arthroplasty on the left. We also talked to him about the possibility of doing a core decompression or being involved [in] the Hedrocel rod study for the right hip to try to prevent collapse on that. He is to the point where he really cannot get around with the left hip and so we need to address that before we can reasonably address the right hip.

(Pine aff., ¶¶ 13 and Exhibit I).  Until Dr. Barrington advised plaintiff of his diagnosis of

avascular necrosis, plaintiff was unaware of his disease. (Godwin aff., p. 2).

Pine spoke with Barrington on the telephone about plaintiff.  (Pine aff., ¶ 14).  On

February 19, 2005, Pine sent plaintiff a letter explaining that his claim for temporary total

disability and accident medical expense benefits was being denied because plaintiff's loss

did not appear to be due to an occupational accidental injury.  Pine indicated that Dr.

Barrington had told her that plaintiff's condition was "an underlying condition that was

aggravated by work," and that plaintiff "had this condition but [was] not aware of it."  Pine

cited the policy provisions defining injury and excluding losses caused "in whole or in part

by . . . disease[.]" (Pine aff., ¶ 15 and Exhibit 2J).  On March 2, 2005, Dr. Barrington sent

Pine a letter in which he stated:

> As you know we have treated Mr. Godwin for avascular necrosis with collapse
> of his left hip.  He related to me that he injured it when he was stepping out of
> his truck back in November and has had basically increased pain in that left
> side since then.  Probably he had an aggravation of a previously unknown
> underlying condition, which was the avascular necrosis.  The injury probably
> caused him to collapse it and therefore have the pain that resulted in his need
> for the hip replacement operation.

(Pine aff., ¶ 16 and Exhibit 2K).  After she received this letter, Pine sent plaintiff's claims

to Dr. Lafleche for review.   Lafleche told Pine that plaintiff's hip problems did not result

solely from the knee injury but also from the previously unknown condition of avascular

necrosis.  (Pine aff., ¶ 17).  On May 3, 2005, Pine sent plaintiff a second letter explaining the

basis for NUFIC's denial of his claim.  (Pine aff., ¶ 18 and Exhibit 2L).  Despite the denial,

NUFIC made some payments with regard to plaintiff's claim for benefits arising from the

October 27, 2004 loss claim.  (Pine aff., ¶ 20).

## Discussion

<u>Applicable Law</u>

*Breach of Contract*

To prove a breach of contract under Alabama law, a plaintiff must establish: "'(1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages.'" <u>State Farm Fire & Cas. Co. v. Slade</u>, 747 So.2d 293, 303 (Ala. 1999)(quoting <u>Southern Medical Health Systems, Inc. v. Vaughn</u>, 669 So.2d 98, 99 (Ala. 1995)).

*Bad Faith*

Alabama law recognizes two types of bad faith claims – "normal" and "abnormal" – each of which must be analyzed under a unique standard. <u>Slade</u>, 747 So.2d 293.  In a "normal" bad-faith case arising from an insurance claim, the plaintiff bears the burden of showing the absence of any reasonably legitimate or arguable reason for denial of a claim. <u>Id.</u> at 306.

This has been termed the "directed verdict standard," under which an allegation of bad faith in the failure to pay an insurance claim can be maintained only if the plaintiff is entitled to a directed verdict; that is, if there is no factual dispute about the validity of the claim. <u>National Sav. Life Ins. Co. v. Dutton</u>, 419 So.2d 1357, 1362 (Ala.1982).

However, to discourage insurance companies from exploiting this exceptionally protective standard by failing to investigate claims properly, the Alabama Supreme Court has identified exceptions, or "abnormal" cases, in which bad faith can consist of: (1) intentional or reckless failure to "properly investigate the claim or to subject the results of the investigation to a cognitive evaluation and review," <u>Thomas v. Principal Financial Group</u>, 566 So.2d 735, 744 (Ala.1990); (2) the manufacture of a debatable reason to deny a claim, <u>Slade</u>, 747 So.2d at 306; or (3) reliance on a "subjective belief" that an ambiguous portion of a policy provides a basis for denying a claim. <u>Id</u>.

14

Black-Gammons v. Zurich America Ins. Co., 2006 WL 47503, *4 (M.D.Ala. Jan. 9, 2006).

The 2004 Hip Claim - Breach of Contract

Defendant argues that plaintiff is not entitled to benefits for his 2004 claim because: (1) plaintiff's hip problem is not a covered "injury" as defined in the policy; and (2) the policy excludes coverage for losses caused, in whole or in part, by sickness or disease. Plaintiff admits that his osteonecrosis existed at the time that he fell as he was stepping out of his truck. However, he argues that his hip injury is covered because his accident caused his hip to collapse. (Plaintiff's brief, pp. 10-14). Plaintiff contends that he should have received $13,000 in temporary disability payments for the period of time during which he was unable to work because of his hip injury, and $39,016.62 in medical and incidental expenses incurred for treatment of the hip injury. (Defendant's Exhibit 4, Plaintiff's answer to interrogatory no. 3).

The NUFIC policy in force at the time of plaintiff's October 2004 injury provided for temporary total disability benefits if "Injury to the Insured Person results in Temporary Total Disability," and for accidental medical expense benefits if an insured suffers an "Injury" that requires him to be treated by a physician. (Pine aff., ¶ 9 and Exhibit 2O, pp. 10, 12). "Injury" is defined as "bodily Injury to an Insured Person caused by an Occupational accident while coverage is in force under this Policy, which results directly and independently of all other causes in a Covered Loss." (Exhibit 2O, p. 3).[7] The "Exclusions"

---

[7] "Covered Loss(es)" include losses or expenses described in Section IV of the policy; temporary total disability and medical expenses arising from covered accidents are included within

section of the policy provides that the policy "does not cover any losses caused in whole or in part by, or resulting in whole or in part from . . . sickness, disease or infections of any kind[.]" (Exhibit 2O, p. 15, ¶ VI (2)).

Defendant has filed the affidavit of Dr. Daniel W. Michael, an orthopedic surgeon. Dr. Michael testifies that he reviewed plaintiff's x-rays and MRIs maintained in Dr. Barrington's office and that they reveal bilateral avascular necrosis of the hips. Michael states that avascular necrosis is a disease resulting from loss of blood supply to the bones, and that this disease process "was definitely present prior to Mr. Godwin's alleged injury on October 27, 2004." Dr. Michael concluded:

> Because of the normal time that it takes for avascular necrosis to develop, particularly to the point it had developed in his left hip, it is my opinion that there is no relationship between the alleged October 2004 accident and the onset and subsequent problems Mr. Godwin had in both hips from the avascular necrosis of the femoral heads.

(Michael aff., Defendant's Exhibit 5).

In support of his argument that his hip injury is covered under the policy, plaintiff relies on Dr. Barrington's December 3, 2004 treatment note stating, "I do think it appears that this is work related," and Dr. Barrington's March 2, 2005 letter to Pine stating that "[p]robably he had an aggravation of a previously unknown underlying condition, which was the avascular necrosis. The injury probably caused him to collapse it and therefore have the pain that resulted in his need for the hip replacement operation." Plaintiff also relies on his

---

Section IV.  (Exhibit 2O, pp. 3, 10, 12).

testimony that he was working in 2004 and did not have any pain or problem with his hip until after he fell getting out of his truck. Plaintiff further argues that "[t]he initial x-rays did not show a collapse of the femoral head but later an MRI showed collapse."[8] (Plaintiff's brief, pp. 12-13).

As noted above, the policy excludes from coverage any loss attributable in part to sickness or disease. Defendant has introduced Dr. Michael's expert opinion that there is no relationship between plaintiff's accident and his subsequent hip problems. When Pine sent plaintiff's claim to Dr. Lafleche for review, Dr. Lafleche informed her that plaintiff's hip problems did not result solely from the knee injury but also from the previously unknown condition of avascular necrosis. Plaintiff's physician, Dr. Barrington, expressed his opinion in his letter to Pine that plaintiff's accidental injury probably aggravated the pre-existing avascular necrosis, causing plaintiff's hip to collapse.[9] Plaintiff's testimony that he was unaware of his disease and that he had not suffered any symptoms of disease before his fall from his truck is uncontroverted.

In the analogous context of an insurance policy providing accidental death benefits,

---

[8] See Michael aff., ¶ 5. Plaintiff has not introduced any expert testimony to explain the significance of the fact that x-rays and MRIs dated early November (after plaintiff's fall from the truck) do not show collapse but that a later MRI does show collapse.

[9] In its motion to strike, defendant made a general hearsay objection to many of the exhibits offered by plaintiff, including an unauthenticated copy of this letter filed as Plaintiff's Exhibit 15. (See Defendant's reply brief, pp. 12-13). However, Dr. Barrington's letter was also offered into evidence on the present motion by the defendant as Exhibit 2K to Pine's affidavit. Defendant has made no specific argument regarding any limitation on the purposes for which the court may consider defendant's exhibit, and the court accordingly considers any such argument waived.

the Alabama Supreme Court stated:

> The insurance policy at issue contained two relatively standard clauses: (1) a general clause providing recovery for injuries caused directly and exclusively by external, violent, and accidental means; and (2) an additional clause excluding benefits for loss resulting directly or indirectly, wholly or partly, by disease or bodily or mental infirmity. The issue of the interrelationship and applicability of these type clauses found within a single insurance policy was addressed by this Court in Wilson v. Liberty National Life Insurance Co., 331 So.2d 617 (Ala.1976), wherein we stated:
>
> > In Alabama, policy language similar to that contained in the "general clause" has been construed to mean that "if the accident aggravated a disease and hastened the death of the insured, the accident is yet considered the proximate cause of the insured's death, notwithstanding the gravity of the disease or that the accidental injury would not have been fatal but for the infirmity." (Emphasis supplied.) Liberty Nat'l Life Ins. Co. v. Reid, 276 Ala. 25, 33, 158 So.2d 667, 674 (1963).
> >
> > However, our cases also hold that where the policy contains the "additional clause" then no recovery can be had where death results from the combined effects of an accident and a pre-existing disease which was accelerated and aggravated by the accident. First Nat'l Bank v. Equitable Life Assurance Soc. of the United States, 225 Ala. 586, 590-91, 144 So. 451, 455 (1932); Liberty Nat'l Life Ins. Co. v. Reid, supra.
> >
> > With respect to the "additional clause," our cases also hold, as stated by Bouldin, J., in Equitable, supra:
> >
> > > "But this does not mean that mere feebleness, nor predisposition to recurrence of former disease, nor every infirmity which may aggravate the effects of an accidental injury, is to be regarded as the cause of death.
> > >
> > > "The general rules of construing insurance policies favorably to the insured apply to these clauses touching bodily infirmity, etc."
> >
> > Thus, it is that Harwood, J., in Reid, supra, concluded: "If an

18

> injury starts a chain reaction resulting in death, recovery may be
> had even if one of the links in the chain is old age, frailty and
> some links are dormant diseases or physical conditions without
> which the chain would be broken. Each case must be
> particularized."

We find that the contested jury charges were predicated upon the
aforementioned "chain reaction" theory and, as such, aptly stated and related
Alabama law to the facts at hand.

Furthermore, our cases hold that "where the evidence is conflicting as to
whether an accident was the cause of an insured's death, or whether the
accident and a disease cooperating therewith combined to cause death, then
ordinarily a question of fact within the resolution of the trier of fact is
presented." Wilson v. Liberty National Life Insurance Co., 331 So.2d 617
(1976); Liberty National Life Insurance Co. v. Reid, 276 Ala. 25, 158 So.2d
667 (1963). Without quoting extensively from the trial record, we find ample
evidence to support a question of fact presentable to the jury based upon the
"chain reaction" theory. There was expert testimony to the effect that the initial
fall, injuries, pain, and other emotional distress could have placed additional
demands upon the deceased's circulatory system in such a way as to play a
precipitating role in the rupture of the dormant Berry aneurysm. Although
none of the medical experts could conclusively causally relate the fall to the
rupture of the aneurysm, none could conclusively rule it out either.

Metropolitan Life Ins. Co. v. Nichols, 393 So.2d 966, 967-68 (Ala. 1981).[10]  The evidence

---

[10]  The Eleventh Circuit has described the development of Alabama's chain reaction theory
as follows:

> A long-standing allegorical tug-of-war exists between the insurance companies and
> the Alabama courts in the accidental death benefits area, with the insured or insured's
> beneficiary being a highly partisan spectator. At the one end, the insurance
> companies have pulled for an accidental death, as defined in their "general clause,"
> which is the equivalent of a truck dropping from the skies, striking squarely and
> killing instantly a perfectly fit human specimen clutching a just-issued physician's
> clean bill of health. When the Alabama courts responded to this position with a
> strong tug the opposite way by reading into the "general clause" a proximate cause
> test, allowing benefits where, but for an infirmity, the insured would not have died
> from the accident, the companies pulled back by citing in their policies an

in this case presents a genuine issue of material fact regarding whether plaintiff's avascular necrosis was a cooperating and efficient cause of plaintiff's hip injury or, instead, whether plaintiff's accident – by setting off a chain reaction leading to plaintiff's hip injury – was the sole efficient cause of the injury, the effects of which were aggravated by plaintiff's dormant avascular necrosis.  See New York Life Ins. Co. v. McGehee, 260 F.2d 768 (5th Cir. 1958)("'When an insured suffers an accident independent of and unconnected with a disease from which he is suffering, it is ordinarily a question for the jury to determine, where the evidence is conflicting, whether the accident was the sole proximate cause of the injury or death, even though the effects thereof may have been aggravated by the disease.'")(quoting John Hancock Mut. Life Ins. Co. v. McCreary, 37 Ala. App. 493, 70 So.2d 817, 820 (Ala. App. 1954)).  Accordingly, defendant's motion for summary judgment as to the breach of contract claim arising from plaintiff's October 2004 fall is due to be denied.

---

"additional clause" designed to negate the courts' undermining (from the companies' point of view) of the general clause. The additional clause disallows recovery where death results from the combined effects of an accident and a pre-existing disease which was accelerated and aggravated by the accident.  Metropolitan Life Ins. Co. v. Nichols, 393 So.2d 966, 967 (Ala.1981). Responding at this point to a negative reaction from the bystanders, however, the Alabama courts have refused to allow the companies to succeed in regaining their original ground, by tugging back at the additional clause with the "chain reaction" theory, which the parties have placed at issue here.

Collins v. Metropolitan Life Ins. Co., Inc., 729 F.2d 1402, 1404 (11th Cir. 1984)(footnote omitted).

20

<u>The 2004 Hip Claim - Bad Faith</u>

As noted above, to prevail on a "normal" bad faith claim, plaintiff must demonstrate the absence of any reasonably legitimate or arguable reason for denial of his claim. The evidence of plaintiff's avascular necrosis, along with evidence that the disease was *a* cause of plaintiff's hip injury (Pine aff., ¶¶ 13-17) – even if not the only cause – presented at least an arguable reason for defendant's denial of the claim. See <u>Hilley v. Allstate Ins. Co.</u>, 562 So.2d 184 (Ala. 1990)("In a normal case, such as this one, to prevail on a claim based on bad faith refusal to pay, the plaintiff must be entitled to a directed verdict on the underlying contract claim.")(citations omitted). "When a claim is 'fairly debatable,' the insurer is entitled to debate it, whether the debate concerns a matter of fact or law." <u>Gulf Atlantic Life Ins. Co. v. Barnes</u>, 405 So.2d 916, 924 (Ala. 1981). Accordingly, plaintiff cannot prevail on his "normal" bad faith claim.

Plaintiff also argues that, upon learning of plaintiff's disease, defendant had an obligation to conduct a further investigation regarding "whether the accident caused the chain of events which ultimately caused Godwin's hip to collapse." (Plaintiff's brief, p. 16). After she received his claim, Pine sent plaintiff's physician, Dr. Barrington, a letter asking whether the plaintiff's disability was due to injuries he sustained on October 27, 2004 and whether it was due to a "congenital and/or degenerative" disease. (Pine aff., ¶ 12 and Exhibit 2H). Dr. Barrington did not respond to the questions but, instead, provided his office treatment records which included his diagnosis of avascular necrosis of both hips with collapse on the

21

left.  In his office notes, Barrington noted that plaintiff reported that he had not had any difficulty with his hips prior to the October 27, 2004 injury at work and but that they had been bothering him since then.  Barrington stated, "I do think this is work related."  (Exhibit 2I to Pine aff.).  Pine then spoke with Barrington, who told her that plaintiff's condition was "an underlying condition that was aggravated by work," and that plaintiff had the condition but was not aware of it.  (Pine aff., ¶ 14 and 2J).  After Pine's letter advising plaintiff of the initial denial, Barrington faxed the March 2, 2005 letter in which he stated that plaintiff's injury when he stepped out of his truck probably caused him to collapse his left hip and to have the pain that resulted in his need for a hip replacement operation.  (Exhibit 2K to Pine aff.).  Pine then sent the claim to Dr. Lafleche for review; he told her that plaintiff's "hip problems did not result solely from the knee injury but also from the previously unknown condition of av[as]cular necrosis."  (Pine aff., ¶ 17).  Pine again determined that plaintiff's claim should not be allowed because his loss was not due to an "injury" as defined in the policy, and because it was caused in whole or in part by sickness or disease.

"'[I]n order to prove a bad-faith-failure-to-investigate claim, the insured must prove that a proper investigation would have revealed that the insured's loss was covered under the terms of the contract.'"  White v. State Farm Fire & Casualty Co., 953 So.2d 340 (Ala. 2006)(quoting State Farm Fire & Casualty Co. v. Slade, 747 So.2d 293, 318 (Ala. 1999)).  Additionally, the plaintiff must "prove that the insurer's failure to investigate at the time of the claim presentation procedure was intentionally or recklessly omissive."  Employees'

Benefit Association v. Grissett, 732 So.2d 968, 976 (Ala. 1998). Plaintiff has not produced or pointed to any evidence not within defendant's claim file that defendant would have discovered had it conducted further investigation. In short, plaintiff disagrees with the conclusion reached by Pine after her investigation but has failed to introduce evidence or even to make specific argument identifying particular deficiencies in that investigation. Pine sought relevant evidence from plaintiff's physician and then, when she received Barrington's letter, referred the claim to Dr. Lafleche for further evaluation. The evidence of record does not permit an inference that Pine recklessly or intentionally failed to investigate the claim or that she showed reckless indifference to proof submitted by the plaintiff. Accordingly, defendant is entitled to summary judgment with regard to plaintiff's bad faith claim based on the 2004 hip injury.

### The 2003 Hernia Claim - Breach of Contract

AIG Life treated plaintiff's 2003 hernia injury as resulting from a non-occupational accident and paid the limited amount payable under the policy for a non-occupational accident, $7,500.00, to L.V. Stabler hospital. (Pine aff., ¶ 6). AIG's claims examiner, Patricia Gambino, advised plaintiff by letter that his accident was considered non-occupational because he was "not under dispatch nor was [his] truck loaded at the time of the accident." (Exhibit 2C to Pine aff.). Plaintiff contends that he is entitled to the greater benefits payable for losses arising from an occupational accident.

The applicable AIG Life accident insurance policy defines "occupational" as follows:

> Occupational means, with respect to an activity, accident, circumstance or condition involving an insured, that the activity, accident, incident, circumstance or condition occurs or arises out of or in the course of the Insured performing services within the course and scope of contractual obligations for the Policyholder, *while under Dispatch*. Occupational does not encompass any period of time during the course of everyday travel to and from work.

(Exhibit 2N, p. 4)(emphasis added). The policy defines "dispatch" to mean "the period of time during which an insured operates his or her vehicle, or performs vehicle repair, while being en route to pick up a load, picking up a load, en route to deliver a load, and unloading a load." (Id., p. 3).

Plaintiff testified that on November 22, 2003 he made three deliveries for Godwin Materials. He then met the driver of one of his trucks at his home shop, which was on the way to the Hyundai plant where plaintiff had his other driver were delivering rock, because the other truck had blown an exhaust pipe. Plaintiff traded trucks with the other driver, then began to repair the exhaust pipe on the broken truck, which was loaded with pea gravel. He intended to deliver that truck's load after he completed the repair. (Godwin aff., p. 1; Godwin depo., pp. 76-86). Plaintiff further testified that he spoke with someone at AIG Life and told her that the information in AIG's letter denying his claim as to occupational accident benefits was incorrect. (Godwin depo., pp. 93-97).

The evidence of record, viewed in the light most favorable to plaintiff, demonstrates the existence of a genuine issue of material fact regarding whether plaintiff was under dispatch at the time of his accident on November 22, 2003. At the time that plaintiff assumed

control of the broken truck to repair it and to deliver its load, he was arguably under dispatch within the meaning of the policy. Accordingly, defendant is not entitled to summary judgment on plaintiff's breach of contract claim arising from this incident.[11]

The 2003 Hernia Claim - Bad Faith

The Policyholder Loss Information Report provided to AIG Life on December 10, 2003 by Cindy Jordan, Godwin Materials' Safety Director, indicated that plaintiff's vehicle was not loaded at the time of the accident, that plaintiff was not under dispatch to pick up a load, and that he was scheduled to be at "home" at the time of the accident. (Exhibit 2A to Pine aff.). The claim form subsequently provided by plaintiff to AIG Life did not provide any facts to suggest that Jordan's representations to AIG Life were incorrect. (Exhibit 2B to Pine aff.). Jerry Godwin's letter to Palomar Insurance after AIG's initial determination that the claim was payable as a non-occupational accident did not indicate that plaintiff had made deliveries on the day of the accident, and it did not clearly set forth any facts to suggest that plaintiff was "under dispatch" at the time of the November 22, 2003 accident. (Exhibit 2D to Pine aff.). The letter did suggest that plaintiff was "under dispatch" in October when

---

[11] Plaintiff may also have been entitled to benefits under the hernia coverage rider. The rider provides that "[a]ny reference to an injury or accident as defined in the policy is hereby deemed to include Hernia[,]" and that "[b]enefits shall be payable for a Covered Loss caused in whole or in part by, contributed to in whole or in party by, or resulting in whole or in part from, the Insured Person's Hernia, provided such Hernia is surgically repaired while the Insured Person's coverage is in force under this Policy[.]" (Exhibit 2N to Pine aff.). However, plaintiff has not produced evidence that he provided AIG Life with evidence that he suffered covered losses as a result of a hernia or that he ever made a claim, at any time prior to his attorney's letter of May 12, 2005, that his hospitalization and period of disability resulted from a hernia.

he slipped and hit his stomach on the tarp rack. (Id.). However, when Palomar asked plaintiff to complete an additional claim form regarding the October incident, plaintiff responded by providing information only with regard to the November 22, 2003 accident. (Defendant's Exhibit 3 (Adger's July 1, 2004 letter to plaintiff); Exhibit 2E to Pine aff.). This second claim form, dated February 23, 2005 – almost a full year after AIG Life's letter explaining its determination that the accident was non-occupational – provided substantially the same information as was provided in the first claim form, except that plaintiff used the words "came home to fix truck" instead of "at home in shop working on my truck." (Exhibits 2B, 2E to Pine aff.). Despite AIG Life's earlier explanation of its rationale for treating the accident as non-occupational, plaintiff did not add any facts to demonstrate that he was "under dispatch" at the time of the accident.[12]

The claims forms and other documents before the claims examiner either affirmatively indicated that plaintiff was not under dispatch when he was injured on November 22, 2003 or did not indicate that he was under dispatch. Plaintiff testified that he told "some lady" at AIG Life that the information in the letter stating that plaintiff's accident was non-occupational was "incorrect." However, plaintiff was not able to recall when the conversation occurred. (Godwin depo., p. 97).

"'[T]he decision of the insurance company to deny a claim under an insurance policy

---

[12] Plaintiff relies on e-mail correspondence between a Palomar agent and the AIG Life claims examiner, and on a commission report showing that he delivered three loads on the day he was injured. (Plaintiff's Exhibits 5 and 19). However, the court is granting defendant's motion to strike these exhibits and has not considered them in resolving the motion for summary judgment.

must be judged by what was before it at the time the decision was made.'" <u>Aetna Life Ins.</u>

<u>Co. v. Lavoie</u>, 505 So.2d 1050, 1053 (Ala. 1987)(quoting <u>Insurance Company of North</u>

<u>America v. Citizensbank of Thomasville</u>, 491 So.2d 880, 883 (Ala. 1986)). When AIG

initially denied the claim, the policyholder's Safety Director, Cindy Jordan, had affirmatively

represented that plaintiff was not under dispatch at the time of his November 22, 2003

accident. After AIG received Jerry Godwin's letter, it sought additional information from

the plaintiff, asking that he complete an additional claims form. This form, completed by

plaintiff almost a year after the initial denial of occupational accident coverage, provided no

new information. Under these circumstances, the court concludes that the admissible

evidence of record is insufficient to permit a reasonable inference that AIG Life did not have

any reasonably legitimate or arguable reason for denial of his claim. Additionally, plaintiff

has not produced admissible evidence that AIG had knowledge of specific facts which would

alert AIG that further investigation was necessary to determine whether plaintiff's loss was

covered under the terms of the contract. Plaintiff suggests that AIG should have investigated

further by speaking with the plaintiff; however, plaintiff testified that he had told someone

at AIG that the information in its initial letter denying coverage for an occupational accident

was incorrect. The new information offered by plaintiff directly contradicted information

previously provided by Godwin Materials, and was not suggested by the plaintiff in either

of the two claims forms he submitted. AIG's failure to credit plaintiff's statement – even if

the new information was accurate – does not demonstrate a reckless or intentional failure to

investigate the claim or reckless indifference to proof submitted by the plaintiff.

Accordingly, defendant's motion for summary judgment is due to be granted as to plaintiff's bad faith claim arising from the 2003 injury.

## CONCLUSION

For the foregoing reasons, it is

ORDERED that defendant's motion to strike plaintiff's exhibits 2-5, 8, 13-15, 18-19 and 21 (included within Doc. # 13) is GRANTED.

It is further ORDERED that defendant's motion for summary judgment (Doc. # 10) is granted as to plaintiff's bad faith claims and denied as to his breach of contract claims.

Done, this 28th day of November, 2007.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
UNITED STATES MAGISTRATE JUDGE

A copy of this checklist is available at the website for the USCA, 11th Circuit at www.ca11.uscourts.gov
Effective on April 9, 2006, the new fee to file an appeal will increase from $255.00 to $455.00.

## CIVIL APPEALS JURISDICTION CHECKLIST

1.  **Appealable Orders:** Courts of Appeals have jurisdiction conferred and strictly limited by statute:

    (a)  **Appeals from final orders pursuant to 28 U.S.C. § 1291:** Only final orders and judgments of district courts, or final orders of bankruptcy courts which have been appealed to and fully resolved by a district court under 28 U.S.C.§ 158, generally are appealable. A final decision is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." Pitney Bowes, Inc. v. Mestre, 701 F.2d 1 365, 1 368 ( 11th Ci r. 1 983). A magistrate judge's report and recommendation is not final and appealable until judgment thereon is entered by a district court judge. 28 U.S.C. § 636(c).

    (b)  **In cases involving multiple parties or multiple claims,** a judgment as to fewer than all parties or all claims is not a final, appealable decision unless the district court has certified the judgment for immediate review under Fed.R.Civ.P. 54(b). Williams v. Bishop, 732 F.2d 885, 885- 86 (11th Cir. 1984). A judg ment which resolves all issues except matters, such as attorneys' fees and costs, that are collateral to the merits, is immediately appealable. Budinich v. Becton Dickinson & Co., 486 U.S.196, 201, 108 S.Ct. 1717, 1721-22, 100 L .Ed.2d 178 (1988); LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 837 (11th Cir. 1998).

    (c)  **Appeals pursuant to 28 U.S.C. § 1292(a):** Appeals are permitted from orders "granting, continuing, modifying, refusing or dissolving injunctions or refusing to dissolve or modify injunctions . . ." and from "[i]nterlocutory decrees . . . determining the rights and liabilities of parties to admiralty cases in which appeals from final decrees are allowed." Interlocutory appeals from orders denying temporary restraining orders are not permitted.

    (d)  **Appeals pursuant to 28 U.S.C. § 1292(b) and Fed.R.App.P. 5**: The certification specified in 28 U.S.C. § 1292(b) must be obtained before a petition for permission to appeal is filed in the Court of Appeals. The district court's denial of a motion for certification is not itself appealable.

    (e)  **Appeals pursuant to judicially created exceptions to the finality rule:** Limited exceptions are discussed in cases including, but not limited to: Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546, 69S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949); Atlantic Fed. Sav. & Loan Ass'n v. Blythe Eastman Paine Webber, Inc., 890 F.2d 371, 376 (11th Cir. 1989); Gillespie v. United States Steel Corp., 379 U.S. 148, 157, 85 S.Ct. 308, 312, 13 L.Ed.2d 199 (1964).

Rev.: 4/04

2.  **Time for Filing**: The timely filing of a notice of appeal is mandatory and jurisdictional. Rinaldo v. Corbett, 256 F.3d 1276, 1278 (11th Cir. 2001). In civil cases, Fed.R.App.P. 4(a) and (c) set the following time limits:

(a)  **Fed.R.App.P. 4(a)(1):** A notice of appeal in compliance with the requirements set forth in Fed.R.App.P. 3 must be filed in the district court within 30 days after the entry of the order or judgment appealed from. However, if the United States or an officer or agency thereof is a party, the notice of appeal must be filed in the district court within 60 days after such entry. **THE NOTICE MUST BE RECEIVED AND FILED IN THE DISTRICT COURT NO LATER THAN THE LAST DAY OF THE APPEAL PERIOD – no additional days are provided for mailing.** Special filing provisions for inmates are discussed below.

(b)  **Fed.R.App.P. 4(a)(3):** "If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later."

(c)  **Fed.R.App.P. 4(a)(4):** If any party makes a timely motion in the district court under the Federal Rules of Civil Procedure of a type specified in this rule, the time for appeal for all parties runs from the date of entry of the order disposing of the last such timely filed motion.

(d)  **Fed.R.App.P. 4(a)(5) and 4(a)(6):** Under certain limited circumstances, the district court may extend the time to file a notice of appeal. Under Rule 4(a)(5), the time may be extended if a motion for an extension is filed within 30 days after expiration of the time otherwise provided to file a notice of appeal, upon a showing of excusable neglect or good cause. Under Rule 4(a)(6), the time may be extended if the district court finds upon motion that a party did not timely receive notice of the entry of the judgment or order, and that no party would be prejudiced by an extension.

(e)  **Fed.R.App.P. 4(c):** If an inmate confined to an institution files a notice of appeal in either a civil case or a criminal case, the notice of appeal is timely if it is deposited in the institution's internal mail system on or before the last day for filing. Timely filing may be shown by a declaration in compliance with 28 U.S.C. § 1746 or a notarized statement, either of which must set forth the date of deposit and state that first-class postage has been prepaid.

3.  **Format of the notice of appeal:** Form 1, Appendix of Forms to the Federal Rules of Appellate Procedure, is a suitable format. See also Fed.R.App.P. 3(c). A pro se notice of appeal must be signed by the appellant.

4.  **Effect of a notice of appeal:** A district court loses jurisdiction (authority) to act after the filing of a timely notice of appeal, except for actions in aid of appellate jurisdiction or to rule on a timely motion of the type specified in Fed.R.App.P. 4(a)(4).